**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| IN RE THE BOEING COMPANY | ) | No. 19 CV 2394 |
| AIRCRAFT SECURITIES | ) | |
| LITIGATION | ) | Judge John J. Tharp, Jr. |

## <u>MEMORANDUM OPINION AND ORDER</u>

In this putative class action, five plaintiffs are vying for appointment as Lead Plaintiff and to approve their selection of counsel to represent the class. For the reasons set forth below, the Court appoints the Public Employees Retirement System of Mississippi as Lead Plaintiff and approves its selection of the law firm of Bernstein Litowitz Berger & Grossman LLP as Lead Counsel.

## I. BACKGROUND

This matter involves securities fraud claims predicated on statements issued by The Boeing Company regarding the safety of its 737 MAX aircraft. In a nutshell, the complaints filed to date allege that during the first part of 2019, Boeing misled investors about the financial prospects for its commercial airplanes business by misstating and concealing information about safety problems with the 737 MAX in the wake of investigations of the crashes of Lion Air Flight 610 in October 2018 and of Ethiopian Airlines Flight 302 in March 2019.

Two class action complaints have been filed. The initial complaint (Case No. 19 CV 2394; the "*Seeks*" action) was filed on April 9, 2019, by plaintiff Richard Seeks on behalf of a class comprising purchasers of Boeing securities between January 8, 2019 and March 21, 2019. A subsequent complaint was filed by plaintiff Mercer Busch (Case No. 19 CV 3548; the "*Busch*" action) on May 28, 2019 on behalf of a class of persons who acquired Boeing securities between

January 8, 2019 and May 8, 2019. The defendants named in the two suits include: Boeing; Dennis Muilenburg, its Chairman, CEO, and President; Gregory Smith, its CFO and Executive Vice President of Enterprise Performance and Strategy; and Kevin McAllister, President and CEO of Boeing Commercial Airplanes.[1]

By order of June 21, 2019, this Court consolidated the cases and set a briefing schedule on the various motions for appointment as Lead Plaintiff submitted by members of the putative class.

## II. DISCUSSION

Neither of the plaintiffs who filed the complaints consolidated in this matter have moved for appointment as Lead Plaintiff. There is, however, no shortage of interest in the job. A collection of seven individuals, groups, and institutions moved for appointment as Lead Plaintiff in the consolidated action:

- Ali Alibrahim [27], represented by Cafferty Clobes Meriwether & Sprengel LLP and Levi & Korsinsky, LLP;

- Robert W. Kegley, Sr., as Trustee of the Robert W. Kegley Sr. Revocable Living Trust [32], represented by Kessler Topaz Meltzer & Check, LLP;

- "The Boeing Investor Group" (comprising Richard Eads, Joseph Fields, John Armstrong, Richard Miller, and Pierre Givenchy) [36], represented by Hagens Berman Sobol Shapiro LLP ("TBIG-I");

- The Wang Family (comprising Kenny K. Wang, Kathleen Wang, Kenny W. Wang) [41], represented by Kahn Swick & Foti, LLC and Miller Law LLC

- Labourers' Pension Fund of Central and Eastern Canada [46], represented by Robbins Geller Rudman & Dowd LLP ("Labourers");

- "The Boeing Investor Group" (comprising Darrell Stock and Kin-Yip Chun) [49], represented by Pomerantz LLP ("TBIG-II"); and

- The Public Employees Retirement System of Mississippi [52], represented by Bernstein Litowitz Berger & Grossman LLP ("MPERS").

---

[1] Mr. McAllister is named only in the *Busch* complaint.

Plaintiffs Alibrahim and The Boeing Investor Group II subsequently withdrew their motions. ECF Nos. 75, 76. The remaining movants have filed further briefs on behalf of their candidacies and in response to the submissions of the other candidates.

### A.    Lead Plaintiff Standards

The Private Securities Litigation Reform Act (PSLRA) sets forth the procedures that govern securities class actions. Once cases have been consolidated, the Court is required to "appoint the most adequate plaintiff as lead plaintiff for the consolidated actions." 15 U.S.C. § 78u-4(a)(3)(B)(ii). Under the PSLRA, there is a rebuttable presumption that the most adequate plaintiff to serve as lead plaintiff is the person or group of persons that:

(aa)    has either filed the complaint or made a timely motion in response to a notice under subparagraph (A)(i);

(bb)    in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc)    otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). In that regard, the relevant Rule 23 criteria are typicality and adequacy: the claims and defenses of the lead plaintiff must be "typical of the claims or defenses of the class," Rule 23(a)(3), and applicants must provide a basis to conclude that they "will fairly and adequately protect the interest of the class," Rule 23(a)(4). This presumption may be rebutted only by proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff: (aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of inadequately representing the class. 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II).

The requisite notice concerning the filing of the *Seeks* action[2] was made within 20 days of its filing and each of the movants thereafter timely filed their lead plaintiff motions.[3] The Court therefore turns to the questions of which of the lead plaintiff candidates has the largest financial interest in the relief sought by the putative class and which otherwise satisfies the requirements of adequacy and typicality under Federal Rule of Civil Procedure 23.

Determining the relevant financial interest in the relief sought by the putative class requires, at the threshold, a determination of the appropriate class period to set the boundaries of that measurement. Here, the two operative complaints plead different, but overlapping, class periods. The *Seeks* complaint alleges that the class period began on January 8, 2019 and ended on March 21, 2019, when the *New York Times* reported that the planes that crashed lacked two safety features that Boeing sold as options on the 737 MAX aircraft. The *Busch* complaint also alleges that the class period should begin on January 8, 2019, but alleges that Boeing continued making false statements after March 21, 2019, and that the inflation in Boeing's stock price was not fully purged until May 8, 2019, when *Bloomberg Businessweek* reported that intense competition with Airbus led Boeing to rush the 737 MAX aircraft to market rather than designing a new, safe commercial aircraft. The determination of which is the appropriate class period by which to measure the movants' respective financial interests in the class claims is a significant one here, because the purchases of several of the movants, including the two institutional investors (MPERS and Labourers) fall largely outside the class period defined by the *Seeks* complaint.

---

[2] Only notice of the first filed action need be published. 15 U.S.C. § 78u-4(a)(3)(A)(ii).

[3] In addition to representing TBIG-1, Hagens Berman represented Richard Seeks and filed the complaint in the *Seeks* action on his behalf.

The movants' submissions appear to assume that the longer class period alleged in the *Busch* complaint is the appropriate period by which to measure their respective financial interests.[4] This is consistent with the approach most courts take when confronted with this question. *See*, *e.g.*, *Hardy v. MabVax Therapeutics Holdings*, No. 18-cv-1160, 2018 WL 425345, **4-5 (S.D. Ca. Sep. 6, 2018) (rejecting argument advocating use of shorter period to avoid potential "gamesmanship"); *Miami Police Relief & Pension Fund v. Fusion-io, Inc.*, No. 13-cv-05368-LHK, 2014 WL 2604991, at *1 n.3 (N.D. Cal. June 10, 2014) ("For purposes of appointing a lead plaintiff, the longest class period governs."); *In re BP, PLC Securities Litig.*, 758 F. Supp. 2d 428 (S.D. Tex. Dec. 28, 2010) (using "the longest noticed class period unless the factual allegations supporting that period are 'obviously frivolous'"); *In re Bank of Am. Corp. Sec. Derivative and Emp't Ret. Income Sec. Act (ERISA) Litig.*, 258 FRD 260, 269 (SDNY 2009) (applying longest-pled class period); *Plumbers & Pipefitters Local 562 Pension Fund v. MGIC Inv. Corp.*, 256 F.R.D. 620, 624–25 (E.D. Wis. 2009); *Eichenholtz v. Verifone Holdings, Inc.*, No. C 07-6140 MHP, 2008 WL 3925289, *2 (N.D. Ca. Aug. 22, 2008) ("Though a shorter class period may simplify the litigation, no benefits accrue by shortening the class period at this stage in the litigation."); *Miller v. Dyadic Int'l, Inc.*, 2008 WL 2465286, at *4 (S.D. Fla. Apr. 18, 2008); *In re*

---

[4] All of the initial motions for appointment as Lead Plaintiff filed by the remaining candidates employed loss figures based on trades spanning the larger class period alleged in the *Busch* complaint. *See* Kegley Memorandum, ECF No. 34, at 1 n.2 ("At the lead plaintiff stage, the longest-pled class period controls."); TBIG-1 Memorandum, ECF No. 40, at 5 (using "Class Period, in total" to measure financial interest); Wang Memorandum, ECF No. 43, at 5 (appropriate to use the longest-pled class period as it is the most inclusive); Labourers Memorandum, ECF No. 48, at 7 (using expanded class period); MPERS Memorandum, ECF No. 55, at 6-7 (using expanded class period). TBIG-1 has argued that the concentration of purchases by the institutional investors after March 21 may create standing or incentive issues if the class is defined more narrowly but does not argue that financial interest should not be measured by reference to the longest-pled class period.

*Doral Fin. Corp. Sec. Litig.*, 414 F. Supp. 2d 398, 402–03 (S.D.N.Y.2006) ("use of the longer, most inclusive class period ... is proper, as it encompasses more potential class members").

For much the same reasons that the court set forth in the *BP Securities Litigation*, this Court agrees that the appropriate period over which to measure the financial interests of the movants is the full class period alleged in the Busch complaint:

> For purposes of selecting a lead plaintiff, the Court will use the longest noticed class period unless the factual allegations supporting that period are obviously frivolous. This standard achieves a proper balance, discouraging plaintiffs from manipulating the class period so that they have the largest financial interest but substantially avoiding the merits of the claims without the benefit of adversarial briefing. The Court agrees with the district courts … who have found it generally inappropriate to narrow the class period at this stage of the litigation. … Moreover, plaintiffs are further discouraged from manipulating the class period by the possibility of sanctions if after further litigation the court learns that the allegations were made in bad faith.

*In re BP, PLC Sec. Litig.*, 758 F. Supp. 2d at 433–35. Accordingly, for purposes of assessing which lead plaintiff applicant has the greatest financial interest in this litigation, the Court considers their transactions in Boeing securities from January 8, 2019 through May 8, 2019.

With the parameters of the class period defined (for present purposes), the Court turns to the assessment of which movant has the greatest financial interest in the claims of the putative class. "Which plaintiff has the largest financial interest may not be immediately apparent; the statute does not define the term, and the size of a shareholder's financial interest can depend on how many shares were purchased and sold, when, and at what price, as well as the order in which the losses are tallied." *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1808 n.3 (2018). That said, the movants here have not disputed that the phrase "largest financial interest" is generally understood to mean "suffered the greatest loss." *Takara Trust v. Molex Inc.*, 229 F.R.D. 577, 579 (N.D. Ill. 2005); *In re Bally Total Fitness Sec. Litig.*, No. 04C3530, 2005 WL 627960, at *4 (N.D. Ill. Mar. 15, 2005) ("the best yardstick by which to judge 'largest financial interest' is the amount

of loss, period").[5] Loss may also be a function of the methodology employed to calculate it, but here none of the movants have disputed the loss calculation methodologies employed by other movants, so the court takes the movants' calculations at face value for purposes of assessing the greatest loss during the relevant period, as follows:

| Plaintiff | Wang Family | MPERS | Kegley | Labourers | TBIG-1 |
|-----------|-------------|-------|--------|-----------|--------|
| Claimed Loss | $4,700,000 | $2,500,000 | $885,000 | $865,000 | $751,000 |

### B. The Wang Family

Based on claimed losses, the Wang Family plainly appears to be the lead plaintiff applicant with the greatest financial stake. Its claimed losses of $4.7 million on purchases during the class period of approximately $40 million are almost twice the losses incurred by the next closest candidate, MPERS, and nearly equal the combined losses ($5 million) of all four of the remaining candidates. The Wangs have executed the certifications required by 15 U.S.C. § 78u-4(a)(2)(A), including affirmations that they did not purchase Boeing securities at the direction of counsel or to participate in a law suit. *Id*. at (a)(2)(A)(ii). They maintain as well that, as purchasers of Boeing stock during the class period, their claims are typical of other Boeing shareholders in the class and that they are adequate representatives of the class given their substantial losses, the absence of any potential conflicts with other class members and their selection of qualified counsel. On this basis, they maintain, they qualify as the presumptive lead plaintiff in this action.

---

[5] Among the factors that most courts consider in determining the largest financial interest are: "(1) the total number of shares purchased during the class period; (2) the net shares purchased during the class period (in other words, the difference between the number of shares purchased and the number of shares sold during the class period); (3) the net funds expended during the class period (in other words, the difference between the amount spent to purchase shares and the amount received for the sale of shares during the class period); and (4) the approximate losses suffered," with "the fourth factor—the approximate losses suffered—[being] the most critical factor." *Chandler v. Ulta Beauty, Inc.*, No. 18-CV-1577, 2018 WL 3141763, at *2 (N.D. Ill. June 26, 2018).

But MPERS (cheered on by several of the other movants) has challenged the Wangs' presumptive status under 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) by questioning both the amount of the Wang Family's loss claim and the Wangs' adequacy to serve as lead plaintiff. With respect to the former, MPERS contends that there are "serious questions concerning the Wangs' purported investments in Boeing stock." MPERS Memorandum in Opposition, ECF No. 93, at 1. It starts with the fact that the Wangs' purchases of Boeing stock between January 31, 2019 and March 31, 2019 were larger than the purchases of all but about 1% of institutional investors over the same period. They note that according to their certifications, the Wangs did not sell a single share of those purchases during the class period, "an unusual trading pattern for an investment of this size." *Id.* at 5. The Wangs' purchases, moreover, begin and end abruptly within the class period; their class period transactions in Boeing stock, in other words, do not appear to be a continuation of regular trading program in Boeing stock. Rather, on January 31, 2019, the Wangs launched into a frenzy of large purchases of Boeing stock which continued for about 10 weeks, through April 8, and then stopped completely (at least during the balance of the class period, through May 8, 2019). More peculiar still, the Wangs' purchases stopped altogether on April 8, 2019, the day before the *Seeks* action was filed. This transaction history is sufficiently quirky to prompt concern that there may be some explanation for the Wangs' frenzy of purchases beyond the sudden onset of intense confidence in Boeing's prospects.

The somewhat peculiar course of the Wangs' purchases of Boeing stock during the class period might be dismissed as a curiosity in the context of an individual investor known to have substantial means and a track record that provides some assurance that the claimed investments are bona fide, but the Wangs' motion provides virtually no information about the family. Indeed, the only information provided in their motion beyond that required by their certifications (*see* 15

U.S.C. § 78u-4(a)(2)(A)[6] is that they live in Las Vegas.[7] The application provides no information

about the Wangs' level of financial sophistication or about the general source of their wealth; no

general information about their backgrounds, education, employment, or investment experience;

no information about their litigation experience generally or any basis to gauge their ability to

control and manage complex class action securities litigation; and no information about their

familiarity with Boeing or the investigations arising from the crashes of the 737 MAX aircraft.

Reciting this litany is relevant not because the Wangs were required to provide all of this

information but because they provided *none* of it. The complete dearth of information

accompanying the Wangs' lead plaintiff motion leaves the Court with virtually no basis to assess

their adequacy to lead and direct litigation potentially involving thousands of claims for tens, or

perhaps hundreds, of millions of dollars and provides no assurance to the Court that the concerns

prompted by the unusual course of the Wangs' trading activity are unwarranted.

Although it generally suffices for a lead plaintiff movant to make a prima facie showing of

adequacy, *see Johnson v. Tellabs, Inc.*, 214 F.R.D. 225, 228 (N.D. Ill.) (2002), to do so a movant

must supply *some* information about its ability to perform the role of lead plaintiff diligently and

effectively. *See*, *e.g.*, *Camp v. Qualcomm Inc.*, No. 18-CV-1208, 2019 WL 277360, *3 (S.D. Ca.

---

[6] The Wangs' certifications are technically inadequate. They have certified that they executed the transactions set forth, but do not state that the list of transactions includes "all of the transactions of the plaintiff in the security," as required by § 78u-4(a)(2)(A)(iv). In other words, they have not certified that the list of transactions they provided is complete. This may just be a semantic issue that could be easily cured, rather than a cagey attempt to omit other transactions in Boeing securities, but it is one more question mark in considering the Wangs' adequacy to serve as lead plaintiff. *Cf. Plaut v. Goldman Sachs Group, Inc.*, No. 18-CV-12084, 2019 WL 4512774, *5 (S.D.N.Y. Sep. 19, 2019) (errors in certification called into question the adequacy and sophistication of individual with largest financial interest to serve as lead plaintiff); *Tomaszewski v. Trevena, Inc.*, 383 F. Supp. 3d 409, 415 (E.D. Pa. May 29, 2019) (same).

[7] And that claim is inaccurate to the extent that Mr. Wang Sr. appears to spend half the year—from April to Thanksgiving—in Shanghai, China.

Jan. 22, 2019) (declining to appoint individual with largest financial interest as lead plaintiff in light of his failure "to include any basic details about himself"). Accordingly, most movants—and particularly individual investors—embrace the opportunity to advise the Court about their financial sophistication, experience, and ability to effectively manage and direct the activities of class counsel. See, for example, the declarations (filed with their opening motions) of TBIG-1, ECF No. 38-5, Exhibit E (providing background information as to each of the individuals in the group regarding education credentials including advanced degrees, work and business management experience (including within the aerospace industry), and expertise in finance) and Kegley, ECF No. 35-3, Exhibit C (providing background information regarding relevant education, decades of experience as a business owner, service as a corporate director, oversight of litigation matters and attorneys (including prior service as a lead plaintiff in a securities fraud class action), management of personal investments, and familiarity with the facts and circumstances of the claims asserted on behalf of the putative class). The Wangs, by contrast, provided no such information.

Seeking to fill this informational void, MPERS has attempted to obtain information about the Wangs and their financial means. The information obtained, though far from comprehensive and some of which is of uncertain reliability (at least as presented to date),[8] nevertheless provides

---

[8] The Wangs maintain that some of the information MPERS has obtained is neighborhood gossip and hearsay-on-hearsay, but they have not contested the accuracy of MPERS' central point, namely that they live a modest working-class lifestyle. In any event, the rules of evidence do not limit the information the court may consider in evaluating lead plaintiff applications; indeed, in contesting MPERS' adequacy, the Wangs also rely on allegations lodged in other complaints that would not, in the form presented, be admissible in a trial. See infra at 18-19 and n.11 The Court finds the evidence presented by MPERS, which includes declarations from the investigators that support the reliability of their reports, sufficiently reliable to consider in connection with its evaluation of the Wangs' lead plaintiff application. As noted in the text, the relevance of the information at this stage is that the incongruity between the Wangs' apparently modest working-class lifestyle and their claim to possess the extraordinary wealth that would be necessary to invest on the scale set forth in their motion raises legitimate questions about the Wangs' bona fides—concerns that the Wangs have only exacerbated by their recalcitrant reticence.

additional reason for concern as to whether the Wang Family has the financial wherewithal to have invested $40 million in Boeing stock over the course of a ten-week period. MPERS represents that its investigation of the Wang family has revealed that the Wangs live modestly in Las Vegas; that Kenny Wang Sr. has no evident current employment and spends half the year in China; that Kathleen Wang (the two are married) is employed as a pest control testing and licensing employee for the Nevada Department of Agriculture earning approximately $60,000 per year; and that Kenny Wang Jr., their son, holds several jobs, including work as a pest exterminator, which together provide a similarly modest income. Mr. and Mrs. Wang are reported to own a home purchased a decade ago for about $630,000; Mr. Wang Jr. reportedly owns another home purchased for about $360,000. MPERS reports that its investigators have interviewed a number of people who profess to know the Wangs well, including neighbors, coworkers, and employers, who have uniformly attested to the Wangs' modest lifestyle and who have expressed disbelief that the Wangs have tens of millions of dollars to invest. Said one: "I don't know where you guys are getting this $40 million-dollar number from but you're wrong. . . . I've known the family for decades and they don't have that kind of money." Reply Decl. of Avi Josefson, ECF No. 103, at Ex. C ¶ 10. Coupled with the Wangs' curious trading history in Boeing securities, this information raises legitimate questions about the bona fides of the Wangs' reported transactions in Boeing securities and, as a result, their position of having the largest financial interest.

The Wangs' reaction to MPERS' challenge has only heightened the Court's concerns. Rather than seizing the opportunity to tout their financial acumen and sophistication, the Wangs have attempted to thwart MPERS' efforts to obtain additional information. They did so first in a motion filed in this court seeking to expedite the briefing schedule on the pending motions for appointment as lead plaintiff on the premise that MPERS' investigators were conducting a "highly

abusive harassment and intimidation campaign" against the Wang family. Motion to Modify, ECF No. 84, at 1. After this Court ruled that there needed to be an adequate opportunity for investigation and briefing as to competing lead plaintiff claims, ECF No. 88, the Wangs then sought a protective order in Nevada state court to enjoin MPERS' investigative efforts, alleging that the MPERS investigators were stalking and harassing them. Before the Nevada court ruled, that motion was withdrawn as moot when the MPERS investigators responded that their investigation had been completed.

The Wangs' efforts to foreclose inquiry into the bona fides of their reported Boeing transactions are troubling on at least three levels. First, there is nothing improper *per se* about an investigation relating to the claimed investments in the securities at issue or the adequacy of a rival movant for appointment as lead plaintiff. Although the PSLRA does not expressly authorize such investigation, acknowledgment of the propriety of such investigation is implicit in the statute's provision for an opportunity to rebut a movant's status as the presumptive lead plaintiff, § 78u-4(a)(3)((B)(iii)(II), and the opportunity to conduct formal discovery where there is "a reasonable basis for a finding that the presumptively most adequate plaintiff is incapable of adequately representing the class," § 78u-4(a)(3)(B)(iv).

Second, the Wang family's complaints about the MPERS investigation appear to have been based on exaggeration and mischaracterization. On the record before this Court, MPERS' efforts to develop information about the Wangs' financial wherewithal has not involved the use of personal investigators "to personally harass and intimidate the Wang Family, their associates and neighbors," as the Wangs claim. Wang Omnibus Memo., ECF No. 90, at 5. The Wangs have offered no support at all for such a claim, and the affidavits of the investigators, submitted in the Nevada proceeding, provide substantial evidence that the investigation conducted by MPERS was

conducted professionally and in a manner that involved no abuse or harassment of anyone contacted by the investigators, much less of the Wang family, none of whom were contacted during the investigation. Indeed, the principal subject of the investigation, Mr. Wang Sr., was not even in the country when the investigation was conducted.

And finally on this point, it also bears noting that the Wang family initiated a court proceeding in Nevada after this Court declined their request to curtail the MPERS investigation by accelerating the briefing schedule on the lead plaintiff motions. While this Court's ruling did not, of course, preclude the Wangs from seeking protection from allegedly criminal behavior in a state court and was not, therefore, improper, it would nevertheless have been appropriate, in this Court's view, for the Wangs to provide notice to this Court of its initiation of a proceeding that might result in an order affecting the resolution of the competing lead plaintiff motions. The Wangs provided no such notice, however, and even in reply have not addressed or defended their initiation of the state court proceeding. Along with the evident lack of merit of their claims concerning the manner in which the investigation was conducted, the Wangs' failure to advise this Court that they were seeking to restrict a rival candidate for Lead Plaintiff from obtaining information that might affect the resolution of motions pending in this case casts doubt on both their judgment and their fealty to the duty of candor to the Court.

The Wangs' resistance to providing information about their financial status is particularly difficult to understand given that, as Lead Plaintiff, they would be required not just to make a prima facie case as to their typicality and adequacy, but to prove as much in the context of a class certification motion. Relatedly, in advance of a motion to certify the class, the Wangs would likely be subject to searching discovery as to their financial condition and experience, investing methodologies, and transactions in Boeing securities during discovery conducted by the

defendants. *See, e.g.*, *Villella v. Chemical & Mining Co. of Chile Inc.*, No. 15 Civ. 2106, 2018 WL 2958361, *6 (S.D.N.Y. June 13, 2018) (authorizing discovery regarding reliance on integrity of market at class certification stage; citing cases); *In re Northfield Labs. Inc. Sec. Litig.*, 264 F.R.D. 407, 409 (N.D. Ill. 2009) (ordering production of account statements to corroborate trade confirmations as defendants were entitled to test the accuracy of Plaintiffs' trade confirmations). Given this prospect, it is difficult to fathom the Wangs' reluctance to provide basic information that bears on their adequacy now. Their present reticence casts further doubt on their adequacy because it suggests that they will be unable or unwilling to carry out the duties of a lead plaintiff, which include responding to discovery and providing deposition testimony. These are significant responsibilities in any case, and all the more so in one, like this one, arising from highly publicized global tragedies. This litigation will be very much in the public eye; a lead plaintiff preoccupied with its own privacy is unlikely to be an adequate representative of the class.

The Wangs do not seem to understand, or accede to, the obligations of a lead plaintiff in this regard. In their reply brief, they offer to make their Boeing trading confirmations available— but only for in camera review by the Court. Why these records should be submitted in camera and shielded from the view of rival movants for lead plaintiff status (and from the public's view) the Wangs do not say and this Court can see no reason that these records should be proffered in secret. The trading records of a lead plaintiff are quite unlikely to remain private; the defendants will be entitled to review them and, it is reasonable to presume, will go through them with a fine-toothed comb. *See, e.g.*, *Tomaszewski*, 383 F. Supp. 3d at 411 (ordering production and briefing based on movant's trade records). Bearing the brunt of this sort of discovery on behalf of the class is one of the lead plaintiff's duties. The Wangs, however, appear unwilling to shoulder that obligation.

Rather than contest the accuracy of the information MPERS obtained through its investigative efforts, or provide additional information that would offer some confirmation of the Wangs' ability to plunk down $40 million on a single stock in the span of just over two months, the Wangs rest on their claim that they are indeed a family of modest means who have amassed this kind of wealth by scrimping and saving over the years and investing wisely. MPERS argues, and this Court agrees, that this claim is too incredible to accept at face value.[9] The Wangs may well have the wealth they claim, and may nevertheless live a commendably modest lifestyle, but the claim that their wealth is the ***product*** of that modest lifestyle is so implausible that, in the absence of some evidence to support the claim, the Court cannot credit it. The claim would presumably be easy to document, but rather than provide basic additional information to corroborate their path to incredible wealth, the Wangs have offered only a bare assertion that they lost $4.7 million on Boeing stock they purchased during the class period with "wealth our family has accumulated over decades of hard work, savings and investments." Wang Declaration, ECF No. 100, at ¶¶ 3, 9. In relying solely on that implausible and uncorroborated explanation, the Wangs have raised so many red flags that the Court cannot in good conscience appoint them to lead this complex, significant, and highly public litigation on behalf of thousands of Boeing investors. Whatever the reasons for the Wangs' reticence about their background, their unwillingness to provide any significant information about themselves has made clear that they

---

[9] The claim becomes all the more incredible when one considers that, unless the Wangs' opted in early 2019 to eschew all tenets of financial diversification and to invest all of their wealth in the shares of a single company, their claim to have invested $40 million in Boeing stock implies the existence of substantially greater wealth.

place priority on their privacy over leading this litigation. As a result, it would be imprudent to appoint them as Lead Plaintiff.[10]

To be clear, in denying the Wangs' motion, the Court makes no finding that their claimed Boeing investments and losses are not legitimate. This ruling is predicated on the Wangs' inability (or refusal) to provide sufficient information to permit the court to make an informed judgment as to their adequacy to serve as Lead Plaintiff and as to the bona fides of their claimed investments in Boeing stock. The Wangs' reticence in this regard precludes the Court from finding that the Wangs satisfy the criteria as presumptive lead plaintiff, particularly in view of their unusual purchase history of Boeing stock, their facially implausible and uncorroborated explanation of their wealth, and their efforts to prevent investigation and discovery of information to address those issues. Based on these factors, the Court cannot be confident that the losses claimed by the Wang family are bona fide or that they will adequately represent the interests of the class. Accordingly, the Court denies the Wang Family's motion for appointment as Lead Plaintiff.

## C.    MPERS

At approximately $2.5 million, MPERS suffered, by a considerable margin, the next largest loss on Boeing stock during the putative class period. Given denial of the Wang Family's motion, then, MPERS should be appointed as the lead plaintiff if it satisfies the Rule 23 criteria of typicality

---

[10] The court has considered whether to conduct an evidentiary hearing to address the questions relating to the Wangs' investments. Had the Wangs timely offered some evidence to support the bona fides of their Boeing investments, an evidentiary hearing may have been warranted. But it is incumbent on the Wangs to make a preliminary showing of their adequacy to serve as representatives of the putative class and their proffer of a facially incredible explanation of their wealth, unsupported by any evidence, convinces the court that that the Wangs are not able or willing to carry out the duties of a lead plaintiff in a securities fraud class action. At this point in the process, an evidentiary hearing would not alleviate the Court's concerns in that regard; a viable candidate for Lead Plaintiff would understand the need to make a more fulsome preliminary showing of adequacy from the outset of the lead plaintiff selection process.

and adequacy. The principal problem that MPERS runs into in that regard is, to a large degree, the antithesis of the issues afflicting the Wang candidacy. Whereas there is virtually no evidence to support the Wangs' adequacy to represent the class, several candidates argue that there is too much evidence of MPERS' adequacy: MPERS, they maintain, has been appointed as a lead plaintiff too many times. Specifically, they invoke the PSLRA's presumptive "5-in-3" limit on appointments as lead plaintiff. Also known as the "professional plaintiff" bar, that provision provides:

> Except as the court may otherwise permit, consistent with the purposes of this section, a person may be a lead plaintiff, or an officer, director, or fiduciary of a lead plaintiff, in no more than 5 securities class actions brought as plaintiff class actions pursuant to the Federal Rules of Civil Procedure during any 3-year period.

15 U.S.C. § 78u-4(a)(3)(B)(vi). Several movants (the Wangs and Labourers) argue that this provision renders MPERS ineligible to serve as lead plaintiff because it has done so 11 times in the past three years. ECF 56-1; ECF 84 at 2.

Contrary to the arguments invoking it, however, the "5-in-3" provision plainly does not bar the appointment of institutional investors as lead plaintiff more than five times in three years. Rather, it expressly permits the court to disregard the limitation when doing so would be "consistent with the purposes" of the PSLRA. As Judge Dow observed in rejecting a similar argument in a recent case, "[a]lthough the 5-in-3 provision does not expressly exclude institutional investors from its scope, it gives the Court discretion to waive the provision when "consistent with the purposes of [the PSLRA]." 15 U.S.C. § 78u-4(a)(3)(B)(vi). The text of the statute thus allows the Court to make exceptions to the 5-in-3 provision consistent with the purposes of the PSLRA. As many courts have noted, that provision "was largely directed at private individuals" and courts thus "have routinely waived the restriction in the case of qualified institutional investors." *Hedick v. Kraft Heinz Co.*, No. 19-CV-1339, 2019 WL 4958238, at *10 (N.D. Ill. Oct. 8, 2019). *See also*, *e.g.*, *Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing & Securitization*,

*LLC*, 616 F. Supp. 2d 461, 467 (S.D.N.Y. 2009) (Rakoff, J.) ("as many courts have noted, the provision of the PSLRA restricting the use of professional plaintiffs was largely directed at private individuals, and courts have routinely waived the restriction in the case of qualified institutional investors"; collecting cases). And, indeed, the PSLRA Conference Committee report expressly explains that courts were given this discretion "to avoid the unintended consequences of disqualifying institutional investors from serving more than five times in three years." See H.R. Conf. Rep. No. 104–369 at *35, reprinted in 1995 U.S.C.C.A.N. 730, 734. Consistent with this view, and as MPERS reports in its reply brief, "at least seven courts have appointed Mississippi as lead plaintiff after expressly rejecting this very argument." ECF No. 101 at 10. This Court agrees that applying the "5-in-3" limitation to bar MPERS from serving as lead plaintiff would be ***inconsistent*** with the PSLRA's purpose of promoting institutional investors as lead plaintiffs in securities fraud class actions.

While acknowledging that many courts have exercised their discretion not to apply the "5-in-3" limitation to bar MPERS' appointment as lead plaintiff, Labourers maintains that the case for doing so is diminished where there is another viable institutional investor seeking to serve as lead plaintiff that would not be subject to the presumptive bar. But why? Labourers points to no evidence suggesting that Congress intended to grant courts discretion to exempt an institutional investor from the bar only when no other institutional investor is seeking appointment as lead plaintiff. That would exalt the "5-in-3" bar over the other requirements governing the selection of the lead plaintiff, a result that finds support neither in the language of the statute nor its logic. As the Conference Committee explained, Congress did not intend for the "5-in-3" provision "to operate at cross purposes with the 'most adequate plaintiff' provision." See H.R. Conf. Rep. No. 104–369 at *35, reprinted in 1995 U.S.C.C.A.N. 730, 734. Yet that would be the result if the "5-

in-3" provision were applied to bar MPERS from serving as lead plaintiff: the presumptively most adequate plaintiff, with losses in excess of $2.5 million during the class period, would be excluded in favor of another institutional investor with losses barely a third of that figure. That is not an outcome that would be "consistent with the purposes" of the PSLRA.

TBIG-1 contests the adequacy of MPERS to represent the class because MPERS purchased most of its shares after March 21, 2019, when the *Seeks* class period ended. Of the 68,062 shares MPERS bought during the class period, only 383 (just six-tenths of one percent) were purchased during the class period alleged in the *Seeks* action. TBG-I argues that this makes MPERS inadequate representative because, should the Court reject the additional disclosures alleged in the *Busch* action, MPERS will have minimal incentive to prosecute the class's claims. ECF 92 at 2. But as discussed above, courts have consistently held that the longest-pled class period should be used to measure financial interest in the putative class claim asserted; it is premature, at this juncture to base a judgment about the adequacy of a lead plaintiff with the greatest loss over the putative class period on an assessment of the substantive merit of the allegations that bear on the boundaries of the class period. TBIG-1's concern about MPERS' adequacy if the class period is deemed to end before April 4, 2019, when MPERS' significant purchases began, is nothing but speculation at this time; one might as easily posit that a plaintiff whose purchases were concentrated at the beginning of the class period would have no incentive to advance the class claims if the class period were found to have begun later than advertised. There is no requirement that a lead plaintiff's purchases have been uniformly distributed over the course of a putative class period. At this stage, it is enough to note that MPERS has the incentive to prove what every other plaintiff in the longest-pled class period seeks to prove: that Boeing made false and misleading statements in the class period that inflated the price of its stock when purchased and that the value

of the stock thereafter declined when accurate information became known. The fact that most of MPERS' purchases of Boeing stock came toward the end of the class period may be relevant if partially corrective disclosures decreased the amount of inflation in the share price at the point when MPERS purchased its shares, and thereby decreased its losses on a per share basis, but that possibility is already reflected in MPERS' loss calculation. Even if its losses on a per share basis turn out to be lower, MPERS still claims, by substantial margin, the largest total loss in the class period of any investor other than the Wangs.

In a bit of tit-for-tat, the Wangs also argue that MPERS is not adequate to serve as Lead Plaintiff because of the "serious alleged misconduct that was just recently independently unearthed by another court considering its lead plaintiff motion." Wang Omnibus Memo, ECF No. 90, at 4 (citing *Cambridge Retirement Sys. v. Mednax, Inc.*, 2018 WL 8804814, *15 (S.D. Fl. Dec. 6, 2018) ("*Mednax*")). The alleged misconduct the Wangs refer to involves allegations that MPERS' counsel, the Bernstein Litowitz firm, paid kick-backs to relatives and friends of attorneys in the Mississippi Attorney General's office who were responsible for litigation in which the Bernstein Litowitz firm was representing MPERS. The former attorney at Bernstein Litowitz who made these allegations in a complaint subsequently dismissed that complaint and signed a statement, in February 2015, conceding that he had received "information that seriously challenges my claims," and that the information "presents insurmountable factual and legal challenges to my ability to recover." *In re Merck & Co. Securities, Derivative & ERISA Litig.*, 2016 WL 8674608, at *2 (D.N.J. Dec. 23, 2016).[11] And since that time, so far as the record presented in this case shows,

---

[11] The abandonment of these allegations was thus of public record at least two years before the Magistrate Judge "unearthed" them in 2018 in *Mednax*. The Court notes as well that while the Magistrate Judge's Report and Recommendation in *Mednax* stated that "[t]he Bernstein firm apparently did not deny that it made the payment," 2018 WL 8804814, *15, the Second Circuit opinion on which the Magistrate Judge based her report (which was addressing a motion to seal

every court (other than the *Mednax* court) that has been presented with arguments about MPERS and/or Bernstein Litowitz's adequacy on this basis has rejected the challenge. And, again, the strongest challenge to MPERS candidacy comes not from rulings that it is not an inadequate representative but from the fact that so many courts have found it appropriate to appoint MPERS as lead plaintiff. MPERS reports, without contradiction, that "since the allegations cited in *Mednax* were made public by the Second Circuit Court of Appeals in 2016, Mississippi and Bernstein Litowitz have been appointed to leadership positions in 17 PSLRA cases in that Circuit [alone]." MPERS Reply, ECF No. 101, at 13. On this record, the Court is satisfied that MPERS' selection of the Bernstein Litowitz firm does not undermine MPERS' adequacy to serve as Lead Plaintiff and that its choice of Bernstein Litowitz as Lead Counsel should be approved.[12]

### D.     TBIG-1

Having concluded that MPERS qualifies as the presumptive Lead Plaintiff, it is not necessary to consider the applications of the remaining movants as to that role. Recognizing that its claimed losses of about $751,000 effectively take it out of the running for appointment as the sole Lead Plaintiff, however, TBG-I asserts that it should be appointed as *Co*-Lead Plaintiff because it is the only movant that can effectively represent the interests of class members who purchased Boeing options. This argument is unpersuasive.

---

the complaint, not the merits of the kickback claim) actually states that the "defendants spend much of their brief arguing that the complaint is unreliable and contesting the truth of the allegations in the complaint." *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 143 (2d Cir. 2016); *see also id.* at 136 ("We emphasize, however, that at this point in the proceeding the facts alleged are exactly that—simply allegations, the truth of which has not been proven."). At this juncture, the court sees no basis to credit these abandoned allegations.

[12] No other challenge to approval of Bernstein Litowitz to serve as Lead Counsel has been made and in approving MPERS' selection of the firm as Lead Counsel the Court notes the firm's extensive experience and record of success on behalf of investors in many substantial securities fraud class actions.

First, courts routinely reject petitions for appointment as co-lead plaintiffs to represent the interests of various varieties of claimants and claims, however, as inconsistent with the PSLRA's focus on appointing as lead plaintiff an entity or person capable of exercising overall control of the litigation. As the Second Circuit has explained, "[n]othing in the PSLRA indicates that district courts must choose a lead plaintiff with standing to sue on every available cause of action.... [I]t is inevitable that, in some cases, the lead plaintiff will not have standing to sue on every claim." *Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 112 (2d Cir. 2013). Nor is it necessary "that a different lead plaintiff be appointed to bring every single available claim, as such a requirement would contravene the main purpose of having a lead plaintiff—namely, to empower one or several investors with a major stake in the litigation to exercise control over the litigation as a whole." *Id. See also Hevesi v. Citigroup Inc.*, 366 F.3d 70, 82-83 (2d Cir. 2004). Typicality required of lead plaintiffs necessitates only that "the defendants committed the same wrongful acts in the same manner against all members of the class." *Id.*

To the extent that class members have distinct claims, it suffices if there is a named plaintiff with standing to pursue that claim. *IndyMac MBS,* 721 F.3d at 112. "Being a lead plaintiff is not the same thing as being a class representative." *Bodri v. Gopro, Inc.*, No. 16-CV-00232-JST, 2016 WL 1718217, at *6 (N.D. Cal. Apr. 28, 2016). The role of a lead plaintiff is to exercise control of the litigation as a whole, not to represent the interests of different constituencies within the class. That is the role of named plaintiffs, or class representatives; apart from the appointment of a lead plaintiff, "additional named plaintiffs may be added later to represent subclasses of plaintiffs with distinct interests or claims. Indeed, the lead plaintiff in a securities class action has a responsibility to identify and include named plaintiffs who have standing to represent the various potential

subclasses of plaintiffs who may be determined, at the class certification stage, to have distinct interests or claims." *Id.*

TBIG-1 also asserts that, without a lead plaintiff who owned options, there is a risk that the lead plaintiff could define the class to exclude options investors and thereby leave Boeing options holders with no recourse against the defendants. As an initial matter, this argument is speculative. A lead plaintiff, to be sure, "is empowered to control the management of the litigation as a whole, and it is within the lead plaintiff's authority to decide what claims to assert on behalf of the class." *In re Bank of Am. Corp. Sec., Derivative & Employment Ret. Income Sec. Act (ERISA) Litig.*, No. 09 MDL 2058 (DC), 2010 WL 1438980, at *2 (S.D.N.Y. Apr. 9, 2010) (Chin, J.) ("*In re Bank of America*"). But there seems little reason at this juncture to anticipate that an amended complaint will exclude options purchasers. Neither of the complaints filed to date does so and TBIG-1 provides no good reason to believe that options purchasers will be excluded from a consolidated amended complaint.

But even if that scenario might come to pass, that prospect does not warrant a prophylactic appointment of an option purchaser as a co-lead plaintiff. The premise that, if defined out of the class in this case, options holders may be left without recourse is flawed. If options holders are defined out of the class, they remain free to pursue their own claims, either individually or perhaps as their own class.[13] Moreover, they might be able to achieve some degree of consolidation with the litigation of claims of common stock purchasers notwithstanding exclusion from the class. They might, for example, seek joinder of their claims with those asserted by the common stock

---

[13] In *In re Bank of America*, Judge Chin held that excluded securities holders could pursue individual but not class claims. 2010 WL 1438980, at *3. It is not clear to this Court, however, that a distinct class could or should be precluded from asserting its own claims simply because litigation of other class claims arising from the same facts began earlier. This issue need not be resolved until and unless presented.

purchasers or an MDL designation that would permit consolidation of the cases for pretrial purposes.

More fundamentally, it is not clear why the possible exclusion of options purchasers bears on the issue of appointment of lead plaintiff. The argument presumes an entitlement on the part of options purchasers to participate in this action that does not exist. Both the *Seeks* and *Busch* complaints purport to assert claims on behalf of purchasers of any Boeing securities, but they were not required to define the class that broadly. The complaints could have been filed on behalf of common stock purchasers only, in which case options holders would already be on the outside looking in. If the Lead Plaintiff files a consolidated amended complaint that excludes options purchasers, those individuals would be no worse off than if the *Seeks* and *Busch* complaints had been more narrowly drawn to exclude them in the first instance.

Accordingly, the Court is not persuaded that there is any need for appointment of TBIG-1 to represent the interests of options holders.

\*     \*     \*     \*     \*

For the foregoing reasons, the court appoints the Public Employees' Retirement System of Mississippi as Lead Plaintiff and approves its selection of Bernstein Litowitz Berger & Grossman LLP as Lead Counsel.

Dated: November 15, 2019

John J. Tharp, Jr.
United States District Judge