**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| IN RE THE BOEING COMPANY | ) | No. 19-cv-02394 |
| AIRCRAFT SECURITIES | ) | |
| LITIGATION | ) | Judge John J. Tharp, Jr. |
| | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

In this matter, the Public Employees' Retirement System of Mississippi (MPERS), as lead plaintiff, brings securities fraud claims on behalf of a putative class of shareholders against The Boeing Company, its former chief executive officer Dennis Muilenburg, and its former chief financial officer Gregory Smith. The plaintiffs contend that Boeing made misleading statements as it responded to the October 2018 and March 2019 crashes of two 737 MAX airplanes designed and manufactured by Boeing. Boeing moved to dismiss the complaint, arguing that the plaintiffs failed to allege that the defendants made any false statements with an intent to deceive investors. The Court grants the motion in part and denies it in part. In broad terms, the plaintiffs have not alleged that the defendants intended to deceive investors with their statements responding to the October 2018 Lion Air crash. Those claims are therefore dismissed without prejudice. Nor have the plaintiffs advanced any plausible allegations that defendant Smith knowingly or recklessly misled investors; he is accordingly dismissed from this suit (also without prejudice). The plaintiffs have, however, plausibly alleged that defendant Muilenburg (and therefore Boeing) made several materially misleading statements following the Ethiopian Airlines crash in March 2019. Specifically, their claims that defendant Muilenburg misrepresented and omitted material information regarding Boeing's interactions with the FAA adequately state claims for securities fraud.

## I.     BACKGROUND

For the purposes of a motion to dismiss under Rule 12(b)(6), the Court accepts the well-pleaded facts alleged in the complaint as true. The Court also draws from the Statement of Facts contained in the Deferred Prosecution Agreement that Boeing reached with the Department of Justice in January 7, 2021, and which the plaintiffs filed along with a Notice of Supplemental Information on January 15, 2021.[1] Statement of Facts, Attachment A to Deferred Prosecution Agreement (hereinafter DPA SOF), ECF No. 173-1.

### A.     Pre-Class Period events

Boeing launched the 737 MAX program in August 2011 in response to competition from Airbus's A320neo. Consolidated Class Action Complaint ("Compl.") ¶¶ 48-50, ECF No. 144. The threat from Airbus prompted Boeing to scuttle plans to develop an entirely new airplane, deciding instead to improve upon its existing 737 model by adding new engines that would vastly improve fuel efficiency. Compl. ¶ 16. Among other advantages, upgrading the 737 would give Boeing an edge over competitors because, unlike an entirely new airplane, pilots with experience on the previous 737 model would not require expensive simulator training. Compl. ¶¶ 55-56. The 737 MAX would be a new, improved version of the same airplane with which pilots were already familiar.

---

[1] Given that the plaintiffs will be granted leave to file an amended complaint, the Court assumes that facts contained in the DPA will be incorporated into the amended complaint. Moreover, "a party opposing a rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (gathering cases); *Packaging Corporation of America, Inc. v. Croner*, 419 F. Supp. 3d 1059, 1067 ("a plaintiff may supplement its argument in opposition to a motion to dismiss with unpleaded facts that are consistent with the allegations of the complaint[.]").

To approve the airplane for commercial use, Boeing's safety regulator, the Federal Aviation Administration (FAA), would have to make two distinct determinations, each of which is made by a separate group within the FAA. One group (otherwise unidentified in the complaint) determines whether airplanes meet federal airworthiness standards; another, known as the Aircraft Evaluation Group (FAA AEG) determines the minimum level of pilot training required. DPA SOF ¶¶ 6-7. The FAA AEG compares the new version of an aircraft with the old and evaluates the differences between the two. *Id.* at ¶ 8. Then the office mandates the level of "differences training" required for pilots to operate the new version of the plane. *Id..* The FAA AEG can assign one of five different levels of training, ranging from Level A, the least intensive, to Level E, the most intensive. *Id.* at ¶¶ 9, 18-19; Compl. ¶ 61. A Level D training designation would have included full simulator training, which is more expensive and burdensome for Boeing's customers than the Level B training, which pilots could complete on-line in a matter of hours. DPA SOF ¶ 18. A Level D designation would also have required Boeing to pay rebates to its 737 MAX customers, to whom Boeing had represented that no simulator training would be required. Compl. ¶ 345. The FAA AEG publishes its recommendation for the appropriate training level in the Flight Standardization Board Report (FSB report). Among Boeing's goals in designing the 737 MAX was ensuring that it received a Level B, computer-training-only, designation in that report. DPA SOF ¶ 19.

But Boeing's plan for a seamless transition to the 737 MAX with minimal pilot training encountered turbulence early in the airplane's development. In 2012, Boeing tests showed that the new fuel-efficient engines, which were much larger than the engines used on the older 737 models, created additional lift and a tendency for the airplane to pitch up abnormally in flight. Compl. ¶ 71. Rather than redesign the entire airplane to address this problem, Boeing decided to make

changes to the aircraft's automated flight control systems by adding a new software component, the Maneuvering Characteristics Augmentation System (MCAS). Compl. ¶ 74. MCAS was designed to automatically swivel the horizontal stabilizer on the aircraft's tail if the plane's nose pitched too far upward, leveling the plane and preventing a potential stall. MCAS was activated by a signal from an angle-of-attack (AoA) sensor. There were two such sensors on the MAX, but MCAS drew data from only one of them, creating a situation in which a single malfunctioning sensor could erroneously trigger MCAS into trying to pitch the nose of the aircraft down when no correction was actually needed. Compl. ¶¶ 75, 82, 84 & Figure 3. By creating this "single point of failure," the complaint alleges, Boeing violated fundamental engineering standards and its own safety design criteria. Compl. ¶¶ 85-90.

In 2014, Boeing Chief Test Pilot Ray Craig and engineer Curtis Ewbank recognized the risk that a faulty angle-of attack sensor could cause MCAS to activate when its operation was neither necessary nor desirable. Compl. ¶¶ 91-92. Senior Boeing executives, including then-737 MAX program director Michael Teal, rejected a proposed remedial measure because it might increase the pilot training requirements for the MAX. Compl. ¶ 93. Furthermore, the complaint alleges, Boeing played fast and loose with a Hazard Analysis of MCAS that was required for certification of the new design, downplaying the risk posed by MCAS by making "unwarranted assumptions" that pilots would be able to recognize and respond to an MCAS failure within a matter of seconds. Compl. ¶¶ 98-105, 112. These assumptions were particularly problematic because the MCAS system was not identified or described in the MAX flight manual—again, the complaint alleges, to avoid the costs associated with having to train pilots on the system. Boeing took the position with the FAA that existing procedures to address a "runaway horizontal

4

stabilizer" would suffice to enable pilots to respond to an erroneous MCAS activation, but that procedure did not account for a scenario in which continued receipt of faulty AoA sensor data caused repeated MCAS activations and might therefore prevent the pilots from ever restoring proper trim to the aircraft and exacerbating the plane's downward pitch.

Boeing Chief Technical Pilot Mark Forkner led a team of Technical Pilots responsible for interfacing with FAA AEG. A series of 2016 messages between Forkner and a technical pilot on his team, Patrick Gustavsson, as well as other internal messages, show Boeing employees grappling with the implications of MCAS and its effect on FAA AEG's assessment of the additional training required to safely fly the MAX. When Forkner first briefed FAA AEG about MCAS in June 2015, he reported that the new system would activate only during a high-speed, wind-up turn, or a sharp turn at speeds between Mach 0.6 and Mach 0.8. DPA SOF ¶¶ 21, 24. A high-speed, wind-up turn is known as a "certification maneuver"—it must be demonstrated for the purposes of federal airworthiness certification but is not expected to occur during normal flight. *Id.* at ¶ 22. With this understanding of MCAS, FAA AEG issued a provisional Level B differences-training determination for the 737 MAX on August 16, 2016. DPA SOF ¶ 26.

Boeing later changed MCAS's parameters so that it could activate between Mach 0.2 and Mach 0.8, encompassing "nearly the entire speed range for the 737 MAX." DPA SOF ¶ 25. In one message exchange from November 2016, Forkner noted with alarm that the MAX was experiencing MCAS activation during low-speed flight. ¶¶ 113, 116-117. After a simulator flight, Forkner messaged his colleague Gustavvson, reporting: "Shocker alert! MCAS is now active down to M[ach] .2" (far below the previous minimum activation speed of Mach .6) and was "running rampant," causing the plane to "trim itself like crazy." Compl. ¶ 116. Because Forkner recognized

that MCAS could activate at low speeds, he acknowledged in a text message that he "basically lied to the regulators (unknowingly)" and that he needed to "update the speed trim description in vol. 2," referring to the FAA AEG's FSB report. Compl. ¶ 118.

Instead of updating FAA AEG regarding these changes, however, Forkner concealed MCAS's expanded activation parameters and its aberrant behavior in the flight simulator. Compl. ¶ 119; DPA SOF ¶¶ 35-42. He repeatedly urged officials at FAA AEG to remove any mention of MCAS from the flight manual, insisting that its inclusion was unwarranted because MCAS was "completely transparent to the flight crew and only operates WAY outside of the normal operating envelope." ¶¶ 148-150. Forkner succeeded, in his words, by "jedi-mind tricking regulators" that simulator training was not necessary. MCAS was not mentioned in the FSB report; this omission ensured that it was not mentioned in the flight manual, and pilots were unaware of its existence. ¶¶ 118-121, 145, 149-150. As a result, the training materials provided to pilots were "materially false, inaccurate, and incomplete[.]" DPA SOF ¶ 46.[2]

---

[2] Forkner was indicted for these actions on October 14, 2021 and charged with two counts of fraud involving aircraft parts in interstate commerce and four counts of wire fraud. Indictment, Ex. A to Pl.'s Notice of Supplemental Authority, ECF No. 183-1. On March 23, 2022, following a trial in the Northern District of Texas, a jury acquitted Forkner on all counts. *United States v. Forkner*, 4:21-cr-00268, ECF No. 192 (N.D. Tex. 2022). The Court does not consider the significance of that acquittal in assessing the merits of this motion to dismiss, and the parties have not filed any supplemental argument (as they did for nearly every other background development in this case) addressing what impact, if any, Forkner's acquittal might have here. Suffice it to say, for now, that the standards of proof in each proceeding are very different, and the charges brought by the government are distinct from the claims brought by the investors in this matter. Here, with respect to Forkner's statements, the plaintiffs must ultimately prove by a preponderance of the evidence that (among other things) Muilenburg was aware that Forkner had communicated misleading information to the FAA; by contrast, in the criminal proceeding, the government's task was to prove beyond a reasonable doubt that Forkner defrauded the FAA—not whether Muilenburg knew that he did so.

Because of this deception, the plaintiffs allege, Boeing secured its desired Level B training designation for the 737 MAX, which meant that pilots would not require expensive simulator training. Compl. ¶¶ 121-22. More stringent training requirements would have made Boeing less competitive than rivals because of the associated expenses and delays with getting the MAX to market. Moreover, failure to secure the Level B designation threatened significant financial exposure because the Company had offered a total of $280 million in rebates to customers if pilots required simulator training. Compl. ¶ 345.

On October 29, 2018, Lion Air flight JT 610 crashed shortly after takeoff from Jakarta, killing all 189 people aboard. Compl. ¶¶ 179-185. Boeing quickly convened a group of experts who concluded that "MCAS activation could have been a scenario" that led to the crash. Compl. ¶ 188. As data from various sources revealed, a single faulty angle of attack sensor on the Lion Air airplane fed erroneous data to MCAS, causing the software to activate over 20 times and pitch the plane downward as the pilots struggled to maintain control. Compl. ¶¶ 181-82. Boeing quickly met with the FAA to explain the details of MCAS. Compl. ¶ 212; Mot. to Dismiss 4, ECF No. 163. Gustavsson, who had since assumed the role of Chief Technical Pilot after Forkner left for another company in July 2018, "caused Boeing to represent in a presentation to the FAA AEG" that Boeing and the regulator had "discussed and agreed on [the] removal of MCAS" from the FSB report, concealing his knowledge of Forkner's deception. DPA SOF ¶ 51.

The plaintiffs allege that, among other problems, the Lion Air pilots were deprived of critical information because their 737 MAX did not have a working AOA Disagree Alert. This indicator notifies pilots when the two AoA sensors supply conflicting data, indicating that one of the sensors is malfunctioning. Comp. ¶ 123. Had they been installed on every MAX, the AoA

7

Disagree Alerts might have warned pilots about a malfunctioning AoA sensor before takeoff, allowing for crews to address the problem before flight. ¶¶ 123, 132. After the Lion Air crash, Boeing's Vice President of Product Development Mark Sinnet told a group of American Airlines pilots that "[t]his wouldn't have happened" to them because American Airlines, unlike Lion Air, had paid for operable AoA Disagree Alerts on the 737 MAX aircraft it had purchased. Compl. ¶¶ 134; 221. Furthermore, then-Acting FAA Administrator Daniel Elwell testified to Congress on July 11, 2019 that the Alert "was part of the approved MAX design, and FAA regulations required the AoA Disagree Alert to be installed on every delivered airplane." *Id.* at ¶ 125. The flight manual and other materials said the alert was operable, when most MAX aircraft did not, in fact, have working Alerts.

On November 6, 2018, Boeing issued a bulletin to pilots informing them of a problem with the MAX's "pitch trim system" (a euphemism for MCAS, the complaint alleges, deployed to obscure its novelty, Compl. ¶ 147) in which erroneous data from an AoA sensor could cause repeated "nose down stabilizer trim movement." The bulletin directed pilots to an "existing procedure" for responding to an errant flight control system.[3] Compl. at ¶¶ 194-95; MTD 5. This pre-existing remedial procedure referred to in the Nov. 6 bulletin is known as the "Runaway Stabilizer Non-Normal Checklist," and was an established method for responding to autopilot malfunctions that shared a key characteristic with MCAS malfunctions—a runaway stabilizer, like a MCAS failure, involved uncontrolled movement of the trim wheel, which could cause the plane to pitch downwards in the absence of pilot commands. Compl. ¶ 220. The procedure had been

---

[3] Boeing has attached this Bulletin as an exhibit and the Court takes judicial notice of the fact that it issued the bulletin. Ex. 1 to Mot. To Dismiss, ECF No. 164-2.

applied by Lion Air pilots on a 737 MAX flight the day before the crash, who successfully managed to recover the airplane from an MCAS-induced downward pitch. Compl. ¶ 205. The plaintiffs allege, however, that because of the differences between MCAS and older pitch-trim systems, this procedure could not reliably counter an MCAS malfunction. Compl. ¶¶ 220, 355.

In an Emergency Airworthiness Directive issued the following day, the FAA warned that this problem presented an "unsafe condition" that was "likely to exist or develop in other products of the same type design." MTD 5. The FAA further directed pilots to use the Runaway Stabilizer Non-Normal Checklist, consistent with Boeing's bulletin issued the day before, in the event of a MCAS malfunction.

**B.    The Class Period: November 7, 2019 to December 12, 2019**

Boeing began working on a software fix for the 737 MAX and, in the months before the second MAX crash, continually struck a confident tone in press releases, interviews, and other public communications as to the aircraft's fundamental safety and its "superior value proposition" to customers and investors. Compl. ¶ 213.

Sometime in February 2019, Muilenburg learned about the text messages and emails written by Forkner and other employees between 2016 and 2017 regarding the expanded operation of the MCAS system and efforts to "jedi-mind trick" regulators. *Id.* at ¶ 340. The messages, which will hereinafter be referred to collectively as the Forkner messages, were among documents that Boeing produced to the Department of Justice in connection with its criminal investigation.

On March 10, 2019, another 737 MAX, operated by Ethiopian Airlines, crashed soon after takeoff from Addis Ababa, killing everyone on board. *Id.* at ¶¶ 227-230. By March 13, the FAA and other regulators around the globe had grounded the airplane. *Id.* at ¶ 402. In the weeks

9

following the Ethiopian Airlines disaster, the Defendants continued to affirm their confidence in the aircraft's fundamental safety and in the integrity of the FAA approval process and represented that Boeing could quickly overcome the grounding order and return the MAX to operation.

At the Paris Airshow in June 2019, Boeing CEO Muilenburg met with then-Acting FAA Director Daniel Elwell, who told Muilenburg to "slow down" his talk of a quick return to service for the MAX so that the FAA could have "space to exercise scrutiny." ¶ 262. Muilenburg continued to represent to investors that he anticipated the MAX would soon be recertified and back in flight. Boeing premised its confidence in a quick return to service for the MAX on its close relationship with the FAA, but the relationship was becoming strained. In August 2019, Boeing invited officials from the FAA and other countries' aviation regulators to Boeing's Seattle Office to discuss the status of MCAS remedial work. Expecting to review "reams of documentation" about MCAS, these officials were frustrated when they were instead given a brief PowerPoint presentation that lacked rigor. Compl. ¶ 275.

In October 2019, the Forkner messages were released to the public. The messages angered the FAA, which only then learned that Boeing had actively worked to remove mention of MCAS from the flight manual. Compl. ¶¶ 277-79. The FAA Administrator also publicly expressed his frustration that the messages had been concealed from the FAA until their public release. ¶ 281.

In response to Muilenburg's further predictions of a speedy recertification, FAA Administrator Dickson held a private meeting with Muilenburg on December 12, 2019, rebuking him for pressuring the agency to move more quickly. Compl. ¶ 301. The same day, Dickson sent a note to Congress asserting that "some of Boeing's statements have been designed to force the FAA into taking quicker action." *Id.* On December 16, Boeing announced a production halt for the

737 MAX. Boeing's Board fired Muilenburg as CEO on December 22, 2019, and appointed defendant Gregory Smith as interim CEO. Compl. ¶¶ 306 & 310. David Calhoun became Boeing's CEO in January 2020.

### C. Procedural History

Richard Seeks filed this action on April 19, 2019. A related action, *Bush v. Boeing*, 19-cv-03548, was consolidated with this one on June 21, 2019. ECF No. 83. Five plaintiffs' groups vied for appointment as lead plaintiff, and on November 15, 2019, the Court appointed the Public Employees' Retirement System of Mississippi (MPERS) as lead plaintiff. Order and Opinion, ECF No. 109. On February 14, 2020, MPERS filed its consolidated class action complaint. ECF No. 144. The defendants then moved to dismiss that complaint.

## II.   DISCUSSION

Private securities fraud actions are based on Section 10(b) of the Securities and Exchange Act of 1934, which proscribes (1) the "use or employ[ment]... of any... deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements this statute, forbidding the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made... not misleading" in connection with sales of securities. 17 C.F.R. § 240.10b-5. To state a claim under Section 10(b), a plaintiff must allege that the defendant made a statement that was (1) false or misleading; (2) material; (3) made with scienter (knowledge of the statement's falsity); (4) connected to the purchase or sale of a security, on which investors relied; (5) and which caused economic loss. *Matrix Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011). Investors' reliance on an allegedly false statement is

11

presumed in an "impersonal, well-developed market for securities." *Basic Inc. v. Levinson*, 485 U.S. 224, 247 (1988).

In ruling on a motion to dismiss, the Court accepts all non-conclusory facts alleged in the complaint as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Securities fraud claims, like other species of fraud claims, are governed by the heightened pleading standard of Rule 9(b), which requires that a party alleging fraud "state with particularity the circumstances constituting fraud[.]" Fed. R. Civ. Proc. 9(b). In 10b-5 actions, "mere silence about even material information is not fraudulent absent a duty to speak," but, "if one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co.,* 51 F.3d 1329, 1331 (7th Cir. 1995). Moreover, an omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having altered the 'total mix' of information made available." *Basic*, 485 U.S. at 231-32.

Private actions under Rule 10b-5 are subject to the further heightened pleading standards of the Private Securities Litigation Reform Act (PSLRA), which requires that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4. To establish the "required state of mind," a plaintiff must show that the defendants either knew their statement was false or were reckless in disregarding a substantial risk that it was false— these two states of mind are wrapped up in the term *scienter*. *Makor Issue & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704-705 (7th Cir. 2008) (describing recklessness as "indifference to the danger that a statement is false."). A "strong inference" that the defendant acted with scienter requires a

showing that is "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs v. Makor Issues & Rights*, 551 U.S. 308, 309 (2007).

Further, "intent to deceive is not a corporate attribute." *Makor*, 513 F.3d at 707. Boeing can be held liable on a *respondeat superior* theory based on fraudulent statements made by its officers in the course of their employment, but those officers must be identified, and their fraudulent statements pled with particularity. *See Makor*, 513 F.3d at 708. Moreover, the Seventh Circuit has rejected the "group pleading doctrine, a judicial presumption that statements in group-published documents are attributable to officers who have daily involvement in company operations; thus, the plaintiffs must create a strong inference of scienter with respect to each individual defendant." *Pugh v. Tribune Co.*, 521 F.3d 686, 693-94 (7th Cir. 2008).

By the Court's count, the plaintiffs claim that 49 statements made by the defendants during the putative class period were fraudulent; the defendants maintain that the plaintiffs have failed to allege with requisite particularity that any of those statements are false or misleading, or that they were made with scienter.

In the Court's view, the plaintiffs have alleged two events that can support a strong inference of scienter as to certain false statements by defendant Muilenburg (and therefore to Boeing): Muilenburg's receipt of the Forkner messages in February 2019, and his conversations with various leaders of the FAA in the latter half of 2019.[4] By contrast, the plaintiffs have not

---

[4] The plaintiffs also allege that Muilenburg received direct warnings from Edward Pierson about slipshod production at the company's Renton, Washington facility that produced both of the 737 MAX aircraft that crashed. Compl. ¶¶ 338-39. However, the plaintiffs have not alleged what statements were rendered false or misleading by the omission or misrepresentation of Pierson's warnings. While they broadly assert that Boeing misled investors "about the 737 MAX's safety," assertions that the MAX was "safe" are not actionable because such statements are immaterial to investors. *See infra* § II.D. And while Pierson testified in December 11, 2019 that his concerns

adequately pleaded that any of the allegedly false or misleading statements made before these events were made with an intent to deceive. As for defendant Smith, there are no particularized allegations regarding any deceptive intent on his part, so he is dismissed from this suit. While it may be plausible to infer that a CEO would keep the CFO apprised of important developments in a brewing crisis, the PSLRA does not permit scienter to be imputed among individual defendants. *See, e.g., In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457 *12 (N.D. Ill. 2021).

This opinion first addresses the Defendants' statements from the early part of the class period, from November and December 2018. Some of these statements were inaccurate, but they all nevertheless fall short of stating a claim for securities fraud because the plaintiffs did not adequately allege they were made with scienter. Appendix, statements 1-11.[5] Second, it considers statements made from January to February 2019 regarding Boeing's financial and operational performance. Appendix, statements 12-19. These statements are either not false (insofar as they merely report the company's performance) or they are predictions that fall within the PSLRA safe harbor for forward-looking statements. Next, the Court addresses Boeing's assurances to the public in the wake of the Ethiopian Airlines crash and the grounding order that soon followed. Appendix, statements 20-30, 34-36. Given Muilenburg's knowledge of the Forkner messages and their content, several of these statements have been adequately pled as securities fraud claims. Finally,

---

were related to the functionality of AoA sensors, there is no allegation that he articulated his concern in those terms in his December 2018 and February 2019 warnings to Boeing leadership. Compl. ¶ 336-37.

[5] An Appendix listing each alleged misstatement and summarizing the Court's ruling as to each statement is included with this opinion.

the Court weighs the allegations that Boeing misled investors regarding the 737 MAX's return to service and finds most of those statements actionable. Appendix, statements 31-33, 37-49.

### A. Boeing's Response to the Lion Air Crash (1-11)

In the weeks following the Lion Air crash, Boeing and its CEO set out to reassure the public and investors that the 737 MAX was safe and that Boeing was working to prevent any future accidents. The plaintiffs claim that this series of statements (numbers 1-11 listed in the appendix) are false for three reasons. First, Boeing concealed the existence of MCAS and obscured other design changes in the 737 MAX in its public response to the Lion Air crash. Compl. ¶ 354. While it is true that Boeing was seemingly reluctant to identify the new system by name, the Court does not agree that these statements concealed the existence of the new system and, in any event, the plaintiffs have not alleged an intent to deceive on the part of anyone who made them. Second, in the November 6 bulletin to pilots Boeing issued after the Lion Air crash (but before the class period), Boeing prescribed an "existing procedure" for responding to an MCAS failure with which pilots have long been familiar, but which could not reliably save the MAX from a MCAS malfunction. By making statements that relied on this bulletin and sought to assure the public that pilots had a familiar counter measure for the MCAS problem, the plaintiffs allege, Boeing falsely implied that pilot error was the cause of the crash. Compl. ¶ 355. The Court agrees that these statements referring pilots to the adequacy of "existing procedures" are misleading, but concludes that the plaintiffs failed to allege scienter. Finally, Boeing and Muilenburg repeatedly affirmed their belief that the MAX was a safe airplane and emphasized the company's commitment to safety. These amount to nonmaterial puffery and opinion, not intentionally fraudulent statements.

15

### 1.     *Existence and Functionality of MCAS (Statements 1, 3(a), 11)*

Several days after the Lion Air crash, on November 6, 2018, Boeing issued a bulletin to pilots in which it "call[ed] attention to an AOA failure condition that can occur during manual flight only" and incorrectly guide the airplane's "pitch trim system" Compl. ¶ 353; Appendix, statement 1.  The terms "AOA failure condition" and "pitch trim system" were references to the novel MCAS system, about which pilots had not been previously informed, in the flight manual or otherwise. Compl. ¶ 354. The plaintiffs complain that the company "made no mention of MCAS, including that MCAS improperly relied on only a single AoA sensor." ¶ 354. Boeing issued this bulletin a day before the class period in this lawsuit, so it is not actionable, but the plaintiffs allege that Muilenburg continued to conceal or deny the existence of MCAS in an interview on November 13th, when, in response to a question whether the 737 MAX had "a new system that wasn't disclosed to the pilots," Muilenburg responded:[6] "No. There are new systems on the airplane that are designed to take advantage of the capabilities of the airplane and provide control capability in high angle of attack conditions[.]"Appendix, statement 3(a); ¶ 359. Similarly, Muilenburg said in an interview on December 7, 2018 that Boeing "purposely designed the airplane to behave in the same way [as older 737 models.] So even though it's a different airplane

---

[6] Muilenburg was responding to an ambiguous compound question or assertion by the interviewer that (i) there was a new system on the MAX and (ii) that it wasn't disclosed to pilots. Exacerbating the ambiguity, the interview was oral so the punctuation provided in the excerpt provided in the complaint (¶¶ 198 & 359) is not a reliable basis to interpret the exchange. It is not clear, then, whether Muilenburg's "no" at the outset of his response represented disagreement with a premise offered by the interviewer or a denial of a compound question in its entirety. It is clear, however, that Muilenburg's "no" was not a denial that the MCAS was a new system; he expressly stated that "there *are* new systems on board" (emphasis added). That statement was not false.

design, the control laws that fly the airplane are designed to make the airplane behave the same way in the hands of the pilot." Appendix, statement 11, ¶ 373.

The plaintiffs have failed to allege that in making these statements Boeing or Muilenburg intended to deceive investors by hiding the existence of MCAS. The existence of MCAS had been disclosed by November 13, when Muilenburg gave the interview. The plaintiffs have alleged that news outlets reported that Boeing "had described the existence and functionality of MCAS to its customers" Compl. ¶ 196, MTD 21. That the 737 MAX had a new system called MCAS, and that that system could malfunction when it received erroneous data from an AOA sensor, was thus information available to the market. And while the plaintiffs' theory for these statements is primarily that they were misleading by omission, neither does the Court discern any affirmative misrepresentation in statements that referred to MCAS as a "new system[]… designed to take advantage of the capabilities of the airplane and provide control capability,—which was an accurate description of its intended function. Even if the Court were inclined to conclude that this description was misleading because Boeing should have called it "MCAS," the plaintiffs have not adequately plead Muilenburg's scienter. Considering the previous disclosure of this new system's nomenclature as alleged at ¶ 196, Muilenberg cannot be said to have been concealing information from the market during the November 13 interview.

The same goes for Muilenburg's statement in the December 7 interview (statement 11): the plaintiffs allege it was false or misleading because "the 737 MAX had substantial design changes from older 737 models and did not behave in the same way as those older models for many reasons[,]" Compl. ¶ 374, including the fact that its engines were placed farther forward on the fuselage and that MCAS was new. *Id.* at ¶ 375. But the fact that there were differences between

17

the 737 MAX and older models was public knowledge by then—the existence of MCAS had been public information since November 13, 2018. It makes little sense to conclude that Muilenburg intended to deceive investors by hiding information that was already known to the public and the FAA. The plaintiffs have failed to allege that Muilenburg intended to deceive investors about the existence of MCAS in these interviews.

### 2. Statements Regarding Information Provided to Pilots (Statements 2, 3(b), 5, 7, 8)

The plaintiffs have also alleged that Boeing's statements regarding the information provided to pilots regarding MCAS and the procedure for responding to a MCAS were false. The November 6 bulletin issued in response to the Lion Air crash directed flight crews to "existing procedures to address this condition," Compl. ¶ 353, and in several public statements following the Lion Air crash, Muilenburg pointed to this procedure to assuage public concern about the plane's safety. Appendix, statements 2, 3(b), 5, 7, 8. The details of MCAS were not included in the flight manual provided to pilots, but Boeing maintained at the time that remedial steps for a similar problem—a runaway stabilizer—were adequate to counter an MCAS failure. *See, e.g.,* Appendix, statement 5 ("[T]hat's part of the training manual. It's an existing procedure. So the bulletin we put out again last weekend … pointed to that existing flight procedure.") This pre-existing remedial procedure is known as the Runaway Stabilizer Non-Normal Checklist. Compl. ¶¶ 206, 220.

The plaintiffs claim, however, that an MCAS failure was different from the typical runaway stabilizer situation which the checklist is meant to address because MCAS could engage when autopilot was turned off, a situation that was previously "exceedingly rare" and which pilots are not expecting. Compl. ¶ 220. The plaintiffs have alleged in detail the shortcomings of the

18

procedure, and thus why it was false for Boeing to imply that pilots had all the information they needed to safely operate the aircraft and that pilot error was the root cause of the accident. Compl. ¶ 355. To summarize those allegations: the runaway stabilizer checklist did not ensure safe operation of the airplane because MCAS, unlike other autopilot systems, could not be disengaged by "pulling back on the control stick," and "the operation of cut-off switches had been changed from prior models." ¶ 355. In addition, MCAS was more powerful than other pitch-trim systems and "had greater authority to rotate the nose of the plane downward than previously disclosed, and because a steep downward turn could mean that the g-forces made it "physically impossible to correct an MCAS activation using physical force." Compl. ¶¶ 355; 105-106.

Boeing therefore mischaracterizes the plaintiffs' argument on this point: the plaintiffs do not argue that these statements are "misleading merely because the manual containing the procedure did not *also* name each flight control law [such as MCAS] operating in the background that could cause the condition to occur." MTD 21 (emphasis in original, brackets added). The plaintiffs allege in detail that, in most cases, a pilot applying the runaway stabilizer non-normal checklist would not be able to recover the 737 MAX from a nosedive caused by an MCAS malfunction. Taking the allegations in the complaint as true, the information provided to pilots was dangerously incomplete and misleading. Muilenburg further erred by repeatedly invoking it as proof that pilots could fly the plane safely. *See* Appendix statement 2 ("our airplane has the ability to handle that with procedures in place and we've already issued a couple of additional bulletins"); statement 3 ("if there is an inaccurate angle of attack sensor feeding information to the airplane there is a procedure to handle that"); statement 5 ("the bulletin we put out again last weekend… pointed to that existing flight procedure); statements 7 and 8.

19

These statements are not actionable, however, because plaintiffs have not plead Muilenburg's scienter. The plaintiffs focus their scienter arguments on three events: Edward Pierson's warnings about shoddy quality control procedures at a production facility in Renton, Muilenburg's receipt of the Forkner messages in February 2019, and Muilenburg's direct interactions with the FAA. Pl.'s Opp. 35-37, ECF No. 167. Each of these events post-dated Boeing and Muilenburg's statements responding to the Lion Air Crash: the earliest of these is Pierson's direct warning to Muilenburg in December 2018. Therefore, none of those events can support scienter for the statements discussed in this section. The plaintiffs are thus left with speculative allegations of Muilenburg's scienter, addressed below in Section II.A.4, which do not suffice standing alone or taken collectively to raise a strong inference that Muilenburg intended to deceive investors regarding the existence and adequacy of prior disclosures concerning procedures to counter a MCAS malfunction.

### 3. Statements Regarding the Safety of the 737 MAX (Statements 4, 6, 9, and 10)

During this period, Muilenburg (and Boeing, through its press releases) also made statements reassuring the public of the airplane's safety. Appendix., statement 2 ("the 737 MAX is safe and safety is a core value for us at Boeing[.]"); statement 4 ("The airplane is safe. We know how to fly it safely."); 6, 9. These vague affirmations of safety, like the ones made after the Ethiopian Airlines crash and discussed in more detail below in section II.C.4, are immaterial

puffery and opinion, nonactionable as a matter of law. *See City of Monroe Emp.'s Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669-670 (6th Cir. 2005).[7]

### 4. Insufficient Allegations of Scienter as to Post-Lion Air Crash Statements (2, 3(b), 5, 7, 8)

The plaintiffs propose several theories to support their allegations that Muilenburg and others knew that statements made after the Lion Air Crash (statements 1-11) were false. Compl. ¶¶ 316. All of these theories fail because they do not amount to particularized allegations that those making the statements (as opposed to others at Boeing) knew the statements were false.

### a) Allegations that "Boeing Knew"

First, the Plaintiffs repeatedly allege that "Boeing knew" various facts about MCAS to be true and argue that statements regarding the safety of MCAS and pilots' ability to counter a malfunction were made with scienter. *See, e.g.,* Compl. ¶¶ 101-102, 112, 188, 210, 223, 285. But, as noted above, "intent to deceive is not a corporate attribute." *Makor*, 513 F.3d at 707. Since the Plaintiffs have sued Muilenburg and Smith, they must plead what those individuals knew or should have known—not what others at the company knew about the truth or falsity of the statement at issue.

### b) Boeing's internal investigation after the Lion Air crash

The plaintiffs allege that Boeing's internal investigations after the Lion Air crash revealed that the MAX was unsafe, and that the company's statements were at odds with the findings of that investigation. The plaintiffs point to the October 2019 testimony of Boeing Commercial

---

[7] Because none of these "safety statements" are materially false, the discussion in the following section does not apply to them. Alleging scienter as to these statements would not salvage them as viable securities fraud claims.

Airplanes ("BCA") chief engineer John Hamilton describing some of those efforts and Boeing's conclusions in the wake of the Lion Air crash in November 2018. Compl. ¶¶ 208-210. Specifically, Hamilton related that, following the crash, Boeing "separately convened a Safety Board" that determined that the pilots' response to the MCAS malfunction in the Lion Air crash "didn't quite follow the assumptions that we had based the design on." Compl. ¶ 209. Hamilton also said that a Hazard Analysis on MCAS conducted during testing and development was "flawed." Compl. ¶ 321.

As Boeing points out, these statements do not amount to an admission or knowledge that the MAX was fundamentally unsafe. But even if Muilenburg knew about these specific conclusions of this safety board, (an allegation that the plaintiffs do not make) this does not, without more, support a strong inference of scienter. Muilenburg's statements that the airplane was safe and that "existing procedures" sufficed for pilots to save the aircraft from a MCAS malfunction are not necessarily inconsistent with the Safety Board's alleged conclusions that pilot responses "didn't quite follow" Boeing's assumptions. Compl. ¶ 209. Boeing's (and Muilenburg's) conclusion that the pilots (who had not followed their assumptions) needed little more than a reminder to follow the runaway stabilizer non-normal checklist may have been unreasonable in hindsight, but that does not suffice to state a securities fraud claim. Reply 23. Boeing contends that "the most logical inference from these alleged facts is that Muilenburg believed the MAX was safe despite the publicly disclosed condition" and that he believed flight crews would be able to respond to the condition using Boeing's guidance in the bulletin. *Id*. At worst, the Safety Board's conclusions, as communicated by Hamilton more than a year later during congressional testimony,

22

support an inference of negligence on Muilenburg's part, which is not adequate for pleading a private securities fraud claim.

### c)    Alleged problems with Boeing's hazard analysis

The plaintiffs also argue that the individual defendants had scienter because they either knew, or should have known, that Boeing failed to conduct a thorough hazard analysis of MCAS, in violation of its own standards and regulatory requirements, and then presented the MAX for certification to the FAA based on that inadequate hazard analysis. Compl. ¶¶ 109-111, 140-44. Once again, there are no particularized allegations regarding what Muilenburg knew about the hazard analysis. Absent such particularized allegations, there is not an adequate basis to conclude that Muilenburg intended to deceive investors by concealing problems with the analysis.

### d)    The 2015 settlement with the FAA

The plaintiffs also contend that a 2015 settlement agreement between Boeing and the FAA that required the implementation of a "Regulatory Compliance Plan" raises an inference of scienter as to Muilenburg and Smith because, under the terms of that plan, they would have been deeply involved in the MAX's safety issues. Compl. ¶¶ 324-325; MTD 38. The Regulatory Compliance Plan called for the BCA executive leadership to be closely involved with issues of regulatory compliance. As a result of this agreement with the FAA, the plaintiffs allege that "Boeing's profound safety failures in the development and production of the MAX… were reported to the highest levels of the BCA organization." Compl. ¶ 327. The BCA is a separate business unit within the Company; Muilenburg and Smith were the CEO and CFO of the larger corporate entity. The plaintiffs have not alleged that the details of Boeing's compliance with this Plan were reported to them. Accordingly, there is no particularized allegation that Muilenburg knew, or was reckless in

23

not knowing, that Boeing engineers had cut corners and made unwarranted assumptions in the hazard analysis.

### e) <u>Boeing's effort to introduce software fixes to MCAS</u>

Boeing's haste to respond with technical "fixes" to the MCAS software, the plaintiffs maintain, shows that the company understood the depth of the MCAS problem while simultaneously representing to the public that pilot error, rather than problems with MCAS, caused the Lion Air crash. Compl. ¶ 213. The changes Boeing began working on involved the following: requiring MCAS to rely on two sensors rather than one, installing the AoA Disagree Alert that Boeing had represented would be available on all airplanes, and reducing MCAS's authority to control the airplane's pitch. ¶ 213. The plaintiffs say that this quiet effort to improve MCAS demonstrates Muilenburg's knowledge that MCAS was unsafe. Perhaps it demonstrates someone's knowledge at Boeing that MCAS was unsafe as originally implemented, but the plaintiffs have not alleged what Muilenburg knew about MCAS and the necessity for fixes when he made the statements in the weeks following the Lion Air crash. At any rate, drawing an inference from Boeing's effort to make corrections to MCAS would run afoul Federal Rule of Evidence 407, which provides that evidence of subsequent remedial measures is not admissible to show a defendant's liability. *Pugh*, 521 F.3d at 695 (finding, at the pleading stage, that the Tribune Co.'s disclosure that, in the future, "it would require certain executives to certify the accuracy" of circulation figures could not be used to support an inference of scienter); *Higginbotham*, 495 F.3d at 760 (declining, at the motion to dismiss stage, to draw inference of scienter from the fact that the defendant hired a consulting firm to improve financial controls). Were such remedial measures

permitted as evidence of liability, companies might be disincentivized from addressing dangerous conditions.

      **f)**      <u>**The importance of the 737 MAX to Boeing's business and "widespread knowledge" of problems with its development**</u>

Finally, the plaintiffs urge the Court to impute scienter to Boeing based on the importance of the MAX to Boeing's bottom line and their allegation that the MAX's problems were "widespread knowledge" throughout the company. Pl.'s Opp. 41-42. For this point, the plaintiffs rely on the Seventh Circuit's *Makor* decision, where the Court (on remand from *Tellabs Inc. v. Makor Issues and Rights*, 551 U.S. 308 (2007)) reversed the dismissal of a complaint alleging that Tellabs engaged in channel stuffing of its flagship product. *Makor*, 513 F.3d at 712. Channel stuffing is the practice of "shipping to one's distributors more of one's product than one thinks one can sell" and "becomes a form of fraud only when it is used, as the complaint alleges, to book revenues on the basis of goods shipped but not really sold[.]" *Id.* at 709. The plaintiffs alleged that the defendant company—as distinct from the named CEO defendant—knew about the fraud. *Id.* at 707. Explaining that "the corporate scienter inquiry must focus on the state of mind of the individual corporate official or officials who make or issue the statement... rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of employment," the Court held that it is nonetheless "possible to draw a strong inference of corporate scienter without being able to name the individuals who concocted and disseminated the fraud." *Id.* at 710. The Court found that it was "very hard to credit" the notion that no "member of senior management" knew that statements about demand for channel-stuffed products were false. *Id.* "The critical question," said the Court, is "how likely it is that the allegedly false

statements… were the result of merely careless mistakes at the management level based on false information fed it from below, rather than of an intent to deceive[.]" The plaintiffs' allegation that the MAX's problems were "widespread knowledge," then, is only relevant if there is a strong inference that such widespread knowledge would necessarily have reached senior management when they made false statements. The channel stuffing alleged in *Makor* involved pervasive misconduct and a "huge number" of product returns, evidencing a purpose that "would have been formed or ratified at the highest level of management." The plaintiffs have alleged that the MAX was an important product for Boeing, to be sure, but they have not alleged Boeing's senior management would necessarily be aware of the particular and detailed technical issues that arose during the MAX's development and that dogged the project in the first months after the Lion Air crash.

The inference that management made careless mistakes based on "false information fed it from below" is stronger—at least for this period following the Lion Air Crash. Despite the MAX's importance to Boeing's prospects, the plaintiffs have not successfully alleged that senior management would necessarily have been privy to the alleged pre-class period problems. The plaintiffs have not alleged that Muilenburg or other senior managers had been exposed to specific information such that the Court can draw such an inference in their favor. *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008) ("Allegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company."); *Hedick v. Kraft Heinz Company*, 2021 WL 3566602 *11-12

26

(N.D. Ill. 2021) (concluding that plaintiffs had alleged corporate scienter where they pled that specific executives attended particular meetings and had access to specific reports). Instead, the plaintiffs have put information before the Court that indicates important decisions were delegated below the corporate management level, and in fact that employees capable of making those decisions defrauded the FAA while concealing their conduct from management. *See* DPA at 6 (Forkner's and Gustavvson's misconduct was "neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management"); DPA SOF ¶ 51 (following the Lion Air crash, Gustavvson misleadingly "caused Boeing to represent in a presentation to the FAA AEG that, during the training-evaluation process, Boeing and the FAA AEG had 'discussed and agreed on [the] removal of MCAS" from the 737 MAX FSB report and associated materials.'"). The plaintiffs allege that Forkner and others had long known about the problems with MCAS and had affirmatively worked to obscure information about the new system—but there is no plausible allegation that, at the time Muilenburg responded to the Lion Air crash, he knew what Boeing's Technical Pilots knew.

While the Court has necessarily discussed the various allegations of scienter one-by-one, this portion of the complaint fares no better when considering whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs,* 551 U.S. at 322-23 (emphasis in original). Taken collectively, the above-rejected theories of scienter are premised on the idea that Muilenburg, by virtue of his position and the importance of the 737 MAX to Boeing's business, must have been deeply involved in the development and testing of the 737 MAX, and if he was not aware of every detail, he was a reckless chief executive. Perhaps the inference that Muilenburg knew, or should have known, about the MAX's problems is a reasonable one. But

27

under the PSLRA, the inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314. The facts the plaintiffs have alleged about these statements in the weeks after the Lion Air crash are more consistent with a nonculpable state of mind—the company was working to determine the cause of the accident and keep all interested parties informed. That some of Boeing's judgments were flawed—such as its "belief that pilots could successfully address" a MCAS failure using the Runaway Stabilizer Non-Normal Checklist—does not mean their executives' statements were made with an intent to defraud investors. MTD 27-28. As the plaintiffs allege, Boeing acted after the crash, convening a safety review board that determined that MCAS activation was likely implicated in the crash. Compl. ¶¶ 208-209. The company issued a bulletin to pilots reminding them of the procedure they believed was appropriate for an MCAS malfunction and began making tweaks to the MCAS software in a parallel effort to improve the safety of its aircraft. The defendants said that, despite this crash, the plane could be operated safely. Their belief was perhaps buttressed by the fact that Lion Air pilots, on the day before the crash, had managed to successfully correct an MCAS malfunction and safely pilot the airplane. Compl. ¶ 206; MTD 6. The plaintiffs, therefore, have failed to raise a strong inference that Muilenburg intended to deceive investors as he responded to the Lion Air Crash.

## B. Statements Regarding Boeing's Financial and Operational Performance (12-19)

The Court turns now to the second category of statements alleged by the plaintiffs to have been fraudulent. These are the statements made in the weeks before the second crash and related to the company's financial and operational performance. The plaintiffs allege that several of the defendants' statements made in the period between the two plane crashes regarding the company's

28

financial outlook, mostly made during a January 30, 2019 earnings call, were calculated to defraud investors. Appendix, statements 12-19. Because these statements were alternatively 1) not false or 2) inaccurate predictions protected by the PSLRA safe harbor, the plaintiffs have not stated a securities fraud claim as to any of them.

First, several of the statements merely report the company's performance. Appendix, statement 12 ("The 737 program delivered 111 MAX airplanes in the fourth quarter[.]); statement 13 ("Delivered record 806 commercial airplanes, including 256 737 MAX's[.]"); statement 17 ("we continue to see strong order momentum… We talked earlier about ramping up to 57 a month. We are oversold against that profile."). The plaintiffs have not alleged that these statements were inaccurate. Such reports of past performance are rarely actionable. *See Anderson v. Abbot Labs*, 140 F. Supp. 2d 894, 909 (N.D. Ill 2001) ("Accurate statements of historical fact, such as past financial results, are not actionable."); *In re Ford Motor Co. Securities Litigation*, 381 F.3d 563, 570 ("Because plaintiffs have not alleged the historical inaccuracy of Ford's financial and earnings' statements, such statements are not misrepresentations."). Rather than challenge the accuracy of these statements, the plaintiffs contend that Boeing materially misled investors because the defendants failed to disclose several things. First, the defendants "did not discuss the Lion Air Crash" when reporting their past performance. Compl. ¶¶ 376, 377, 380. Failing to reference a tragedy that was public knowledge is not securities fraud. The plaintiffs also contend that these statements misled investors because the trend in revenues was unsustainable due to the MAX being "fundamentally unsafe and unsalable[.]" *Id.* ¶ 376. But "an accurate report of past successes does not contain an implicit representation that the trend is going to continue." *Alizadeh v. Tellabs*, 2015 WL 557249 *11 (N.D. Ill. 2015). Moreover, the Court disagrees with Plaintiff's

contention that these reports of past performance "t[ied] historical sales and order data to present and future demand." That contention is belied by the language in the statements themselves. See Appendix, statements 12 and 13 ("delivered 111 MAX airplanes" and "increased 737 MAX rate to 52/mo"). But even if they could be construed as implications of future performance, then, like the statements addressed in the following paragraphs, they are protected by the PSLRA safe harbor for forward-looking statements.

In the earnings call, in addition to touting past successes, Muilenburg projected that Boeing would increase its production of the 737 MAX from 52 to 57 per month. Appendix, statements 14, 15, 16, 17 and 19. These are forward-looking statements subject to the PSLRA safe harbor. 15 U.S.C. § 78u-5(c). The safe harbor provides that a defendant "shall not be liable with respect to any forward-looking statement" if either (1) the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," § 78u-5(c)(1)(A)(i); or (2) "the plaintiff fails to prove" that the officer who approved the statement had "actual knowledge … that the statement was false or misleading." Id. § 78u-5(c)(1)(B)(ii). When it comes to predictions, allegations of recklessness do not suffice. The investors must raise a strong inference that Muilenburg knew his stated plan to increase production to 57 MAX airplanes per month was materially misleading. *Makor*, 513 F.3d 702.

The plaintiffs do not meet this high bar. They refer vaguely to "safety issues" that rendered Boeing's optimism unfounded. The plaintiffs failed to allege scienter with respect to the safety-related statements the company made in the wake of the Lion Air crash; there is therefore no basis for an inference of "actual knowledge" of falsity required under the PSLRA safe harbor. There

was one new development intervening between that period and the January 30 earnings call that could influence the analysis: Edward Pierson's warnings about production problems at Boeing's Renton factory. Compl. ¶¶ 336-37. These warnings do not provide a basis for a strong inference that Muilenburg knew his 57 per month target was unattainable. *See Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 176 (2015) ("An opinion statement, however, is not misleading simply because the issuer knows, but fails to disclose, some fact cutting the other way."). The plaintiffs have not alleged facts to support the notion that Pierson's view on the matter would necessarily lead to the conclusion that a production increase was not feasible. *See Pugh*, 521 F.3d at 695 (holding that litigation accusing defendants of fraud indicating only knowledge of "accusations of fraud, not fraud itself).

Some of the statements from the January 30 earnings call also have a vague, aspirational quality, like the affirmations of safety that the Court rejected as actionable statements above. Appendix, statement 17 ("[The 737 MAX] is creating value in the market for our customers"). Opinions, like this statement, are seldom actionable under *Omnicare. See also City of Taylor Police and Fire Retirement Sys. V. Zebra Technologies Corp.,* 8 F.4th 592, 595 (7th Cir. 2021) (statements of "vague optimism" constitute non-actionable puffery). The plaintiffs have not plead the specific information that Muilenburg had on hand that contradicted his assessment. *Omnicare*, 575 U.S at 189.

### C. Boeing's Response to the Ethiopian Airlines Crash (20-30, 34-36, 39)

The discussion so far has revolved around what Muilenburg knew or should have known, and it is worth pausing the march through his alleged false statements to discuss the Forkner messages, which the plaintiffs allege Muilenburg knew about in February 2019. Muilenburg's

31

alleged awareness of these messages significantly affects the Court's approach to the statements he made after February 2019 and persuades the Court that several of the statements made after Muilenburg received these messages were adequately plead as securities fraud claims.

### 1. The Forkner Messages

Forkner and his team of Technical Pilots were responsible for interfacing with the FAA's Aircraft Evaluation Group (FAA AEG). DPA SOF ¶¶ 11-12. This office in the FAA is "responsible for determining the minimum level of pilot training required for a pilot to fly the airplane for a U.S-based airline." DPA SOF ¶¶ 8-9.

The Forkner messages consist of Forkner's text exchanges with Patrick Gustavsson, a Technical Pilot on his team, and emails with FAA AEG regarding the contents of the FSB report. The messages allegedly show that Forkner 1) recognized MCAS had greater control over the aircraft than he previously understood and that it was active at low speeds as well as high, 2) that this meant he would need to notify FAA AEG so they could update their assessment of MCAS and 3) that he nonetheless continued working to secure a Level B training designation by concealing the change from FAA AEG.

In November 2016, Forkner conducted a simulator flight of the 737 MAX and experienced MCAS activating at a lower speed than he anticipated. That experience prompted the following exchange with Gustavsson:

> Forkner: Oh shocker alerT! [sic] / MCAS is now active down to M[ach] .2 / It's running rampant in the sim on me / at least that's what [a Boeing simulator engineer] thinks is happening
>
> Gustavsson: Oh great, that means we have to update the speed trim description in vol 2
>
> Forkner: so I basically lied to the regulators (unknowingly)

Gustavsson: it wasn't a lie, no one told us that was the case

Compl. ¶¶ 116-118; DPA SOF ¶ 32.

This exchange shows that Forkner recognized that MCAS could activate at lower speeds than he previously understood, and that the FAA AEG did not know this. Despite his acknowledgment that he had unwittingly provided false information to FAA AEG, Forkner did not correct the record. Rather, he allegedly continued to suppress any mention of MCAS in the FSB report lest he endanger the 737 MAX's Level B designation. When the FAA AEG emailed a draft FSB report to Forkner and Gustavsson just a few days after this simulator flight, Forkner noticed that the report mentioned MCAS and proposed deleting that reference, saying "We agreed not to reference MCAS since it's outside normal operating envelope." DPA SOF ¶ 39. Forkner, who had experienced MCAS's propensity to "run rampant" down to speeds of Mach 0.2 (allegedly well inside the MAX's normal operating envelope), nonetheless concealed that knowledge from FAA AEG.  In January 2017, Forkner again reminded FAA AEG to delete a mention of MCAS from the FSB report: "Delete MCAS, recall we decided we weren't going to cover it […] since it's way outside the normal operating envelope." DPA SOF ¶ 41. The FSB report ultimately did not mention MCAS, and "in turn, airplane manuals and pilot-training materials for U.S.-based airlines lacked information about MCAS, and relevant portions of these manuals and materials were similarly false, inaccurate, and incomplete as a result." DPA SOF ¶ 46. In other internal text messages and emails to colleagues, Forkner bragged about his success in "Jedi-mind tricking regulators into accepting the training that I got accepted by FAA." Compl. ¶ 150. He also bragged about performing the same "jedi mind trick" on Boeing's customer Lion Air by persuading that airline that simulator training was not necessary. Compl. ¶ 151.

33

The defendants downplay the significance of the Forkner messages. According to the defendants, Forkner's "shocker alert" text message only "concerned an employee's experience in a simulator, not the airplane, and nothing in the message indicates the employee had concerns related to aircraft safety." MTD 34. There may be a factual dispute, appropriate for resolution later in the litigation, as to whether a simulator flight accurately captures actual flight characteristics, but at the pleading stage, the plaintiffs' allegation that it does will suffice. Moreover, the defendants argue that the plaintiffs "do not plead what caused the 2016 simulator issue or what actions Boeing took in response." But the plaintiffs plead that the cause of the "2016 simulator issue" was the same over-active and expanded MCAS system that played a role in both the Lion Air and Ethiopian Airlines crash. Finally, the defendants point to the nearly three-year gap between the time the messages were sent and when Muilenburg became aware of them, arguing that the plaintiffs do not explain "why Muilenburg should have viewed the message as casting doubt on the 737 MAX's safety when he saw it… after months of intensive regulatory engagement regarding MCAS following the Lion Air accident." Mot. to Dismiss at 35. If the facts about MCAS changed during that period, then the defendants can present those facts at a later stage of the litigation.

The plaintiffs also allege that Muilenburg failed to disclose the messages to regulators, thus allowing FAA AEG to persist in the belief that the regulator had erred because it had deleted MCAS from the FSB report following an informed decision arising from discussions with Boeing, when, in reality, the fault lay fully with Boeing because Forkner and Gustavsson had misled the FAA. *See* DPA SOF ¶ 51, Comp. ¶¶ 279-283. As the plaintiffs contend, this failure to disclose the messages to regulators does support an inference that when he learned of them, Muilenburg knew

34

that Forkner's messages were more significant than just "an employee's experience in a simulator." MTD 30.

Accordingly, the plaintiffs' allegation that Muilenburg knew about the Forkner messages suffices to allege that he knew: 1) that MCAS was active throughout the airplane's speed range ("down to M 0.2," as Forkner put it), 2) that Boeing's technical pilots knew this and thought this posed a risk to the FAA AEG's Level B training designation and 3) that Forkner, knowing that that FAA AEG was misinformed about MCAS's operation, doubled down and kept it in the dark so that MCAS would not be mentioned in the FSB Report nor in the pilot training materials.

With Muilenburg's alleged knowledge about MCAS and its concealment from FAA AEG in mind, the Court turns to the statements made in the months after the Ethiopian Airlines crash. This section deals with statements 20-30,34-36 and 39 as listed in the appendix. First, the Court addresses statements in which Muilenburg makes technical assertions about MCAS and about information provided to pilots in the Flight Manual, which the Court finds actionable. Appendix, statements 22-24, 28. Next, the plaintiffs have alleged that Boeing's statement in response to regulators' grounding order was fraudulent; the Court concludes that the plaintiffs have not alleged it was a false statement, nor that it was material to investors. Appendix, statement 26. Third, the Court addresses statements making general assertions about the aircraft's safety, which the Court does not find actionable because they were immaterial. Appendix, statements 20, 25, 27, 29. Fourth are statements about the AoA Disagree Alert, which are not actionable, both because plaintiffs have not alleged Muilenburg's scienter nor that such statements proximately caused any loss to investors. Appendix, statements 35 and 36. Finally, there are two statements during this period about certification and FAA approval of the airplane; the Court concludes these claims are

actionable based on Muilenburg's knowledge that Forkner misled the FAA, Appendix, statements 34 and 39.

### 2. Statements Regarding MCAS Functionality and Pilot Training Materials (22-24, 28)

The day after the Ethiopian Airlines crash, Boeing issued a press release. After a series of platitudes about safety of the sort that the Court rejects as actionable (*see infra*, § II.C.4), the release addressed some technical questions about MCAS and the flight manual:

> A pitch augmentation control law (MCAS) was implemented on the 737 MAX to improve aircraft handling characteristics and decrease pitch-up tendency at elevated angles of attack. It was put through flight testing as part of the certification process prior to the airplane entering service. ***MCAS does not control the airplane in normal flight; it improves the behavior of the airplane in a non-normal part of the operating envelope***.
>
> ***Boeing's 737 MAX Flight Crew Operations Manual (FCOM) already outlines an existing procedure to safely handle the unlikely event of erroneous data coming from an angle of attack (AOA) sensor***. The pilot will always be able to override the flight control law using electric trim or manual trim. In addition, it can be controlled through the use of the existing runaway stabilizer procedure as reinforced in the Operations Manual Bulletin (OMB) issued on Nov. 6, 2018.

Compl. ¶ 396; Appendix, statements 22-23. The following day, after many foreign regulators had grounded the MAX in their countries, Boeing issued another statement in which it reiterated that it did not have "any basis to issue new guidance to operators." Compl. ¶ 397; Appendix, statement 24.

There are two components to the March 11, 2019 statement; the court addresses them in turn. As for the statement about MCAS's operation in "a non-normal part of the operating envelope," the plaintiffs argue this is false because MCAS was active during normal flight, as described by Forkner in his messages.

36

The Defendants argue that the plaintiffs have not alleged that MCAS was active during normal flight, and the Forkner messages do not mention the "operating envelope" at all. Reply at 5. Indeed, the complaint does not explicitly describe plaintiff's theory as to why this statement constitutes a falsehood. *See* Compl. ¶¶ 396-400 (explaining why other assertions in this press release are false but not addressing the "operating envelope" statement). But their theory is evident from facts alleged in the complaint and is clarified by the DPA.

The complaint alleges that after Forkner sent his "shocker alert" message in which he described to Gustavsson MCAS's propensity to "run rampant" at lower speeds, he recognized the need to correct his earlier comment to FAA AEG that MCAS "only operates WAY outside of the normal operating envelope." Compl. ¶¶ 116-118, 148. DPA SOF ¶ 35, 39. Forkner recognized that MCAS was now "active down to M[ach] .2," which meant, as the DPA describes, that MCAS's operational scope had been "expanded to include high angle of attack conditions in nearly the entire speed range of ordinary commercial flight[.]" DPA SOF ¶ 35. Boeing ultimately stipulated to its guilt for one count of conspiring to defraud the United States because, among other things, Forkner did not update FAA AEG about this expansion, and instead he urged edits to a draft FSB report that mentioned MCAS because Forkner and the regulators had "agreed not to reference MCAS since it's outside normal operating envelope." DPA SOF ¶ 39. The fraud, Boeing has admitted, lay in the fact that Forkner and Gustavvson "withheld and concealed from the FAA AEG their knowledge of MCAS's expanded operational scope." DPA SOF ¶ 35.

The Defendants respond by acknowledging that Forkner and his colleagues may have concealed MCAS's expansion, but they contend that this does not mean that MCAS was now operating during "normal flight." Opposition to Plaintiff's Notice of Supplemental Information 7,

ECF No. 177. The DPA does not reference the "normal" or the "non-normal" operating envelope, and the Defendants argue that even with the expansion of MCAS, the system was still active only in the non-normal part of the operating envelope. According to the DPA, the expansion made it so that "when the airplane registered a ***high angle of attack***, the change expanded the speed range within which MCAS could activate from approximately Mach 0.6-0.8 to approximately Mach 0.2-0.8—that is, from only high-speed flight to nearly the entire speed range for the 737 MAX, including low-speed flight, which generally occurs at a lower altitude and in and around takeoff and landing." DPA SOF ¶ 25. Because MCAS only activated at a "high angle of attack," say the Defendants, it was still only active outside of normal flight. But in the plaintiffs' telling, because it was now active throughout "***the entire speed range for the 737 MAX, including low speed flight***," MCAS was active "well within the normal flight envelope." Compl. ¶ 116, Pl.'s Notice of Supplemental Information 5, ECF No. 173.

What the Court is missing at this stage is a precise definition of what, precisely, constitutes "normal" versus "non-normal" flight in this industry and regulatory jargon. But a factual dispute as to whether MCAS's parameters had been expanded beyond the "normal operating envelope" is not appropriately resolved at the pleading stage, and for now, the Court accepts as true the plaintiffs' contention that expanding MCAS to potentially activate throughout the airplane's entire speed range meant it was active during "normal flight" and that therefore the March 11, 2019 statement that MCAS is not active during "normal flight" was false.

Because the Forkner messages, of which Muilenburg was aware since February 2019, discussed MCAS's expanded operation and revealed how Forkner had misled the FAA AEG about the subject, Muilenburg allegedly knew that this statement in the press release was false. Loss

38

causation will be discussed in more detail below, but the plaintiffs have adequately alleged that there was a corrective disclosure in October 2019, when the Forkner messages were made public.

The other reassurances in this statement that plaintiffs assert are fraudulent have to do with the flight manual: "Boeing's 737 MAX Flight Crew Operations Manual (FCOM) already outlines an existing procedure to safely handle the unlikely event of erroneous data coming from an angle of attack (AOA) sensor." Compl. ¶ 396; Appendix, statement 23.[8] Muilenburg's decision to rely on information provided in the Flight Manual as a way to reassure investors makes this statement misleading. The plaintiffs have alleged why the Flight Manual was deficient and thus why this statement was false and omitted material facts, namely that the Flight Manual did not discuss MCAS because of Forkner's "jedi-mind-tricks.". *Id.* ¶ 355. Boeing may not have had a duty to disclose everything the company knew about the compromised process that produced the flight manual, but once Boeing chose to rely on the information in the flight manual as a way to reassure investors, it had a duty to tell the whole truth. *See* 17 C.F.R. § 240.10b-5(2) ("It shall be unlawful for any person… to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[.]") And as discussed above, the plaintiffs have alleged that Forkner intentionally misled the FAA AEG in order to excise

---

[8] Consistent with their arguments about statements referencing "existing procedures" in the early part of the class period, the plaintiffs say that Muilenburg misleadingly implied in this statement that pilot error caused the crash, and that Boeing provided false reassurance to investors that "Defendants had the situation under control and were promptly responding to the MAX's safety problems." Compl. ¶ 236-37. And as discussed above, the plaintiffs also set forth plausible allegations as to why "existing procedures" were not sufficient for pilots to recover a 737 MAX from a MCAS-induced dive. ¶ 355.The plaintiffs have not alleged, however, any basis on which to infer that Muilenburg, even after the Ethiopian Airlines crash, was familiar with the shortcomings of the Runaway Stabilizer Non-Normal checklist for a pilot responding to a MCAS malfunction—there is nothing about the procedure in Forkner's messages.

any mention of MCAS from the FSB Report, and in turn the Flight Manual. Boeing has stipulated that this made the Flight Manual "materially false, inaccurate, and incomplete[.]" DPA SOF ¶ 46. The plaintiffs have therefore sufficiently plead Muilenburg's scienter regarding this alleged falsehood by alleging his knowledge of the Forkner messages. Accordingly, statements 22 and 23 in the March 11, 2019 press release—regarding the "normal operating envelope" and information provided in the Flight Manual are both actionable.

For similar reasons, the statement in the March 12 press release in which Boeing said "we do not have any basis to issue new guidance to operators" is also actionably false. Compl. ¶ 397; Appendix, statement 24. The plaintiffs allege that, by this statement, "Defendants continued to mislead investors by concealing what they knew about… the perilous conditions the plane could create for unsuspecting pilots." ¶ 241. The Defendants do not address this aspect of the statement, they instead moved to dismiss this claim based on the argument that vague statements of safety are not material. For that reason, the Court recognizes that the first part of the statement, "we have full confidence in the safety of the 737 MAX" is not actionable. But the statement about guidance to operators is a different story. The plaintiffs have adequately alleged that Muilenburg knew, by February 2019, that his employees had engaged in a deliberate effort to reduce the required pilot training and limit the guidance provided to them, resulting in training materials that were "materially false and misleading." DPA SOF ¶¶ 46-47.

The plaintiffs also allege that Boeing committed securities fraud when it released a statement on March 22, 2019 saying that "Airplanes are delivered with a baseline configuration, which includes a standard set of flight deck displays and alerts, crew procedures and training materials that meet industry safety norms and most customer requirements." Compl. ¶ 407;

Appendix, statement 28. The plaintiffs allege this is false because the training materials provided to pilots were deficient as a result of Forkner's misrepresentations to FAA AEG. ¶ 411. For the same reasons as the statements described above, this too is actionable.

### 3. Boeing's Response to the Grounding Order (26)

The plaintiffs allege that Boeing made false statements about whether the company supported the FAA's decision to ground the 737 MAX. On March 13, 2019, the FAA and the NTSB indefinitely grounded the MAX. Muilenburg issued a statement the same day that suggested Boeing had recommended the grounding order and fully supported it: "Boeing has determined… out of an abundance of caution and in order to reassure the flying public of the aircraft's safety— to recommend to the FAA the temporary suspension of operations" of the 737 MAX fleet. Compl. ¶ 402, Appendix statement 26. The plaintiffs claim this is misleading spin; just the day before, they allege, Muilenburg placed a call to the President and personally "made the case that the 737 MAX" should not be grounded. Compl. ¶ 404. The defendants say this claim should be dismissed because the plaintiffs also allege that the FAA made its decision based on information gathered after Muilenburg's call to the President—the FAA's March 13 grounding order stated that the decision was based on "new evidence collected at the site and analyzed today" and "newly refined satellite data available to FAA this morning." Compl. ¶ 402. Thus, plaintiffs allege that Boeing's reversal—supporting the grounding order rather than opposing it—was also based on this new information. Accordingly, the plaintiffs have not adequately plead that this statement is false. And the defendants correctly point out that the plaintiffs have not alleged that Boeing's March 13 statement in support of the grounding order was material to investors. There is no allegation about what impact Boeing's support or opposition of the grounding order was consequential enough to

41

affect total mix of information available to the market—a mix that now included two plane crashes and an FAA grounding order. These statements, therefore, do not suffice as the basis for a securities fraud claim.

### 4.   Vague Statements of Airplane Safety and Boeing's "Core Values" (25, 26, 27, 29)

The next class of statements are general statements about the aircraft's safety, Boeing's core values, and Boeing's commitment to safety. *See* Appendix, statement 20 ("the 737 MAX is a safe airplane") statement 21 ("safety is a core value for everyone at Boeing… the 737 MAX is a safe airplane); 24 ("we have full confidence in the safety of the 737 MAX"); 25, 26, 27, 29.  The plaintiffs allege that Muilenburg defrauded investors by these statements because the defendants omitted facts that cut the other way: MCAS had a single point of failure, Boeing had misled regulators, Boeing knew that many MAX airplanes were missing an AoA Disagree Alert, Boeing increased the power of MCAS during development without fully informing stakeholders, and several other reasons. Compl. ¶ 358.

The Defendants contend that any securities fraud claims based on these safety-related statements must be dismissed for several reasons.  First, they argue that the statements are not false because they acknowledged the possibility for erroneous MCAS activation and other problems. Additionally, the statements were insufficiently specific to affect a reasonable investor's assessment of the value of Boeing  value, and so they are immaterial as a matter of law. Regardless of the falsity of these statements, the Court concludes that a reasonable investor could not find them material.

Federal courts "everywhere have demonstrated a willingness to find immaterial as a matter of law certain kinds of rosy affirmation heard from corporate managers and numbingly familiar to

the marketplace—loosely optimistic statements that are so vague, so lacking in specificity… that no reasonable investor could find them important to the total mix of information available." *City of Monroe Emp.'s Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669-670 (6th Cir. 2005) (cleaned up). Muilenburg's statements about Boeing's "core values" and similar affirmations of safety are just that kind of rosy affirmation that reasonable investors know are meaningless to the total mix of information.[9]

When Muilenburg and Boeing made these statements, there had been two closely related plane crashes, followed by an indefinite emergency grounding order from the FAA. Because all that information was public knowledge, only unreasonable investors would find Muilenburg's statement about Boeing's core values meaningful to the total mix of information. *See Singh v. Cigna Corporation*, 918 F.3d 57, 63 (2d Cir. 2019) (holding that statements in company's code of ethics are puffery; "too general to cause a reasonable investor to rely upon them.") Additionally, several of the statements, on their face, contain a vague assertion of safety while acknowledging facts that sounded a blaring warning that the airplane was not, in fact, safe. For example, in Boeing's statement about the grounding, Muilenburg trotted out his common refrain that "Safety is a core value at Boeing" but also acknowledged the "suspension of operations of the entire global fleet of 371 737 MAX aircraft" and the need for "safety enhancements" to ensure that "this does

---

[9] The plaintiffs filed a Notice of Supplemental Authority notifying the Court of a decision in this District, *Hedick v. Kraft Heinz Company*, 2021 WL 3566602 (N.D. Ill. 2021). They argue that the Court should reject Boeing's arguments that the safety statements are immaterial for the same reason Judge Dow rejected similar arguments made by Kraft Heinz in that action. On this point, *Hedick* is distinguishable: Kraft Heinz allegedly failed to disclose that it had renegotiated several contracts with retailers, prompted by its channel stuffing. *Id.* at *7. It also restated its financial statements in the amount of $208 million dollars. Those alleged omissions and misrepresentations were considerably more specific than the vague assurances of safety that were allegedly misleading to investors in this case.

not happen again." Appendix, Statement 26. It is difficult to imagine that the market found Muilenburg's "core value" statement relevant to the total mix of information in a statement that also announced the indefinite grounding of the 737 MAX because of safety problems. *Cf. Omnicare,* 575 U.S. at 190 ("an investor reads each statement within such a document, whether of fact or of opinion, in light of its surrounding text, including hedges, disclaimers, and apparently conflicting information."). Accordingly, the defendants' statements about the safety of the 737 MAX are not actionable.

### 5. *AOA Disagree Alert (35 and 36)*

The plaintiffs allege that Boeing lied to investors about the equipping of MAX aircraft with a cockpit indicator known as the AoA Disagree Alert. Compl. ¶¶ 123-29, 433, 442; Appendix, statements 35-36, 41. Boeing allegedly knew "no later than August 2017" that the alerts were not operable unless its airline customers purchased optional "AoA indicator" software. Compl. ¶ 126. In its public statements, Boeing cast this problem as a mistake—the operability of the AOA Disagree Alert should not have been dependent on the purchase of the "AoA indicator" software; this arrangement meant the alert "was not activated as intended." Compl. ¶ 126. Boeing allegedly planned to fix this problem with a 2020 software update but ignored the issue in the meantime, falsely representing to customers that the alert was installed and operable on every MAX, when in fact it was sold as an optional add-on. ¶ 128.

On April 28, 2019, Southwest Airlines released a statement saying that when Boeing delivered 737 MAX's to them before the Lion Air crash, "the AoA Disagree Lights were depicted to us by Boeing as operable on all MAX aircraft. After the Lion Air event, Boeing notified us that

44

the AoA Disagree Lights were inoperable without the optional AoA Indicators on the MAX aircraft." ¶ 431.

In response to this revelation by Southwest, Boeing made two statements in which it asserted that the AOA Disagree Alert was not a required safety feature and that "all flight data and information needed to safely operate the aircraft is provided in the flight deck on the flight deck display." Compl. ¶ 431; Appendix, statements 35-36. The plaintiffs allege these statements were materially misleading because Boeing had represented to the FAA that the AoA Disagree Alert "was to be a standard, ***non-optional*** safety feature of the aircraft[,]" and that the statements were false "to the extent they included safety-related claims about the 737 MAX[.]" ¶ 434-435. While the plaintiffs broadly assert that Boeing concealed its knowledge about the AoA Disagree Alert from investors throughout the class period, these are the only allegedly fraudulent statements pertaining to the alerts. A broad theory of non-disclosure won't do: the complaint must "specify each statement alleged to have been misleading[.]" 15 U.S.C. § 78u-4(b)(1)(B). Accordingly, the Court's inquiry into whether the complaint sufficiently alleges a securities fraud claim as to the AoA Disagree Alerts is confined to statements 35 and 36.

Boeing argues that these statements issued in response to Southwest's claim were not false, or were immaterial, and alternatively that the plaintiffs have not alleged that Muilenburg intended to deceive investors regarding this issue. MTD 21-22, 37. Splitting hairs, Boeing contends that, while the Alert was part of the design that the FAA had approved, it had not been classified as a "safety feature." MTD 21. One of the company's Vice Presidents told American Airlines pilots they would not have experienced the same disaster as the Lion Air pilots because their planes had operable AoA Disagree Alerts. A feature that may have prevented the two plane crashes, even if

not classified under regulatory definitions as a safety feature, is obviously important for the airplane's safety and would be understood by investors as such.

The statements are not actionable, however, because the plaintiffs have not alleged the scienter of anyone involved in making the statements, nor that the false statements caused an economic loss. The complaint does not allege what Muilenburg knew about the AoA Disagree Alert problem. While it plausibly alleges that Boeing misrepresented the operability of the alerts to their customers, they do not allege that Muilenburg made any such representations to customers. Instead, the plaintiffs allege that "Boeing knew" that the AoA Disagree Alerts was not operational and submit that contrary statements were made with scienter. Compl. ¶¶ 84, 126, 157. Again, "intent to deceive is not a corporate attribute." *Makor*, 513 F.3d at 707. The plaintiffs must plead what Muilenburg knew when he made the statement at issue. Alleging that "Boeing knew" is insufficient.

Moreover, the plaintiffs do not allege how any misstatement about AoA Disagree Alerts caused a loss to investors. Loss causation will be discussed in more detail below, but plaintiffs making private securities fraud claims must plausibly allege that "the defendant's fraud caused an economic loss." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 338 (2005). The plaintiffs have alleged that Boeing's stock fell on March 21, 2019, after The New York Times reported on the AoA Disagree Alert issue. Compl. ¶¶ 252-254. The first alleged misstatement regarding the AoA issue, however, came weeks later, on April 29. Compl. ¶ 432. The information about Boeing's misrepresentations to its customers was available to investors before Boeing issued its denials and defended its actions with respect to the Alert.

46

### 6. Statements about Boeing's Relationship with the FAA (34 and 39)

In an April 25, 2019 earnings call in which analysts expected to receive updates about Boeing's response to the two 737 MAX crashes, Bank of America Merrill Lynch asked Muilenburg:

> how does this happen right? I mean, this sort of seemingly sort of came out of nowhere. I mean, is there any way you can kind of give us a feeling for how did this slip through the engineering organization? How did it slip through the FAA? Can you give us a feel for that? . . . [T]hat's the part that befuddles me most about all this because it doesn't seem like there was a lot of new science going on here, right? . . . This seems to be applications of existing technology to an existing platform."

Cons. Compl. ¶ 425. Muilenburg responded:

> ...**there was no surprise or gap or unknown here or something that somehow slipped through a certification process**. Quite the opposite. We know exactly how the airplane was designed. **We know exactly how it was certified. We have taken the time to understand that**. That has led to the software update that we've been implementing and testing[.]

*Id*; Appendix, statement 34. The plaintiffs say this statement was materially false and misleading because, among other things, Muilenburg omitted information about Boeing's true standing with the FAA and the manner in which Boeing secured FAA approval of the 737 MAX— that Forkner and others had misled the FAA about MCAS's expanded operational scope in order to secure Boeing's desired pilot training designation for the MAX. ¶ 429.

Boeing contends the statement about certification is technically true—the company was aboveboard about MCAS with FAA officials who handled the 737 MAX's airworthiness certification. Reply at 6-7, 14-15. This argument relies on the distinction between FAA AEG, the arm of the FAA that deals with pilot training requirements and publishes the FSB report, and the FAA office that grants airworthiness certifications. The FSB Report contains FAA AEG's

47

determination regarding the extent of pilot training required for an airplane. Accordingly, Boeing argues that plaintiffs failed to allege that Boeing misled **certification** officials. Reply at 6. Indeed, the plaintiffs acknowledge that some FAA personnel knew about MCAS's expanded operational scope. ¶ 144 ("even where Boeing did provide information to the FAA, the Joint Report concluded "the information and discussions about MCAS were so fragmented and were delivered to disconnected groups" that it "was difficult to recognize the impacts and implications of this system.").

On the other hand, Boeing "entirely failed to disclose these dangerous modifications [to MCAS]" to the FAA AEG officials responsible for approving pilot training requirements. Compl. ¶ 144. Instead, the plaintiffs allege, Forkner and other employees actively misled the FAA AEG, successfully advocating that any mention of MCAS be removed from the flight manual, Compl. ¶¶ 148-49, and later bragged about tricking regulators into not requiring extensive training for MAX pilots. *Id.* at ¶ 150-52 (describing Forkner's email bragging about "jedi-mind-tricking into accepting the training that I got accepted by the FAA" and other employees' messages boasting that "I just jedi mind tricked this [*sic*] fools... *I save this company a sick amount of $$$$*[.]"). Muilenburg said that he "knew exactly how [the 737 MAX] was certified." On this, the plaintiffs agree: they allege he knew that the FAA AEG's Level B training designation was secured by Forkner's "jedi mind tricks."

While Muilenburg was technically correct, insofar as Boeing had made more substantial disclosures about MCAS to FAA airworthiness certification officials, his failure to disclose that Boeing pulled the wool over FAA AEG's eyes makes the statement materially false and misleading. The analyst asked if anything had slipped past the FAA; Muilenburg answered that

48

nothing had, affirming the integrity of a regulatory approval process that he allegedly knew had been compromised. *See McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("literally accurate" statements "can become through their context and manner of presentation, devices which mislead investors."); *In re Par Pharmaceutical, Inc. Securities Litigation*, 733 F. Supp. 668, 672 (S.D.N.Y. 1990) (finding that company's public statements about its excellent record in obtaining quick FDA approval, while technically true, were false in light of employees' bribery of FDA officials); *cf. Universal Health Servs., Inc. v. U.S. and Massachusetts ex. rel. Escobar*, 136 S. Ct. 1989, 1999 (2016) (noting that false or fraudulent claims "include more than just claims containing express falsehoods.").

Disclosure would have altered the total mix of information available to investors by revealing the depths of Boeing's regulatory troubles and, at the very least, would have cast a pall on the likelihood that the MAX's problems would soon be resolved. Boeing's relationships with the government, especially with its regulators, are material information to investors, as demonstrated by several analysts' comments after these messages were disclosed to the public. Compl. ¶ 286 ("we still see a set of poor technical assumptions as being the core, those are now coupled with reported instances of potential regulatory incomplete disclosure").

The investors have pled Muilenburg's scienter by alleging that he knew about Forkner's messages in February 2019 but failed to disclose the regulatory subterfuge they revealed. Compl. ¶ 459. His knowledge of the messages does not necessarily mean he would have investigated and uncovered every detail of the 737 MAX's allegedly chaotic and compromised development in the years before the class period. But upon learning that the 737 MAX Chief Technical Pilot bragged about "jedi-mind-tricking" regulators, he either conducted an inquiry, learned what Forkner and

others had done, and then falsely reassured investors that nothing "slipped through the FAA," or he did not inquire and spoke with indifference to the accuracy of his statement. Either premise suffices to support the plaintiffs' claim. *Makor*, 513 F.3d at 704.

Muilenburg made similar assertions about the integrity of the FAA approval process in a May 29, 2019 presentation at the Sanford C. Bernstein Strategic Decisions Conference. Compl. ¶ 437; Appendix, statement 39. In response to a question "on the relationship with the FAA," and "the delegated authority approval and how that process works," Muilenburg affirmed his "great deal of confidence in that process and how it works. It's a high-integrity process, and I think it's proven. It's demonstrated results. It's a way for the FAA to exercise its independent role, its regulatory role as it should, but also tap into the deep technical expertise in our company." Compl. ¶ 439.[10] The plaintiffs allege that it was materially misleading for Muilenburg to extol the integrity of the FAA's oversight—and Boeing's conduct of its own regulator responsibilities—when he knew that the integrity of the process had been compromised by Forkner's "jedi mind tricks." ¶¶ 446, 429-430. For the same reasons the Court finds Muilenburg's "no slips or gaps" statement actionable, this statement about the FAA's oversight is also actionable.

### D. Statements about the MAX's Return to Service

After the MAX was grounded in the wake of the Ethiopian Airlines crash, among the most important issues for investors was the timing for the lifting of the grounding order and the 737

---

[10] Boeing participated in an FAA program called "Organization Designation Authorization" (ODA) in which the FAA allegedly delegated many of its functions to the company. Compl. ¶ 53. Under the ODA, Boeing was permitted to "manage and make findings related to type certification programs, issue airworthiness certificates and approvals, determine conformity, approve data for major repairs and alterations, and approve design changes to products." *Id.* The complaint alleges that 1,500 employees worked in Boeing's ODA, vastly outgunning the FAA's "fewer than 45 employees." *Id.*

MAX's return to service. The plaintiffs allege that Muilenburg painted a misleading picture of Boeing's interactions with regulators who had the ultimate word on whether the MAX would be certified and returned to service. Compl. ¶¶ 268, 415, 437-39. Because Boeing had "extensive interactions with regulators," *Id.* at ¶ 268, and was working closely with them, *Id.* at ¶ 454, Muilenburg projected confidence that the MAX would quickly return to service. Pl.'s Opp. 28. He did so while knowing, but not disclosing, that the FAA saw the matter very differently.

The basis for inferring Muilenburg's scienter is a meeting he held with then-Acting FAA Administrator Elwell in the back of an airplane at the Paris Airshow, which took place between June 17-23, 2019.[11] Compl. ¶ 262. In the weeks leading up to that meeting, Muilenburg had said that Boeing was "finishing that dialogue with the FAA" and that they were "making clear and steady progress" towards returning the MAX to flight. ¶¶ 437-38.[12] During the Paris Airshow

---

[11] Because this meeting with Elwell provides the basis for inferring Muilenburg's scienter with respect to statements about the MAX's return to service, statements in this category that occurred before this meeting are not actionable for lack of allegations of scienter. See Appendix, statements 31, 37, 38.

[12] The plaintiffs allege that many of these statements touting ongoing "progress" are actionable, but they do not allege that there was no progress. MTD 24. However halting and insufficient that progress may have been, the investors have not plead that vague assertions of "progress" are false statements. The plaintiffs allege these statements are false because, among other things, "the investigations into the MAX's safety issues were nearer to the beginning than the end." That the MAX's return to service in fact took much longer, and progress was much slower than anticipated, does not provide a basis for alleging securities fraud. *See, e.g, Zebra Technologies,* 8 F.4th at 595 (statement that consolidation was "progressing as planned" cannot be called false" where progress was made throughout the class period); *City of Livonia Employees' Ret. Sys. And Local 295/Local 851 v. Boeing Co.*, 711 F.3d 754, 758 (7th Cir. 2013) ("There is no securities fraud by hindsight."). Moreover, the statements are immaterial because of their vagueness. *See Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1321 (holding that defendant's proclamations that it was making progress towards regulatory compliance are immaterial as a matter of law). This means that statements 30, 31, 32, 33, 38, and 45 listed in the Appendix are not actionable. Insofar as some of the statements made before June 2019 make more specific assertions about Boeing's relationship with the FAA and the timing for a return to service, they are not actionable because the June 2019 meeting with Elwell provides the basis for inferring

meeting, Elwell told Muilenburg that Boeing needed to "slow down its talk of progress [on the 737 MAX]" and give the FAA "space to exercise scrutiny.' ¶ 262. Muilenburg agreed, saying "we're not going to push." *Id.*

A few days later, on June 26, 2019, however, Muilenburg, speaking at the Aspen Ideas Festival, announced that Boeing was "still … looking at the end of summer 2019" as the "timeframe" for the MAX returning to operation. Compl. ¶ 263; Appendix statement 42. According to the plaintiffs, this projection was materially false and misleading considering Muilenburg's meeting with Elwell, which signaled that the FAA did not agree with Muilenburg's projected timeline for returning the 737 MAX to flight status. Comp. ¶ 445; Pl.'s Opp. 28-29.

Boeing argues that this statement is forward looking, and so is protected by the PSLRA safe harbor for such statements. 15 U.S.C. § 78u-5(c). The investors must raise a strong inference that Muilenburg knew his return to service statement were materially misleading—a reckless state of mind does not suffice to incur liability for forward-looking statements. *Makor*, 513 F.3d at 705. Accordingly, Boeing argues that the complaint fails to allege actual knowledge. Boeing also argues that cautionary statements in various SEC filings put these statements within the safe harbor's protection.

The plaintiffs respond that they need not plead that the Defendants had actual knowledge the statements were false because the return-to-service statements are not forward looking, but rather assertions about present facts. Pl.'s Opp. 28 n.10. It is true the return-to-service statements

---

Muilenburg's scienter with respect to statements about the MAX's return to service. See Appendix, statements 31, 37, 38.

contain both present and future elements, especially since those assertions were buttressed by Boeing's repeated affirmations that it was working closely with regulators. Cons. Compl. ¶ 419.

But the Court concludes that the June 26, 2019 statement that Boeing is "still targeting... summer 2019" for the MAX's return to service is best understood as a "statement of the plans and objectives of management for future operation, including plans or objectives relating to the products or services of the issuer," 15 U.S.C. § 78u-5(i)(1)(B), and therefore qualifies as a forward looking statement. This, and other statements like it, were "predictions or speculations about the future." *Makor*, 513 F.3d at 705. Thus, to state a claim based on these statements, the plaintiffs must plead facts that give rise to a strong inference that Muilenburg knew his return to service estimates were misleading. *See Tellabs*, 551 U.S. at 322-23 (explaining that a court must examine "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter[.]").

The fundamental misrepresentation in these statements, according to the plaintiffs, is that the optimism about a quick return to service was grounded in Boeing's close relationship with regulators, and that Muilenburg cultivated a misunderstanding among investors that the relationship was productive, and thus the timeline attainable, while omitting Elwell's warning to Muilenburg to "slow down" his talk of progress. ¶445. The CEO's language on June 26 supports this: while the plaintiffs don't explain what exactly Muilenburg meant by saying that he was "still" targeting 2019, they connect this prediction with prior assertions of progress, including his May 29, 2019 statement that Boeing was "now in the process of applying for final certification. We are finishing that dialogue with the FAA[.]" Compl. ¶¶ 437, 445. At the very least, a reasonable investor could have understood that Muilenburg's summer timeline was consistent with his previous assertions that the process was nearly finished. The FAA Director had told him to "slow

down" that talk, but Muilenburg's words suggest that the regulatory environment had remained the same as it was when he made previous statements promising progress toward certification.

Given the meeting with Elwell, the plaintiffs have alleged enough to support the inference that Muilenburg knew he was presenting a misleading timeline. Muilenburg was not just overly optimistic or reckless in giving such an aggressive timeline—he omitted to say that *the FAA had informed him* that he was overly optimistic and aggressive in his public statements. The FAA's view of things was directly contrary to Muilenburg's description; it had advised him that it needed more time to exercise appropriate scrutiny. *In re Amgen*, 544 F. Supp. 2d 1009, 1028-29 (C.D. Cal. 2008) (finding company's statement that "we think the market has plenty of room to grow" actionable in light of undisclosed FDA warnings that products would require further testing); *Selbst v. McDonald's Corp.*, 2005 WL 2319936 *20 (N.D. Ill. 2005) (concluding that unrealistic projections were actionable where the defendants "had access to reports which would lead a reasonable person to believe that the predictions being made in public statements are not accurate and/or missing relevant information."). Moreover, the plaintiffs have made other allegations that support an inference of actual knowledge—that Muilenburg intended, by his public comments, to pressure the FAA into moving more quickly to recertify the airplane. Compl. ¶ 458. The FAA understood Muilenburg's aggressive timeline predictions as calculated to exert such pressure, and publicly chastised Muilenburg for it. *Id.* at ¶ 301 The allegations of a pressure campaign buttress the inference of knowledge. *See SEC v. Ustian*, 2019 WL 7486835 *32 (N.D. Ill. 2019) (finding that efforts to pressure the EPA could give rise to an inference that the defendant "did not actually have a basis to believe Navistar had a certifiable engine.").

Boeing points to cautionary language in its SEC filings to argue that the statutory safe harbor applies. Mot. to Dismiss 25-26. In its SEC form 10-Q filed on April 24, 2019, Boeing included a warning that projected results could vary based on "conditions surrounding return to service of the 737 MAX fleet." *Id.* at 25. In its June 26 Form 8-K, Boeing cautioned that it "will not offer the 737 for certification by the FAA until we have satisfied all requirements for certification of the MAX and its safe return to service." *Id*. Boeing made similar disclaimers in its July 18, 2019 SEC Form 8-k and in a written warning associated with its September 11, 2019 investor presentation. Those cautionary statements are part of the total mix of information informing the market and "must be treated as if attached to every one of [defendant's] oral and written statements." *See Asher v. Baxter Int'l*, 377 F.3d 727, 732 (7th Cir. 2004).

These caveats may have been cautionary, the plaintiffs argue, but they were not meaningful. They are correct; cautionary statements are not meaningful if they warn of potential risk that has already materialized. *See, e.g., Desai v. General Growth Properties, Inc.*, 654 F. Supp. 2d 836 (N.D. Ill. 2009) (finding cautionary statements warning that company may not be able to obtain essential refinancing no longer protected defendants once the company had actually run out of financing); *In re Harman Intern. Industries, Inc. Securities Litigation*, 791 F.3d 90, 102 (D.C. Cir. 2015) ("cautionary language cannot be 'meaningful' if it is 'misleading in light of historical fact[s] ... that were established at the time the statement was made.") (citations omitted). As far as the market was concerned, Muilenburg's prediction on June 26 was accompanied by this caveat: that there were future risks around the MAX's return to service timeline. The risk that regulators would not move as quickly as Muilenburg was forecasting, however, had already materialized when Elwell told Muilenburg to slow down, as the FAA exercised significant (if not total) control

over certification of the MAX. Companies cannot claim the protection of cautionary language by listing broad areas of risk and then avoid liability for statements "implying that no such risks on the horizon even if a precipice were in sight." *Asher*, 377 F.3d at 733. Here, the precipice was not just in sight—the plaintiffs have alleged that Muilenburg already had one foot off the edge.

In addition to arguing that the return to service estimates are protected by the statutory safe harbor, the defendants argue that the timing estimates are statements of opinion, and that plaintiffs have not plead that Muilenburg did not actually believe his own estimates. MTD 26. In *Omnicare*, the Supreme Court held that a statement of opinion is not actionable if the opinion expressed "fairly aligns with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 188-189. An investor "cannot state a claim by alleging only that an opinion was wrong; the complaint must as well call into question the issuer's basis for offering the opinion." *Id.* at 194. Had the plaintiffs only alleged that the return-to-service estimates were misleading because hindsight proved that the MAX did not return to service in line with Boeing's optimistic projections, then these statements would not be actionable. But the plaintiffs have alleged that Muilenburg was representing that his opinion was backed by some inquiry, and specifically, that investors assumed Muilenburg's remarks were based on "extensive interactions with regulators." Compl. ¶ 268. Muilenburg did have close interactions with his regulator, and he knew that they took a decidedly less optimistic view of the MAX's return to service. Under *Omnicare*, an investor must allege "particular (and material) facts going to the basis for the issuer's opinion .... whose omission makes the opinion statement at issue misleading to a reasonable person[.]" *Id.* at 194. The investors here have done so by pleading that the FAA Director told Muilenburg to "slow down" his talk of progress so that the FAA could exercise scrutiny. Muilenburg did not disclose this darkening cloud of regulatory

56

scrutiny to investors. *See Omincare*, 575 U.S. at 188-89 ("if the issuer made the statement… with knowledge that the Federal Government was taking the opposite view, the investor again has cause to complain[.]").

Muilenburg compounded the problem by making similarly optimistic projections in the following months. Compl. ¶¶ 451-454, 456. On July 18, 2019, Boeing filed a Form 8-K in which it informed investors the company would recognize a $4.9 billion charge to its earnings due to the 737 MAX grounding. Included in that release was a statement that Boeing "has assumed that regulatory approval of 737 MAX return to service in the U.S. and other jurisdictions begins early in the fourth quarter 2019." Compl. ¶ 448. And on July 24, 2019, Muilenburg represented in an earnings call that Boeing was

> working with the FAA and other regulators to complete as many elements of the certification process as possible in parallel with the development of the software update. We will submit our final certification package to the FAA once we have satisfied all of their requirements, **which we currently estimate will be in the September time frame**."

¶ 451 (emphasis added). When pressed by a Seattle Times reporter about "some optimistic assumptions" in that projection, Muilenburg again reiterated that Boeing's "current best estimate… is to deliver our certification package, including the certification flight, in that September time frame and then return to service in the—early in the fourth quarter… and we are assessing that on a daily basis and working hand-in-hand with the FAA in this process." ¶ 454. Similarly, on September 11, 2019, Muilenburg emphasized that Boeing was "actively engaged with regulators around the world and day-to-day working with the FAA on return-to-service timing… we are still targeting early fourth quarter for a return to service of the 737 MAX." ¶ 456.

As with Muilenburg's statement on June 26, the plaintiffs allege that these projections both affirmatively misrepresented Boeing's relationship with its regulator and concealed the material fact that the FAA did not support Muilenburg's stated timelines. Muilenburg's optimism about the return-to-service timeline is couched in terms of the company's close relationship with the FAA—Boeing was "working hand-in-hand" and "day-to-day" with the FAA. In reality, the plaintiffs allege, that relationship was quickly deteriorating such that there was no basis for Muilenburg's estimates. In addition to the Paris Air Show meeting, the plaintiffs describe an August 2019 presentation to regulators, which a frustrated FAA official described as lacking rigor and demonstrating that Boeing was not ready. Compl. ¶ 275. On October 18, then-FAA Administrator Dickson sent Muilenburg a letter demanding Boeing's "immediate explanation" for both the content of the Forkner messages and the reason for Boeing's delay in disclosing them to the FAA. *Id.* at ¶ 281. Then, on November 11, Muilenburg called Administrator Dickson to ask if Boeing could resume MAX deliveries before the FAA certified the plane; Dickson was noncommittal, responding that he would "look into it." *Id*. at ¶ 299. Nevertheless, Boeing released a statement suggesting that the Company could resume deliveries "in December, after certification, when the FAA issues an Airworthiness Directive rescinding the grounding order." ¶ 457. Dickson allegedly told colleagues that this statement made him feel as though he were being manipulated. Compl. ¶ 459.

The defendants say that this statement about resuming deliveries in December is not actionable because Dickson's noncommittal "I'll look into it" is still, in theory, consistent with Boeing's statement that a December certification was "possible," and therefore this is yet another opinion that was merely proven wrong by subsequent events, an alleged fraud-by-hindsight. At

the motion to dismiss stage, however, the Court should not adopt the defendants' preferred interpretation. *See Stransky*, 51 F.3d 1329 (noting that, at the pleading stage, the court could not "resolve the interpretation of the press release against" the plaintiff). Construing the release in a manner consistent with the complaint, it does not express merely a "possibility" that certification could happen in December. Rather, it suggests that Boeing expected certification to happen in December, full stop. And in support of this proposed timeline, Boeing once again assured investors that Boeing was "working closely with the FAA and other regulatory agencies," thus representing that his belief in a December certification was based on some knowledge of the FAA's position. In fact, plaintiffs allege, Muilenburg did have knowledge of the FAA's position, and it contradicted Boeing's.

On December 12, Dickson held a private meeting with Muilenburg at the FAA in which he "chastised Muilenburg for suggesting the plane would be recertified [in 2019]." Compl. ¶ 301. Soon after, the FAA memorialized its rebuke in a note to Congress: "Boeing continues to pursue a return-to-service schedule that is not realistic …." *Id.* The letter went on to explain that the FAA saw these statements, in which Boeing "continue[d] to pursue a return-to-service schedule that is not realistic" as "designed to force the FAA into taking quicker action." ¶ 301. That's not a good posture to be in vis-à-vis regulators and the allegations of the complaint suffice to show that Muilenberg omitted his fraying relationship with the FAA in order to mislead investors and others about Boeing's near-term prospects.

### E.     Competing Inferences of Scienter

The Court must consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 U.S. at 324. Accordingly, the Court

considers Boeing's alternative inference of scienter, and finds that the plaintiff's inference is cogent and compelling as to the statements that have been deemed materially false.

First, Boeing argues that it is unlikely the defendants would have knowingly allowed an unsafe aircraft to continue in operation, risking passenger deaths in order to boost the stock price. Mot. to Dismiss 44-45. As to the first crash and the period immediately afterwards, the Court agrees—Boeing's actions during that period, as alleged in the complaint, raise an inference of negligence at worst. Against the plaintiff's allegations of scienter after the second crash, Boeing argues that "it would make no sense" for the Defendants to give estimates and otherwise make claims that they knew would be soon proven as false "because that would be a short-term fraud certain to be unmasked as soon as those estimated dates arrived." MTD 45.

The Court is not persuaded that the stronger inference is that Muilenburg was deterred from securities fraud because any deception was "certain to be unmasked." Rather, Muilenburg's alleged actions are consistent with him taking a gamble that he could cover up damning information until the MAX was back in operation. Such gambles need not be perfectly rational to support a 10b-5 claim, since the securities laws "forbid foolish frauds along with clever ones." *Asher*, 377 F.3d at 728.

The plaintiffs have alleged that Muilenburg had information that he did not want to publicly disclose: the Forkner messages demonstrating that 1) pilot training materials were incomplete because Forkner had worked to excise any mention of MCAS from the Flight Manual, 2) MCAS's operation had been expanded through the entire speed range of the airplane, and 3) that Forkner had concealed that expansion from the FAA AEG. Muilenburg allegedly made or approved statements that misled investors (or omitted information that would have rendered the statements

60

not misleading) as to the expanded operational scope of MCAS (statement 22), the information provided in pilot training materials (statements 23 and 24), and the integrity of the FAA approval process (statements 34 and 39). While failing to disclose material information revealed in the Forkner messages, he attempted to pressure the FAA into approving the MAX to return to service by offering misleadingly optimistic predictions (statements 42-44, 46-49) while knowing that the acting FAA director held a contrary view about the airplane's prospects.

The Seventh Circuit recognizes that "conceal[ing] bad news in the hope it will be overtaken by good news" fits a familiar pattern of fraud. *Makor*, 513 F.3d at 710. The complaint also describes Boeing's underhanded dealings with the FAA, including its success in securing a Level B training designation for the 737 MAX. ¶¶ 277-81. Finally, the plaintiffs say that Muilenburg's return to service statements were calibrated to pressure the FAA into generating good news by rushing the recertification process, and that the FAA understood his statements that way. ¶¶ 331-32. One of his alleged goals was to "evade scrutiny from regulators." Compl. ¶ 347. Had he succeeded, the MAX's return to operation would have blunted the reputational harm created by the disclosure of the damning internal messages and warnings.

In determining whether a defendant acted with scienter, it is relevant to ask whether they acted with "motive and opportunity to commit the fraud." *Atsi Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Here, the plaintiffs have alleged both in a cogent and compelling manner: According to the complaint, Muilenburg wanted to conceal damning information and believed he could pressure the FAA into acting faster so that the bad news of Boeing's having misled the FAA would be overtaken by the MAX's return to service. And he had opportunity: Muilenburg allegedly had access to senior officials in the federal government,

including the President and FAA officials, and the inference that he believed he had influence over a pliant FAA that had delegated much of its oversight to Boeing is quite cogent. Compl. ¶ 53.

### F.     Loss Causation

A plaintiff claiming securities fraud must allege that the defendant's fraud caused an economic loss. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005). Allegations of loss causation are governed by the notice pleading standard of Rule 8. Fed. Rule Civ. Proc. 8(a); *Dura Pharmaceuticals,* 544 U.S. at 338. A plaintiff must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* at 347 (holding that allegations of an inflated price alone, without some price drop after the truth became known are insufficient to state a 10b-5 claim). While ***proving*** loss causation is often a complex and fact-intensive exercise that typically requires expert testimony, *see Glickenhaus & Co. v. Household Intern.*, 787 F.3d 408, 421 (7th Cir. 2015), ***pleading*** loss causation requires no proof, just plausible allegations that when corrective information became available to the public, that information caused the share price to drop—not because of the information itself, but because the information revealed the falsity of statements by the defendants. "This element of the claim attempts to distinguish cases where the misrepresentation was responsible for the drop in the share's value from those in which market forces are to blame." *Ray v. Citigroup Global Markets*, 482 F.3d 991, 995 (7th Cir. 2007). The stock drop that followed the second crash, for example, is relevant to this suit only if it revealed the falsity of some prior misstatement(s) by the defendants. If the stock dropped merely because airplane crashes are bad news for airplane manufacturers, the loss cannot be recovered by investors through a securities fraud lawsuit.

As discussed above, the plaintiffs have adequately alleged that Muilenburg deceived investors with respect to 1) Boeing's relationship with the FAA and the integrity of the FAA approval process and 2) the prospects for the MAX's recertification and return to service. Therefore, the plaintiffs must allege that when information became available to the market 1) revealing Boeing's misrepresentations to the FAA in securing FAA approval of the MAX and 2) revealing that the FAA took a view contrary to Muilenburg's regarding recertification and return to service, that information caused the stock price to fall, proximately causing the plaintiffs' loss. The corrective disclosures need not, as plaintiffs point out, be a "mirror image" of previous misstatements. Pl.'s Opp. 50; *see In Re Motorola Securities Litigation*, 505 F. Supp. 2d. 501 (N.D. Ill. 2007) (holding that a damaging disclosure that appears "on its face unrelated to any fraudulent scheme" can be a basis for showing loss causation."). Loss causation is more "functional than facial: a disclosure is sufficiently 'corrective' if it dissipates the price inflation that had resulted from a defendant's misrepresentations or omissions." *Id* at 543.

The plaintiffs point to eight dates on which corrective disclosures caused the price of Boeing securities to fall. The defendants argue that the plaintiffs have failed to connect the alleged corrective information to prior false statements. While the Court agrees with the plaintiffs that the corrective disclosures need not be "mirror images" of the alleged false statements (that is, they need not on their face refer to earlier false statements), they must have something to do with the circumstances that prior false statements concealed or misrepresented. Only two of the alleged corrective disclosures—the October 2019 release of the Forkner messages to the public, and the

December 16, 2019 announcement of a production halt for the 737 MAX—can be said to have corrected prior materially false statements.[13]

After the disclosure of the Forkner messages on October 18, 2019, Boeing's stock dropped 6.79% on the 18th, a Friday, and then another 3.76% on the following Monday. FAA administrator Dickson was not pleased to discover that Boeing had known about these messages but had not disclosed them to the regulator. Compl. ¶ 281. By including several analyst statements showing concern about this revelation, the plaintiffs have plausibly alleged that the release of the Forkner messages revealed the falsity of Boeing's previous statements about regulatory compliance and the integrity of the FAA's oversight. *See Washtenaw Cty. Emps.' Sys. V. Walgreen Co.,* 2019 WL 4597518 *8 (N.D. Ill. 2019) (finding loss causation allegations plausible in light of an analyst report supporting plaintiff's proposed causal connection). For example, UBS opined that "poor technical assumptions now have to be combined with a view that there could be evidence to support a perception of and potential action of incomplete disclosure" and that the public rebuke from Dickson was "a clear sign that these new disclosures likely hit a nerve at the regulator." Compl. ¶ 286. Credit Suisse wrote that "the messages may shatter the fragile trust" between Boeing and the

---

[13] Most of the statements above that the Court concluded were not materially false statements would alternatively fail on loss causation grounds as well. For example, statements about the AoA Disagree Alert, in April 2019, were made after the alleged corrective disclosure that occurred on March 21, 2019. Compl. ¶ 462. Moreover, the plaintiffs made no effort to connect specific statements to corrective disclosures. Instead, they argue at a high level of generality that "Defendants' materially false and misleading statements misrepresented the magnitude of the safety deficiencies in the 737 MAX model." *Id.* The plaintiffs, therefore, did not plead a causal connection between alleged misstatements and corrective disclosures. With respect to the Forkner messages and Muilenburg's alleged misrepresentations to the FAA, inferring the causal connection is straightforward. The same cannot be said of the Ethiopian Airlines crash (the plaintiff's first alleged corrective disclosure) which, while certainly a grave disaster and business reversal, does not reveal the falsity of any prior statement, since Boeing never represented that a second crash could not occur or that MCAS would never malfunction again.

FAA. *Id.* at ¶287. The plaintiffs have alleged that several of defendant Muilenburg's and Boeing's statements about the FAA's oversight of the 737 MAX were false because Muilenburg concealed the reality, of which he was aware, that the FAA had been the victim of Forkner's "jedi mind tricks." See Appendix, statements 22, 23, 24, 34 and 39. The plaintiffs have plausibly alleged that the disclosure of Forkner's deceit, followed by a substantial drop in the value of Boeing securities, revealed the falsity of those statements and proximately caused an economic loss.

The plaintiffs have also plausibly alleged that Boeing's December 16, 2019 announcement that it would halt production of the 737 MAX altogether was a corrective disclosure. Compl. ¶ 304. The defendants contend that plaintiffs have not alleged any previous misstatement that this event corrected. MTD at 50; Reply at 30. Plaintiffs' allegations on this front are not detailed, but they have just barely carried out their task at the pleading stage of providing the defendants "with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharmaceuticals,* 544 U.S. at 347. They allege that the December 16 announcement "made it clear that the [FAA] would not act on Boeing's timeline." Compl. ¶ 15. In their opposition brief, the Plaintiffs explain their theory that the decision to shut down production resulted from Dickson reprimanding Muilenburg on December 12 for "pressuring the agency to move faster in approving the MAX's return." Pl.'s Opp. 14; Compl. ¶ 301. The plaintiffs may face an uphill climb in proving that the 4.3 % drop in stock price resulted from the revelation that Boeing's regulator never agreed with its timeline and saw the timeline as part of a pressure campaign—rather than from the fact that a production halt is the sort of business reversal that would scare off investors. But their allegation of loss causation suffices at this stage.

### III.    <u>ORDER</u>

For the foregoing reasons, Defendant's Motion to Dismiss is granted in part and denied in part. The plaintiffs may elect to proceed on their 10(b)(5) claims against defendants Boeing and Muilenburg as to statements 22, 23, 24, 28, 34, 39, 42, 44, 46, 47, 48. Alternatively, the plaintiffs are granted leave to file an amended complaint by October 10, 2022.

Dated: August 23, 2022

John J. Tharp, Jr.
United States District Judge

66

**Appendix**

| No. | Date of Statement | Compl. ¶ | Alleged Misstatement | Category | Remarks |
|---|---|---|---|---|---|
| 1 | 11/6/2018 | 353 | Boeing: "This bulletin directs flight crews to existing procedures to address this condition. . . ." | Information Provided to Pilots | Pre-Class Period |
| 2 | 11/13/2018 | 356 | Muilenburg: "The bottom line here is the 73MAX is safe and safety is a core value for us at Boeing . . . . [T]here were some indications of an inaccurate angle of attack signal that was being sent to the airplane and of course our airplane has the ability to handle that with procedures in place and we've already issued a couple of additional bulletins to our operators and pilots around the world that point them back to existing flight procedures to handle that kind of condition . . . . Again, we ensure that we provide all of the information that is needed to safely fly our airplanes . . . ." | Safety of the 737 MAX | No Scienter |
| 3 | 11/13/2018 | 359 | Muilenburg: (a) "No. There are new systems on the airplane that are designed to take advantage of the capabilities of the airplane and provide control capability in high angle of attack conditions and those systems operate properly[.]" (b) "in certain failure modes if there is an inaccurate angle of attack sensor feeding information to the airplane there is a procedure to handle that." | Design of the 737 MAX | (a) Not False; No Scienter  (b) No Scienter |
| 4 | 11/13/2018 | 359 | Muilenburg: "The airplane is safe. We know how to fly it safely." | Safety of the 737 MAX | Puffery/ Opinion |

1

| No. | Date of Statement | Compl. ¶ | Alleged Misstatement | Category | Remarks |
|---|---|---|---|---|---|
| 5 | 11/13/2018 | 361 | Muilenburg: "[T]hat's part of the training manual. It's an existing procedure. So the bulletin we put out again last weekend . . . pointed to that existing flight procedure." | Information Provided to Pilots | No Scienter |
| 6 | 11/19/2018 | 365 | Muilenburg: "First, the 737 MAX is a safe airplane designed, built and supported by skilled men and women." | Safety of the 737 MAX | Puffery/ Opinion; No Scienter |
| 7 | 11/19/2018 | 365 | Plaintiffs allege Muilenburg "disputed specific reports" regarding MCAS, including "reports in some media outlets that the procedure pilots need to deal with [the MCAS's] uncommanded movements was not in the 737 pilot manual and that pilots were not trained on how to handle it." | Information Provided to Pilots | False; No Scienter |
| 8 | 11/21/2018 | 366 | Boeing: "[w]e are confident in the safety of the 737 MAX" and "re-emphasize[d] existing procedures for these situations." | Safety of the 737 MAX | False; No Scienter |
| 9 | 11/27/2018 | 369 | Boeing: "our assurance that the 737 MAX is as safe as any airplane that has ever flown the skies." | Safety of the 737 MAX | Puffery/ Opinion |
| 10 | 11/29/2018 | 370 | Boeing: customers and passengers "have our assurance that the 737 MAX is as safe as any airplane that has ever flown the skies." | Safety of the 737 MAX | Puffery/ Opinion |
| 11 | 12/7/2018 | 373 | Muilenburg: "Part of what we wanted to accomplish was seamless training and introduction for our customers, so we purposely designed the airplane to behave in the same way. So even though it's a different airplane design, the control laws that fly the airplane are designed to make the airplane behave the same way in the hands of the pilot." | Design of the 737 MAX | Not False; Opinion |

| No. | Date of Statement | Compl. ¶ | Alleged Misstatement | Category | Remarks |
|-----|------|------|------|------|------|
| 12 | 1/30/2019 | 376 | Boeing: "The 737 program delivered 111 MAX airplanes in the fourth quarter, including the first MAX delivery from the China Completion Center, and delivered 256 MAX airplanes in 2018." | Financial and Operational Performance | Not False |
| 13 | 1/30/2019 | 377 | Boeing: "Delivered record 806 commercial airplanes, including 256 737 MAXs," with "111 737 MAX deliveries in 4Q"; "Increased 737 rate to 52/mo"; "Delivered the first 737 MAX from the China Completion Center"; and "737 MAX family surpassed 5,000 net orders." | Financial and Operational Performance | Not False; Safe Harbor |
| 14 | 1/30/2019 | 378 | Muilenburg: "Our customers continue to recognize the superior value proposition of our more fuel-efficient airplanes as reflected in the strong intake of new orders we saw last year. . . . Our current [737 MAX] production rate of 52 per month and planned increase to 57 this year is based on our backlog of more than 4,700 aircraft and a production skyline that is sold out into early next decade. . . . We continue to assess the market upward pressure on the 737 production rate." | Financial and Operational Performance | Not False; Safe Harbor |
| 15 | 1/30/2019 | 379 | Smith: "The ramp-up on the 737 MAX production continues, and we expect 737 MAX to account for approximately 90% of total 737 deliveries in 2019. . . . As we look towards the remainder of the year, our key focus areas are continuing to manage the 737 recovery progress within our factory and throughout our supply chain, including assuring rate readiness for a smooth transition to 57 a month." | Financial and Operational Performance | Safe Harbor |

3

| No. | Date of Statement | Compl. ¶ | Alleged Misstatement | Category | Remarks |
|-----|-------------------|----------|----------------------|----------|---------|
| 16 | 1/30/2019 | 380 | Muilenburg: "We're moving forward on our plans to ramp up to 57 a month during the year…. [W]e're going to be very, very disciplined in that process. Again, we're making good progress, we know exactly what needs to be done." | Financial and Operational Performance | Safe Harbor |
| 17 | 1/30/2019 | 381 | Muilenburg: "[W]e continue to see strong order momentum there. . . . That airplane is creating value in the market for our customers. . . . We talked earlier about ramping up to 57 a month. We are oversold against that profile. We're filling skyline slots way out in 2023. . . . But in terms of the MAX, the demand signals in the marketplace continue to be very strong." | Financial and Operational Performance | Not False |
| 18 | 2/6/2019 | 387 | Smith: "[C]ertification is a big part of any development program, but I'd like to think we get well ahead of that. . . . I wouldn't tell you that we see anything that's been outside the norm of what we've normally been through in our certification of our other aircraft. . . . I think we've talked about . . . getting stable at 52 [planes per month] and getting the confidence and the rate readiness to go up to 57." | Financial and Operational Performance | Safe Harbor |
| 19 | 2/8/2019 | 389 | Boeing: "We continue to plan to increase the production rate to 57 per month in 2019." | Financial and Operational Performance | Safe Harbor |
| 20 | 3/11/2019 | 395 | Boeing: "the 737 MAX is a safe airplane." | Safety of the 737 MAX | Immaterial |

4

| No. | Date of Statement | Compl. ¶ | Alleged Misstatement | Category | Remarks |
|---|---|---|---|---|---|
| 21 | 3/11/2019 | 396 | Boeing: "Safety is a core value for everyone at Boeing and the safety of our airplanes, our customers' passengers and their crews is always our top priority. The 737 MAX is a safe airplane. . . . Boeing has been developing a flight control software enhancement for the 737 MAX, designed to make an already safe aircraft even safer." | Safety of the 737 MAX | Not False |
| 22 | 3/11/2019 | 396 | Boeing: "MCAS does not control the airplane in normal flight; it improves the behavior of the airplane in a non-normal part of the operating envelope." | Design of the 737 MAX | Actionable |
| 23 | 3/11/2019 | 396 | Boeing: "Boeing's 737 MAX Flight Crew Operations Manual (FCOM) already outlines an existing procedure to safely handle the unlikely event of erroneous data coming from an angle of attack (AOA) sensor." | Information Provided to Pilots | Actionable |
| 24 | 3/12/2019 | 397 | Boeing: "we have full confidence in the safety of the 737 MAX" and "we do not have any basis to issue new guidance to operators." | Safety of the 737 MAX | "Confidence in safety" - Immaterial; "No basis to issue guidance" - Actionable |
| 25 | 3/13/2019 | 402 | Muilenburg: "Boeing continues to have full confidence in the safety of the 737 MAX." | Safety of the 737 MAX | Immaterial |

| No. | Date of Statement | Compl. ¶ | Alleged Misstatement | Category | Remarks |
|-----|------|------|------|------|------|
| 26 | 3/13/2019 | 402 | Muilenburg: "Boeing has determined – out of an abundance of caution and in order to reassure the flying public of the aircraft's safety – to recommend to the FAA the temporary suspension of operations of the entire global fleet of 371 737 MAX aircraft. . . . We are supporting this proactive step out of an abundance of caution. Safety is a core value at Boeing for as long as we have been building airplanes; and it always will be. There is no greater priority for our company and our industry. We are doing everything we can to understand the cause of the accidents in partnership with the investigators deploy safety enhancements and help ensure this does not happen again." | Boeing's Progress Toward or the Timing of Return to Service | Grounding Order - Not False; Safety Language - Immaterial |
| 27 | 3/18/2019 | 406 | Muilenburg: "Safety is at the core of who we are at Boeing, and ensuring safe and reliable travel on our airplanes is an enduring value and our absolute commitment to everyone. . . . we're taking actions to fully ensure the safety of the 737 MAX. . . . This is an ongoing and relentless commitment to make safe airplanes even safer." | Safety of the 737 MAX | Not False; Immaterial |
| 28 | 3/22/2019 | 407 | Boeing: "All Boeing airplanes are certified and delivered to the highest levels of safety consistent with industry standards. Airplanes are delivered with a baseline configuration, which includes a standard set of flight deck displays and alerts, crew procedures and training materials that meet industry safety norms. . . ." | Safety of the 737 MAX | Actionable |

6

| No. | Date of Statement | Compl. ¶ | Alleged Misstatement | Category | Remarks |
|-----|-------------------|----------|----------------------|----------|---------|
| 29 | 4/5/2019 | 413 | Muilenburg: "Safety is our responsibility, and we own it." | Safety of the 737 MAX | Immaterial |
| 30 | 4/11/2019 | 415 | Muilenburg: "our top engineers and technical experts have been working tirelessly in collaboration with the Federal Aviation Administration and our customers to finalize and implement a software update that will ensure accidents like these never happen again. The update will make the 737 MAX even safer. . . . [W]e continue to demonstrate that we've identified and met all certification requirements. We look forward to completing near-term milestones on the path to final certification." | Boeing's Progress Toward or the Timing of Return to Service | Safe Harbor |
| 31 | 4/24/2019 | 419 | Boeing: "making steady progress on the path to final certification for a software update for the 737 MAX," and "continues to work closely with global regulators . . . ." | Boeing's Progress Toward or the Timing of Return to Service | Safe Harbor; Immaterial; Opinion |
| 32 | 4/24/2019 | 420 | Boeing: "We continue to work with the FAA and other regulatory agencies worldwide to develop and certify the software update and training program." | Boeing's Progress Toward or the Timing of Return to Service | Not False |
| 33 | 4/25/2019 | 423 | Smith: "[a]s [Muilenburg] noted, we're taking steps amid current challenges to preserve the future value and growth of this important franchise . . . ." | Boeing's Progress Toward or the Timing of Return to Service | Safe Harbor |
| 34 | 4/25/2019 | 425 | Muilenburg: "[T]here is no technical slip or gap here, right? . . . [T]here was no surprise or gap or unknown here or something that somehow slipped through a certification process." | Design of the 737 MAX | Actionable |

| No. | Date of Statement | Compl. ¶ | Alleged Misstatement | Category | Remarks |
|-----|-------------------|----------|----------------------|----------|---------|
| 35 | 4/29/2019 | 432 | Boeing: "[o]n every airplane delivered to our customers, including the MAX, all flight data and information needed to safely operate the aircraft is provided in the flight deck on the flight display." | Information Provided to Pilots | False, but No Scienter as to AOA Disagree Alerts, and No Loss Causation |
| 36 | 5/5/2019 | 433 | Boeing: "the angle of attack indicator" and "the AOA Disagree alert" "have never been considered safety features," and that "the absence of the AoA Disagree alert did not adversely impact airplane safety or operation. . . . [T]he existing functionality was acceptable until the alert and the indicator could be delinked in the next planned display system software update." | Information Provided to Pilots | False, but No Scienter as to AOA Disagree Alerts, and No Loss Causation |
| 37 | 5/29/2019 | 437 | Muilenburg: "We are finishing that dialogue with the FAA, working through a series of questions and answers with them. . . ." | Boeing's Progress Toward or the Timing of Return to Service | Safe Harbor; Apr. 24 Cautionary Language |
| 38 | 5/29/2019 | 438-439 | Muilenburg: "we're making clear and steady progress." | Boeing's Progress Toward or the Timing of Return to Service | Safe Harbor; Apr. 24 Cautionary Language |
| 39 | 5/29/2019 | 439 | Muilenburg: "I have a great deal of confidence in that process [the FAA's delegated authority approval process] and how it works. It's a high-integrity process, and I think it's proven. It's demonstrated results. It's a way for the FAA to exercise its independent role, its regulatory role as it should, but also tap into the deep technical expertise in our company." | Boeing's Progress Toward or the Timing of Return to Service | Actionable (for the same reasons as No. 34) |

8

| No. | Date of Statement | Compl. ¶ | Alleged Misstatement | Category | Remarks |
|---|---|---|---|---|---|
| **40** | 6/5/2019 | 441 | Smith: Boeing was "working with our regulators and ensuring that we're answering all the questions, addressing any concerns that are taking place," and "ensuring that we're meeting the priorities and the needs of the regulator. . . . [T]here's a lot of progress." | Boeing's Progress Toward or the Timing of Return to Service | No Allegations about Smith's Scienter |
| **41** | 6/7/2019 | 442 | Boeing: "[t]he absence of the AOA Disagree alert did not adversely impact airplane safety or operation." | Information Provided to Pilots | No Scienter as to AOA Disagree Alerts |
| **42** | 6/26/2019 | 443 | Muilenburg: Boeing was "still . . . looking at" the end of summer 2019 as the "timeframe" for the 737 MAX returning to operation. | Boeing's Progress Toward or the Timing of Return to Service | Actionable |
| **43** | 7/18/2019 | 448 | Boeing: "has assumed that regulatory approval of 737 MAX return to service in the U.S. and other jurisdictions begins early in the fourth quarter 2019. . . ." | Boeing's Progress Toward or the Timing of Return to Service | Actionable |
| **44** | 7/24/2019 | 451 | Muilenburg: "We will submit our final certification package to the FAA once we have satisfied all of their requirements, which we currently estimate will be in the September time frame." | Boeing's Progress Toward or the Timing of Return to Service | Actionable |
| **45** | 7/24/2019 | 453 | Muilenburg: "We're making good, steady progress" and "we know we're making progress. . . . [W]e have [a] good understanding of each of those workflows. We know the work that has to be done.  We are on it on a daily basis." | Boeing's Progress Toward or the Timing of Return to Service | Not False |

9

| No. | Date of Statement | Compl. ¶ | Alleged Misstatement | Category | Remarks |
|-----|------|------|------|------|------|
| **46** | 7/24/2019 | 454 | Muilenburg: "Boeing's current best estimate … is to . . . return to service in the - early in the fourth Quarter. . . . And we are assessing that on a daily basis and working hand-in-hand with the FAA in this process." | Boeing's Progress Toward or the Timing of Return to Service | Actionable |
| **47** | 9/11/2019 | 456 | Muilenburg: "On the 737 MAX, we're continuing to make solid progress on return to service. We're actively engaged with regulators around the world and day-to-day working with the FAA on return-to-service timing. We are making good, solid progress on the software update to the airplane. . . . And we are still targeting early fourth quarter for a return to service of the 737 MAX." | Boeing's Progress Toward or the Timing of Return to Service | Actionable |
| **48** | 9/11/2019 | 456 | Muilenburg: Boeing had "very active engagement with the FAA and other regulators" on "certification deliverables," and that "all of that work is converging and supporting our return-to-service time line." | Boeing's Progress Toward or the Timing of Return to Service | Actionable |

10

| No. | Date of Statement | Compl. ¶ | Alleged Misstatement | Category | Remarks |
|---|---|---|---|---|---|
| **49** | 11/11/2019 | 457 | Boeing: "working closely with the FAA and other regulatory agencies as we work towards certification and safe return to commercial service, and we are taking the time to answer all of their questions…. Boeing continues to target FAA certification of the MAX flight control software updates during this quarter. Based on this schedule, it is possible that the resumption of MAX deliveries to airline customers could begin in December, after certification, when the FAA issues an Airworthiness Directive rescinding the grounding order." | Boeing's Progress Toward or the Timing of Return to Service | Actionable |