**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| IN RE THE BOEING COMPANY | ) | Case No. 1:19-cv-02394 |
| AIRCRAFT SECURITIES LITIGATION | ) | |
| | ) | |
| | ) | Hon. Nancy L. Maldonado |
| | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**

John F. Hartmann, P.C.
Michael B. Slade
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
(312) 862-2000

Craig S. Primis, P.C. (*pro hac vice*)
Katherine R. Katz (*pro hac vice*)
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 389-5000

*Counsel for Defendants*

Dated: October 16, 2023

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................................. 1

    A.     Boeing's 737 MAX Aircraft ........................................................................... 5

    B.     Boeing's Deferred Prosecution Agreement ................................................... 10

    C.     Plaintiffs' Allegations ................................................................................... 11

    D.     Procedural Background .................................................................................. 12

LEGAL STANDARDS ...................................................................................................... 13

ARGUMENT ...................................................................................................................... 14

I.     THE RE-ALLEGED SAFETY STATEMENTS PREVIOUSLY REJECTED BY JUDGE THARP ARE STILL NOT ACTIONABLE. ...................................................... 16

    A.     The Court Should Not Revisit Judge Tharp's Ruling That The Thirteen Safety Statements Are Immaterial Or Non-Actionable Opinions ........................... 16

    B.     There Is No Basis To Revisit Judge Tharp's Alternative Ruling That The Thirteen Safety Statements Also Fail On Loss Causation Grounds. ..................... 20

II.     THE OTHER RE-ALLEGED STATEMENTS PREVIOUSLY REJECTED BY JUDGE THARP ARE ALSO STILL NOT ACTIONABLE. .......................................... 23

    A.     The Challenged Statements Related To "Existing Procedures" Are Still Not Actionable. .......................................................................................... 23

    B.     The Challenged Statement Related To MCAS Design Is Still Not Actionable. ..................................................................................................... 30

    C.     The Challenged Statements Regarding The MAX's Grounding And Return To Service Are Still Not Actionable. .......................................................... 32

    D.     All Of The Previously Rejected Statements Also Continue To Fail For Lack Of Loss Causation. ................................................................................ 36

III.     THE DECEMBER 16, 2019 ANNOUNCEMENT WAS NOT A CORRECTIVE DISCLOSURE. ................................................................................................................. 38

    A.     Plaintiffs' Own Allegations Demonstrate That Boeing's Inability To Meet Its Projected RTS Timeline Had Been Disclosed To The Market Before December 16, 2019. .......................................................................... 40

B.      Plaintiffs' Own Allegations Demonstrate That The December 16, 2019 Announcement Of A Production Halt Was The Materialization Of A Fully Disclosed Risk. ...................................................................................................... 43

CONCLUSION.................................................................................................................................. 45

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arizona v. California*,
460 U.S. 605 (1983)....................................................................................................15

*In re Baxter Int'l Inc. Sec. Litig.*,
2021 WL 100457 (N.D. Ill. Jan. 12, 2021).........................................................27, 28

*Best v. Shell Oil Co.*,
107 F.3d 544 (7th Cir. 1997) .......................................................................15, 22

*Carvelli v. Ocwen Fin. Corp.*,
934 F.3d 1307 (11th Cir. 2019) ...............................................................................35

*Cause of Action v. Chicago Transit Auth.*,
815 F.3d 267 (7th Cir. 2016) ......................................................................................6

*In re Century Aluminum Co. Sec. Litig.*,
2011 WL 830174 (N.D. Cal. Mar. 3, 2011)............................................................44

*City of Monroe Emps.' Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ..............................................................................18, 19

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
8 F.4th 592 (7th Cir. 2021) ......................................................................................19

*Coll. Ret. Equities Fund v. The Boeing Co.*,
2023 WL 6065260 (N.D. Ill. Sept. 18, 2023) ................................................... *passim*

*Denius v. Dunlap*,
330 F.3d 919 (7th Cir. 2003) ......................................................................................8

*Donohoe v. Consolidated Operating Prod. Corp.*,
30 F.3d 907 (7th Cir. 1994) ......................................................................................15

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)....................................................................................13, 20, 36

*Fin. Acquisition Partners LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006) ....................................................................................30

*Gonzalez v. City of Elgin*,
2007 WL 4246899 (N.D. Ill. Nov. 28, 2007) ...............................................1, 2, 15

*Higginbotham v. Baxter Int'l Inc.*,
   495 F.3d 753 (7th Cir. 2007) ....................................................................................14

*Howe v. Shchekin*,
   238 F. Supp. 3d 1046 (N.D. Ill. 2017) .....................................................................13

*In re Hum. Genome Scis. Inc. Sec. Litig.*,
   933 F. Supp. 2d 751 (D. Md. 2013) ..........................................................................44

*Katyle v. Penn Nat'l Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) ....................................................................................37

*In re KBC Asset Mgmt. N.V.*,
   572 F. App'x 356 (6th Cir. 2014) .............................................................................43

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005)......................................................................................44

*In re Liberty Tax, Inc. Sec. Litig.*,
   435 F. Supp. 3d 457 (E.D.N.Y. 2020) ................................................................41, 42

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) .........................................................................28, 30, 33

*Minch v. City of Chicago*,
   486 F.3d 294 (7th Cir. 2007) ....................................................................................15

*Monroe County Employees' Retirement System v. YPF Sociedad Anonima*,
   15 F. Supp. 3d 336 (S.D.N.Y. 2014)....................................................................44, 45

*In re New Energy Sys. Sec. Litig.*,
   66 F. Supp. 3d 401 (S.D.N.Y. 2014)..........................................................4, 39, 41, 44

*Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*,
   575 U.S. 175 (2015).................................................................................................19

*In re Omnicom Grp. Inc. Sec. Litig.*,
   541 F. Supp. 2d 546 (S.D.N.Y. 2008).......................................................................43

*Ray v. Citigroup Glob. Mkts., Inc.*,
   482 F.3d 991 (7th Cir. 2007) ..............................................................................14, 21

*City of Livonia Emps.' Ret. Sys. v. The Boeing Co.*,
   2010 WL 2169491 (N.D. Ill. May 26, 2010) ............................................................29

*Rosenblum v. Travelbybus.com Ltd.*,
   299 F.3d 657 (7th Cir. 2002) ......................................................................................6

iv

*Rosenzweig v. Azurix Corp.*,
   332 F.3d 854 (5th Cir. 2003) ...................................................................................................35

*Schmude v. Sheahan*,
   312 F. Supp. 2d 1047 (N.D. Ill. 2004) ....................................................................................42

*Searls v. Glasser*,
   64 F.3d 1061 (7th Cir. 1995) ...........................................................................................14, 25

*Singh v. Cigna Corp.*,
   918 F.3d 57 (2d Cir. 2019)......................................................................................................17

*Tellabs v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)....................................................................................................13, 28, 29

*In re The Boeing Co. Aircraft Sec. Litig.*,
   2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ...........................................................................1

*Toulon v. Cont. Cas. Co.*,
   877 F.3d 725 (7th Cir. 2017) ...................................................................................................13

*Tricontinental Indus., Ltd. v. PwC*,
   475 F.3d 824 (7th Cir. 2007) .............................................................................................14, 21

*United States v. Saporito*,
   2011 WL 2473332 (N.D. Ill. June 22, 2011) ..........................................................................15

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
   987 F.2d 429 (7th Cir. 1993) ...............................................................................................6, 42

*West Palm Beach Firefighters v. Conagra Brands, Inc.*,
   495 F. Supp. 3d 622 (N.D. Ill. 2020) ......................................................................................31

**Statutes**

15 U.S.C. § 78u-4(b)(2)(A).......................................................................................................13

49 U.S.C. § 44701 .......................................................................................................................7

**Rules**

Fed. R. Civ. Pro. 12(b)(6) ..........................................................................................................15

**INTRODUCTION**

In granting in part Defendants' motion to dismiss, Judge Tharp correctly held that Plaintiffs failed to state a claim for securities fraud for the majority of the challenged statements. *In re The Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058 (N.D. Ill. Aug. 23, 2022), Dkt. No. 191 ("8/23/22 Order"). Since Judge Tharp's decision, another court in this District also concluded that many of the same statements are not actionable under the securities laws, based on very similar reasoning. *Coll. Ret. Equities Fund v. The Boeing Co.*, 2023 WL 6065260 (N.D. Ill. Sept. 18, 2023) (Shah, J.). Both Judge Tharp and Judge Shah squarely rejected many of the challenged statements as a matter of law such that no amount of new factual allegations can alter the outcome. And they rejected the others for failure to plead scienter under the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"). Both Judge Tharp and Judge Shah also rejected all but two of the alleged "corrective disclosures" that, according to the complaints, supposedly "revealed the falsity" of the alleged misstatements. The only alleged corrective disclosures that survived dismissal are: (i) Boeing's December 16, 2019 announcement of a 737 MAX production halt, which purportedly corrected Boeing's earlier estimated timelines for the 737 MAX's return to service ("RTS"); and (ii) the October 18, 2019 publication of certain instant messages involving 737 Chief Technical Pilot Mark Forkner, which purportedly "revealed the falsity of Boeing's previous statements about regulatory compliance and the integrity of the FAA's oversight." 8/23/22 Order at 64-65.

More than a year after Judge Tharp's ruling, Plaintiffs' Amended Complaint seeks to revive their claims for securities fraud based on the same alleged misstatements that Judge Tharp (and Judge Shah) properly rejected as non-actionable under the securities laws. To be sure, a plaintiff may amend a complaint "in order to make warranted corrections in the allegations that support the plaintiff[']s case." *Gonzalez v. City of Elgin*, 2007 WL 4246899, at *3 (N.D. Ill. Nov. 28, 2007).

But a plaintiff cannot use the amendment process as "a means [to] get around prior rulings in an action and rehash resolved legal issues." *Id.* That is precisely what the Amended Complaint attempts to do here. And although Judge Tharp previously permitted Plaintiffs to proceed on misstatements based on the 737 MAX's return to service, those misstatements should now be held not actionable. For the reasons explained below, this Court should deny Plaintiffs' attempt to resuscitate claims based on the same purported misstatements that Judge Tharp already rejected, as well as certain return-to-service statements he improperly sustained.[1]

*First*, the Court should not disturb Judge Tharp's holding that all thirteen of Boeing's alleged misstatements related to the "safety" of the 737 MAX are not actionable as a matter of law.[2] Those statements fall into two related categories: (i) statements expressing Defendants' confidence that the 737 MAX is "safe," and (ii) statements emphasizing that safety is a "core value" at Boeing. By their very nature, such general statements of opinion and corporate values cannot support a securities fraud claim. Judge Tharp thus properly dismissed Plaintiffs' claims based on all thirteen safety-related statements as a matter of law, holding that the statements were "immaterial to investors" and/or non-actionable opinions. 8/23/22 Order at 13 n.4. As Judge Tharp correctly explained, the challenged statements are "just th[e] kind of rosy affirmation that reasonable investors know are meaningless to the total mix of information." *Id.* at 42–43. As a separate basis for dismissal, Judge Tharp further held that Plaintiffs' claims "alternatively fail on loss causation grounds as well" because Plaintiffs "made no effort to connect specific statements to corrective disclosures." *Id.* at 64 n.13. Although the Amended Complaint re-alleges the same

---

[1] Throughout this memorandum, Boeing refers to Plaintiffs' alleged misstatements using the Statement Nos. assigned to them in the Appendix to the Court's August 23, 2022 Order. Boeing has also attached its own Appendix to this filing setting forth the statements subject to this motion to dismiss.

[2] The thirteen "safety" statements are identified in the Appendix as Statement Nos. 2(a), 4, 6, 8(a), 9, 10, 20, 21, 24(a), 25, 26(b), 27, and 29.

thirteen safety statements, Plaintiffs offer nothing new that would make those statements actionable.  Nor could they, as Plaintiffs' claims based on those statements were dismissed due to the non-actionable nature of the statements themselves.  The Court should again dismiss Plaintiffs' claims based on the thirteen safety statements for the same reasons identified by Judge Tharp.

*Second*, the Court likewise should reject Plaintiffs' attempt to revive their claims based on other statements regarding:  (i) "existing procedures" for responding to an erroneous MCAS activation, (ii) the design of MCAS, and (iii) the 737 MAX's grounding and later return to service.[3] As with the safety statements, Judge Tharp already rejected Plaintiffs' claims based on these statements—many as a matter of law—and nothing in the Amended Complaint changes that outcome.  As before, Plaintiffs come nowhere close to alleging that the speakers of the "existing procedures" statements knew at the time of their statements that existing procedures might not fully address an erroneous MCAS activation.  As before, Plaintiffs also fail to allege that the purported misstatement regarding MCAS's design would have been material to investors in light of pre-existing information about MCAS already available at the time that statement was made. As before, Plaintiffs do not allege that forward-looking statements regarding the 737 MAX's return to service made at the time of the grounding and shortly thereafter are actionable.  And as before, Plaintiffs make no effort to connect the specific statements they claim are fraudulent to specific corrective disclosures.

---

[3] The statements related to "existing procedures" are Statement Nos. 1, New-1, 2(b), 3(b), 5, 7, and 8(b).  The challenged statement related to MCAS design is Statement No. 11.  And the challenged statements related to the grounding and return to service include Statement Nos. 26(a), 30, and 40.

***Third***, the Court should dismiss Plaintiffs' claims based on certain statements about when the 737 MAX was expected to return to service because Plaintiffs fail to plead loss causation.[4] The loss causation element of a § 10(b) claim requires Plaintiffs to plead a "corrective disclosure" connected to each alleged misstatement through "plausible allegations that when corrective information became available to the public, that information caused the share price to drop—not because of the information itself, but because the information revealed the falsity of statements by the defendants." 8/23/22 Order at 62.

Plaintiffs fail to plead that the December 16, 2019 announcement of a 737 MAX production halt corrected the prior statements predicting that the 737 MAX would return to service in the fourth quarter of 2019 or sooner. Judge Tharp concluded that Plaintiffs had "just barely carried out their task at the pleading stage" based on their "not detailed" allegations that the December 16, 2019 announcement "made it clear that the [FAA] would not act on Boeing's timeline" for return to service. *Id.* at 65. But that conclusion was based on a straightforward error that merits correction. In sustaining the production-halt announcement as a corrective disclosure, Judge Tharp did not consider that Plaintiffs' own pleadings make absolutely clear that the December 16, 2019 announcement disclosed no ***new*** information to the market about the RTS timeline. In fact, Plaintiffs' own allegations show beyond any dispute that the market knew on December 12, 2019—four days earlier—that Boeing would not meet its stated goal of returning the 737 MAX to service in 2019. Like Plaintiffs' initial Complaint, the Amended Complaint alleges that the *Seattle Times* published an article on December 12, 2019, titled "As the 737 MAX's return slips out to

---

[4] The alleged misstatements related to RTS that Judge Tharp previously sustained are Statement Nos. 42, 43, 44, 46, 47, 48, and 49, and the alleged misstatements related to RTS that Judge Tharp previously dismissed (on grounds other than loss causation) are Statement Nos. 26, 30, and 40. Defendants are not moving to dismiss Statement Nos. 34 and 39, which also concern the 737 MAX's RTS.

4

mid-February, FAA boss tells Boeing CEO to back off predictions." Dkt. No. 278 ("Am. Compl.") ¶ 347. That article leaves no doubt that the 737 MAX would *not* be returning to service in 2019 and that the RTS timeline instead had been pushed out to mid-February 2020 at the earliest.[5] Simply stated, Plaintiffs' original Complaint and Amended Complaint establish that the December 16, 2019 announcement did not correct Boeing's earlier RTS statements.

For these reasons and those that follow, the Court should grant Boeing's motion to dismiss and hold that Statement Nos. 1, New-1, 2, 3(b), 4, 5, 6, 7, 8, 9, 10, 11, 20, 21, 24(a), 25, 26, 27, 29, 30, 40, 42, 43, 44, 46, 47, 48, and 49 are not actionable.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     Boeing's 737 MAX Aircraft

In August 2011, Boeing announced the launch of the 737 MAX program. Am. Compl. ¶ 60. Boeing spent almost six years, from 2011 through 2017, developing, testing, and certifying the 737 MAX. *See id.* ¶¶ 61, 146. As Plaintiffs themselves acknowledge, the 737 MAX went through "thousands of hours of testing." *Id.* ¶ 240.

Early tests showed that the 737 MAX's larger engines and their position on the plane's wings created a tendency for the plane's nose to pitch up under conditions not expected to occur in commercial air travel involving high speed and a high "angle of attack." *Id.* ¶ 77. To address this potential issue, Boeing added a software function, MCAS, to the aircraft's flight control systems to automatically adjust the plane's nose down in those circumstances. *Id.* ¶¶ 83–85. Later, in 2016, during flight testing of the 737 MAX, the plane "wasn't handling well when nearing stalls

---

[5] The December 16, 2019 announcement of a production halt was the materialization of a risk that the Amended Complaint alleges Boeing fully disclosed to the market on July 24, 2019, namely, that "it might entirely *halt production* of the 737 MAX if the grounding continued." Am. Compl. ¶ 317.

at low speeds." *Id.* ¶ 147. As a result, Boeing modified the design of MCAS to adjust the nose of the plane down when it encountered high angles of attack at low speeds. *Id.*

On October 29, 2018, Lion Air Flight 610 crashed shortly after takeoff. *Id.* ¶ 197. During the flight, MCAS activated after receiving inaccurate information from one of the plane's angle of attack ("AOA") sensors, which incorrectly indicated the plane's nose was too high. *Id.*

As Plaintiffs allege, "immediately after the Lion Air crash," Boeing met with and "explained the details of MCAS" to FAA officials. *Id*. ¶ 230. Boeing then issued a bulletin to flight crews on November 6, 2018, explaining that "[t]he Indonesian National Transportation Safety Committee has indicated that Lion Air flight 610 experienced erroneous AOA data." *Id.* ¶ 442. The bulletin described the flight conditions that could result from erroneous AOA data, including that aircraft could experience "repetitive cycles of uncommanded nose down stabilizer"—that is, repeated MCAS activation. Ex. 1, November 6, 2018 Boeing Flight Operations Manual Bulletin; *see* Am. Compl. ¶ 442 (quoting Ex. 1).[6] The bulletin identified the specific procedure pilots should follow to counteract those conditions: the "Runaway Stabilizer Non-Normal Checklist" or "NNC" procedure in existing pilot training manuals, which pilots were required to commit to memory. Ex. 1, November 6, 2018 Boeing Flight Operations Manual Bulletin. The bulletin directed pilots to use that checklist, emphasizing that turning off the stab trim cutout switches was the proper procedure to "deactivate[]" the "stabilizer trim system":

---

[6] The Court may consider in full the bulletin and other documents expressly referenced in the Amended Complaint under the incorporation-by-reference doctrine. *See Coll. Ret. Equities Fund*, 2023 WL 6065260, at *3 n.1 (citing *Rosenblum v. Travelbybus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002)); *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."). For other documents not explicitly referenced in the Amended Complaint, the Court can take judicial notice and consider them on this motion to dismiss not for their truth, but for the fact that the information in them was public. *See infra* at 42, 44 n.19; *see also Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 277 n.13 (7th Cir. 2016) (taking judicial notice of matters of public record).

6

> Boeing would like to call attention to an AOA failure condition that can occur during manual flight only . . . . In the event of erroneous AOA data, the pitch trim system can trim the stabilizer nose down in increments lasting up to 10 seconds. The nose down stabilizer trim movement can be stopped and reversed with the use of the electric stabilizer trim switches but may restart 5 seconds after the electric stabilizer trim switches are released. Repetitive cycles of uncommanded nose down stabilizer continue to occur unless the stabilizer trim system is deactivated through use of both STAB TRIM CUTOUT switches in accordance with the existing procedures in the Runaway Stabilizer NNC. It is possible for the stabilizer to reach the nose down limit unless the system inputs are counteracted completely by pilot trim inputs and both STAB TRIM CUTOUT switches are moved to CUTOUT.

*Id.*

After describing these flight conditions, the bulletin instructed pilots to counteract them by performing the Runaway Stabilizer Non-Normal Checklist, moving both stab trim cutout switches to cutout and keeping them there for the rest of the flight:

> In the event an uncommanded nose down stabilizer trim is experienced on the 737-8/-9, in conjunction with one or more of the above indications or effects, do the Runaway Stabilizer NNC ensuring that the STAB TRIM CUTOUT switches are set to CUTOUT and stay in the CUTOUT position for the remainder of the flight.

*Id.*[7] Boeing's bulletin was consistent with the conclusions of its Safety Review Board, which Plaintiffs allege had concluded by November 6 that "Boeing should issue 'a Flight Operations Tech Bulletin (FOTB) to advise Flight Crews of the proper response to unreliable airspeed, IAS disagree, AoA disagree, speed trim, and runaway stabilizer.'" Am. Compl. ¶ 216.

The next day, November 7, 2018, the FAA issued an Emergency Airworthiness Directive requiring that the 737 MAX flight manual include the instructions in Boeing's bulletin. Ex. 2, November 7, 2018 FAA Emergency Airworthiness Directive.[8] Like Boeing's bulletin, the FAA's

---

[7] The bulletin also cautioned pilots that, "[i]nitially, higher control forces may be needed to overcome any stabilizer nose down trim already applied." Am. Compl. ¶ 442. It instructed that "[e]lectric stabilizer trim can be used to neutralize control column pitch forces before moving the STAB TRIM CUTOUT switches to CUTOUT" and that "[m]anual stabilizer trim can be used after the STAB TRIM CUTOUT switches are moved to CUTOUT." *Id.*

[8] The FAA issued that directive under its statutory rulemaking authority. Ex. 2, November 7, 2018 FAA Emergency Airworthiness Directive at 1; *see* 49 U.S.C. § 44701. The Court should take judicial notice of it and other official

7

Directive advised that "if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer." *Id.* at 1. Prompted by the "analysis performed by [Boeing]," the FAA determined that this was a condition that, "if not addressed, could cause the flight crew to have difficulty controlling the airplane, and lead to excessive nose-down attitude, significant altitude loss, and possible impact with terrain." *Id.* Consistent with Boeing's bulletin, the FAA described the flight conditions that could result from erroneous AOA data, directed pilots to "do the existing AFM Runaway Stabilizer procedure," and made clear that pilots could counteract uncommanded nose down stabilizer trim by executing that procedure and "ensuring that the STAB TRIM CUTOUT switches are set to CUTOUT and stay in the CUTOUT position for the remainder of the flight." *Id.* at 4.

As Plaintiffs allege, the Lion Air plane's AOA sensor had also malfunctioned on the flight immediately before Flight 610, erroneously triggering MCAS, but the pilots of that earlier flight had "simply switch[ed] off the flight-control system"—part of the same existing procedure that Boeing's November 6 bulletin and the FAA's November 7 Directive later instructed pilots to follow—and successfully controlled the plane. Am. Compl. ¶ 245. Plaintiffs themselves also note that the Indonesian regulator's preliminary report about the Lion Air crash concluded that the pilots on Flight 610, the flight that crashed, "did not do what the pilots the day before had done—and what Boeing indicated was the appropriate counter measure." *Id.*

On November 10, 2018, Boeing sent a message to all 737 MAX operators explaining that "[a] pitch augmentation system function called 'Maneuvering Characteristics Augmentation

_____

documents cited here. *See Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (courts shall take judicial notice of information published by federal agencies).

System' (MCAS) is implemented on the 737-8, -9 (MAX) to enhance pitch characteristics with flaps UP and at elevated angles of attack." Ex. 3, November 28, 2018 Preliminary Accident Investigation Report at 53. And on November 12, 2018, the *Seattle Times* published an article stating that pilots had not been told "about a key change to an automatic system that's been linked to the fatal crash of a Lion Air jet last month." Ex. 4, November 12, 2018 *Seattle Times* Article at 2. The article reported that this change was the addition of MCAS, which "automatically pushes the nose of the aircraft down when a bladelike sensor [the AOA sensor] that sticks out of the fuselage indicates that the nose is pitched up and putting the plane in danger of a stall." *Id*.

On March 10, 2019, Ethiopian Airlines Flight 302 crashed. Am. Compl. ¶ 269. As with the Lion Air accident, MCAS activated during flight based on erroneous data from an AOA sensor and forced the nose of the plane down. *Id*. ¶¶ 143, 270. On March 11, 2019, Boeing announced that it was developing an MCAS software update. *Id*. ¶ 279. On March 13, 2019, the FAA issued an order grounding the 737 MAX fleet. *Id*. ¶ 286.

On April 5, 2019, Boeing's then-CEO, Defendant Dennis Muilenburg, noted that both accidents "were caused by a chain of events, with a common chain link being erroneous activation of the aircraft's MCAS function." *Id*. ¶ 490. He stated that Boeing was taking steps to eliminate the risk of an erroneous MCAS activation. *Id*. Periodically between June and November 2019, Muilenburg provided estimates of when Boeing believed the grounding order would be lifted and the 737 MAX would return to service. *Id*. ¶¶ 507–20. The earliest such estimate was "the end of summer 2019." *Id*. ¶ 507. As the certification process proceeded, however, Boeing continued to revise its estimate, first to early fourth quarter 2019 and then to the end of 2019. *Id*. ¶¶ 512, 520. Throughout this period, Boeing repeatedly cautioned that the timetable for certification and the

plane's return to service was uncertain and contingent on the FAA's approval. Ex. 5, Boeing's April 24, 2019 SEC Form 10-Q at 50; Am. Compl. ¶ 312.

Boeing actively engaged with the FAA throughout the return-to-service process. After a meeting between Muilenburg and then-FAA Administrator Steve Dickson on December 12, 2019, Boeing announced that same day, as reported in the *Seattle Times*, that "[w]e will work with the FAA to support their requirements and their timeline as we work to safely return the Max to service *in 2020*." Ex. 6, December 12, 2019 *Seattle Times* Article (emphasis added); *see* Am. Compl. ¶ 347 (referencing the same *Seattle Times* article). The Amended Complaint itself quotes the December 12, 2019 *Seattle Times* article's reporting that the 737 MAX's "return slips out to mid-February" 2020 and that the FAA Administrator had "chastised Muilenburg for suggesting the plane would be recertified [in 2019]." Am. Compl. ¶ 347 (quoting Ex. 6); *see also, e.g.*, Ex. 7, December 11, 2019 *Seattle Times* Article (quoting FAA Administrator as saying "[i]f you do the math, [FAA approval is] going to extend into 2020"). Boeing announced four days later on December 16, 2019 that it was halting production of the 737 MAX. *Id*. ¶ 348. Boeing had previously warned the market that "it might entirely *halt production* of the 737 MAX if the grounding continued." *Id*. ¶ 317 (emphasis added).

### B. Boeing's Deferred Prosecution Agreement

In January 2021, Boeing entered into a deferred prosecution agreement ("DPA") with the Department of Justice acknowledging that, between November 2016 and December 2018, two technical pilots failed to disclose certain information related to MCAS to the FAA's Aircraft Evaluation Group ("AEG"), the FAA group responsible for determining the required level of pilot training. Ex. 8, January 7, 2021 DPA. The DPA stated that this misconduct "was neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management," and that "others in the Company disclosed MCAS's expanded operational scope to

10

different FAA personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards." *Id.* ¶ 4h.

### C. Plaintiffs' Allegations

In the Amended Complaint, Plaintiffs allege that Defendants Boeing, Muilenburg, and Boeing's then-CFO Gregory Smith made false public statements regarding the 737 MAX in violation of § 10(b) of the Securities Exchange Act of 1934. Am. Compl. ¶ 539. [9] Four categories of previously dismissed misstatements are at issue in this motion:

- *Safety Statements:* Defendants' statements in late 2018 and early 2019 that the 737 MAX was "safe" and that safety is a "core value" at Boeing;

- *Existing Procedures Statements:* Defendants' statements in November 2018 that erroneous MCAS activations could be addressed by pilots using specific "existing procedures" identified in Boeing's November 6 bulletin;

- *MCAS Design Statement:* Defendants' statement in December 2018 that the 737 MAX was "designed" to "behave the same way in the hands of the pilot" as prior generations of the 737; and

- *RTS and Certification Statements:* Defendants' statements from 2019 about the grounding of the 737 MAX and the plane's projected RTS timeline.

In attempting to add statements back into the case through their Amended Complaint, Plaintiffs seek to more than double the number of alleged misstatements at issue and to expand substantially the length of the proposed class period. Following Judge Tharp's ruling, the proposed class period begins on March 11, 2019. Plaintiffs now seek to bring the start date for the class period back to November 7, 2018.

---

[9] The Court previously dismissed Smith from this suit because Plaintiffs' initial Complaint contained "no particularized allegations regarding any deceptive intent on his part." 8/23/22 Order at 14. That remains true of Plaintiffs' Amended Complaint.

11

### D.     Procedural Background

On February 14, 2020, Plaintiffs filed their initial class action Complaint. Dkt. No. 144 ("Compl."). Boeing moved to dismiss that complaint on June 30, 2020. Dkt. No. 190. On August 23, 2022, the Court granted in part and denied in part Boeing's motion to dismiss, holding that 37 of the 49 statements challenged in the Complaint were not actionable, including the statements Plaintiffs now seek to revive—Statement Nos. 1, 2, 3(b), 4, 5, 6, 7, 8, 9, 10, 11, 20, 21, 24(a), 25, 26, 27, 29, 30, and 40. *See* 8/23/22 Order. In so ruling, the Court explained that these purported misstatements either failed as matter of law or were inadequately pleaded for a number of reasons, including that some of the statements were not false, some were immaterial, some were protected by the PLRSA's safe harbor, and some lacked the requisite allegations of scienter. The Court further held that "[m]ost of the statements . . . that the Court concluded were not materially false statements would alternatively fail on loss causation grounds as well" because Plaintiffs "did not plead a causal connection between alleged misstatements and corrective disclosures." *Id*. at 64 n.13. And Judge Tharp rejected six of Plaintiffs' eight alleged corrective disclosures because those alleged corrective disclosures did not "correct[] prior materially false statements." *Id.*

The Court's August 23, 2022 Order permitted the Plaintiffs to proceed on their claims against Boeing and Muilenburg based on Statements Nos. 22, 23, 24, 28, 34, 39, 42, 43, 44, 46, 47, 48, and 49. 8/23/22 Order at 66; *see id.*, Appendix (holding Statement No. 49 not actionable). Alternatively, the Court granted Plaintiffs leave to file an amended complaint by October 10, 2022. *Id.* at 66. Plaintiffs elected not to file an amended complaint by the original deadline in Judge Tharp's Order. Rather, they chose to take discovery on the thirteen statements and two corrective disclosures that had survived Defendants' motion to dismiss. They did not seek leave to amend their Complaint until nearly a year later on the deadline for amendments in the Scheduling Order.

The Amended Complaint seeks to revive Plaintiffs' claims based on statements that Judge Tharp already rejected. This motion thus seeks to dismiss once again any claims based on Statement Nos. 1, 2, 3(b), 4, 5, 6, 7, 8, 9, 10, 11, 20, 21, 24(a), 25, 26, 27, 29, 30, 40, and New-1.[10] Boeing also seeks to dismiss Plaintiffs' claims based on Statements Nos. 42, 43, 44, 46, 47, 48, and 49 given Plaintiffs' failure to plead that the December 16, 2019 production halt announcement was a corrective disclosure.

## LEGAL STANDARDS

The PSLRA "goes beyond Rule 9(b), imposing even more demanding requirements" on securities fraud claims. *Howe v. Shchekin*, 238 F. Supp. 3d 1046, 1051 (N.D. Ill. 2017). To state a claim for securities fraud under the PSLRA, a plaintiff must allege: (1) a material misrepresentation, (2) scienter, (3) a connection with the purchase or sale of a security, (4) reliance on the misrepresentation, (5) economic loss, and (6) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Federal Rule of Civil Procedure 9(b) and the PSLRA together heighten the pleading standards for such claims. *Tellabs v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). Rule 9(b) requires a plaintiff to plead "the who, what, when, where, and how" of the alleged fraud. *Toulon v. Cont. Cas. Co.,* 877 F.3d 725, 734 (7th Cir. 2017). And under the PSLRA, a plaintiff must identify each alleged misstatement and allege with particularity why it was misleading. 15 U.S.C. § 78u-4(b)(2)(A).

The PSLRA also requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-

___

[10] In addition to statements Judge Tharp already rejected, this motion also seeks dismissal of one new statement added to the Amended Complaint. Statement No. "New-1" is a statement Boeing made summarizing the bulletin that was labeled Statement No. 1 in Judge Tharp's prior decision. *See* Am. Compl. ¶ 442 (bulletin, previously identified as Statement 1); *id.* ¶ 443 (summary of bulletin, herein identified as Statement New-1). Statement No. New-1 is substantively the same as Statement No. 1, but was issued the following day.

4(b)(2)(A). This is a heavy pleading burden. The required state of mind for a § 10(b) claim is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). Recklessness, for these purposes, means conduct "so severe that it is the functional equivalent of intent." *Searls v. Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995). The scienter inquiry requires "look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees." *Id.* at 708. As Judge Tharp recognized, "the PSLRA does not permit scienter to be imputed among individual defendants" or different corporate employees. 8/23/22 Order at 14.

To plead loss causation, the PSLRA requires that the complaint "allege that it was the very facts about which the defendant lied which caused its injuries." *Tricontinental Indus., Ltd. v. PwC*, 475 F.3d 824, 842 (7th Cir. 2007). "This element of the claim attempts to distinguish cases where the misrepresentation was responsible for the drop in the share's value from those in which market forces are to blame." *Ray v. Citigroup Glob. Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007). As Judge Tharp explained, the loss causation element requires Plaintiffs to plead a "corrective disclosure" connected to each alleged misstatement through "plausible allegations that when corrective information became available to the public, that information caused the share price to drop—not because of the information itself, but because the information revealed the falsity of statements by the defendants." 8/23/22 Order at 62.

## ARGUMENT

The Court should reject Plaintiffs' efforts to re-litigate the viability of the statements that Judge Tharp previously dismissed from the case. "[W]hen a court decides upon a rule of law, that

14

decision should continue to govern the same issues in subsequent stages in the same case." *Donohoe v. Consolidated Operating Prod. Corp.*, 30 F.3d 907, 910 (7th Cir. 1994) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)). A court should not change its ruling on a previously decided issue unless there is a compelling reason such as when the prior ruling was "manifestly erroneous," *United States v. Saporito*, 2011 WL 2473332, at *4 (N.D. Ill. June 22, 2011), or the product of "clear error," *Best v. Shell Oil Co.*, 107 F.3d 544, 546 (7th Cir. 1997). Fidelity to the law of the case is just as important, if not more so, when one judge is asked to reconsider the ruling of a different judge. "In situations where a different member of the same court re-examines a prior ruling, the law of the case doctrine … reflects the rightful expectation of litigants that a change of judges midway through a case will not mean going back to square one." *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007) (internal quotation marks omitted). These well-settled principles apply to rulings on a second motion to dismiss under Rule 12(b)(6) following an amendment to the complaint. *See Gonzalez*, 2007 WL 4246899, at *3 (granting leave to amend does not permit plaintiffs to evade "prior rulings").

Judge Tharp correctly rejected Plaintiffs' claims based on the same statements Plaintiffs now try to bring back into the case, and his reasoning rejecting those statements is free from any "clear error" warranting reexamination. This Court therefore should once again dismiss Plaintiffs' claims based on the same statements that Judge Tharp already held are not actionable. In addition, the Court should take this opportunity to correct one clear error in Judge Tharp's lengthy ruling: Plaintiffs themselves plead facts that defeat their contention that the December 16, 2019 announcement of a 737 MAX production halt was a corrective disclosure for the prior statements predicting that the MAX would return to service in 2019.

15

**I.     THE RE-ALLEGED SAFETY STATEMENTS PREVIOUSLY REJECTED BY JUDGE THARP ARE STILL NOT ACTIONABLE.**

The Court should deny Plaintiffs' attempt to revive their claims based on the thirteen safety statements that Judge Tharp already held are not actionable.  *See* 8/23/22 Order, Appendix (dismissing Statement Nos. 2(a), 4, 6, 8(a), 9, 10, 20, 21, 24(a), 25, 26(b), 27, and 29).[11]  As Judge Tharp correctly concluded, Plaintiffs' claims based on these statements fail because the statements either were "immaterial to investors," 8/23/22 Order at 13 n.4, or were non-actionable opinions, *id.* at 13 n.4, 20–21.  Plaintiffs' claims based on those statements "alternatively fail on loss causation grounds as well." *Id.* at 64 n.13.  The Court should not reconsider those well-reasoned legal conclusions.  The Amended Complaint cannot and does not cure the deficiencies Judge Tharp identified with respect to those claims based on the nature of the statements themselves.  Nor does the Amended Complaint remedy Plaintiffs' failure to plead loss causation for those statements.

**A.     The Court Should Not Revisit Judge Tharp's Ruling That The Thirteen Safety Statements Are Immaterial Or Non-Actionable Opinions.**

There is no basis for the Court to reconsider Judge Tharp's holding that the thirteen safety statements are immaterial or non-actionable opinions.  The challenged safety statements fall into two categories:  (i) statements that the 737 MAX is "safe" (Statement Nos. 2(a), 4, 6, 8(a), 9, 10, 20, 21, 24(a), and 25); and (ii) statements that safety is a "core value" at Boeing or similar value-based statements (Statement Nos. 2(a), 21, 26(b), 27, and 29).  *See*, *e.g.*, Am. Compl. ¶ 472 (Statement No. 9 in category (i)—Boeing: "our assurance that the 737 MAX is as safe as any airplane that has ever flown the skies."); *id.* ¶ 490 (Statement No. 29 in category (ii)—Muilenburg: "Safety is our responsibility, and we own it.").  Some statements fall into both categories.  For

---

[11]  Statement Nos. 2, 8, 24, and 26 each contains two discrete statements that are addressed separately in this memorandum as part (a) and part (b), *e.g.*, Statement 2(a) and Statement 2(b).

16

example, in Statement No. 2(a), Muilenburg stated: "The bottom line here is ***the 737 MAX is safe and safety is a core value*** for us at Boeing." *Id*. ¶ 447 (emphasis modified). All thirteen statements use substantially similar language in addressing the safety of the 737 MAX and Boeing's "core value" of safety. They fail on at least two separate grounds.

***First***, Judge Tharp correctly concluded that Defendants' statements "reassuring the public of the airplane's safety" are "immaterial puffery and opinion" and, as a result, "nonactionable as a matter of law." 8/23/22 Order at 20–21 & n.7 (discussing Statement Nos. 2(a), 4, 6, 9, and 10); *see also id.* at 35 (finding Statement Nos. 20, 25, 27, and 29 "not . . . actionable because they were immaterial"), 40 (finding Statement No. 24(a) "not actionable"), 41–42 (holding that Statement No. 26(b) "do[es] not suffice as the basis for a securities claim" and that Plaintiffs failed to plead this statement "was material to investors" or even false). At a minimum, Judge Tharp's ruling on these statements is not clearly wrong such that this Court should reconsider it. In fact, in another securities action against Boeing in this District, Judge Shah similarly held that the exact same statements are not actionable as a matter of law. *Coll. Ret. Equities Fund,* 2023 WL 6065260, at *7, 15 (dismissing plaintiffs' claims based on Statement Nos. 2(a), 4, 6, 10, 21, 24(a), 25, 26, 27, and 29).

As Judge Tharp held, these safety statements are "just th[e] kind of rosy affirmation that reasonable investors know are meaningless to the total mix of information." 8/23/22 Order at 42–43 (discussing Statement Nos. 20, 21, 24(a), 25, 26(b), 27, and 29); *see also Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (holding that statements in company's code of ethics are immaterial because they are "too general to cause a reasonable investor to rely upon them" (footnote omitted)). Because, as Judge Tharp held, Plaintiffs' claims based on the safety statements fail as a matter of law due to the nature of the statements themselves, Plaintiffs' new scienter allegations cannot

17

revive those dismissed statements. "Because none of these 'safety statements' are materially false, . . . [a]lleging scienter as to these statements would not salvage them as viable securities fraud claims." 8/23/22 Order at 21 n.7.

The safety statements made in March 2019 after the Ethiopian Airlines accident exemplify the flaws in Plaintiffs' claims. As Judge Tharp pointed out, "there had been two closely related plane crashes, followed by an indefinite emergency grounding order from the FAA," and accordingly, "only unreasonable investors would find" Defendants' vague affirmations of safety "meaningful to the total mix of information." *Id*. at 42–43 (discussing Statement Nos. 20, 21, 24(a), 25, 26(b), 27, and 29); *see also Coll. Ret. Equities Fund*, 2023 WL 6065260, at *15 (discussing Statement Nos. 21, 24(a), 25, 26, 27, and 29). Judge Tharp thus properly concluded that these safety statements were immaterial as a matter of law: "It is difficult to imagine that the market found Muilenburg's 'core value' statement relevant to the total mix of information in a statement that also announced the indefinite grounding of the 737 MAX because of safety problems." 8/23/22 Order at 44.

The safety statements are also immaterial as a matter of law because they "lack[] a standard against which a reasonable investor could expect them to be pegged." *City of Monroe Emps.' Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005). As both Judge Tharp and Judge Shah noted: "Federal courts 'everywhere have demonstrated a willingness to find immaterial as a matter of law certain kinds of rosy affirmation heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity . . . that no reasonable investor could find them important to the total mix of information available.'" 8/23/22 Order at 42 (quoting *Bridgestone*, 399 F.3d at 669–70); *see also Coll. Ret. Equities Fund*, 2023 WL 6065260, at *15 (same). Consistent with this body of case law, the

18

Seventh Circuit has explained that statements that do "not make any concrete assertion" and instead "express[] only vague optimism" are not actionable as a matter of law. *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021).

Judge Tharp and Judge Shah both relied on the Sixth Circuit's decision in *Bridgestone* in holding that these statements by their very nature are not actionable under the securities laws. In *Bridgestone*, the defendant made statements about its ATX tires after a series of accidents, reassuring the public that it had "no reason to believe there is anything wrong with [the tires]," that it had "full confidence" in the tires, and that "rigorous testing under diverse conditions at our proving grounds around the world helps ensure reliable quality." 399 F.3d at 670–71. After a recall of the tires, shareholders claimed the statements were false because Bridgestone possessed directly contrary information when the statements were made. The Sixth Circuit held that the statements were immaterial as a matter of law because they were "best characterized as loosely optimistic statements insufficiently specific for a reasonable investor to find them important to the total mix of information available." *Id.* at 671. The safety-related statements that Plaintiffs seek to bring back into the case are, if anything, ***less*** concrete—or put differently, more amorphous— than the statements held to be non-actionable in *Bridgestone*.

***Second***, as Judge Tharp previously concluded, many of the safety statements on their face reference Boeing's "confidence" in the 737 MAX and thus are best viewed as statements of opinion. Under the standard set forth by the Supreme Court in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015), those opinion statements cannot form the basis for a securities fraud claim. 8/23/22 Order at 13 n.4, 20–21. As the Supreme Court stated in *Omnicare*, it "is no small task" to base a securities fraud claim on statements of opinion. 575 U.S. at 194. Opinion statements are actionable only if a plaintiff pleads with

19

particularity that the speaker did not actually believe the opinion professed or that the opinion did not "fairly align[]" with the information the speaker had at the time. *Id*. at 188–90, 194. If the latter, "the investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194.

Here, Plaintiffs have not alleged that any individual who prepared or approved the safety-related opinion statements did not actually believe the expressed opinions or that the opinions did not "fairly align" with the information in that individual's possession at the time. *See id*. at 188–89, 194. Nor have Plaintiffs identified any "particular (and material) facts going to the basis for" each opinion "whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id*. at 194.[12]

## B. There Is No Basis To Revisit Judge Tharp's Alternative Ruling That The Thirteen Safety Statements Also Fail On Loss Causation Grounds.

All thirteen safety statements also fail for the independent reason that they lack a corresponding corrective disclosure necessary to adequately plead loss causation. As Judge Tharp explained, a "plaintiff claiming securities fraud must allege that the defendant's fraud caused an economic loss." 8/23/22 Order at 62 (citing *Dura*, 544 U.S. at 346). The loss-causation element of a securities fraud claim requires Plaintiffs to plead a "corrective disclosure" connected to each

---

[12] The safety statement in Boeing's November 21, 2018 press release, Statement No. 8(a), also should be dismissed for the same reasons. The Court previously dismissed this statement—"[w]e are confident in the safety of the 737 MAX" and "reemphasize[d] existing procedures for these situations," Am. Compl. ¶¶ 459–60 (alterations in original)—based on lack of scienter. But the safety component of that statement (Statement No. 9(a)—"[w]e are confident in the safety of the 737 MAX") is the exact same kind of "immaterial puffery and opinion" as the other safety statements and, therefore, is "nonactionable as a matter of law" for the same reasons. 8/23/22 Order at 20–21. And the "existing procedures" component (Statement No. 8(b)—Boeing "reemphasize[d] existing procedures for these situations") should be dismissed once again for the reasons discussed *infra* in Section II.A.

alleged misstatement through "plausible allegations that when corrective information became available to the public, that information caused the share price to drop—not because of the information itself, but because the information revealed the falsity of statements by the defendants." *Id*.; *see also Tricontinental*, 475 F.3d at 842; *Ray*, 482 F.3d at 995.

Judge Tharp correctly held that the safety statements "alternatively fail on loss causation grounds as well" because "the plaintiffs made no effort to connect specific statements to corrective disclosures." 8/23/22 Order at 64 n.13. As he explained, Plaintiffs simply "argue at a high level of generality that 'Defendants' materially false and misleading statements misrepresented the magnitude of the safety deficiencies in the 737 MAX model.'" *Id*. He therefore ruled that Plaintiffs "did not plead a causal connection between the alleged misstatements and the corrective disclosures." *Id*. Plaintiffs' Amended Complaint does not even attempt to cure this fundamental pleading deficiency, and accordingly, the safety statements should be dismissed for this independent reason as well.

To the extent Plaintiffs now try to link safety statements made ***before*** the Ethiopian Airlines accident on March 10, 2019 (Statement Nos. 2(a), 4, 6, 8(a), 9, and 10) to that accident itself, such an attempt would run directly counter to Judge Tharp's holding that the Ethiopian Airlines accident—the second one involving a 737 MAX—was not a corrective disclosure. *Id*. Judge Tharp rightly concluded that Plaintiffs cannot plead that "the Ethiopian Airlines crash" is a viable corrective disclosure because that accident, "while certainly a grave disaster and business reversal, does not reveal the falsity of any prior statement, since Boeing never represented that a second crash could not occur or that MCAS would never malfunction again." *Id*. In their Amended Complaint, Plaintiffs simply re-allege this same corrective disclosure without offering any reason—that is, any new factual allegations—meriting a departure from the Court's holding that

21

this accident was not a corrective disclosure. Plaintiffs' conclusory assertion that "[t]he Ethiopian Airlines Crash also revealed the true nature of the risks of (1) a catastrophic crash involving the 737 MAX and (2) regulatory action grounding the 737 MAX fleet," Am. Compl. ¶ 278, is no different from the original Complaint's conclusory assertion, rejected by Judge Tharp, that the crash was a "corrective event" that corrected "materially false and misleading statements misrepresent[ing] the magnitude of" "safety deficiencies," Compl. ¶ 462. Judge Tharp's reasoning on loss causation thus continues to apply with full force, and it forecloses any claim based on Statement Nos. 2(a), 4, 6, 8(a), 9, or 10. 8/23/22 Order at 64 n.13.

For safety statements made *after* the Ethiopian Airlines accident (Statement Nos. 20, 21, 24(a), 25, 26(b), 27, and 29), Plaintiffs still "ma[ke] no effort to connect specific statements to corrective disclosures" and instead simply "argue at a high level of generality that 'Defendants' materially false and misleading statements misrepresented the magnitude of the safety deficiencies in the 737 MAX model.'" *Compare* 8/23/22 Order at 64 n.13, *with* Am. Compl. ¶ 525 (relying on same factual allegations previously found insufficient). Because Plaintiffs added no new factual allegations to their Amended Complaint connecting the safety statements after Ethiopian Airlines accident to a corrective disclosure, these statements once again should be dismissed on loss causation grounds.

In sum, Plaintiffs' Amended Complaint largely ignores Judge Tharp's loss-causation ruling. As a result, Plaintiffs fail to plead new facts that might warrant a different outcome on loss causation or to show that Judge Tharp committed "clear error" in rejecting the challenged safety statements on this alternative ground. *See Best*, 107 F.3d at 546. There is, in short, no basis for the Court to revisit this ruling.

## II. THE OTHER RE-ALLEGED STATEMENTS PREVIOUSLY REJECTED BY JUDGE THARP ARE ALSO STILL NOT ACTIONABLE.

The Court again should reject the three other categories of statements that Judge Tharp previously found to be not actionable: (i) statements in November 2018 related to "existing procedures" for responding to an erroneous MCAS activation, (ii) a December 2018 statement related to the design of MCAS, and (iii) statements related to the 737 MAX's return to service made after the grounding of the MAX fleet but before the Paris Air Show in June 2019. Judge Tharp identified various pleading deficiencies with respect to each set of statements, including Plaintiffs' failure to establish that the statements were material and their failure to plead the required strong inference of scienter. The Amended Complaint does not cure those deficiencies.

### A. The Challenged Statements Related To "Existing Procedures" Are Still Not Actionable.

Judge Tharp rejected as non-actionable Boeing statements in November 2018 "that existing procedures . . . would suffice to enable pilots to respond to an erroneous MCAS activation." 8/23/22 Order at 4–5. These "existing procedure" statements all referred to Boeing's November 6 bulletin identifying the "Runaway Stabilizer Non-Normal Checklist," which required pilots to move the stab trim cutout switches to the cutout (or off) position and keep them there for the remainder of the flight. This existing procedure "had been applied by Lion Air pilots on a 737 MAX flight the day before the [first] crash," and those pilots "successfully managed to recover the airplane from an MCAS-induced downward pitch." *Id.* at 8–9; Am. Compl. ¶¶ 246, 247. Moreover, after Boeing had met with the FAA in the immediate wake of the Lion Air crash and "explained the details of MCAS," *id.* ¶ 230, the FAA highlighted the same procedure in an Emergency Airworthiness Directive issued on November 7, 2018 that expressly advised pilots to follow Boeing's guidance in its November 6 bulletin in the event of erroneous MCAS activation. Ex. 2, November 7, 2018 FAA Emergency Airworthiness Directive.

23

Plaintiffs nevertheless seek to add back to the case the same "existing procedures" statements that Judge Tharp already held are not actionable. These statements include Boeing's November 6, 2018 bulletin itself (Statement No. 1) and Boeing's press release on November 7, 2018 describing the bulletin as "directing operators to existing flight crew procedures to address circumstances where there is erroneous input from an AOA sensor" (Statement No. New-1). Am. Compl. ¶¶ 442, 443. Plaintiffs also contend that Muilenburg falsely stated during a November 13, 2018 interview on cable news that Boeing had "existing . . . procedures to handle" an erroneous MCAS activation (Statement Nos. 2(b), 3(b), and 5). *Id.* ¶¶ 447–49. And Plaintiffs allege that Muilenburg purportedly made similar statements in an email to employees and a Boeing press release on November 19 and 21, 2018, respectively (Statement Nos. 7 and 8(b)). *Id.* ¶¶ 457, 459.

Judge Tharp correctly held that Plaintiffs "failed to allege scienter" for these statements. 8/23/22 Order at 15. He concluded that the statements were not actionable because Plaintiffs lacked "particularized allegations that those making the statements (as opposed to others at Boeing) knew the statements were false." *Id.* at 21. With respect to Muilenburg's "existing procedure" statements, Judge Tharp stressed that all of those statements were made before Muilenburg purportedly learned about the Forkner messages "in February 2019." *Id.* at 31–32. This was critical to Judge Tharp's ruling, as he explained: "Muilenburg's alleged awareness of these messages significantly affects the Court's approach to the statements he made after February 2019 and persuades the Court that several of the statements made after Muilenburg received these messages were adequately plead as securities fraud claims." *Id.* Plaintiffs plead no facts suggesting that Judge Tharp's ruling on these pre-Forkner statements was clearly wrong. There is thus no basis for this Court to revisit Judge Tharp's holding that all of the existing procedures statements are not actionable.

24

### 1. Muilenburg's Existing Procedures Statements Are Not Actionable.

Plaintiffs again fail to plead facts creating a strong inference of scienter for Muilenburg's "existing procedures" statements (Statement Nos. 2(b), 3(b), 5, and 7) for three reasons.

***First***, as in their original Complaint, Plaintiffs allege that Muilenburg made these statements in November 2018—***before*** he purportedly learned of the Forkner messages that Judge Tharp found could support, at the pleading stage, the required strong inference of scienter for his later statements referencing pilot manuals. *See* Am. Compl. ¶¶ 447, 448, 457. Unlike the original Complaint, which alleged that Muilenburg learned of the Forkner messages in February 2019, Compl. ¶ 340, the Amended Complaint asserts that Muilenburg learned of the messages somewhat earlier, in "December 2018 or January 2019." Am. Compl. ¶ 268. But those revised allegations do nothing to alter the analysis. Plaintiffs still do not allege that Muilenburg was aware of the Forkner messages when he made the challenged existing procedures statements in November 2018. *Id*. ¶¶ 447, 448, 457.

***Second***, as before, the work of Boeing's Safety Review Board (*see id*. ¶¶ 202–18) cannot give rise to a strong inference that Muilenburg knew his statements were false or that he made the statements with reckless disregard for their accuracy. *See Searls*, 64 F.3d at 1061 (noting high bar for pleading severe recklessness). Both Judge Tharp and Judge Shah rejected the theory that Boeing's internal investigation concerning the safety of the 737 MAX made Muilenburg aware that the existing procedures were inadequate to counter an erroneous MCAS activation. Although Judge Tharp concluded that the Safety Review Board determined "that the pilots' response to the MCAS malfunction in the Lion Air crash 'didn't quite follow the assumptions that we had based the design on'" and that "a Hazard Analysis on MCAS conducted during testing and development was 'flawed,'" 8/23/22 Order at 22, he held that this investigation did not give rise to a strong inference of scienter for any of Muilenburg's "existing procedures" statements in November 2018

25

in the wake of the Lion Air crash. Judge Tharp provided two reasons for that ruling: (i) it was unclear whether Muilenburg even "knew about these specific conclusions of th[e] safety review board" because Plaintiffs "d[id] not make that allegation," and (ii) the Safety Review Board's conclusions were insufficient on their own terms because they at most show that it "may have been unreasonable in hindsight" for Muilenburg to "conclud[e] that the pilots (who had not followed their assumptions) needed little more than a reminder to follow the runaway stabilizer non-normal checklist." *Id.* Thus, Judge Tharp held that, "[a]t worst," the allegations "support an inference of negligence on Muilenburg's part," but negligence "is not adequate for pleading a private securities fraud claim." *Id.* Judge Shah agreed. *See Coll. Ret. Equities Fund*, 2023 WL 6065260, at *9 (similar).

Plaintiffs' allegations acknowledging that both the Safety Review Board and the FAA concluded that existing procedures were sufficient—after Boeing had, as Plaintiffs allege, "explained the details of MCAS" to the FAA, Am. Compl. ¶ 230—foreclose Plaintiffs from pleading a strong inference of scienter. There was simply no basis for Muilenburg or anyone else at Boeing to have thought that existing procedures were inadequate in the face of the conclusions of both the Safety Review Board and the FAA. That is particularly true given that pilots on the prior Lion Air flight had used those same existing procedures and safely controlled the plane. Am. Compl. ¶ 245. Without a showing of clear error, this Court should not depart from the well-reasoned ruling by Judge Tharp and Judge Shah.

Plaintiffs try to cure this glaring deficiency by alleging that on November 6, 2018, ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

26



Am. Compl. ¶¶ 210, 211, 218.  But none of these allegations suggests that Boeing's engineers—much less Muilenburg, the speaker of the challenged statements—believed that an MCAS-related issue could not be corrected through existing procedures.  To the contrary, Plaintiffs allege that ███████████████████ ███████████████ id. ¶ 213—that is, that █████████████████████████ ███████████████████████████████████████ ██████████, id. ¶ 216.  And Plaintiffs allege that the FAA came to the same conclusion when it issued the November 7, 2018 Airworthiness Directive instructing pilots to follow the existing procedures highlighted in Boeing's November 6 bulletin *after* Boeing had "explained the details of MCAS" following the Lion Air accident.  *Id.* ¶ 230.  Indeed, Plaintiffs themselves allege that "[t]he *only* way to counter multiple erroneous activations was to turn the auto trim switch to the off position," *id.* ¶ 208—precisely what Boeing's November 6 bulletin and the FAA's November 7 Directive had reminded pilots to do.[13]

Plaintiffs also do not allege that ████████████ or any of the other above alleged facts were reported to Muilenburg or that Muilenburg was aware of them when he made the challenged statements in November 2018.  As Judge Tharp explained, "the PSLRA does not permit scienter to be imputed" to the speaker of a statement based on the alleged knowledge of other individuals at the company.  8/23/22 Order at 14; *see also In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457,

---

[13] Moreover, many of Plaintiffs' new allegations parallel their prior allegations that Judge Tharp found insufficient.  For instance, Plaintiffs allege that ████████████████████████████████████████ *Id.* ¶ 216.  That allegation is substantively indistinguishable from the original Complaint's allegation that pilots in the Lion Air flights "didn't quite follow the assumptions that we had based the design on."  Compl. ¶ 209.

at *12 (N.D. Ill. Jan. 12, 2021) ("even if Bohaboy reported to both Almeida and Saccaro," the court could not infer that he actually "reported these issues" to them). At most, Plaintiffs assert that ███████████████████████████████████████████ Am. Compl. ¶ 205. But Plaintiffs do not allege that any of these highly technical details about MCAS were "something new" that immediately were reported to Boeing's CEO in November 2018. Even if that inference had some colorable support in the Amended Complaint, that still would not be enough to survive the demanding standard for pleading scienter under the PSLRA. As another court in this District recently put it, even if "it may be plausible to infer that a CFO would keep the CEO apprised of important developments in a brewing crisis," plausibility is not enough to satisfy the PSLRA's pleading standard, which requires particularized allegations that create a ***strong*** inference of scienter. *In re Baxter*, 2021 WL 100457, at *2.

***Third***, even if Plaintiffs had pleaded facts showing that Muilenburg might have been aware of reports calling into question the effectiveness of existing procedures, they still have not alleged sufficient facts to create a strong inference of scienter as that term is properly understood. To plead a "strong inference" of scienter under the PSLRA, the inference must be both "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309; *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 705 (7th Cir. 2008) (inference "must be as cogent as the opposing inference"). As Judge Shah stated in rejecting similar allegations in the almost identical securities case pending before him, even if the allegations relating to existing procedures and the Safety Review Board's investigation could support some inference of scienter, "[t]he much more plausible inference" is still that "Muilenburg believed the airplane remained safe to fly." *Coll. Ret. Equities Fund*, 2023 WL 6065260, at *9 (internal quotation omitted).

28

Plaintiffs acknowledge that after the Lion Air accident, Boeing met with the FAA and "explained the details of MCAS." Am. Compl. ¶ 230. After that meeting, the FAA itself, in addition to Boeing, endorsed using an existing procedure, the Runaway Stabilizer Non-Normal Checklist, to counter an erroneous MCAS activation. Plaintiffs also acknowledge that the pilots of the earlier Lion Air flight had successfully implemented that procedure to counter such an activation. Ex. 2, November 7, 2018 FAA Emergency Airworthiness Directive; Am. Compl. ¶ 245. Given those allegations, *Tellabs*' test for scienter again requires dismissal of Plaintiffs' claims based on Muilenburg's "existing procedures" statements for failure to plead the required strong inference of scienter. The inference of scienter is not "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 309. At bottom, Plaintiffs' claims based on Muilenburg's existing procedures statements are merely the product of hindsight and do not reflect what Muilenburg actually knew or understood at the time of his statements.

### 2. The Other "Existing Procedures" Statements Are Also Not Actionable.

The other "existing procedures" statements (not made by Muilenburg) also should be rejected because they suffer from the same pleading deficiencies as they did in the original Complaint.

As an initial matter, Statement No. 1 (Boeing's November 6, 2018 bulletin to flight crews) is not actionable because it was issued before the proposed class period begins on November 7, 2018. Judge Tharp correctly recognized that "Boeing issued this bulletin a day before the class period in this lawsuit, so it is not actionable." 8/23/22 Order at 16. That remains true. The bulletin containing Statement 1 was issued on November 6, 2018, Am. Compl. ¶ 442, one day before the alleged class period begins on November 7, 2018, *id*. ¶ 531. *See City of Livonia Emps.' Ret. Sys. v. The Boeing Co.*, 2010 WL 2169491, at *4 (N.D. Ill. May 26, 2010) (statement "issued before the start of the … class period" was "not actionable"). Plaintiffs attempt to cure this deficiency by

29

challenging a similar statement made the next day in a press release (Statement No. New-1), but the addition of this new statement does not make Statement 1 actionable. This is especially true considering that the FAA signed off on Boeing's bulletin. No matter how much Plaintiffs contend otherwise, the bulletin Boeing issued to pilots in the wake of the Lion Air accident was a *safety* notice that did not contain actionable misstatements amounting to securities fraud.

More broadly, Statement Nos. 1, New-1, and 8(b) are not actionable because Plaintiffs fail to identify "the individual corporate official or officials who ma[de] them." *Makor*, 513 F.3d at 705. The Amended Complaint fails to attribute these three statements (contained in a Boeing bulletin, a Boeing press release, and on Boeing's website) to any particular author or other individual. Am. Compl. ¶¶ 442, 443, 459. Instead, Plaintiffs simply offer the conclusory assertion that ███████ "personally reviewed and approved Boeing's numerous subsequent false and misleading statements assuring the public, including investors, that 'existing flight procedures' already told pilots all they needed to know about safely operating the MAX." *Id*. ¶ 211. But even that conclusory assertion does not allege that ███████ authored, reviewed, or approved the particular bulletin, press release, or website statements at issue here. Plaintiffs do not allege, for example, that ███████ "signed the documents" or that he was "involv[ed] in creating the[m]." *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 288 (5th Cir. 2006). Because Plaintiffs do not allege who made or approved Statement Nos. 1, New-1, and 8(b), the Amended Complaint does not plead any facts to support a strong inference of scienter for those statements. *See id.*

**B.      The Challenged Statement Related To MCAS Design Is Still Not Actionable.**

Plaintiffs also re-allege a statement (Statement No. 11) made by Muilenburg during a December 7, 2018 CNBC interview relating to the design of MCAS. According to Plaintiffs, Muilenburg stated that "[p]art of what we wanted to accomplish was seamless training and introduction for our customers, so we purposely designed the airplane to behave in the same way.

30

So even though it's a different airplane design, the control laws that fly the airplane behave the same way in the hands of the pilot." *Compare* Compl. ¶ 373 (alleging this statement) *with* Am. Compl. ¶ 467 (same).

Both Judge Tharp and Judge Shah dismissed the claims based on this statement because the statement is not misleading. Whether a statement is misleading is judged from the perspective of "reasonable investors" considering the "total mix of information available." *West Palm Beach Firefighters v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 651 (N.D. Ill. 2020). As Judge Tharp emphasized, by December 7, 2018—the date of the challenged statement—"[t]he existence of MCAS had been disclosed." 8/23/22 Order at 17. As a result, reasonable investors already understood "[t]hat the 737 MAX had a new system called MCAS, and that that system could malfunction when it received erroneous data from an AOA sensor." *Id.* Judge Tharp thus correctly determined that Muilenburg's December 7, 2018 statement was not misleading in light of the total mix of information about MCAS that already was "available to the market." *Id.*

Furthermore, the fact that the statement addressed MCAS's **intended** design also undermines any allegation that the statement was misleading or made with scienter. As Judge Tharp concluded, Plaintiffs fail to allege that Muilenburg "intended to deceive investors" with this statement because he accurately described how the system at least was "intended [to] function" and such intentional deception would make no sense in view of the previous disclosures about MCAS. *Id.* Judge Shah agreed: "Muilenburg spoke of Boeing's **intentions** in designing the plane, which plaintiffs' allegations support as true." *Coll. Ret. Equities Fund*, 2023 WL 6065260, at *8 (emphasis added). The Amended Complaint contains no new factual allegations that would support disturbing these well-considered rulings by two judges in this District.

     C.      **The Challenged Statements Regarding The MAX's Grounding And Return To Service Are Still Not Actionable.**

Plaintiffs re-allege three early statements (Statement Nos. 26(a), 30, and 40) regarding the 737 MAX's grounding and return to service that Judge Tharp previously rejected. Again, the Amended Complaint does not cure the deficiencies that Judge Tharp identified, and accordingly, Plaintiffs' claims based on those statements once again should be dismissed.

*First*, Judge Tharp correctly rejected Plaintiffs' claim based on Muilenburg's statement on March 13, 2019, the day of the grounding of the 737 MAX fleet, that "Boeing has determined . . . out of an abundance of caution and in order to reassure the flying public of the aircraft's safety— to recommend to the FAA the temporary suspension of operations" of the 737 MAX fleet. 8/23/22 Order at 41 (quoting Statement No. 26); Am. Compl. ¶ 479 (re-alleging this statement). Judge Tharp concluded that this statement was not material given the enormity of the events that preceded it: "the plaintiffs have not alleged that Boeing's March 13 statement in support of the grounding order was material to investors," where the "total mix of information available to the market … now included two plane crashes and an FAA grounding order." 8/23/22 Order at 41–42. Judge Shah reached the same conclusion in dismissing the claim based on this same statement, holding that reasonable investors would not have put weight on Boeing's statement in light of the significant preceding events. *See Coll. Ret. Equities Fund*, 2023 WL 6065260, at *15.

Plaintiffs' Amended Complaint cannot overcome this common-sense defect in their claim. Plaintiffs assert that Statement No. 26 was misleading because it omitted that the 737 MAX was not a safe airplane. *See* Am. Compl. ¶ 480 (cross-referencing assertions that 737 MAX was not safe "in paragraphs 452–455 and 477 above"). But Plaintiffs cannot show—especially when viewed from the perspective of a "reasonable investor"—that the omission from that statement of a warning that the 737 MAX was not a safe airplane would have been material to reasonable

32

investors when the 737 MAX already had crashed twice in less than six months and had been grounded by authorities across the globe. There is no reason for this Court to depart from the prior decisions of both Judge Tharp and Judge Shah.

*Second*, the previously dismissed statements relating to the projected timeline for the 737 MAX's return to service remain non-actionable as a matter of law for the same reason identified by Judge Tharp. As Judge Tharp explained, the PSLRA contains a special "safe harbor" for "forward-looking statement[s]" or for "statement[s] of the plans and objectives of management for future operation, including plans or objectives relating to the products or services of the issuer." 8/23/22 Order at 53. Where a statement is forward-looking and the safe harbor applies, the PSLRA requires allegations of "actual knowledge of falsity, not merely indifference to the danger that a statement is false." *Makor*, 513 F.3d at 705. Because the RTS statements were all "predictions or speculations about the future," Plaintiffs needed (and still need) to allege facts that "give rise to a strong inference that Muilenburg *knew* his return to service estimates were misleading." 8/23/22 Order at 53 (emphasis added).

Plaintiffs do not come close to clearing the PSLRA's high bar for the relevant RTS statements made on April 11, 2019 and June 5, 2019. In attempting to plead Muilenburg's knowledge, Plaintiffs allege that Muilenburg met with "then-acting FAA Administrator Elwell in the back of an airplane at the Paris Airshow" *between June 17 and 23, 2019*. 8/23/22 Order at 51. At that meeting, Elwell allegedly "told Muilenburg that Boeing needed to 'slow down its talk of progress [on the 737 MAX]' and give the FAA 'space to exercise scrutiny.'" *Id*. (citing Compl. ¶ 262); Am. Compl. ¶ 306. Judge Tharp concluded that, at the pleading phase, this meeting in mid-June 2019 had important implications for Muilenburg's knowledge and scienter for statements made *after* the Partis Air Show. 8/23/22 Order at 53 (discussing June 26, 2019 statement made

33

after the Paris Air Show). Accepting Plaintiffs' allegations as true, Judge Tharp concluded that Boeing's optimism about a quick return to service was "grounded in Boeing's close relationship with regulators" and that, because Elwell purportedly told Muilenburg to "slow down" Boeing's talk of progress on the 737 MAX's RTS at the Paris Air Show in mid-June 2019, Plaintiffs adequately alleged scienter for RTS statements made *after* the Paris Air Show. *Id.*[14] But as to estimates of the 737 MAX's RTS made *before* the Paris Air Show, Judge Tharp held that Plaintiffs alleged no facts to support an inference of scienter: "Because this meeting with Elwell provides the basis for inferring Muilenburg's scienter with respect to statements about the MAX's return to service, statements in this category that occurred before this meeting are not actionable for lack of allegations of scienter." *Id.* at 51 n.11.

The Court should apply this same reasoning and dismiss Plaintiffs' claims based on the two RTS statements made *before* the Paris Air Show: (i) Muilenburg's April 11, 2019 statement that "we continue to demonstrate that we've identified and met all certification requirements" and that we "look forward to completing near-term milestones on the path to final certification," Am. Compl. ¶ 492 (Statement No. 30); and (ii) Smith's June 5, 2019 statement that Boeing was "working with our regulators and ensuring that we're answering all the questions, addressing any concerns that are taking place," and "ensuring that we're meeting the priorities and the needs of the regulator . . . . [T]here's a lot of progress," *id.* ¶ 506 (Statement No. 40). Both of those forward-looking statements occurred *before* the Paris Air Show, which was the sole basis for Judge Tharp's scienter ruling for the later RTS statements. *Compare* Am. Compl. ¶¶ 492, 506, *with id.* ¶ 306.

---

[14] Although Judge Tharp held that these scienter allegations were sufficient to survive a motion to dismiss, Boeing will demonstrate at summary judgment that its RTS estimates were based on detailed assessments of the facts and circumstances known at the time and were entirely consistent with the company's contemporaneous internal projections.

The Amended Complaint does not allege any new facts showing that either Muilenburg or Smith had actual knowledge of the falsity of their RTS statements made on April 11, 2019 and June 5, 2019. Although Plaintiffs allege that Defendants purportedly knew of the Forkner messages when they made those two statements, *id.* ¶ 510, that same allegation also existed in the original Complaint, *see* Compl. ¶ 459. Judge Tharp nevertheless concluded that the only allegation of "actual knowledge" relevant to Boeing's RTS projections stemmed from the Paris Air Show. 8/23/22 Order at 51–52 & n.11. Accordingly, Judge Tharp's previous ruling with respect to these two RTS statements should continue to apply.

Statement Nos. 26 and 40 also are not actionable for the additional reasons that neither statement was misleading or material to reasonable investors. Statement No. 26 stated that Boeing was completing "near-term milestones," implicitly acknowledging that more "milestones" remained to be completed. Am. Compl. ¶ 492. The statement did not make any promise about when the MAX would return to service. *Id.* Statement No. 40 also did not promise any specific RTS date and instead used vague and malleable language, such as "[t]here's a lot of progress." *Id.* ¶ 506. As the Eleventh Circuit explained in a similar case, where a company stated that it "'felt good about the progress' it had made towards its 'national mortgage settlement compliance,'" the statement was "vague" and immaterial—"no reasonable investor would have considered [it] in making investment decisions." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1320–21 (11th Cir. 2019); *see also Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) ("'[M]aking steady progress' is precisely the sort of generalized positive characterization that is not actionable under the securities laws."). That reasoning squarely applies here and provides an independent reason to reject again as non-actionable the vague language related to RTS in Statement Nos. 26 and 40.

35

**D.      All Of The Previously Rejected Statements Also Continue To Fail For Lack Of Loss Causation.**

Plaintiffs also fail to allege loss causation for these previously dismissed statements.  To plead loss causation, Plaintiffs must connect each alleged misstatement to a "corrective disclosure" that reveals that the statement was false and causes the stock price to go down and investors to incur a loss.  *Dura*, 544 U.S. at 341–42.  It is not enough for Plaintiffs simply to allege that later bad news caused the stock price to drop—Plaintiffs must plead specific corrective disclosures connected to each of the "specific statements" that they challenge.  8/23/22 Order at 64 n.13.

As Judge Tharp correctly recognized, Plaintiffs' original Complaint made little attempt to connect specific corrective disclosures to specific misstatements, instead asserting only "at a high level of generality" that events eventually revealed that Defendants made false and misleading statements.  *Id.*  That remains true of the Amended Complaint.  Indeed, Plaintiffs did little, if anything, to buttress their loss-causation allegations.  Loss causation therefore remains an independent and alternative basis for dismissing Plaintiffs' claims based on these alleged misstatements.

***First***, Plaintiffs do not allege any corrective disclosure revealing that any of the "existing procedures" statements were false.  Plaintiffs do not allege when the purported falsity of these statements was revealed to the market or whether Boeing's stock price declined on that date.  Plaintiffs instead simply allege a list of adverse developments in 2019 that caused Boeing's stock price to decline without even attempting to connect those events to any of the challenged statements.  *See* Am. Compl. ¶ 525.  Statement Nos. 1, New-1, 2(b), 3(b), 5, 7, and 8(b) therefore all fail for lack of loss causation.

***Second***, the statement about the design of MCAS fails for lack of loss causation because "[t]he existence of MCAS had been disclosed" and it was "already known … that the system could

36

malfunction" by the time the challenged statement was made. 8/23/22 Order at 16–17. There can be no causal link between that statement (Statement No. 11) and a later decline in Boeing's stock price as a result: the "truth" supposedly concealed by that statement was already known to the market when the statement was made. *See Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) ("Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time.").

***Third***, Plaintiffs fail to connect Statement Nos. 26, 30, and 40—about the 737 MAX's grounding and RTS—to any specific corrective disclosures. Plaintiffs allege that on June 26, 2019, "[a]fter the market's close, the FAA announced that a new software flaw had been discovered during testing of the software update for MCAS and that Boeing would need to fix this problem, which could be implicated during the emergency response in the event of an MCAS failure, further delaying the 737 MAX's return to the skies." Am. Compl. ¶ 525. Plaintiffs also allege that on July 24, 2019, "[b]efore the market's open, Boeing disclosed that the protracted grounding of the 737 MAX could result in a temporary halt of production for the plane if the delays continued." *Id.* But as before, Plaintiffs fail to plead facts that connect those alleged corrective disclosures to any prior specific misstatement. Nor do they explain how those alleged corrective disclosures purportedly revealed the falsity of prior statements concerning Boeing's recommendation to the FAA of a "temporary suspension of operations" of the 737 MAX fleet (Statement 26), Boeing's compliance with "near-term milestones" or "path" to certification (Statement 30), or Boeing's efforts to "work[] with our regulators" or belief that "there's a lot of progress" (Statement 40). Both Judge Tharp and Judge Shah correctly determined that neither of these purported corrective disclosures was connected to any particular misstatement. *See* 8/23/22 Order at 64 n.13; *Coll. Ret. Equities Fund*, 2023 WL 6065260, at *24. Plaintiffs still do not plead any new facts that purport

37

to connect Statement Nos. 26, 30, or 40 to any particular corrective disclosure alleged in the Amended Complaint.

## III.    THE DECEMBER 16, 2019 ANNOUNCEMENT WAS NOT A CORRECTIVE DISCLOSURE.

Plaintiffs allege that Boeing's December 16, 2019 announcement that "it would be temporarily shutting down production of the Boeing 737 MAX in January 2020" corrected Boeing's RTS statements from June 2019 through November 2019.  Am. Compl. ¶ 525.  At the pleading stage, Judge Tharp credited Plaintiffs' theory that "the December 16 announcement 'made it clear that the [FAA] would not act on Boeing's timeline'" and that "the decision to shut down production resulted from [FAA Administrator] Dickson reprimanding Muilenburg on December 12 for 'pressuring the agency to move faster in approving the MAX's return.'"  8/23/22 Order at 65.[15]  Judge Tharp emphasized that these allegations "just barely carried out their task at the pleading stage" and that "plaintiffs may face an uphill climb" on this corrective disclosure later in the litigation, questioning whether a decline in Boeing's stock price related to a production halt could fairly be said to correct statements about RTS.  *Id.*

In sustaining this alleged corrective disclosure, Judge Tharp overlooked allegations in Plaintiffs' lengthy Complaint showing that *all* of the information correcting Boeing's prior RTS timelines was known to the public four days before Boeing's December 16 announcement.  The Court should correct this clear error and dismiss Plaintiffs' claims based on the seven RTS statements that Judge Tharp sustained (Statement Nos. 42, 43, 44, 46, 47, 48, and 49) for failure

---

[15] Judge Tharp also sustained the October 18, 2019 publication of the Forkner messages as a corrective disclosure that purportedly "revealed the falsity of Boeing's previous statements about regulatory compliance and the integrity of the FAA's oversight"—*i.e.*, Statement Nos. 22, 23, 24, 28, 34, and 39.  8/23/22 Order at 64.  Although Defendants are not seeking to dismiss these allegations in this motion, Defendants will demonstrate that these statements were not false or made with scienter, and that they were not "corrected" by the disclosure of the Forkner messages.

to plead loss causation.[16]    Based on Plaintiffs' own pleadings, the December 16, 2019 announcement was not a corrective disclosure for two independent reasons.

*First*, Plaintiffs' own allegations reveal that the December 16, 2019 production-halt announcement disclosed no *new* information related to Boeing's projected RTS timeline.  As Judge Tharp noted, the only plausible connection between Boeing's December 16, 2019 production-halt announcement and Boeing's earlier RTS estimates was that it revealed to the public that the FAA had "'made it clear that the [FAA] would not act on Boeing's timeline'" during a December 12, 2019 meeting with Boeing.  *Id.*  But Plaintiffs' allegations and widespread reporting leave no doubt that the market knew about that meeting and the FAA's decision not to return the MAX to service in 2019 on December 12, four days *before* the production-halt announcement.  Indeed, the Court need look no further than Paragraph 347 of the Amended Complaint—which quotes a December 12, 2019 *Seattle Times* article reporting that the 737 MAX's RTS timeline had slipped to mid-February 2020 and characterizing Boeing's meeting with the FAA as "a starkly direct rebuke to Boeing"—to confirm that no new news regarding Boeing's return-to-service estimate was broken on December 16, 2019.

*Second*, the Amended Complaint also shows that the December 16, 2019 announcement of a production halt was the materialization of a risk that Boeing had already disclosed to the market on its July 24, 2019 earnings call when it stated that it "might entirely halt production of the 737 MAX if the grounding continued."  Am. Compl. ¶ 317 (emphasis omitted).

Correcting this one error now regarding the purported December 16, 2019 corrective disclosure would reduce the number of alleged misstatements at issue by seven, would greatly

---

[16] Judge Tharp dismissed another RTS statement (Statement No. 40) made by Smith on the ground that Plaintiffs failed to plead he possessed the requisite scienter.  8/22/23 Order at 14.  That remains true in the Amended Complaint. Statement No. 40 is also not actionable because the December 16, 2019 announcement is not a corrective disclosure.

simplify the case as it moves forward, and would make the parties' briefing of (and this Court's ruling on) class certification far more straightforward.

**A.  Plaintiffs' Own Allegations Demonstrate That Boeing's Inability To Meet Its Projected RTS Timeline Had Been Disclosed To The Market Before December 16, 2019.**

The December 16, 2019 announcement was not a corrective disclosure of Boeing's RTS estimates because it did not disclose any new information to the market about the 737 MAX's expected return to service.  According to Judge Tharp, the December 16, 2019 announcement "made it clear that the [FAA] would not act on Boeing's timeline" for RTS and, as such, corrected earlier statements that had projected RTS in the "end of summer 2019," "early in the fourth quarter 2019," or by the end of 2019.  8/23/22 Order at 65 (quoting Compl. ¶ 15).[17]  Judge Tharp also credited Plaintiffs' theory that the December 16 production-halt announcement "resulted from" and made public the FAA Administrator's "reprimanding Muilenburg on December 12 for 'pressuring the agency to move faster in approving the MAX's return.'"  *Id.*  (quoting Pl.'s Opp'n to Mot. to Dismiss at 14 (background section entitled "December 12-16, 2019"; citing Compl. ¶ 301).  Although Judge Tharp acknowledged that Plaintiffs "ha[d] just barely carried out their task at the pleading stage" and predicted that "[t]he plaintiffs may face an uphill climb" going forward, he sustained this alleged corrective disclosure on the pleadings.  *Id*.

In so ruling, we respectfully submit that Judge Tharp must have overlooked allegations in Plaintiffs' own Complaint that cannot be squared with the theory on which he sustained that alleged corrective disclosure:  the market knew about the December 12, 2019 meeting between

---

[17] By December 16, 2019, earlier statements predicting RTS in the "end of summer 2019" or "early in the fourth quarter 2019" already had been corrected by the passage of time.  Am. Compl. ¶¶ 507, 512, 515, 517, 519.  The market obviously understood by December 16, 2019 that the 737 MAX would not return to service in the end of summer 2019 or early in the fourth quarter 2019.

Boeing and the FAA—and the fact that the 737 MAX would not return to service in 2019 on December 12, 2019—four days *before* the December 16, 2019 announcement. *See In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 472 (E.D.N.Y. 2020) ("Plaintiffs cannot rely on events that happened *after* Hewitt's misconduct was revealed to the market … to establish loss causation" (emphasis added)). Plaintiffs' own allegations therefore defeat any argument that the December 16, 2019 announcement disclosed *new* information about Boeing's RTS timeline and corrected Boeing's previous statements predicting a return to service in 2019. *See* Am. Compl. ¶ 347.

In a widely reported statement on December 12, 2019, Boeing informed the market after the meeting with the FAA: "We will work with the FAA to support their requirements and their timeline as we work to safely *return the Max to service in 2020*." Ex. 6, December 12, 2019 *Seattle Times* Article (emphasis added). Plaintiffs' own pleadings allege as much. Paragraph 347 of the Amended Complaint expressly references a *Seattle Times* article published on December 12, 2019, "the same day of the meeting," titled "As the 737 MAX's return slips out to mid-February, FAA boss tells Boeing CEO to back off predictions." Am. Compl. ¶ 347 (citing Ex. 6); *see also* Compl. ¶ 301 (same). As Plaintiffs' allegations demonstrate, by December 12, the market understood both that the 737 MAX would not return to service on Boeing's predicted timeline and that the FAA's was concerned about "the perception that some of Boeing's statements have been designed to force the FAA into taking quicker action." Am. Compl. ¶ 347.[18] In fact, one day earlier, another *Seattle Times* article had reported that, in the FAA Administrator's own words, "[i]f you do the math, [FAA approval is] going to extend into 2020." Ex. 7, December 11, 2019

---

[18] Plaintiffs suggest that the FAA "made its warning to Muilenburg public" sometime after December 12, 2019. *See* Am. Compl. ¶ 347. That is wrong. The exact "note to Congress" from the FAA that Plaintiffs quote in both their original Complaint, Compl. ¶ 301, and their Amended Complaint, Am. Compl. ¶ 347, was publicly reported on December 12, 2019. *See, e.g.*, Ex. 9, December 12, 2019 Reuters Article "Boeing Scuttles 2019 Timeline for 737 MAX Return after CEO Meets with U.S. FAA" (quoting the same FAA "email to congressional staff").

41

*Seattle Times* Article (noting that FAA announcement "dash[ed] the company's hopes" that "the FAA would approve [Boeing's] fixes to the 737 MAX by the end of 2019"). The release of this information fully correcting Boeing's previous projected RTS timelines four days ***before*** the December 16, 2019 announcement "severs the causal connection" between that purported corrective disclosure and any prior RTS statement. *See In re Liberty Tax*, 435 F. Supp. 3d at 472.

The Court may consider the December 12, 2019 *Seattle Times* article in full under the incorporation-by-reference doctrine because the Amended Complaint expressly references that article. *See, e.g.*, *Venture Assocs.*, 987 F.2d at 431 ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."). The Court also may take judicial notice of the December 11, 2019 *Seattle Times* article for information that was available to the market at that time. *See, e.g.*, *Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1064 (N.D. Ill. 2004) ("[I]t is routine for courts to take judicial notice of both newspaper articles and court records, among other things."). But the Court really need not go beyond Paragraph 347 of the Amended Complaint expressly referencing the December 12, 2019 *Seattle Times* article reporting that RTS had slipped to mid-February 2020. Because Boeing focused on other grounds for dismissal of this corrective disclosure, Judge Tharp understandably overlooked this allegation in Plaintiffs' prior Complaint making clear that all of the prior RTS statements had been corrected by December 12, 2019. *See* Compl. ¶ 301 (containing the same allegation found in Paragraph 347 of the Amended Complaint).

In short, Plaintiffs' own pleadings leave no doubt that the December 16, 2019 announcement was not a corrective disclosure for the prior RTS statements. By December 12, 2019 at the latest, the market already understood that the 737 MAX was not going to return to service before the end of 2019. As a result, the December 16, 2019 announcement provided no

42

new information to the market about the expected RTS timeline for the 737 MAX and was not a corrective disclosure as a matter of law.  *See, e.g.*, *In re Omnicom Grp. Inc. Sec. Litig.*, 541 F. Supp. 2d 546, 552 (S.D.N.Y. 2008) ("A recharacterization of previously disclosed facts cannot qualify as a corrective disclosure."), *aff'd*, 597 F.3d 501, 513 (2d Cir. 2010) ("Because appellant failed to demonstrate any new information in the June 12 article regarding Omnicom's alleged fraud, appellant has failed to show a price decline due to a corrective disclosure.").[19]  Because Plaintiffs have not pleaded loss causation as to the RTS statements, claims based on those statements must be dismissed.

> **B.  Plaintiffs' Own Allegations Demonstrate That The December 16, 2019 Announcement Of A Production Halt Was The Materialization Of A Fully Disclosed Risk.**

The December 16, 2019 production-halt announcement was not a corrective disclosure for another independently sufficient reason: any decline in Boeing's stock price following that disclosure reflected the materialization of a fully disclosed risk.

Plaintiffs themselves allege that Boeing disclosed during an earnings call on July 24, 2019 "that it might entirely halt production of the 737 MAX if the grounding continued."  Am. Compl. ¶ 317 (emphasis omitted).  In fact, in its April 24, 2019 SEC Form 10-Q, Boeing had cautioned that RTS delays "could result in additional disruption to the 737 production system, including further reductions in the production rate and/or a temporary cease of production."  Ex. 5, Boeing's April 24, 2019 SEC Form 10-Q at 50.  And contemporaneous analyst reports show that the market fully understood the risk of a production halt if Boeing's projected return-to-service timeline continued to be extended, predicting that delays in the RTS timeline increased the likelihood of a

---

[19] *See also, e.g.*, *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014) (disclosure of "public information that the market absorbed long before" cannot support loss causation).

production halt. *See, e.g.*, Ex. 10, October 20, 2019 Morgan Stanley Research Update ("These headlines created concerns of … extended delays for the 737 MAX return to service, raising the probability of a production halt or cut.").[20]

The December 16, 2019 production-halt announcement was therefore the materialization of a known risk that Boeing had fully disclosed to the market. As such, it cannot serve as a corrective disclosure. *See, e.g.*, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 176–77 (2d Cir. 2005) (dismissing action at pleading stage based on lack of loss causation where risk that led to stock-price decline was "apparent on the face of every report challenged in the underlying complaints"); *In re New Energy Sys. Sec. Litig.*, 66 F. Supp. 3d 401, 406 (S.D.N.Y. 2014) (concluding that plaintiff failed to plead loss causation where "risk necessarily was clear to the market" before drop in stock price).

The court's decision in *Monroe County Employees' Retirement System v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336 (S.D.N.Y. 2014), is instructive on this point. The plaintiffs in that case asserted securities fraud claims against YPF Sociedad Anonima—a leading Argentine energy company—for alleged material misrepresentations related to the risks of eventual nationalization by the Argentine government. *Id.* at 342–46. To establish loss causation, the plaintiffs "claim[ed] that YPF's stock plummeted on April 16, 2012 because investors discovered the concealed risks for the first time." *Id.* at 357. But that theory of loss causation, according to the court, was "not plausible" based on "the media coverage throughout January, February, and March" regarding the

---

[20] This Court may take judicial notice of analyst reports for the information that was available in the market at the time. *See, e.g.*, *In re Century Aluminum Co. Sec. Litig.*, 2011 WL 830174, at \*9 (N.D. Cal. Mar. 3, 2011) ("[C]ourts routinely take judicial notice of analyst reports, not in order to take notice of the truth of the matters asserted therein, but in order to determine what may or may not have been disclosed to the public."); *see also In re Hum. Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 758 (D. Md. 2013) (noting that district courts can "take judicial notice of newspaper articles, analysts' reports, and press releases in order to assess what the market knew at particular points in time, even where the materials were not specifically referenced in the complaint").

44

risks of nationalization. *Id.*; *see also, e.g.*, *id.* at 343 ("On January 30, 2012, media reports indicated that 'Argentine officials were discussing a government takeover of YPF because of the Company's lack of investment.'" (quoting complaint)). Instead, "[t]he drop in YPF's share price after the announcement of nationalization likely represented the ***materialization of a known risk***, rather than the disclosure of a concealed one," and the court thus dismissed the plaintiffs' § 10(b) claim for a failure to plead loss causation. *Id.* at 358 (emphasis added).

The same is true here: the drop in Boeing's share price after the December 16, 2019 announcement of a production halt represented the materialization of a known risk that Boeing already had disclosed to the market and that had been reported by analysts. As in *YPF Sociedad Anonima*, this Court should conclude that the December 16, 2019 announcement was not a corrective disclosure that can show loss causation.

*    *    *

In sum, Judge Tharp clearly erred in holding that the December 16, 2019 announcement was a valid corrective disclosure. Once that mistake is corrected, Statement Nos. 42, 43, 44, 46, 47, 48, and 49 fail for lack of loss causation.

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' claims based on Statement Nos. 1, New-1, 2, 3(b), 4, 5, 6, 7, 8, 9, 10, 11, 20, 21, 24(a), 25, 26, 27, 29, 30, 40, 42, 43, 44, 46, 47, 48, and 49—and also dismiss all claims against Defendant Gregory Smith—with prejudice.

Dated:  October 16, 2023       Respectfully submitted,


             */s/ John F. Hartmann, P.C.*
             John F. Hartmann, P.C.
             Michael B. Slade
             KIRKLAND & ELLIS LLP
             300 North LaSalle
             Chicago, Illinois 60654
             (312) 862-2000

             Craig S. Primis, P.C. (*pro hac vice*)
             Katherine R. Katz (*pro hac vice*)
             KIRKLAND & ELLIS LLP
             1301 Pennsylvania Avenue, N.W.
             Washington, D.C. 20004
             (202) 389-5000

             *Counsel for Defendants*

46