# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| Richard Seeks, et al., | No. 19-cv-02394 |
| Plaintiffs, |  |
|  | Judge Franklin U. Valderrama |
| v. |  |
| The Boeing Company, et al., |  |
| Defendants. |  |

## MEMORANDUM OPINION AND ORDER

Plaintiffs bring this putative class action on behalf of Boeing shareholders who Plaintiffs allege were damaged when Boeing, its former President and CEO, Dennis Muilenburg, and its former CFO, Gregory Smith (collectively, Defendants) made public statements in response to two devastating plane crashes in 2018 and 2019, both involving Boeing's 737 MAX plane. Plaintiffs assert claims for securities fraud under Section 10(b) of the Securities Exchange Act, alleging that Defendants misrepresented the safety of the 737 MAX to the investing public, which artificially inflated Boeing's stock price and caused injury to the putative class members.

Before the Court is Defendants' motion to dismiss the amended complaint. R. 292.[1] Defendants argue that Plaintiffs have not met the exacting standards of

---

[1] Citations to the docket are indicated by "R." followed by the docket number or filing name, and, where necessary, a page or paragraph citation.

pleading a securities fraud claim. The Court grants the motion in part and denies it in part. Plaintiffs have corrected some of the deficiencies of their original complaint with new allegations of what the Defendants had knowledge of and when, therefore plausibly alleging that Defendants Boeing and Muilenburg made materially misleading statements following the 2018 and 2019 crashes. Plaintiffs, however, have not alleged facts sufficient to state a claim against Defendant Smith.

## Background[2]

Plaintiffs, a group of pension funds and private investors, bring this putative securities fraud class action against Defendants Boeing, Boeing's President and CEO from July 2015 to December 2019, Dennis Muilenburg, and Boeing's CFO and Executive Vice President of Enterprise Performance and Strategy from 2011 to July 2021, Gregory Smith. R. 275 ¶¶ 46–47.

Plaintiffs allege that Defendants made false and misleading comments with the intent to deceive investors in the wake of two catastrophic plane crashes involving Boeing 737 MAX airplanes. Although the Court set forth a detailed factual background in its prior order on Defendants' motion to dismiss the original Complaint, it will do so again here based on the allegations in the operative Amended Complaint.

---

[2] The Court takes the factual background from the well-pled allegations in the Amended Complaint (R. 275) and assumes the allegations to be true for the purposes of the instant motion. *See, e.g.*, *Anicich v. Home Depot U.S.A., Inc.*, 852 F.3d 643, 648 (7th Cir. 2017).

## I.        Development and Certification of the 737 MAX

Boeing is the world's largest aerospace company and for decades has been the dominant commercial aircraft manufacturer in the United States. R. 275 ¶¶ 45, 50. Boeing's 737 model commercial jetliner, which was introduced to the market in 1964, became the highest selling commercial aircraft in aviation history. *Id.* ¶ 50.

Boeing's main competitor in the commercial aircraft industry is Airbus, a European-based manufacturer of commercial airliners. *Id.* ¶ 51. Facing competition from Airbus, Boeing began development of a new, more fuel-efficient airplane in early 2011. *Id.* ¶¶ 54–55.

During the same time, Airbus took a different approach and decided to upgrade the engines on its A320—one of the most popular commercial airplanes in the world—to create a "revamped" version of the plane with more efficient engines. *Id.* ¶¶ 51–52. Airbus' plans to revamp the A320, rather than develop a new plane entirely, proved to be very lucrative, causing Boeing to rethink its decision to develop a new plane. *Id.* ¶ 57–58.

 Accordingly, in August of 2011, Boeing decided to follow in Airbus' footsteps and launch development of the 737 MAX—an upgrade of the 737 model with more fuel-efficient engines. *Id.* ¶¶ 58–59. From the Plaintiffs' view, Boeing's board of directors were mainly concerned with how fast Boeing could get the new 737 MAX to market and how best to minimize costs, with safety considerations taking a backseat. *Id.* ¶ 59.

Boeing's decision to upgrade the design of its 737 model, rather than design a new plane entirely, changed the regulatory framework Boeing faced from the FAA. *Id.* ¶ 61. Instead of going through the lengthy process of certifying an entirely new model, Boeing could attempt to certify the 737 MAX through an amendment to its 737 certificate, which would cut the time for certification nearly in half and therefore keep Boeing's costs down. *Id.* Not only would upgrading the design of the 737 MAX prove a faster route to certification for Boeing, but Plaintiffs also allege Boeing played a large role in certifying its own designs. *Id.* ¶ 62. This was because of an FAA program called "Organization Designation Authorization," which allowed the FAA to delegate the work associated with certification and compliance to the manufacturers themselves. *Id.* Under to this program, according to Plaintiffs, the FAA ultimately delegated 96% of the certification process for the 737 MAX to Boeing itself. *Id.*

Another benefit to upgrading the 737, as opposed to designing a new plane entirely, was that Boeing argued the 737 MAX would not require any simulator training for pilots already trained to fly 737 planes, because such simulator training is both lengthy and cost intensive. *Id.* ¶ 65. Therefore, Boeing's message to its airline customers was essentially that, because the 737 MAX was so similar to the 737—which had an excellent safety reputation—pilots would not need new training to fly the 737 MAX and airlines could seamlessly roll out the new 737 MAX planes. *Id.* ¶¶ 66–67. The way Plaintiffs see it, the lack of pilot simulator training was so important to Boeing that, after the two crashes involving 737 MAX planes, Boeing employees came forward and described "intense internal pressure to avoid any design changes"

that might have caused the FAA to require pilot simulator training for the 737 MAX. *Id.* ¶ 68.

Plaintiffs generally describe the culture at Boeing in developing the 737 MAX as one that valued "profits over safety." *Id.* ¶¶ 72–76. This culture, allege Plaintiffs, is best exemplified by various whistleblower reports that came to light after two crashes involving 737 MAX airplanes in late 2018 and 2019. Employees described a high pressure and overly fast-paced environment in completing certification and production of 737 MAX planes. *Id.* ¶¶ 69, 75, 76. One former Boeing employee described a culture that incentivized burying any safety concerns with the 737 MAX, rather than reporting those concerns to management. *Id.* ¶ 75. As discussed more fully below, Plaintiffs allege this culture of "profits over safety" is ultimately what led to the two fatal crashes, caused by faulty software on the 737 MAX.

### a. MCAS Design and Functionality

To understand the full context of Defendants' statements that Plaintiffs' claim were false and misleading, additional background is necessary on the design elements of the 737 MAX and the features that ultimately caused the crashes.

Boeing's plan for the 737 MAX was to install more fuel-efficient engines on the same design as the original 737 plane. *Id.* ¶ 77. The engines required to meet Boeing's desired fuel efficiency were much larger, however, than those used on the original 737, which meant Boeing had to make certain additional design changes to compensate for the larger engines. *Id.* ¶ 77–78. Specifically, Boeing had to move the position of the engines and place them in front of the wing, as opposed to where they

sat hanging under the wing on the original 737. *Id.* ¶ 79. Changing both the location of the engines and the size altered the "centerline" of the engine's thrust, which Boeing learned could cause the plane to "pitch up"—meaning that the nose of the plane would point up, with the tail end of the plane falling down, as depicted in the graphic shown below. *Id.*



Boeing discovered that when the nose of the plane pitched up—or was at a high "angle of attack,"—the size and location of the engines forced the plane to continue to pitch up even higher, compounding the lack of stability. *Id.* ¶ 80. Plaintiffs allege that for Boeing to have adequately solved this problem, Boeing would have had to make structural changes to the 737 MAX's airframe to make the plane more stable. *Id.* ¶ 82. However, such drastic design changes could have rendered the MAX too different from the original 737 and required Boeing to seek FAA certification of the MAX as a new plane. *Id.* Due to the culture of "profits over safety," as described above, Plaintiffs allege Boeing would not entertain this option. *Id.*

Instead of making structural changes to compensate for the issues caused by the larger engines, Boeing installed an automated system on the 737 MAX called the Maneuvering Characteristics Augmentation System (MCAS) into the plane's flight

control systems. *Id.* ¶ 83. MCAS was designed to automatically pitch the nose of the plane down if the system determined that the "pitch up" situation described above was starting to occur. *Id.* ¶ 84. MCAS relied on "angle of attack" (AoA) sensors that communicated to MCAS if the nose of the plane was pitching up to a level at which the plane was in danger of stalling, in which case the system would take over and correct the pitch down. *Id.*

While MCAS was initially meant to rely on two AoA sensors, Plaintiffs allege the final version of MCAS was designed to draw data from only one sensor. *Id.* ¶ 91. Plaintiffs allege Boeing ultimately made this decision to use one sensor to avoid additional pilot training that could have delayed rollout of the 737 MAX to the market. *Id.* ¶ 92. But according to Plaintiffs, allowing MCAS to rely on only one sensor did not align with either Boeing's internal safety standards or industry-wide safety standards at the time. *Id.* ¶ 96, 98.

Plaintiffs allege that the use of a single sensor was an obvious safety hazard because it created a "single point of failure," wherein MCAS might mistakenly believe the plane is at a dangerous pitch up when it is not, and therefore erroneously take control of the plane and tilt the pitch down, even though the plane was not in danger of stalling. *Id.* Plaintiffs also quote a Seattle Times article in which a former Boeing employee stated it would be "highly unusual" to have a "safety-critical system dependent on a single sensor." *Id.* ¶ 97. Plaintiffs also allege that Boeing misrepresented to the FAA that the standard design of the 737 MAX included software that would alert pilots if the AoA sensors malfunctioned. *Id.* ¶¶ 134–35. In

reality, this software was not standard on the 737 MAX, and was only operational if it was purchased by Boeing's airline customers and installed on the flight computers. *Id.* ¶ 137.

### b. Plaintiffs allege Boeing submitted a hazard assessment of the 737 MAX to the FAA hiding the safety risks associated with MCAS

In light of the potential risks posed by allowing MCAS to rely on a single point of failure, the FAA required Boeing to perform a "hazard assessment," which would determine the probability and severity of the risk posed by an MCAS activation caused by a faulty AoA sensor. *Id.* ¶ 104. The FAA grades the severity of risk on a scale from "Minor Failure Condition" to "Catastrophic Failure Condition." *Id.* ¶ 105. A "Minor Failure Condition" does "not significantly reduce airplane safety" and is one in which the flight crew are equipped to handle. *Id.* A "Catastrophic Failure Condition," on the other hand, is one that would result in "multiple fatalities, and usually with the loss of the entire airplane." *Id.* For FAA certification purposes, a "Catastrophic Failure Condition" must be less likely than one in one billion to occur. *Id.*

Plaintiffs allege that Boeing submitted a false Functional Hazard Analysis to the FAA, which classified MCAS failure as only a "Major Failure Condition," two grades below a "Catastrophic Failure Condition." *Id.* ¶ 107. Part of the falsity of the report, Plaintiffs allege, was that Boeing assumed if MCAS erroneously activated, pilots would be equipped to adequately respond within four seconds. *Id.* ¶ 108. At the same time, Plaintiffs allege that Boeing knew—but did not report to the FAA—that

if pilots took longer than ten seconds to properly respond to an erroneous MCAS activation, the failure would instead be a "Catastrophic Failure Condition," likely resulting in a crash and multiple fatalities. *Id.* ¶ 110. Moreover, Plaintiffs allege that Boeing was aware of an internal report showing that, during a simulator test of the 737 MAX, a pilot took longer than ten seconds to respond to an MCAS activation, which would have resulted in a "Catastrophic Failure Condition." *Id.* ¶ 111. Plaintiffs further allege that in an effort to skirt the FAA's requirements for hazard conditions, Plaintiffs allege Boeing "concocted" a false calculation to downgrade the likelihood of an MCAS malfunction rate in reporting to the FAA. *Id.* ¶ 125. Boeing was able to do this by concluding that MCAS could only activate during more "strenuous flight operations," which are not as likely to occur during a regular flight. *Id.*

According to Plaintiffs, Boeing's estimate that pilots could react to an erroneous MCAS activation within four seconds rested on a series of assumptions that ultimately proved not to be the case. *Id.* ¶ 112. Boeing assumed that pilots could react in the same manner and with the same speed as they would in response to an erroneous activation of a 737's automatic trim control system. *Id.* The trim system on the 737 was not nearly as powerful as the MCAS system, however, and pilots on a 737 could disable the entire system by pulling back on the yoke, while pulling back on the yoke of a 737 MAX did nothing to disable MCAS. *Id.* ¶¶ 112–113. Instead, pilots on a 737 MAX would need to activate two "kill" switches to shut off the automatic trim control system, and if the pilot failed to activate these switches fast enough, MCAS could override the entire system. *Id.* ¶¶ 113, 114. Even if the pilot

could deactivate MCAS by cutting the power to it, the pilot would then have to manually control the trim of the plane to adjust the pitch back up, which would be impossible at the rate of speeds they would be going. *Id.* ¶ 116. Further, even if the pilots were able to stop an erroneous MCAS activation without cutting power to the stabilizer, MCAS could misfire repeatedly and "start the process all over again." *Id.* ¶ 122.

In later flight tests that Boeing performed on the 737 MAX in 2016, test pilots reported issues with flight that Boeing engineers responded to by expanding MCAS's authority to move the tail of the plane. *Id.* ¶ 148. Plaintiffs allege this change "greatly expanded" MCAS's authority to push the nose of the plane into a dive even at low speeds. Plaintiffs allege these changes fundamentally altered MCAS's authority from what Boeing previously represented to the FAA in its hazard analysis. Regardless, the 737 MAX was certified by the FAA on March 8, 2017. *Id.* ¶ 152.

After certification and as Boeing rolled out production of the 737 MAX, in June 2018, senior personnel at Boeing began reporting concerns with the quality of production of 737 MAX planes at Boeing's production facility in Renton, Washington. *Id.* ¶ 170. Specifically, Edward Pierson, a Senior Manager at the Renton facility, reported to Boeing executives, including Defendant Muilenburg, that he had serious concerns about "production quality" at the facility. *Id.* ¶ 171. Boeing, however, continued to produce the 737 MAX, and it became one of Boeing's best-selling aircrafts and a huge source of revenue for the company by 2018. *Id.* ¶ 189. After the Lion Air crash in October of 2018, Pierson again raised concerns with Boeing

10

executives about the Renton facility and the quality of the planes being produced there. *Id.* ¶ 177, 178. Pierson ultimately raised his concerns with Boeing's Board of Directors to no avail. *Id.* 181.

### c. Forkner messages later reveal that Boeing employees knew the FAA did not have all the necessary information about the 737 MAX before certification

Plaintiffs allege that internal communications which occurred years before the crashes reveal that at least some Boeing employees knew about (1) the falsity of the hazard report Boeing submitted to the FAA; and (2) that MCAS could take control of the 737 MAX and force the nose of the plane down.

On November 16, 2016, Boeing employee Mark Forkner, the 737 MAX's Chief Technical Pilot, sent text messages about MCAS to another Boeing technical pilot, Patrik Gustavsson. *Id.* ¶ 127. Forkner texted Gustavsson that, during flight simulation for the 737 MAX, MCAS was capable of being activated "well within the normal flight envelope." *Id.* This was contrary to what Boeing reported to the FAA, which was that MCAS was only operational during "strenuous flight operations." *Id.* Forkner stated that MCAS was "running rampant in the sim[ulator] on me" and that the plane was "trimming itself like crazy." *Id.* Forkner referred to the MCAS activation as "egregious." *Id.* Forkner also sent a text message admitting that what Boeing represented to the FAA—that MCAS could only operate outside of the normal operating envelope—was false, and that he "basically lied to the regulators (unknowingly)." *Id.* ¶ 129. After this revelation, however, Plaintiffs allege no further action was taken by Boeing to correct the hazard analysis or disclose this truth to the

FAA. *Id.* ¶ 130. Plaintiffs attribute this lack of disclosure to the culture at Boeing as one that "prioritized speed and profits over safety," and Plaintiffs further cite to later reports quoting former Boeing employees who worked with Forkner, stating that Forkner feared losing his job if the FAA rejected Boeing's attempts to minimize pilot training for the 737 MAX. *Id.*

Earlier that same year, on March 30, 2016, Forkner had requested that the FAA approve Boeing's decision to remove all references to MCAS from the flight manuals provided to aircraft crew. *Id.* ¶ 159. Forkner explained that MCAS was "completely transparent to the flight crew and only operates WAY outside of the normal operating envelope." *Id.* Forkner's request proved successful—the training that the FAA ultimately approved for the 737 MAX for pilots who were already trained to fly the 737 consisted of just one hour of material taken on an iPad, and MCAS was not included in the training. *Id.* ¶ 133. In an email sent on November 3, 2016, Forkner explained that he "jedi-mind trick[ed] regulators into accepting the training that I got accepted by FAA etc." *Id.* ¶ 161.

## II.    Lion Air Crash and Subsequent Internal Investigations

On October 29, 2018, Lion Air flight JT 610 departed Jakarta, Indonesia, on a 737 MAX. *Id.* ¶ 190. Two minutes into the flight, MCAS began to repeatedly activate, causing the plane to fall more than 20 times. *Id.* ¶ 190–93. The plane ultimately entered a steep dive and crashed into the Java Sea, killing all 189 people on board. *Id.* ¶ 197. The Associated Press reported that data from flight trackers showed "erratic speed, altitude, and direction in the minutes after takeoff" and that a

"downward plunge" immediately preceded the crash. *Id.* ¶ 198. While early public speculation pointed to Lion Air, which was a budget airline with a "mixed safety record" and "checkered past," Plaintiffs allege that Boeing quickly identified MCAS as a possible cause. *Id.* ¶¶ 199–200. Analysts at the time did not suspect the Boeing-manufactured plane to have any role in the crash. *Id.*

### a. Boeing and the FAA's internal investigations reveal MCAS was the likely cause of the Lion Air crash

Soon after the Lion Air crash, Boeing initiated an internal investigation involving senior executives and members of Boeing's communications and legal teams. *Id.* ¶ 203. The internal investigation team included Defendants Muilenburg and Smith, Boeing Commercial Airlines (BCA) Chief Engineer John Hamilton, Boeing's regulatory team lead and VP of Safety, Security and Compliance Elizabeth Pasztor, BCA President and CEO Kevin McAllister, General Counsel Michael Luttig, Chief Technology Officer Greg Hyslop, Vice President of Product Development Mike Sinnett, and Senior Vice President of Communications Anne Toulouse. *Id.* ¶ 203. Defendant Muilenburg also set up a daily call with members of the investigation team to brief the leadership on the findings of the investigation. *Id.* ¶ 204. Hamilton briefed Defendant Muilenburg on the investigation's findings in real time, often meeting with him twice daily to provide updates. *Id.* ¶ 205.

As Boeing's internal investigation commenced in the days after the Lion Air crash, Boeing Chief Engineer Thomas Dodt left a voicemail on November 6, 2018, for Hamilton, communicating to him that when MCAS is in operation, "the stabilizer can be commanded well beyond the electric stabilizer limit . . . . [T]here's no way that you

can control that, that is a lot of stabilizer." *Id.* ¶ 210. Dodt also warned Hamilton that Boeing had never tested the hazards associated with repeat MCAS activation, because that was "never a design requirement." *Id.* ¶ 211. Dodt later emailed Hamilton and explained that repeat MCAS activations could "overpower the pilots' ability to react using the electric trim stabilizer." *Id.* ¶ 212. Boeing's Safety Review Board (SRB), which was responsible for evaluating and reporting safety issues concerning Boeing's airplanes, reached the same conclusions in their investigation and reported those conclusions to the senior executives listed above. *Id.* ¶¶ 10, 213.

Boeing's SRB held its first meeting about the Lion Air crash on November 4, 2018, at which point Plaintiffs allege the SRB had already identified erroneous MCAS activation as a "safety issue," and knew that pilots would not know how to respond to repeated MCAS activation. *Id.* ¶ 213. These findings, allege Plaintiffs, were distributed to Boeing executives, and that Defendant Muilenburg was updated on the SRB's conclusions daily. *Id.* The SRB met again on November 6, 2018, and concluded that erroneous MCAS activation was an "Attention Level 'A' . . . Airplane Safety Concern," which is Boeing's highest safety emergency classification. *Id.* ¶ 214. The SRB also concluded that the same procedure pilots would follow to respond to a similar error in an original 737, if performed by the pilots of a 737 MAX, would only reset, but not entirely deactivate MCAS, so MCAS could continue to activate over and over. *Id.* The SRB also concluded that Boeing should issue a "Flight Operations Tech Bulletin" (FOTB) to advise flight crews of how to properly respond to the errors that can cause erroneous MCAS activation. *Id.* ¶ 216. Plaintiffs allege that Defendant

Muilenburg pressured employees to make sure that any changes to the flight crew manual were "innocuous," so that the communications would not affect Boeing's "near-term deliveries" of more 737 MAX planes. *Id.* ¶ 217.

On November 6, 2018, Boeing issued a bulletin to flight crews, pointing them to existing flight crew procedures to address a runaway stabilizer and erroneous AoA data. *Id.* ¶ 218, 234. While the bulletin did not mention MCAS by name or address that Boeing needed to make further software changes to ensure the safety of the 737 MAX, it pointed flight crews to existing 737 procedures to address automatic trim inputs.[3] *Id.* ¶ 251.

Plaintiffs also allege that Boeing was in communication with leaders from the FAA after the Lion Air crash. The FAA immediately directed Boeing to "address the flight control software," and identify necessary fixes to the plane that were "needed to safely operate the 737 MAX." *Id.* ¶ 231. The FAA also issued an Emergency Airworthiness Directive (AD) that directed flight crews to the procedures they should use if they encountered similar conditions that led to the Lion Air crash. *Id.* Plaintiffs allege the FAA was clear that this Emergency AD was an "interim action," and that further action by Boeing was necessary to ensure that flight crews could safely fly the 737 MAX. *Id.*

On November 9, 2018, the FAA issued a risk assessment of the 737 MAX privately to Boeing. *Id.* ¶ 227. The risk assessment concluded that erroneous MCAS

---

[3] Plaintiffs allege that one day before the Lion Air crash, pilots of another 737 MAX faced an erroneous MCAS activation which they were able to counter by switching off the flight control system, which was the procedure for addressing a similar problem in the original 737. *Id.* ¶ 245. Accordingly, in the bulletin, Boeing directed crews to follow this same procedure of switching off the flight control system. *Id.*

activation was a "High Priority" safety issue and recommended that Boeing take "urgent action" to address it. *Id.* The assessment also concluded that repeat MCAS activation was "likely a significant contributing factor in a catastrophic event" and required Boeing to submit a report to the FAA detailing what led to the Lion Air crash. *Id.* ¶¶ 228–29. In response to the FAA's directives, Boeing planned a number of software fixes to ensure compliance. *Id.* ¶ 232.

### b. Boeing's public statements after the Lion Air crash

At the same time, Boeing launched what Plaintiffs describe as a "public relations offensive." *Id.* ¶ 202. Boeing put out numerous statements reassuring Boeing's customers and the public that the 737 MAX was a safe plane and that pilots were well equipped to safely fly the 737 MAX. *Id.* ¶¶ 236–37. On November 7, 2018, Boeing issued a press release stating that it had issued a bulletin to flight crews on November 6, detailed above, which directed flight crews to "existing flight crew procedures to address circumstances where there is erroneous input from an AOA sensor." *Id.* ¶ 239. Boeing also made statements shifting the blame for the crash to pilot error, and even comparing the pilots of the Lion Air flight response to erroneous MCAS activation with that of a flight that occurred the day before without error. *Id.* ¶ 246.

Defendant Muilenburg also made public statements, including appearing on Fox Business, where he touted the safety of the 737 MAX and emphasized the importance of safety to Boeing as a company. *Id.* ¶¶ 240. Defendant Muilenburg also crafted an internal employee-wide email reiterating the safety of the 737 MAX plane

and stating that "[s]afety is a core value at Boeing[.]" *Id.* ¶ 241. Plaintiffs allege that Defendant Muilenburg approved the intentional leak of this email to Jim Cramer of CNBC's *Mad Money* days after it was sent. *Id.*

Ultimately, Plaintiffs allege that Boeing's campaign was successful. Multiple financial analyst firms credited Boeing's public statements in rendering investment advice, with one firm maintaining their "Buy" rating for Boeing stock, stating there was "nothing at this point to deter our positive bias on shares of Boeing and continue to see most probable outcomes having limited materiality to [Boeing's] financials or product demand." *Id.* ¶ 253.

Plaintiffs allege that, at some point in the aftermath of the Lion Air crash, possibly as early as December of 2018, Defendants Muilenburg and Smith, along with other Boeing senior management, learned about the Forkner messages discussed above, in which Forkner admits that he unknowingly lied to regulators about MCAS in seeking certification of the 737 MAX. *Id.* ¶ 268. Plaintiffs allege that, despite learning about the contents of these messages and that the 737 MAX had been certified under false pretenses, no one who learned about the messages at Boeing, including Defendants Muilenburg and Smith, took any action to address the flaws in the 737 MAX. *Id.*

### III.  Ethiopian Airlines Crash and subsequent public statements

Nearly five months after the Lion Air crash, on March 10, 2019, Ethiopian Airlines flight ET 302, a 737 MAX flight, crashed minutes after takeoff, killing all 157 people on board. *Id.* ¶¶ 269, 272. Flight data revealed that MCAS activated just

17

one minute into the flight and forced the nose of the plane down. *Id.* ¶ 270. Pilots followed the existing flight procedures Boeing had pointed to after the Lion Air crash and disconnected power to the electric trim motor. *Id.* ¶ 271. This, however, forced the pilots to attempt to manually trim the stabilizer, which they were physically incapable of doing given the high speed of the plane. *Id.* ¶ 272. The pilots then reactivated power to the electronic trim, but this caused MCAS to reactivate and force the plane into a steep dive, ultimately causing the plane to crash into a nearby farm field at nearly 700 miles per hour. *Id.*

Following the Ethiopian Airlines crash, aviation regulators around the world began ordering a temporary grounding of the 737 MAX fleet. *Id.* ¶ 275. Plaintiffs allege that in response to the Ethiopian Airlines crash and the grounding orders, Boeing stock declined $47.13 per share—a loss of $26.63 billion of Boeing market capitalization. *Id.* ¶ 276. Ultimately, on March 13, 2019, the FAA issued an emergency order grounding the 737 MAX indefinitely. *Id.* ¶ 286. Boeing publicly supported this decision, and on the same day Defendant Muilenburg issued a statement that Boeing determined "out of an abundance of caution and in order to reassure the flying public of the aircraft's safety—to recommend to the FAA the temporary suspension" of the 737 MAX and stated that Boeing was "supporting this proactive step out of an abundance of caution[.]" *Id.* ¶ 479. Despite the public support, Plaintiffs allege that Defendant Muilenburg was privately looking for ways to stop the FAA's grounding order, and even made a "personal plea" to the President of the United States to stop the grounding order. *Id.* ¶ 478.

18

### a. Defendants' statements about safety after the Ethiopian Airlines crash

Plaintiffs allege that after the Ethiopian Airlines crash, Boeing launched a public relations campaign with the purpose of reassuring the public of the safety of the 737 MAX, similar to after the Lion Air crash. *Id.* ¶ 279. Part of this campaign was to attempt to shift blame away from the operation of the 737 MAX and instead focus on pilot error as the cause for the Ethiopian Airlines crash. *Id.* ¶ 280. Plaintiffs allege that financial analysts again relied on Boeing's safety statements, with some even expressing disbelief that a Boeing manufactured plane could present a safety issue given the "rigorous" testing and maintenance required of plane manufacturers. *Id.* ¶ 283.

In the days after the Ethiopian Airlines crash, news outlets began reporting on the potential issues with MCAS. *Id.* ¶ 284. Specifically, on March 12, 2019, The Wall Street Journal published an article indicating that the necessary software changes Boeing had previously identified for the 737 MAX would be more extensive than what industry officials had anticipated. *Id.* On March 17, 2019, the Seattle Times published an investigative report that detailed safety issues with the 737 MAX based on interviews with current and former Boeing engineers. *Id.* ¶ 289. The article also reported on the responsibilities the FAA delegated to Boeing for reviewing the safety of its own plane. *Id.* ¶ 290. Perhaps the most revealing report came from The New York Times on March 21, 2019, which explained that Boeing concealed the fact that the two 737 MAX planes involved in the Lion Air and Ethiopian Airlines crashes, respectively, did not have optional safety features which Boeing charged extra for. *Id.*

19

¶¶ 296–97.[4] The article reported that Boeing concealed from investors, airlines, pilots, and passengers the fact that these "optional" features were in fact critical safety features that could have prevented the crashes. *Id.* While Defendants continued to publicly tout the safety of the 737 MAX, Plaintiffs allege the public was learning of the real problems with the 737 MAX design.

### b. Return to Service Statements

Not long after the fatal Ethiopian Airlines crash, and considering the numerous grounding orders across the world, Boeing announced that it would be cutting back on production of the 737 MAX. *Id.* ¶ 302. Plaintiffs allege, that during this time, Boeing and Defendants continued to make optimistic public statements about a quick return to service for the 737 MAX in order to quell investor concern over the indefinite grounding.

On April 24, 2019, Boeing held its first earnings conference call of 2019 and faced questions about the safety of the 737 MAX from financial analysts. *Id.* ¶ 303. In response to questions about how the safety issues with the 737 MAX "slipped" past the FAA, Defendant Muilenburg stated that there was "no technical slip or gap here" and that "there was no surprise or gap or unknown here or something that somehow slipped through a certification process. Quite the opposite. We know exactly how the airplane was designed. We know exactly how it was certified. We have taken the time to understand that." *Id.* ¶ 303. Shortly after this earnings call, on April 29, 2019,

---

[4] These features were the angle of attack indicator and the disagree light. The angle of attack indicator displays the readings from the plane's AoA sensors and the disagree light activates when the sensors' data are mismatched. R. 275 ¶ 297.

Boeing held its Annual Shareholders Meeting, during which Defendant Muilenburg stated that Boeing "followed exactly the steps in our design and certification processes that consistently produce safe airplanes." *Id.* ¶ 304.

Sometime between June 17 and June 23, 2019, The Wall Street Journal later reported that Defendant Muilenburg had a private meeting with then-Acting Administrator of the FAA, Daniel Elwell, at the Paris Air Show. *Id.* ¶ 306. During that meeting, Elwell specifically told Defendant Muilenburg to "slow down [Boeing's] talk of progress [on the 737 MAX]" and to "giv[e] the FAA space to exercise scrutiny" in the recertification process. *Id.* However, on June 26, 2019, Muilenburg made a public announcement that Boeing was "still . . . looking at" the end of summer 2019 as the "timeframe" for when the 737 MAX would return to operation. *Id.* ¶ 307.

After this meeting, on June 26, 2019, the FAA issued a statement on Twitter, which described an "additional requirement" that the FAA asked Boeing to address via software updates. *Id.* ¶ 312. The FAA also confirmed that Boeing would not offer the 737 MAX for recertification by the FAA until all requirements for certification of the 737 MAX were met. *Id.* The software updates the FAA referenced were related to MCAS, as was later reported by The Wall Street Journal and the Associated Press. *Id.* ¶ 313. Plaintiffs allege that financial analysts reacted negatively to this news and that Boeing's stock price fell 2.9% in response, causing a $6.14 billion market capitalization drop. *Id.* ¶¶ 314–15.

Boeing continued to publicly express optimism about the swift recertification of the 737 MAX. However, on July 24, 2019, Boeing disclosed for the first time to the

public that it may halt production of the 737 MAX entirely. *Id.* ¶¶ 316–17. Plaintiffs allege that the market responded negatively to this disclosure as well, and that Boeing's stock price declined nearly 7% in response, falling from $373.07 per share on July 23 to $361.43 per share on July 24, then continuing to fall to close to $348.09 per share on July 25. *Id.* ¶¶ 319, 321–22. Put differently, over the two-day trading period following the July 24 second-quarter earnings call, Boeing's stock price allegedly plummeted, erasing $14.06 billion of Boeing's market capitalization. *Id.* At the same time, Plaintiffs allege Boeing continued to hide important safety information about the 737 MAX from the public in an attempt to continue to inflate Boeing's stock price and maintain its story that the 737 MAX would be returned to service within the year. *Id.* ¶ 320.

### c. Disclosure of the Forkner messages to the public

On October 18, 2019, The New York Times published an article which detailed that top officials at Boeing knew of safety concerns relating to MCAS as early as 2016. *Id.* ¶ 325. The article also published the Forkner messages, discussed *supra* at Sec. I(A)(i), including a message that Forkner sent after running simulator tests on the 737 MAX and stating that "MCAS was running rampant on the sim[ulator]." *Id.* ¶ 327. As more and more news sources picked up the story and the negative press intensified for Boeing, Plaintiffs allege financial analysts also reacted negatively to the news, and ultimately Boeing's stock price fell by over 10% in the days following publication of the Forkner messages, resulting in a total loss of $21.38 billion from Boeing's market capitalization. *Id.* ¶¶ 331–37. Boeing was then publicly rebuked by

the Senate Commerce, Science, and Transportation Committee in a hearing held after the Forkner messages were disclosed, with senators accusing Boeing of placing profits above safety. *Id.* ¶¶ 338–44.

Plaintiffs allege that behind the scenes, Boeing was still pressuring the FAA to recertify the 737 MAX. *Id.* ¶ 345. Boeing also continued to express optimism publicly about the return to service timeline for the 737 MAX, and issued a statement on November 11, 2019, stating it was possible the MAX could be recertified by the end of the year, despite receiving no indication from the FAA that this was a possibility. *Id.* ¶ 346.

News sources later reported that the FAA Administrator at the time, Steve Dickson, chastised Defendant Muilenburg for continuing to make such optimistic statements to the public and for implying that the 737 MAX could return to service before the end of the year. *Id.* ¶ 347. Ultimately, on December 16, 2019, Boeing announced that it was halting production of the 737 MAX. *Id.* ¶ 348. Plaintiffs allege Boeing's stock price fell 4.3% in reaction to this news. *Id.* ¶ 350. In total, Plaintiffs allege that the various misrepresentations made by Defendants to the public, which were later revealed to be false by corrective events, resulted in a total loss of nearly 27% in shareholder value. *Id.* ¶ 351.

## IV. Procedural Posture

Plaintiffs filed their Consolidated Complaint on February 14, 2020. R. 144. On June 30, 2020, Defendants moved to dismiss the Consolidated Complaint in its entirety, arguing that Plaintiffs had failed to state a claim for securities fraud. R. 163.

Defendants argued that Plaintiffs failed to plead that Defendants intentionally made false statements after the Lion Air and Ethiopian Airlines crashes, causing losses to investors because Plaintiffs did not adequately allege the elements of scienter, materiality, and loss causation. *See generally* R. 164.

Judge Tharp, who was presiding over the case at the time, issued a ruling on August 23, 2022, granting in part and denying in part Defendants' motion to dismiss. R. 191. Judge Tharp concluded that Plaintiffs stated a claim for securities fraud against Defendants, but only as to certain statements made by Boeing and Defendant Muilenburg. *Id.* at 1. Judge Tharp dismissed Defendant Smith from the case entirely, holding that Plaintiffs had failed to adequately allege any scienter on Defendant Smith's part. *Id.*

 Judge Tharp specifically held that Plaintiffs failed to state a claim for securities fraud as to the statements made by Boeing and Defendant Muilenburg after the Lion Air crash in October of 2018 and the safety related statements made after both crashes. *Id.* Judge Tharp allowed Plaintiffs to proceed on their claims regarding materially misleading statements by Boeing and Defendants Muilenburg made in the wake of the Ethiopian Airlines crash regarding Boeing's interactions with the FAA and the return to service timeline of the 737 MAX. *Id.*

The parties began discovery in September of 2022. R. 306 at 18. Shortly after, on October 3, 2022, this case was transferred to then District Court Judge Maldonado. R. 204. Plaintiffs filed their operative Amended Consolidated Complaint (Amended Complaint) on August 15, 2023. R. 275, 278. The Amended Complaint contains new

factual allegations uncovered by Plaintiffs through discovery to date. R. 306 at 18. Defendants move to dismiss the Amended Complaint. R. 292. Defendants again argue that Plaintiffs have failed to plead scienter, materiality, and loss causation, and therefore that the Amended Complaint should be dismissed in its entirety. *Id.*; R. 298 at 7–11.[5] Following Judge Maldonado's confirmation to serve as a U.S. Circuit Judge, this case was reassigned to this Court. R. 337.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). The Court need not, however, accept conclusory allegations, or allegations that contain only legal conclusions. *See*, *e.g.*, *Dix v. Edelman Fin. Servs., LLC*, 978 F.3d 507, 513 (7th Cir. 2020) (citations omitted). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible

---

[5] As part of his Order on Defendants' previous motion to dismiss, Judge Tharp identified the alleged misrepresentations at issue and prepared an Appendix containing the date of the statement, paragraph of the complaint where the statement appeared, the substance of the statement, the category the statement fell into, and remarks as to why the Court either held that the statement was actionable or inactionable. (R. 191 at 67.) Plaintiffs and Defendants both attach appendices to their briefing which correspond to the format of Judge Tharp's appendix to isolate the alleged misrepresentations in the Amended Complaint. (R. 293-11; R. 305-1.) The Court will treat the statements included in Defendants' Appendix as those that Defendants challenge as inactionable by way of the instant motion to dismiss.

"when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Seventh Circuit has held that a motion to dismiss under Rule 12(b)(6) "doesn't permit piecemeal dismissals of *parts* of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015).

## Analysis

Defendants seek dismissal of the Amended Complaint, asserting that it fails to state a claim for securities fraud. Defendants advance several arguments in support of their motion, including: (1) many of the statements Plaintiffs allege were fraudulent, Plaintiffs have not sufficiently alleged that a reasonably investor would have relied on those statements in making investment decisions; (2) Plaintiffs have failed to plead that Defendants made those statements with knowledge that they were misleading; (3) Plaintiffs have failed to plead that the statements relating to the 737 MAX's return to service after the grounding orders caused any damage to Plaintiffs; and (4) the Court must remain consistent with its prior order on Defendants' motion to dismiss the original Complaint in accordance with the law of the case doctrine.

The Court will first address Defendants' law of the case argument before setting forth the legal standards applicable to Plaintiffs' securities fraud claim. The Court will then turn to the merits of Defendants' motion to dismiss and determine whether Plaintiffs' allegations are sufficient at the pleading stage. As explained fully

below, the Court concludes that Plaintiffs have stated a claim as to Defendants Boeing and Muilenburg, but grants Defendants' motion to dismiss as to Defendant Smith.

## I. Law of the Case Doctrine

As an initial matter, Defendants argue that Judge Tharp correctly dismissed parts of Plaintiffs' claims, and that the Court must reach the same result here under the law of the case doctrine. R. 289 at 21. Defendants characterize Plaintiffs' Amended Complaint as an attempt to merely "re-litigate" claims that Judge Tharp properly dismissed. *Id.* at 14.

When a case is transferred between district judges midway through litigation, the law of the case doctrine "discourages the new judge from reconsidering rulings made by the original judge." *Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022). This ensures that, once a court decides an issue of law, that decision "continue[s] to govern the same issues in subsequent stages in the same case." *Id.* However, "law of the case is a discretionary doctrine, not a rigid bar." *Id.* Further, "law of the case does not apply at all where the precise issue presented differs from the one decided earlier." *Id.* at 954 (citing *Gilbert v. Illinois State Bd. of Educ.*, 591 F.3d 896, 903 (7th Cir. 2010)).

Defendants cite *Minch v. City of Chicago* for the proposition that the law of the case doctrine is even more important "[i]n situations where a different member of the same court re-examines a prior ruling." R. 289 at 21 (citing *Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007)). In such situations, the Seventh Circuit has

explained that "the law of the case doctrine . . . reflects the rightful expectation of litigants that a change of judges midway through a case will not mean going back to square one." *Id.*

Defendants argue that the law of the case controls, and repeatedly suggest that the Court's review is governed by the clear error standard, that is, the Court must reach the same result as Judge Tharp's prior order unless it finds he committed clear error. But Defendants are mistaken.

Plaintiffs filed an Amended Complaint. An amended pleading supersedes all prior pleadings, and therefore the Court must take a fresh, *i.e.*, *de novo*, look at whether the allegations in the Amended Complaint state a claim. *Wellness Community-Natl. v. Wellness H.*, 70 F.3d 46, 49 (7th Cir. 1995) (amended pleading supersedes the original complaint). Indeed, Defendants ignore the fact that Plaintiffs have included dozens of new allegations in the Amended Complaint. Under these circumstances, the Court is not reviewing Judge Tharp's prior findings for clear error, but making a *de novo* determination on whether the allegations, including the new allegations, state a claim. Of course, to the extent that Judge Tharp made any rulings with respect to allegations that did not change from the original complaint, the Court does agree that the Court should generally, consistent with the law of the case, stick to those prior rulings.

## II. Legal Standards for Securities Fraud Claims under the PLSRA

Plaintiffs bring their Amended Complaint under Section 10(b) of the Securities Exchange Act, alleging that Defendants made misrepresentations to the investing

public, which artificially inflated Boeing's stock price and caused Plaintiffs and members of the putative class to purchase Boeing stock at those artificially inflated values. R. 275 ¶¶ 540–42.

Section 10(b) of the Securities Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security . . ., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b-5 implements Section 10(b) and makes it unlawful for a company or individual "to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements . . . not misleading . . . in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b). The Supreme Court has clarified that the purpose of this statute is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

To bring a claim for securities fraud under Section 10(b), a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by & through Lyon v. Buth*, 99 F.4th 928, 951 (7th Cir. 2024) (quoting *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008)). While §10(b) and Rule 10b-5(b) do not create an

affirmative duty to disclose any and all material information, disclosure is required "when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (internal citation omitted). In fact, "[m]ere silence about even material information is not fraudulent absent a duty to speak." *Stransky v. Cummins Engine Co., Inc.*, 51 F.3d 1329, 1331 (7th Cir. 1995). However, "[i]f one speaks, he must speak the whole truth." *Id.*

Private actions under Rule 10b-5 are subject to the heightened pleading standards of the Private Securities Litigation Reform Act (PSLRA). 15 U.S.C. §78u-4. Congress enacted the PSLRA "[a]s a check against abusive litigation by private parties[.]" *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007). One of the control measures of the PSLRA is its "[e]xacting pleading requirements," which require plaintiffs "to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud.'" *Id.* (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)). Specifically, under section 21D(b)(2) of the PSLRA, a plaintiff must state with particularity facts giving rise to a "strong inference" that the defendant acted with the required state of mind. 15 U.S.C. ¶ 78u-4(b)(2).

Here, Defendants challenge the alleged misrepresentations on grounds that Plaintiffs fail to plead materiality, scienter, and loss causation. Defendants argue that because Plaintiffs have not adequately pled these elements as to the alleged

misrepresentations made by Defendants, Plaintiffs' Amended Complaint should be dismissed. The Court addresses each element in turn.

To sufficiently plead scienter, a plaintiff must plead a "strong inference" that the defendant acted with the required intent to "deceive, manipulate, or defraud[.]" *Tellabs*, 551 U.S. at 313–14. A strong inference demands more than a plausible or reasonable one, it must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. To make this determination, the Court must review "all the allegations holistically." *Matrixx*, 563 U.S. at 48. The PSLRA contains a safe harbor for "forward-looking" statements, or "predictions or speculations about the future." *Makor*, 513 F.3d at 705. Specifically, the PLSRA requires that a complaint allege "actual knowledge" of falsity for "forward-looking" statements, or "predictions or speculations about the future." *Makor*, 513 F.3d 702, 705 (7th Cir. 2008) (citing 15 U.S.C. § 78u-5(c)(1)).

To prevail on a §10(b) claim, a plaintiff must also allege that the defendant made a statement that was "*misleading* as to a *material* fact." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (emphasis in original). The Supreme Court has consistently rejected a bright line rule for materiality but has held that a representation may be material if "there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx*, 563 U.S. at 38.

Finally, a plaintiff bringing a securities fraud claim under the PSLRA must "prov[e] that the act or omission of the defendant . . . caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. §78u–4(b)(4). In other words, the plaintiff has the burden to show "that the loss in value of [plaintiffs'] shares was proximately caused by the defendants' alleged misrepresentation." *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 994 (7th Cir. 2007). The loss causation element "attempts to distinguish cases where the misrepresentation was responsible for the drop in the share's value from those in which market forces are to blame." *Id.* at 995. This is because the broader purpose of the securities statute is not to "provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

### III. Plaintiffs have stated a claim against Defendants Muilenburg and Boeing for securities fraud under Section 10(b)

The Court now turns to whether Plaintiffs have adequately alleged the elements of a securities fraud claim for the various misrepresentations alleged in the Amended Complaint. Defendants place the challenged statements into four categories, which the Court will use to guide its discussion: (i) safety statements; (ii) existing procedures statements; (iii) MCAS design statement; and (iv) return to service and certification statements. R. 289 at 17. The Court will address these statements in chronological order below. Ultimately, the Court concludes that while some of the alleged statements are not actionable, Plaintiffs have stated a claim as to the majority of the safety statements at issue, the existing procedures statements,

and the return to service and certification statements. Plaintiffs, however, have failed to state a claim against Defendant Smith, and he is therefore dismissed from this case.

### a. Statements made after the Lion Air crash

Plaintiffs allege that certain statements made by Defendants in the days and weeks following the Lion Air crash were misrepresentations, which later caused damage to Plaintiffs. Specifically, Plaintiffs allege that Defendants made statements about the safety of the 737 MAX that were knowingly misleading, as well as statements misrepresenting that "existing procedures" were sufficient for flight crews to address erroneous MCAS activations on the 737 MAX. Defendants argue that Plaintiffs cannot maintain their claims based on these statements because Plaintiffs have failed to adequately plead scienter, materiality, and loss causation. R. 289 at 16.

### i. Materiality of safety statements after the Lion Air crash

In the weeks following the Lion Air crash, Plaintiffs allege that Defendants made various statements reassuring the public that the 737 MAX was a safe plane. R. 275 ¶¶ 447–48, 457, 459, 462; Statements 2 ("The bottom line here is the 737 MAX is safe and safety is a core value for us at Boeing[.]"); 4 ("The airplane is safe, we know how to fly it safely."); 6 ("[T]he 737 MAX is a safe airplane[.]"); 8(a) ("We are confident in the safety of the 737 MAX"); 9 ("[T]he 737 MAX is as safe as any airplane that has ever flown the skies."); 10 (same)). Defendants argue that Plaintiffs' claim for securities fraud based on these safety statements are not actionable because they could not have been material to a reasonable investor. R. 289 at 16. As further support

for their argument, Defendants point to Judge Tharp's order finding that these statements were nothing more than immaterial "puffery." R. 191 at 20–21. Defendants also cite to a decision issued by Judge Shah in *College Retirement Equities Fund v. Boeing Company*, a securities fraud case brought by equity funds against the same defendants and on the same set of facts. No 22 CV 3845, 2023 WL 6065260, at *7, *15 (N.D. Ill. Sept. 18, 2023). In that case, Judge Shah also found that similar safety statements made by Defendants were inactionable puffery. *Id.* at *15.

Defendants then assert that no reasonable investor could find the safety statements material because they are the type of "rosy affirmation heard from corporate managers and numbingly familiar to the marketplace." R. 289 at 18 (citing R. 191 at 42.) For this reason, Defendants argue the Court must reach the same conclusion as Judge Tharp's previous order dismissing these statements from the lawsuit. Defendants cite to *Bridgestone*, a decision from the Sixth Circuit in which that court held that similar safety statements were immaterial as a matter of law to a reasonable investor. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669–70 (6th Cir. 2005). The Court finds *Bridgestone* instructive.

The plaintiffs in *Bridgestone* brought securities fraud claims against a tire manufacturer. *Id.* at 655. Their claims stemmed from public statements made by the defendant and its CEO after defective tires manufactured by the defendant led to thousands of passenger crashes and high numbers of fatalities. *Id.* 657–59. The court ultimately determined that the safety statements which reaffirmed that the defendants had "full confidence" in their tires and that defendants sold "the best tires

34

in the world," were immaterial puffery and were too vague to be actionable as securities fraud. *Id.* at 670–71. However, the court did hold that one statement was actionable, because it referred to "objective data," which reinforced the defendants' "belief that these are high-quality, safe tires. *Id.*

Plaintiffs counter that the safety statements are actionable because Plaintiffs added new allegations to the Amended Complaint, detailing investor concern over safety risks following both the Lion Air and Ethiopian Airlines crashes. R. 306 at 43. Plaintiffs also argue that the Amended Complaint adds facts that explain in more detail the context surrounding the safety statements to show that a reasonable investor would find those statements material in the total mix of information. R. 306 at 34. Specifically, Plaintiffs point to new allegations in the Amended Complaint that describe financial analyst statements following the Lion Air crash, and that those financial analysts often relied on Boeing's safety statements. R. 275 ¶¶ 252–54. The Amended Complaint also adds allegations regarding Boeing's internal communications, which show that Boeing executives found such "public assurances of safety" were crucial for Boeing to issue at the time. *Id.* ¶ 237.

In determining whether a statement is misleading, the Court considers "the context in which the statement was made" and determines "whether the facts alleged are sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 474 (N.D. Ill. 2021) (citing *Constr. Workers Pension Fund-Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 651 (N.D. Ill. 2015)). Courts must also look to "the

significance the reasonable investor would place on the withheld or misrepresented information." *Macovski*, 114 F. Supp. 3d at 476. Statements that are vague or non-specific "puffery" are generally not actionable under Rule 10b-5. *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021). Similarly, statements of opinion generally are not actionable in a securities fraud case. *See Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015) ("a sincere statement of pure opinion is not an 'untrue statement of material fact,' regardless of whether an investor can ultimately prove the belief wrong."). This rule, however, is not limitless, "because a reasonable investor may, depending on the circumstances, understand an opinion statement to convey facts about how the speaker has formed the opinion—or, otherwise put, about the speaker's basis for holding that view." *Id.* at 188.

The Court agrees with Judge Tharp's prior order in this case and the reasoning in *Bridgestone* that certain safety statements are inactionable because they are immaterial puffery. Specifically, the Court finds that the following statements are not actionable: 2(a) (partially) ("safety is a core value for us at Boeing"); 8(a) ("We are confident in the safety of the 737 MAX[.]"). These statements are too vague to be considered material to a reasonable investor in the total mix of information at the time.

However, for the remaining more specific safety statements made by Defendants after the Lion Air crash, the Court finds that it cannot determine as a matter of law that these statements are immaterial to a reasonable investor.

Specifically, the Court concludes that Plaintiffs have alleged sufficient facts showing that the following statements were material: Statements 2(a) ("The bottom line here is the 737 MAX is safe"); 4 ("The airplane is safe. We know how to fly it safely."); 6 ("[T]he 737 MAX is a safe airplane"); 9 ("[T]he 737 MAX is as safe as any airplane that has ever flown the skies."); 10 (same)).

Even if these safety statements reflect opinions rather than facts, the context in which the statements were made convey sufficient facts about how Boeing came to its conclusions such that they could be material. *See Omnicare*, 575 U.S. at 194. In the month after the Lion Air crash, a reasonable investor would understand that Boeing was investigating the crash and its plane design, particularly as the public learned more information about what caused the crash. In fact, in the days after the crash, initial speculation pointed to Lion Air, as well as the pilots' response which differed from the pilots who experienced a similar problem the day before. R. 275 ¶¶ 200, 245–46. The Court finds it reasonable to infer that investors might have been looking to Boeing to affirm that the 737 MAX was a safe plane, and therefore one of these other factors must have been the cause of the crash. Therefore, the Court cannot determine as a matter of law that a reasonable investor would not find these statements affirming the safety of the plane material.

Plaintiffs have also added allegations that financial analysts at the time were crediting Boeing's safety statements in their analyses following the Lion Air crash. R. 275 ¶¶ 252–54. Defendants, however, argue that Plaintiffs cannot rely on comments made by financial analysts to show that the safety statements were

material to a reasonable investor because "investor and analyst reaction" is "not enough to show the materiality of these particular statements." *Id.* (citing *W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 653 (N.D. Ill. 2020)). The Court finds *West Palm Beach* inapposite.

The court in *West Palm Beach* recognized that while "[t]he market's negative reaction further tends to show that defendants' alleged misstatements were material[,]" the court concluded that investor and analyst reactions were insufficient to render the statements at issue material for purposes of a securities fraud claim. 495 F. Supp. 3d at 653 (citing *Ross v. Career Educ. Corp.*, No. 12-cv-00276, 2012 WL 5363431, at *6 (N.D. Ill. Oct. 30, 2012)).

However, the statements the court analyzed were "all forward-looking" predictions about the defendant's merger with another company, and the merger's "likely financial benefits[.]" 495 F. Supp. 3d at 653. There, the court held that investor and analyst reactions were not enough to show the materiality of those forward-looking statements. *Id.* Here, the safety statements at issue were not forward-looking predictions, but rather were made in the context of an ongoing investigation into the safety of the 737 MAX after it was involved in a fatal accident. Accordingly, the Court finds the new allegations of financial analysts crediting Boeing's safety statements bolsters the inference a reasonable investor could have found these statements to be material. *See Ross*, 2012 WL 5363431, at *6.

Accordingly, the Court finds that Plaintiffs have adequately pled the materiality of statements 2(a), 4, 6, 9, and 10.

### ii. Allegations of scienter for existing procedure statements made after the Lion Air crash

Judge Tharp previously held that Plaintiffs failed to adequately plead a strong inference of scienter on the part of Defendants with respect to the existing procedure statements made after the Lion Air crash. R. 191 at 21. Plaintiffs' Amended Complaint adds new allegations of scienter, but Defendants maintain that Plaintiffs have failed again to meet their burden.

Defendants specifically argue that Plaintiffs have not pled a strong inference that Defendants acted with intent to deceive by communicating to the public and to pilots that existing procedures were sufficient to correct an erroneous MCAS activation. *See* Statements 1 (flight bulletin, discussed below), New-1 (press release regarding the flight bulletin), 2(b) ("our airplane has the ability to handle that with procedures in place . . . we provide all of the information that is needed to safely fly our airplanes[.]"); 3 ("if there is an inaccurate angle of attack sensor feeding information to the airplane there is a procedure to handle that[.]"); 5 ("It's an existing procedure. So the bulletin we put out again last weekend, over the weekend, pointed to that existing flight procedure."); 7 (Muilenburg disputed that pilots were not trained on how to handle erroneous MCAS activation); and 8(b) (Boeing "re-emphasize[d] existing procedures for these situations.").

The existing procedure statements stem from the bulletin Boeing issued on November 6, 2018, which directed flight crews to existing procedures to address an erroneous MCAS activation. *Supra* p. 13. Judge Tharp previously held that the bulletin was inactionable because it was made outside of the class period, which

Plaintiffs allege begins on November 7, 2018. R. 275 ¶ 10. Defendants argue this Court should reach the same result because Plaintiffs have added no new allegations to the Amended Complaint to change the fact that the class period starts one day after the November 6 bulletin was issued. R. 289 at 35. As support, Defendants cite *City of Livonia Employees' Retirement System v. The Boeing Company*, 2010 WL 2169491, at * 4 (N.D. Ill. May 26, 2010), which held that a press release was not actionable in a securities fraud class action suit because the press release was issued before the start of the class period. *Id.*

Plaintiffs counter that the Court should not find *Livonia* persuasive, because Plaintiffs specifically allege in the Amended Complaint that the November 6 bulletin was made after trading hours, which *Livonia* does not contemplate. R. 306 at 39, n.6. Because the bulletin was issued after trading hours, Plaintiffs posit, investors who purchased Boeing stock on November 6, 2018, could not have relied on the November 6 bulletin. *Id.*

The Court finds that, despite the added allegation that the November 6 bulletin was issued after trading hours on November 6, it was issued outside of the class period, and therefore is not actionable. Another court in this District has addressed the exact same facts, where an alleged fraudulent statement was made after trading hours on the day prior to the class period, and that court determined that the statement was inactionable. *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 855 (N.D. Ill. 2009). The Court next turns to whether Plaintiffs have pled a strong inference of scienter regarding the remaining existing procedure statements.

40

Defendants specifically assert that Plaintiffs have not pled a strong inference that Defendants had any knowledge when they made statements after the Lion Air crash that existing procedures were not sufficient to address erroneous MCAS activation. R. 289 at 29–30. Defendants argue their lack of scienter is evidenced by the fact that these statements were consistent with the SRB findings and FAA directives at the time. *Id.* Defendants cite to Judge Tharp's previous order, which held that the "existing procedure" statements were not actionable because Plaintiffs failed to allege that the individuals who made those statements "knew the statements were false." R. 191 at 21–22. Judge Tharp based this conclusion on the fact that it appeared from the allegations in the original complaint that Defendant Muilenburg did not have knowledge of the Forkner messages until February of 2019. *Id.* at 31.

The Amended Complaint, however, adds a number of new allegations about Defendants' scienter and what Defendants knew at the time they made the existing procedure statements. For the statements issued by Boeing, the Court must look to "the state of mind of the individual corporate official or officials" who either make, issue, or approve the statement, "rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment." *Makor*, 513 F.3d at 708 (quoting *Southland Securities Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004)).

The Amended Complaint alleges that Chief Pilot James Webb, Chief Engineer Michael Murphy, VP of Safety, Security and Compliance Elizabeth Pasztor, Muilenburg, Hamilton and Toulouse crafted and approved the public statements,

including the November 6, 2018 bulletin. R. 275 ¶¶ 440, 443. Plaintiffs allege these individuals had the requisite scienter in publishing these statements because they were all warned that: "(i) Boeing had failed to perform required safety testing on the MAX, (ii) even the testing Boeing did perform showed that the MAX failed to satisfy regulatory safety standards, (iii) the Company had not equipped pilots to adequately respond to the unique dangers posed by MCAS, and (iv) the FAA required Boeing to take further corrective action to address the flaws in MCAS's design." R. 275 ¶ 445.

Moreover, Plaintiff alleges that Hamilton was informed by Thomas Dodt that MCAS could not be controlled after repeated activations, but nevertheless approved Boeing's statements pointing to existing procedures. *Id.* ¶ 440. Additionally, prior to issuing these statements, the SRB concluded that MCAS was an "Attention Level 'A' . . . Airplane Safety Concern" which is the highest emergency safety classification at Boeing. R. 306 at 21; R. 275 ¶ 214. Plaintiffs also argue the SRB concluded that MCAS could force the nose of the plane down and be impossible for pilots to counteract because "[s]ubsequent cycles of MCAS trim can exceed column authority[.]" R. 206 at 30.

For the statements issued by Defendant Muilenburg, Plaintiffs have added to the allegations relating to Muilenburg's scienter in two ways. First, Plaintiffs have added allegations that Muilenburg and other top Boeing executives were briefed at least once daily about the conclusions of the SRB and the FAA in investigating the cause of the Lion Air crash. R. 306 at 29–33. Accordingly, Plaintiffs have alleged that Defendant Muilenburg was briefed in real time on the SRB's findings that MCAS

could overpower pilot controls, that MCAS could not successfully be countered using existing procedures, that Boeing failed to perform certain safety testing related to repeat MCAS activation, and that the FAA directed Boeing to make significant software updates to the 737 MAX. R. 303 at 29. Second, Plaintiffs now allege that Defendant Muilenburg knew of the Forkner messages as early as December of 2018. R. 275 ¶ 268.

As further support for their allegations of scienter, Plaintiffs argue that Defendant Muilenburg and other Boeing top executives knew that Boeing never performed mandatory safety testing of repeated erroneous MCAS activations. R. 306 at 31 (citing R. 275 ¶¶ 210, 211, 220, 222, 227, 229). Plaintiffs contend that despite knowing Boeing had never adequately tested the safety of erroneous MCAS activations, the statements pointing to existing procedures were signed off on by Muilenburg and other Boeing executives without "any basis, reasonable or otherwise, to conclude that the existing procedures were adequate." R. 306 at 31. Finally, Plaintiffs argue that Defendants knew the FAA had instructed Boeing to make drastic changes to the software on the 737 MAX in order to safely operate the planes. R. 306 at 32–33. Plaintiffs maintain this direction from the FAA, which required Boeing to make significant changes to the 737 MAX software, directly contradicted with Boeing's public statements at the time directing flight crews to "existing procedures." *Id.*

The Court finds these allegations sufficient to state a strong inference of scienter by Boeing and Muilenburg in making the existing procedure statements after

the Lion Air crash. (Appendix, Statements 1, New-1, 8.) The Amended Complaint raises a strong inference that Boeing and Muilenburg either knowingly, or at least recklessly, issued statements directing flight crews to existing procedures when they did not have a reasonable basis to do so, and had knowledge that the FAA instructed Boeing to make significant changes to the software of the 737 MAX for safety purposes. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 49 (2011) (holding inference that defendant acted intentionally or recklessly was at least as compelling as the opposite inference where plaintiffs alleged the substance of a press release issued by defendant's company was not supported by sufficient scientific evidence and defendant knew this).

Moreover, Plaintiffs have alleged a strong inference of scienter of the individuals responsible for preparing and approving statements made by Boeing. Plaintiffs allege that Defendants Muilenburg and Smith, BCA Chief Engineer John Hamilton, Boeing's regulatory team lead and VP of Safety, Security and Compliance Elizabeth Pasztor, BCA President and CEO Kevin McAllister, General Counsel Michael Luttig, Chief Technology Officer Greg Hyslop, Vice President of Product Development Mike Sinnett, and Senior Vice President of Communications Anne Toulouse all either attended SRB meetings and presentations or were kept apprised of the SRB investigation findings. R. 275 ¶ 203. While Judge Tharp concluded that Muilenburg's knowledge of the Forkner messages "significantly affects the Court's approach to statements he made after February 2019 and persuades the Court that several of the statements made after Muilenburg received these messages were

adequately plead as securities fraud claims[,]" the court did not conclude that knowledge of the Forkner messages was the *only* way Plaintiffs could plead Defendant Muilenburg's scienter. R. 191 at 32.

Accordingly, Plaintiffs have adequately alleged a strong inference of scienter for statements 1, New-1, 2(b), 3, 5, 7, and 8(b).

### iii. MCAS Design Statement

Defendants argue that the statements Plaintiffs allege Defendant Muilenburg made on December 6, 2018, regarding MCAS design is not actionable because it was not misleading. R. 275 ¶ 467. Defendant Muilenburg made an appearance on CNBC on December 6, 2018, and explained that Boeing "purposely designed the airplane to behave in the say way" as the 737 and that it was designed to "behave the same way in the hands of the pilot." R. 275 ¶ 467. Defendants contend that both Judge Tharp and Judge Shah dismissed this statement as not misleading because it merely references the intended design of MCAS. R. 289 at 37. In fact, Judge Shah recognized that this allegation—that Boeing intended for the 737 MAX to be similar to the 737— is actually bolstered by the allegations in the Complaint. *College Ret. Equities Fund*, 2023 WL 6065260, at *8.

This Court similarly finds that the MCAS design statement (statement 11) is inactionable, because it is too vague in its reference to Boeing's "intentions" in designing the 737 MAX to be material to a reasonable investor. Moreover, as Plaintiffs' Amended Complaint alleges, Boeing did in fact design the 737 MAX to be similar to the 737. (*See* R. 275 ¶¶ 61, 64, 66). As such, this statement is not a

misrepresentation, and Defendants' motion to dismiss is granted with respect to statement 11.

### iv. Loss causation for statements made after the Lion Air crash

Defendants argue that, regardless of whether the safety statements and "existing procedures" statements made after the Lion Air crash were material or pled with the requisite scienter, they are still not actionable because Plaintiffs have failed to plead loss causation—*i.e.*, that the statements caused damage to Plaintiffs. To plead loss causation, Plaintiffs allege that the following events "corrected" the prior misrepresentations by Defendants and caused the value of the Boeing stock to drop:

- The Ethiopian Airlines crash on March 10, 2019. R. 275 ¶ 183.
- An article published by The Seattle Times on March 17, 2019, partially revealing both the extent to which Boeing had control over the certification process and the possibility that Boeing had mischaracterized certain information submitted to the FAA about MCAS. *Id.* ¶ 289.
- An article published in The New York Times on March 21, 2019, which reported that Boeing failed to include "vital" standard safety hardware on the 737 MAX. R. 275, ¶¶ 296–299.
- An article published by The Wall Street Journal on March 21, 2019, reporting that the "necessary changes to MCAS were more extensive than Defendants had previously disclosed" and that the changes "would mark a major shift from how Boeing originally designed a stall-prevention feature in the aircraft." R. 275 ¶ 284.

Plaintiffs argue that the Ethiopian Airlines crash on March 10, 2019 corrected Defendants' previous statements that existing procedures were sufficient for flight crews to counter an erroneous MCAS activation, as well as the safety statements made by Defendants about the MAX generally. Plaintiffs contend that other federal courts have found similar catastrophic accidents to be corrective disclosures in

46

securities fraud litigation. R. 306 at 40 (citing *Howard v. Arconic, Inc.*, 2021 WL 2561895, at *17 (W.D. Pa. June 23, 2021)) (plaintiffs could proceed on a "materialization of the risk theory" where complaint alleged that certain safety certifications were hidden from the public and investors, and this risk materialized by the occurrence of a devastating and deadly fire, in other words "the risks concealed by the misleading fire safety ratings—such as a devastating fire . . . —subsequently materialized and did so to Plaintiffs' detriment."); *see also In re BP p.l.c. Sec. Litig.*, 922 F. Supp. 2d 600, 637–38 (S.D. Tx. 2013) (holding plaintiffs alleged loss causation by claiming underwater oil rig explosion and spill corrected defendant's previous statements regarding safety and managing risks); *In re Massey Energy Co. Sec. Litig.*, 883 F. Supp. 2d 597, 626 (S.D. W. Va. 2012) (holding plaintiffs alleged loss causation because the defendants' mine explosion "and the cause of the explosion revealed to the market the fraudulent nature of which Plaintiffs complaint, specifically, that Defendants mislead the market about the safety at its mines and its commitment to put production over safety.").

Defendants contend that Judge Tharpe already ruled the Ethiopian Airlines crash was *not* a corrective disclosure, and even though this was an alternate holding in Judge Tharp's Order, Plaintiffs have done nothing to correct the deficiency in the Amended Complaint. R. 313 at 25. Judge Tharp explained that the Ethiopian Airlines crash could only be a corrective disclosure "if it revealed the falsity of some prior misstatement(s) by the defendants." R. 191 at 62. If, however, "the stock dropped merely because airplane crashes are bad news for airplane manufacturers, the loss

cannot be recovered by investors through a securities fraud lawsuit." *Id.* Judge Tharp ultimately concluded that, because the Plaintiffs did not allege that Boeing "never represented that a second crash could not occur or that MCAS would never malfunction again[,]" the Ethiopian Airlines crash was not a corrective disclosure. R. 191 at 64, n.13. Defendants also cite *College Retirement Equities Fund* as support, in which Judge Shah similarly did not find that the Ethiopian Airlines crash was a corrective disclosure. 2023 WL 6065260.[6]

Plaintiffs again argue that the new allegations in the Amended Complaint correct the deficiencies and plead the Ethiopian Airlines crash as a loss causation event. R. 306 at 49. Specifically, Plaintiffs allege that the Ethiopian Airlines crash was a "materialization of the safety risks Defendant concealed[.]" R. 306 at 49. Plaintiffs argue the Ethiopian Airlines crash revealed that the 737 MAX was not safe and that pilots were not equipped or properly trained to handle repeat MCAS activations. R. 306 at 50–51. Further, Plaintiffs argue new allegations in the Amended Complaint show that the Ethiopian Airlines crash "changed the market's perception of the MAX's safety." R. 306 at 42. Defendants counter that, in reality, the Amended Complaint does not add any new facts or allegations that correct the deficiencies in Plaintiffs' loss causation theory. R. 313 at 25.

Loss causation is a "fact-based inquiry that need not be proven until later stages of litigation." *Ray*, 482 F.3d at 995 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 174 (2d Cir. 2005)) (internal citations omitted). For this reason, at the

---

[6] The Court notes, however, that the *College Retirement* opinion contains no analysis on this point because the Court had already held the statements related to the Ethiopian Airlines crash were not actionable.

pleading stage, "loss causation allegations need only 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Id.* (quoting *Dura*, 544 U.S. at 347). While the element of scienter is subject to a heightened pleading standard as explained above, loss causation is subject to the notice pleading standard of Rule 8. *Dura Pharmaceuticals*, 544 U.S. at 346.

While the Court is somewhat skeptical that Plaintiffs will ultimately be able to prove the Ethiopian Airlines crash was a corrective disclosure, which caused harm to Plaintiffs as stockholders, at this stage, the Court finds that Plaintiffs have adequately pled loss causation for the statements made after the Lion Air crash. Plaintiffs point to new allegations in the Amended Complaint, which adequately allege, at least for purposes of Rule 8, that the Ethiopian Airlines crash corrected prior safety statements and existing procedure statements. R. 275 ¶¶ 277–78. The Court finds that, with this added context, the Amended Complaint adequately pleads that the Ethiopian Airlines crash could constitute loss causation for the Defendants' prior statements.

Additionally, irrespective of whether the Ethiopian Airlines crash was itself a corrective disclosure, Plaintiffs have pled other adequate corrective disclosure. Specifically, the March 17, 2019 article published by the Seattle Times and the March 21, 2019 article published by The New York Times. R. 275 ¶ 525. The Amended Complaint alleges the Seattle Times article partially revealed "several fundamental flaws in the MAX's safety analysis and design that materially exacerbated safety concerns with the plane." *Id.* Plaintiffs allege that after publication of this article,

Boeing's stock price dropped by 1.77 percent. *Id.* ¶ 292. Plaintiffs allege this article revealed to the public that Boeing had more control over the safety analysis of the 737 MAX than the FAA and that Boeing had misrepresented information submitted to the FAA in seeking to certify the 737 MAX. *Id.* ¶ 290. Further, the Amended Complaint alleges that the New York Times article revealed that neither 737 MAX involved in the Lion Air and Ethiopian Airlines crashes had certain safety features because Boeing charged its customers extra for them. *Id.* ¶ 297. Plaintiffs also allege that Boeing stock price dropped after publication of this article. *Id.* ¶ 525. The Court finds Plaintiffs have pled a reasonable inference that publication of these news articles were also corrective disclosures of the safety and existing procedure statements made after the Lion Air crash.

Accordingly, the Amended Complaint states a claim for the statements made by Defendants Boeing and Muilenburg after the Lion Air crash.

### b. Statements made after the Ethiopian Airlines crash

The Amended Complaint alleges that similar safety and existing procedure statements made after the Ethiopian Airlines crash were misrepresentations that ultimately caused damage to Plaintiffs as stockholders when the falsity of the statements was later corrected. Plaintiffs also allege that Defendants made misrepresentations regarding when the 737 MAX would return to service after it was grounded worldwide following the Ethiopian Airlines crash. As explained below, and with a few exceptions, the Court finds that Plaintiffs have stated a claim for securities

fraud regarding the safety statements made after the Ethiopian Airlines crash and the return to service statements.

### i. Materiality of safety statements

Plaintiffs allege that Defendants made similar safety statements about the 737 MAX after the Ethiopian Airlines crash that were misrepresentations, and that Defendants knew these statements were untrue: Statements 20 ("the 737 MAX is a safe airplane"); 21 (same); 24(a) ("we have full confidence in the safety of the 737 MAX"); 25 (same); 26(b) ("Safety is a core value at Boeing for as long as we have been building airplanes[.]"); 27 ("we're taking actions to fully ensure the safety of the 737 MAX[.]"); 29 ("Safety is our responsibility and we own it.").

Defendants argue again that these statements would not be material to a reasonable investor and therefore are not actionable. Similar to the Court's holding above, the Court finds that statements 24(a), 25, 26(b), 27, and 29 are too vague to be actionable, as a reasonable investor would not find such statements material. These statements merely affirm that, at the time, Boeing had "confidence" in the 737 MAX. (Statements 24(a), 25.) Moreover, Plaintiffs do not allege the falsity of Defendant Muilenburg's statement that Boeing was "taking actions to fully ensure the safety of the 737 MAX[.]" (Statement 27.) These statements are the type of "vague optimism" the Seventh Circuit has held cannot be false, and therefore are not actionable as securities fraud. *See City of Taylor Police*, 8 F.4th at 595.

On the other hand, the Court cannot say as a matter of law that statements 20 and 21, which more specifically state that "[t]he 737 MAX is a safe airplane," are

immaterial, particularly given that the statements came after a second crash. Accordingly, the Court concludes that Plaintiffs have adequately pled materiality for statements 20 and 21. Statements 24(a), 25, 26(b) and 29, however, are too vague to be material for purposes of Plaintiffs' securities fraud claims. *See City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021) (holding non-specific puffery is not actionable under Rule 10b-5).

### ii. Loss causation for safety statements made after the Ethiopian Airlines crash

Defendants argue Plaintiffs have failed to connect the specific safety statements made after the second crash with any corrective disclosure, and therefore Plaintiffs have failed to plead loss causation for these statements. Plaintiffs allege the following loss causation events after the second crash:

- A statement released by the FAA on June 26, 2019, regarding a "potential risk that Boeing must mitigate" related to the 737 MAX's software before the FAA would certify the 737 MAX (R. 275 ¶ 312).

- An earnings call held on July 24, 2019, where Boeing disclosed for the first time that it might entirely halt production of the 737 MAX if the grounding orders continued (R. 275 ¶ 317).

- An article published by The New York Times on October 18, 2019, publishing a series of text messages showing that "in 2016 Boeing and top officials at the Company knew MCAS was making the 737 MAX difficult to control in flight simulators" as well as the Forkner messages revealing that important safety information related to MCAS was concealed from the FAA and international regulators in the certification process (R. 275 ¶¶ 325–26).

The Amended Complaint alleges that disclosure of the Forkner messages to the public revealed that certain employees at Boeing knew of the safety issues with the 737 MAX, specifically related to faulty AoA sensors and repeat MCAS activation, prior to the two devastating crashes resulting from these safety issues. R. 275 ¶ 332.

Moreover, Plaintiffs allege Defendant Muilenburg knew about the Forkner messages as early as December of 2018, but still made the safety statements discussed above with this knowledge. Accordingly, the Court finds that Plaintiffs have adequately pled the disclosure of the Forkner messages corrected the safety statements.

### iii. Return to service statements

Finally, Plaintiffs allege that Defendants made statements after the 737 MAX was grounded which overestimated how soon the 737 MAX would return to service and be recertified by the FAA. Specifically, Plaintiffs allege that while the FAA was communicating to Boeing behind closed doors that it needed time and discretion to adequately investigate the safety of the 737 MAX planes, Defendants were publicly telling a much different story.

Defendants argue that the return to service statements should be dismissed from the lawsuit for two main reasons. First, for the statements made prior to the Paris Air show, Plaintiffs have failed to plead materiality and scienter. Second, Defendants argue that Judge Tharp erred in finding that Boeing's announcement on December 16, 2019, that it was indefinitely halting production of the 737 MAX, was a corrective disclosure, and that Plaintiffs have failed to plead loss causation in the Amended Complaint. R. 289 at 44.

### 1. Pre-Paris Air Show Statements

For the return to service statements made by Defendants prior to the Paris Air Show, Defendants argue that Plaintiffs have not pled materiality or scienter. R. 289 at 38. Defendants cite to Judge Tharp's prior order which held that in the total mix

of information available to the market, "includ[ing] two plane crashes and an FAA grounding order" Muilenburg's statement that Boeing "recommend[ed] to the FAA the temporary suspension of operations" and that Boeing was "supporting this proactive step out of an abundance of caution" could not have been material to a reasonable investor. *See* Statement 26; R. 289 at 38 (citing R. 191 at 41–42).

As to statement 26, Plaintiffs allege that Defendants "fought against the decision to ground the MAX." R. 275 ¶ 481. Accordingly, the Court finds that Plaintiffs have pled Defendant Muilenburg made the statement that Boeing made the decision to "recommend to the FAA the temporary suspension" of the 737 MAX and that Boeing was "supporting this proactive step out of an abundance of caution" with knowledge that this statement was false.

Defendants also argue that because statements 30 and 40 were forward looking that fall within the PSLRA's safe harbor, Plaintiffs are required to allege "actual knowledge of falsity, not merely indifference to the danger that a statement is false." R. 289 at 39 (citing *Makor*, 514 F.3d at 705). Because Defendant Muilenburg did not meet with FAA director Elwell at the Paris Airshow until at least June 17, 2019, Defendants contend that Defendant Muilenburg did not have the requisite scienter prior to that conversation. R. 289 at 39.

As to statement 30, Plaintiffs have adequately alleged that Defendant Muilenburg made the statement that Boeing was "continu[ing] to demonstrate that [it] identified and met all certification requirements" with knowledge that this statement was false. R. 275 ¶ 492. The Amended Complaint alleges that Defendant

Muilenburg knew about the Forkner messages as early as December of 2018. The Forkner messages explicitly communicate that Boeing made various misrepresentations to the FAA about important safety features of the 737 MAX during the certification process. Therefore, Defendant Muilenburg had knowledge that his statement that Boeing was demonstrating that the 737 MAX "met all certification requirements" was a misrepresentation, and Defendant Muilenburg omitted the crucial information that the FAA did not certify the 737 MAX with accurate or complete information about the plane's safety features.

However, as to statement 40, in which Defendant Smith stated that Boeing was working with regulators and "ensuring that we're answering all the questions, addressing any concerns that are taking place," and confirming that "[t]here's a lot of progress that's been made[,]" the Court finds that this statement is too vague to be actionable. R. 275 ¶ 506. First, Plaintiffs have not alleged that this statement was false or misleading. The Amended Complaint does not allege that Boeing was *not* working with regulators to "address[] concerns" with the 737 MAX. While Plaintiffs do allege that Defendant Smith also knew about the Forkner messages at this time, this statement does not misrepresent any information that is contradicted by the Forkner messages. Smith's statement that there was "a lot of progress" is the kind of vague optimism that cannot be construed as a misrepresentation that would have been material to a reasonable investor. Accordingly, the Court finds that statement 40 is inactionable. Because this is the only statement Plaintiffs allege Defendant Smith made, Defendant Smith is dismissed from this action.

### 2. Loss Causation for Pre-Paris Air show statements

Defendants argue that statements 26, 30, and 40 all fail for the additional reason that Plaintiffs have not pled a corrective disclosure. Because the Court has already determined that statement 40 is inactionable, it will focus its analysis on statements 26 and 30. Plaintiffs insist that, in fact, loss causation was pled for these statements because the Amended Complaint alleges that on June 26, 2019, the FAA issued a statement that it had discovered a "potential risk that Boeing must mitigate" with the software on the 737 MAX. R. 275 ¶ 312. Plaintiffs argue this statement corrected statements 26 and 30 by revealing that the 737 MAX was much farther from recertification than Defendants made it out to seem. R. 306 at 53.

The Court finds, however, that Plaintiffs have not pled how the FAA's statement regarding the software update corrected statements 26 and 30. While it is true the statement may have revealed to the public that the 737 MAX might be grounded for a longer period of time, statements 26 and 30 do not relate to the *timing* of the 737 MAX returning to service. Rather, the statements relate more to Boeing's cooperation with the FAA in returning the 737 MAX to service, which the FAA's statement does not contradict. Accordingly, Plaintiffs have failed to plead loss causation for statements 26 and 30, and therefore cannot proceed on their securities fraud claim based on these statements.

### 3. Post-Paris Air Show statements

After Defendant Muilenburg met with FAA Director Elwell at the Paris Air Show on or about June 17, 2019, Plaintiffs allege that Defendants Muilenburg and

Boeing continued to put out statements that were misleadingly optimistic about the 737 MAX's return to service. Even though FAA Director Elwell warned Muilenburg to "slow down" talk of return to service, Defendant Muilenburg continued to predict publicly that the 737 MAX would be back in service by the end of the year.

Judge Tharp previously held that Plaintiffs adequately alleged that these statements were misleading and that Plaintiffs adequately pled scienter, even for the forward-looking statements falling under the PSLRA's safe harbor. R. 191 at 53–54, 59. Judge Tharp found that Plaintiffs pled scienter by Defendant Muilenburg because he met with the FAA director, who told Defendant Muilenburg to "slow down" talk of returning the 737 MAX to service. R. 191 at 53–54. Judge Tharp also held that Plaintiffs' pled loss causation by alleging that the return to service statements were corrected by Boeing's December 16, 2019 announcement that it was halting production of the 737 MAX.

Defendants argue that Judge Tharp clearly erred in holding that Plaintiffs had adequately pled loss causation for the return to service statements made after the Paris Air show. R. 289 at 38. Specifically, Defendants assert that Judge Tharp "overlooked" allegations in the complaint which reveal that the public already knew of the falsity of Boeing's prior statements about the 737 MAX returning to service before the end of 2019. R. 289 at 44. Defendants point to news articles in the Amended Complaint which they maintain show that the public knew, prior to Boeing's December 16 announcement, that the 737 MAX would not return to service in 2019. R. 289 at 45 (citing R. 275 ¶ 347.) Plaintiffs, however, characterize Defendants'

argument as a "truth on the market" approach and argue that such arguments are generally rejected at the pleading stage. R. 306 (citing *In re Motorola Sec. Litig.*, 2004 WL 2032769, at *25 (N.D. Ill. Sept. 9, 2004). Plaintiffs also argue this type of defense is typically fact-intensive, and therefore inappropriate to rule on as a matter of law. *Id.*

Judge Tharp previously ruled as a matter of law that Plaintiffs stated a claim for securities fraud as to the return to service statements made after the Paris Air show. The Court notes that Defendants have not filed a motion for reconsideration. Accordingly, in this instance, the Court follows the law of the case doctrine. *Flynn*, 39 F.4th at 955 ("When there are 'no significant differences in the legal landscape' since the prior ruling, courts may apply law of the case and refuse to reconsider the precise . . . issue previously decided.") The Court, however, will analyze Defendants' arguments to determine whether Plaintiffs have stated a claim with regard to the return to service statements.

The Court finds an important distinction between news articles reporting that the 737 MAX might not be returned to service until the following year and an announcement directly from Boeing that it was *halting* production of the 737 MAX. For loss causation, Plaintiffs only need to provide "some indication of the loss and the causal connection that the plaintiff has in mind." *Ray*, 482 F.3d at 995. While the Seattle Times article Defendants cite to may have raised suspicions about the 737 MAX's return to service, the Court cannot rule as a matter of law that this article revealed the truth to the public prior to Boeing's announcement.

Defendants also argue that the December 16, 2019 announcement was merely a materialization of a disclosed risk, because Boeing had previously publicly expressed that it might stop production of the 737 MAX if the grounding continued. R. 289 at 49. Defendants cite to a statement made by Boeing that it "might entirely halt production of the 737 MAX" and analyst reports predicting that there was a "probability of a production halt or cut." R. 289 at 49–50 (citing R. 275 ¶ 317). Defendants' materialization of a disclosed risk argument essentially repeats the prior argument that the public already knew the 737 MAX likely would not be returned to service in 2019. Again, due to the fact intensive nature of this defense and that Plaintiffs are only required at the pleading stage to plead a loss and the causal connection, the Court rejects Defendants' materialization of the risk argument and finds that Plaintiffs have adequately pled loss causation. *See Coll. Ret. Equities Fund v. Boeing Co.*, 2023 WL 6065260, at *25 (N.D. Ill. Sept. 18, 2023); *see also Schleicher v. Wendt*, 618 F.3d 679, 683 (7th Cir. 2010) (explaining "'materialization of risk' . . . is not a legal doctrine or anything special as a matter of fact.") Accordingly, Defendants' motion to dismiss as to statements 42, 43, 44, 46, 47, 48, and 49 is denied.

## Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss is granted in part and denied in part. The Plaintiffs may proceed on their 10(b)(5) claims against Defendants Boeing and Muilenburg on statements New-1, 2(a), 2(b), 3, 4, 5, 6, 7, 8(b), 9, 10, 20, 21, 42, 43, 44, 46, 47, 48, and 49. Defendants' motion to dismiss is granted in part as to statements 1, 11, 24(a), 25, 26(a), 26(b), 27, 29, 30 and 40. Defendant

Smith is dismissed from the case. Defendants must answer Plaintiffs' Amended Complaint by 10/22/2024.

Date:  9/30/2024

_____

United States District Judge

Franklin U. Valderrama