**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

IN RE THE BOEING COMPANY
AIRCRAFT SECURITIES
LITIGATION

No. 19-cv-02394

Judge Franklin U. Valderrama

**MEMORANDUM OPINION AND ORDER**

In 2018 and 2019, Boeing's 737 MAX plane was involved in two fatal plane crashes. Following the crashes, Boeing's former President and CEO, Dennis Muilenburg, and its former CFO, Gregory Smith, made public statements in response to the crashes concerning, among other things, the safety of the 737 Max plane. Plaintiffs, a group of pension funds and private investors, sued Boeing, Muilenburg, (together, Defendants), and Smith,[1] on behalf of shareholders, under Section 10(b) of the Securities Exchange Act. R. 275, FAC.[2] Plaintiffs allege that Defendants made false and misleading comments with the intent to deceive investors in the wake of the two catastrophic plane crashes, which artificially inflated Boeing's stock price and caused injury to the putative class members. *Id.*

Before the Court is Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23. R. 388, Mot. Class Cert. For the reasons stated below, the Court grants in part and denies Plaintiffs' motion for class certification.

---

[1]The Court granted Defendants' motion to dismiss in part on September 30, 2024 and dismissed all claims against Smith. R. 346, MTD Opinion.

[2]Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation.

## Background

### I.     The 737 MAX and MCAS

In August 2011, Boeing announced that it would develop the 737 MAX—an upgraded 737 model with more fuel-efficient engines. R. 388-1, Memo. Class Cert. at 3. However, because these upgraded engines were larger, they needed to be placed in front of the wings, meaning the plane's nose tended to "pitch up" in flight and the tail end would drop, causing the plane to stall. *Id.* Instead of making structural changes to compensate for the issues caused by the larger engines, Boeing installed an automated system on the 737 MAX called the Maneuvering Characteristics Augmentation System (MCAS) into the plane's flight control systems. *Id.* MCAS would detect if this "pitch up" situation occurred and drive the nose down. *Id.* This fix, however, posed a serious safety risk if MCAS activated erroneously. *Id.* During development, according to Plaintiffs, Boeing dramatically increased the risk of erroneous activation causing a plane crash by: (1) implementing a rare "single point of failure" trigger for MCAS; (2) expanding MCAS's authority to seize control of the plane in both low- and high-speed environments; and (3) expanding its authority by more than 300%. *Id.*

Boeing's primary directive with the 737 MAX was to expedite Federal Aviation Administration (FAA) approval of the plane by amending the "type" certificate for the original 737, rather than seeking new certification. Memo. Class Cert. at 3. This provided a faster road to certification and also allowed Boeing to claim to potential customers that the 737 MAX needed only minimal training requirements. *Id.* To

2

accomplish this goal, Plaintiffs claim that Boeing misled the FAA, including by submitting a hazard analysis based on the false premises that pilots would be able to respond to erroneous MCAS activation in less than four seconds—even though Boeing knew one of its own test pilots took more than **ten seconds** during a simulation, which would have "catastrophic" results in real flights—and that MCAS would only activate during "more strenuous flight operations." *Id.* at 3–4. In reality and contrary to what Boeing reported to the FAA, however, Boeing's undisclosed modifications allowed MCAS to activate under conditions "well within the normal flight envelope." *Id.* at 4. The 737 MAX's Chief Technical Pilot Mark Forkner (Forkner) helped ensure that the FAA required minimal training and that all references to MCAS were removed from the flight manuals provided to pilots; he ultimately bragged in internal text messages and emails that he "jedi-mind trick[ed]" the FAA. *Id.* As a result, pilots did not even know MCAS existed prior to the first 737 MAX crash. *Id.*

## II.    The Lion Air Crash

On October 29, 2018, MCAS erroneously activated on Lion Air flight JT 610 and caused it to crash, killing 189 people (the Lion Air Crash). Memo. Class Cert. at 4. While early public speculation pointed to Lion Air, which was a budget airline with a "mixed safety record" and "checkered past," by November 4, 2018, Boeing's Safety Review Board (the SRB) identified erroneous MCAS activation as a serious "safety issue" and found that multiple MCAS activations could force the plane into a fatal dive that pilots could not correct; the same report concluded that "[m]ultiple failure indications can lead to pilot confusion, delaying appropriate response" until it was too

3

late. *Id.*; FAC ¶¶ 199–200. The SRB met again on November 6, 2018, and concluded that erroneous MCAS activation warranted Boeing's highest safety emergency classification. Memo. Class Cert. at 4. The same day, Boeing's Chief Engineer John Hamilton—who briefed Defendant Muilenburg up to twice daily—learned that when MCAS is activated, "the stabilizer can be commanded well beyond the electric stabilizer limit . . . . [T]here's no way that you can control that." *Id.* at 4–5.

The FAA also directed Boeing to take "urgent action" to address erroneous MCAS activation, which the agency found could, if not remedied, ultimately cause up to 76 crashes and more than 14,000 deaths. Memo. Class Cert. at 5. The FAA issued a "mandate" to fix MCAS, although Muilenburg personally ensured Boeing did not disclose this mandate to the public. *Id.* at 5. Internally, Boeing engineers reported to senior executives that MCAS had not been adequately tested during the original certification process, and the limited testing performed after the crash showed the airplane far exceeded FAA safety tolerances. *Id.*

Still, even with this knowledge, Defendants sought to assure the public that the 737 MAX was safe and that it was the pilots who were at fault in the Lion Air Crash. Memo. Class Cert. at 5. Muilenburg personally instructed Boeing executives to be "tightly coordinated" regarding Defendants' public statements about the 737 MAX. *Id.* On the first day of the Class Period, November 7, 2018, Boeing issued a press release stating that it had issued a bulletin to flight crews on November 6, which directed flight crews to "existing flight crew procedures to address circumstances where there is erroneous input from an AOA sensor." *Id.*; FAC ¶ 239.

Muilenburg coupled these statements with a repeated insistence that "the 737 MAX is a safe airplane" and that it was "as safe as any airplane that has ever flown the skies." Memo. Class Cert. at 5.

### III.   The Ethiopian Airlines Crash

Nearly five months after the Lion Air Crash, on March 10, 2019, Ethiopian Airlines flight ET 302, a 737 MAX flight, crashed minutes after takeoff (the Ethiopian Airlines Crash). Memo. Class Cert. at 5. Within minutes of takeoff, MCAS erroneously activated again. *Id.* Although the pilots followed "existing flight procedures," they were unaware that one of those procedures would not work at all, while the other had to be implemented within just 10 seconds to have a chance of working, because thereafter the downward pressure would be too strong to mitigate. *Id.* As a result, the pilots were unable to stop the plane from crashing, killing all 157 people on board. *Id.* at 5–6; FAC ¶ 272. After this crash, regulators around the world grounded the 737 MAX. Memo. Class Cert. at 6.

Analysts immediately questioned the 737 MAX's safety and the similarities between the Ethiopian Airlines Crash and the Lion Air Crash. Memo. Class Cert. at 6. In response to the Ethiopian Airlines Crash and its apparent similarities to the Lion Air Crash, Boeing's stock declined $47.13 per share—a loss of $26.63 billion of Boeing market capitalization. *Id.*

In the days after the Ethiopian Airlines crash, news outlets began reporting on the potential issues with MCAS. For example, on March 17, 2019, the Seattle Times published an investigative report that detailed safety issues with the 737 MAX based

on interviews with current and former Boeing engineers. Memo. Class Cert. at 6. On March 21, 2019, *The New York Times* revealed that the planes that crashed lacked certain safety features because Boeing made them optional and charged extra for them. *Id.* Boeing's stock price declined materially after both of these articles. *Id.*

Defendants continued defending the 737 MAX's FAA certification, stating that there was "no technical slip or gap" in the "high-integrity process," even though they were fully aware of numerous deficiencies, including that Forkner, by his own admission, "lied" to the FAA about the dangers posed by the MCAS system. Memo. Class Cert. at 6. Defendants also provided unrealistically short timelines for the MAX's return to service, such as reporting "the end of summer 2019" as the "timeframe" on June 26, 2019, and then "early in the fourth quarter" on July 18, 2019, and specifying "September" a week later on July 24, 2019. *Id.* at 6–7. Defendants made these claims even after, among other things, FAA Administrator Daniel Elwell personally directed Defendant Muilenburg in a June 2019 meeting to "slow down [Boeing's] talk of progress." *Id.* at 7.

On June 26, 2019, the FAA announced that it had discovered a "potential risk" related to MCAS software "that Boeing [had to] mitigate" before the FAA would recertify the MAX—thus revealing that the plane's safety problems were more severe than previously known and belying any hopes that the safety issues could be addressed with a "simple MCAS software fix that would not involve significant engineering labor on the existing MAX fleet." Memo. Class Cert. at 7. Then, on July 24, 2019, Defendant Muilenburg announced that Boeing "might need to consider . . .

a temporary shutdown of the MAX production"—contradicting Defendants' earlier statements touting the prospect of the MAX's near-term return to service. *Id.* Boeing's stock price again declined substantially. *Id.*

On October 18, 2019, a *New York Times* article disclosed to the public Forkner's text messages, including one describing MCAS as "running rampant"—messages that, among other things, confirmed that there were safety issues with the plane that "existing procedures" could not remedy and that the certification process had been anything but "high integrity." Memo. Class Cert. at 7. These revelations invited intense scrutiny from the markets, lawmakers, and regulators and Boeing stock declined more than $25 per share. *Id.*

Finally, on December 16, 2019, Boeing announced that it was suspending production on the 737 MAX. Memo. Class Cert. at 7. Boeing shares dropped $14.67 per share the next day, a 4.3% decline. *Id.* at 8. All told, Boeing shares declined nearly 27% from their Class Period high of $446.01 to $327.00 on December 17, 2019. *Id.*

Defendants have since faced numerous investigations based on their misconduct concerning the 737 MAX's safety and certification. For example, Boeing paid $200 million and Defendant Muilenburg paid $1 million (out of his own pocket) to resolve charges with the Securities and Exchange Commission (SEC) for "materially misleading" Boeing's investors by claiming that the 737 MAX was "as safe as any airplane that has ever flown the skies" and that "there was no surprise or gap or unknown . . . that somehow slipped through [the] certification process" for the 737 MAX. Memo. Class Cert. at 8. Further, in Boeing's January 2021 Deferred

7

Prosecution Agreement (DPA) with the Department of Justice (DOJ), Boeing admitted that the 737 MAX's flight manual was "materially false, inaccurate, and incomplete" and that it had "intentionally withheld and concealed from the FAA" its "knowledge of MCAS's expanded operational scope." *Id.* Boeing paid $2.5 billion to settle the DOJ's claims. *Id.* On July 24, 2024, the DOJ and Boeing jointly submitted a plea agreement wherein Boeing pled guilty to "breach[ing] the terms of the DPA by failing to sufficiently design, implement, and enforce a compliance and ethics program to prevent and detect violations of the U.S. fraud laws throughout its operations." *Id.* (citing *United States of America v. The Boeing Company*, No. 4:21-cr-00005-O Dkt. No. 221-1 (N.D. Tex. July 24, 2024)).

Plaintiffs, individually and on behalf of a class of similarly situated individuals, sued Defendants, asserting claims for securities fraud under Section 10(b) of the Securities Exchange Act, alleging that Defendants misrepresented the safety of the 737 MAX to the investing public, which artificially inflated Boeing's stock price and caused injury to the putative class member. FAC. Following the Court's ruling on Defendants' motion to dismiss the FAC, six disclosures that Plaintiffs contend corrected Defendants' alleged misstatements remain in the case: (1) The Ethiopian Airlines Crash on March 10, 2019, which corrected Defendants' statements following the Lion Air Crash about the safety of the 737 MAX, Am. Compl. ¶ 525; (2) A *Seattle Times* article on March 17, 2019, that supposedly "revealed several fundamental flaws in the MAX's safety analysis and design," Am. Compl. ¶ 525; (3) A *New York Times* article on March 21, 2019, reporting that Boeing had not

8

included certain software on the 737 MAX airplanes involved in the Lion Air and Ethiopian Airlines accidents, Am. Compl. ¶ 525; Dkt. No. 346 at 50; (4) Boeing's July 24, 2019 announcement before the market's open that the protracted grounding of the 737 MAX could result in a temporary halt of production for the plane if the delays continued, Am. Compl. ¶¶ 317–22, 525; (5) A *New York Times* article on October 18, 2019, that published certain text messages involving 737 Chief Technical Pilot Mark Forkner, Am. Compl. ¶ 525; and (6) Boeing's announcement on December 16, 2019, that it was temporarily halting production of the 737 MAX, Am. Compl. ¶ 525.[3] Before the Court is Plaintiffs' motion for class certification.

### Legal Standard

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties." *Wal-Mart Stores, Inc., v. Dukes*, 564 U.S. 338, 348 (2011) (cleaned up).[4] To be certified, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. *Harper v. Sheriff of Cook County*, 581 F.3d 511, 513 (7th Cir. 2009); *Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006). In addition to the four Rule 23(a) requirements, a proposed class must also satisfy

---

[3]Plaintiffs' Appendix A to their motion for class certification lists seven corrective disclosures. *See* Memo. Class Cert at 8 n.3; R. 388-2, Appx. A. The Court dismissed one of the listed disclosures, however, in its September 30, 2024 Order granting in part Defendants' motion to dismiss. MTD Opinion. Specifically, the Court dismissed the claims based on the FAA's June 26, 2019 announcement that the FAA's testing revealed a MCAS software flaw. *Id.* at 56.

[4]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, Cleaning Up Quotations, 18 Journal of Appellate Practice and Process 143 (2017).

one of the subsections in Rule 23(b): that "common questions of law or fact predominate over individual ones and that a class action is superior to other methods of adjudicating the case." *Howard v. Cook Cty. Sheriff's Office*, 989 F.3d 587, 597 (7th Cir. 2021) (cleaned up). The named plaintiff bears the burden of proving by a preponderance of the evidence that their proposed class satisfies the requirements of Rule 23. *Id.*

In evaluating Plaintiffs' motion, the Court need not assume the truth of Plaintiffs' assertions and is free to "receive evidence and resolve factual disputes as necessary to decide whether certification is appropriate." *Messner v. Northshore Unv. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012). That said, courts "should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Id.* "Merit questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Jacks v. DirectSat USA, LLC,* 118 F.4th 888, 895 (7th Cir. 2024) (cleaned up). "A class may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites for class certification have been met." *Id.* (cleaned up).

## Analysis

Plaintiffs seek to certify the following class: all persons or entities who purchased or otherwise acquired Boeing common stock and/or call options or sold put options between November 7, 2018 and December 16, 2019, inclusive (the Class Period) and were damaged thereby (the Class). Defendants argue against

10

certification, challenging predominance on the basis of Plaintiffs' classwide damages methodology, and in the alternative, in the event that a class is certified, challenging the end date of the Class Period and the inclusion of option traders in the Class. R. 418, Resp.

An implicit requirement under Rule 23 is that a class be "defined clearly and that membership be defined by objective criteria." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 657 (7th Cir. 2015). Here, the class is readily ascertainable—and Defendants do not argue otherwise—as it is clear and membership is based on objective, as opposed to subjective, criteria. The Court now turns to the Rule 23(a) requirements.

## I. Rule 23(a)

### A. Numerosity

Rule 23(a)'s first requirement is numerosity. Under Rule 23(a)(1), the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "While there is no magic number that applies to every case, a forty-member class is often regarded as sufficient to meet the numerosity requirement." *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 860 (7th Cir. 2017).

Plaintiffs maintain that they satisfy this requirement, and Defendants do not disagree. During the Class Period, Boeing had over 560 million shares outstanding, with a weekly trading volume of over 20 million shares. Memo. Class Cert. at 10 (citing R. 388-4, Tabak Rpt. ¶ 17; *id.*, Exh. 7a; *Pub. Employees' Ret. Sys. of Mississippi v. TreeHouse Foods, Inc.*, 2020 WL 919249, at *2 (N.D. Ill. Feb. 26, 2020) (weekly

11

trading volume of 4 million shares sufficient)). The Court finds that Plaintiffs have satisfied the numerosity requirement, as there is evidence that the class would consist of well over forty members and that joinder of all members would be impracticable.

### B.     Commonality

Rule 23(a)'s second requirement is that there exist "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A court need only find a single common question of law or fact, the mere occurrence of all plaintiffs suffering as a result of a violation of the same provision of law is not enough." *Chi. Teachers Union, Local No. 1 v. Bd. of Ed. of Chi.*, 797 F.3d 426, 434 (7th Cir. 2015) (cleaned up). Rather, "[t]he claims must depend upon a common contention that is capable of class-wide resolution." *Id*. "A common nucleus of operative fact is usually enough to satisfy" this requirement. *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). The Seventh Circuit has instructed courts to "begin the class certification analysis by identifying the elements of the plaintiff's various claims." *Eddlemon v. Bradley Univ.*, 65 F. 4th 335, 339 (7th Cir. 2023) (cleaned up).

To bring a claim for securities fraud under Section 10(b), a plaintiff must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan by &*

12

*through Lyon v. Buth*, 99 F.4th 928, 951 (7th Cir. 2024) (quoting *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008)).

Plaintiffs maintain that common questions here include "whether Defendants' statements were materially false or misleading, whether Defendants acted with scienter, and whether the market price of Boeing's common stock and call options were artificially inflated due to the alleged conduct by Defendants." Memo. Class Cert. at 11 (citing FAC ¶ 535; *In re Anicom Inc. Sec. Litig.*, 2002 WL 472249, at *2 (N.D. Ill. Mar. 27, 2002); *TreeHouse*, 2020 WL 919249, at *3).

Defendants do not challenge the commonality requirement.[5] No matter, as the Court must still ensure that Rule 23(a)'s requirements are met to "protect[] absent class members whose rights may be affected by the class certification." *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003). The Court agrees with Plaintiffs that they satisfy Rule 23's commonality requirement: the claims of the named Plaintiffs arise from the same conduct that gives rise to all claims in the putative class, and indeed, is the same kind of conduct that other courts in this District have found to have satisfied the commonality requirement in securities fraud actions. *See In re Hartmarx Sec. Litig.*, 2002 WL 31103491, at *4 (N.D. Ill. Sept. 19, 2002); *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. 563, 565–66 (N.D. Ill. 2004). The questions are common to the Class and "determination of [the common questions'] truth or falsity

---

[5]To the extent that Defendants' arguments relating to damages calculation, options traders, and end date of the Class Period implicate the commonality requirement, the Court addresses those arguments below as they pertain to predominance, as that is how Defendants framed them. Outside of those issues, the Court sees no reason to question commonality and finds this factor satisfied. So too with typicality, below.

will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350.

### C. Typicality

Rule 23(a)'s third requirement is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "A claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and . . . her claims are based on the same legal theory." *Oshana,* 472 F.3d at 514 (cleaned up). "Although the typicality requirement may be satisfied even if there are factual distinctions between the claims of the named plaintiffs and those of other class members, the requirement primarily directs the district court to focus on whether the named representatives' claims have the same essential characteristics as the claims of the class at large." *McFields v. Dart*, 982 F.3d 511, 518 (7th Cir. 2020) (cleaned up). The Seventh Circuit has explained that "[t]he logic behind the typicality requirement is that a class representative will adequately pursue her own claims, and if those claims are typical of those of the rest of the class, then her pursuit of her own interest will necessarily benefit the class as well." *Howard*, 989 F.3d at 605 (cleaned up). "[T]he typicality requirement is liberally construed." *Dennis v. Greatland Home Health Servs., Inc.*, 591 F. Supp. 3d 320, 328 (N.D. Ill. 2022).

According to Plaintiffs, they satisfy the typicality requirement, as Plaintiffs, like the other Class members, allege that Defendants made material representations and omissions during the Class Period, including about the safety of the 737 MAX,

the adequacy of information provided to 737 MAX pilots in order to address erroneous MCAS activation, the integrity of the certification process for the 737 MAX, and the timeline for the 737 MAX's return to service. Memo. Class Cert. at 12. Similarly, Plaintiffs contend that they, like the other Class members, were injured by purchasing or acquiring Boeing common stock and/or call options at prices that were artificially inflated by Defendants' fraud and/or wrote Boeing put options at artificially deflated prices, which artificial inflation/deflation was removed from the stock when the true facts became known. *Id.* (citing FAC ¶ 543; *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. at 566).

Like commonality, Defendants do not attack typicality. And, like the commonality requirement, the Court also finds that Plaintiffs have satisfied the typicality requirement, as Plaintiffs' claims arise from the same core events and fraudulent course of conduct that gives rise to the claims of all other Class members, and all claims are based on the same legal theory.

### D. Adequacy

Rule 23(a)(4) requires a showing that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The adequacy "inquiry consists of two parts: (1) the adequacy of the named plaintiffs as representatives of the proposed class's myriad members, with their differing and separate interests, and (2) the adequacy of the proposed class counsel." *Gomez v. St. Vincent Health, Inc.*, 649 F.3d 583, 592 (7th Cir. 2011). A named plaintiff is ordinarily

15

considered to be adequate so long as her claims neither conflict with nor are antagonistic to those of other class members. *Howard*, 989 F.3d at 609–10.

Plaintiffs insist that they satisfy both prongs of the adequacy requirement. Memo. Class Cert. at 12–14. Again, Defendants do not challenge this requirement, but the Court nonetheless briefly addresses it. *See Davis*, 321 F.3d at 649.

Starting with the named Plaintiffs, as discussed above, the Court agrees with Plaintiffs that they assert the same claims and injuries as the other Class members, and thus do not have "antagonistic or conflicting claims." Memo. Class Cert. at 12–13 (quoting *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992); citing *In re Groupon, Inc. Sec. Litig.*, 2014 WL 5245387, at *2 (N.D. Ill. Sept. 23, 2014)). Moreover, Plaintiffs have submitted declarations from individuals authorized to make declarations on behalf of named Plaintiffs demonstrating that Plaintiffs understand their fiduciary duties to the Class, and Plaintiffs have demonstrated their commitment to "fairly and adequately protect the interests of the class" by vigorously prosecuting this action on behalf of themselves and all other class members over at least five years. *Id.* at 13 (citing Exhs. 388-5, Ryals Decl.; 388-6, Marciano Decl.; 388-7, Houser Decl.; 388-8, Kegley Sr. Decl.; 388-9, Taggart Decl.; *Groupon*, 2014 WL 5245387, at *2). The Court finds that Plaintiffs are adequate class representatives.

Turning to Class counsel, Rule 23 also requires that "class counsel [] be experienced and competent." *TreeHouse*, 2020 WL 919249, at *3. In determining the adequacy of class counsel, the Court considers "counsel's work on the case to date, counsel's class action experience, counsel's knowledge of the applicable law, and the

16

resources counsel will commit to the case." *Reliable Money Order, Inc. v. McKnight Sales Co.*, 704 F.3d 489, 498 n.7 (7th Cir. 2013) (citing Fed. R. Civ. P. 23(g)(1)(A)). Here, Plaintiffs are represented by Bernstein Litowitz Berger & Grossman LLP (Bernstein Litowitz), as well as Kessler Topaz Meltzer & Check, LLP, which Bernstein Litowitz enlisted as additional counsel for the Class. Memo. Class Cert. at 13 & n.4. As Plaintiffs point out, Bernstein Litowitz has already "committed substantial time and effort" to prosecuting this action and has achieved successful results of Plaintiffs, including but not limited to their work drafting a consolidated complaint, an amended complaint, and two oppositions to Defendants' motions to dismiss, which were denied in large part, as well as counsel's significant discovery efforts. Memo. Class Cert. at 13–14 (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 602 (N.D. Ill. 2009); *TreeHouse*, 2020 WL 919249, at *3). Additionally, Kessler Topaz has participated in the litigation throughout, and has been found by other courts to be "highly qualified" and "skilled in shareholder and transactional litigation." *Id.* at 13–14 n.4 (quoting *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 2013 WL 3486990, at *2 (S.D.N.Y. Jul. 11, 2013); *Gilbert v. Abercrombie & Fitch, Co.*, 2016 WL 4159682, at *6 (S.D. Ohio Aug. 5, 2016)). The Court concludes that Class counsel is adequate.

## II.    Rule 23(b)

Once Rule 23(a) is satisfied, a class action may only be maintained under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class

action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The Court addresses both the predominance and superiority questions in turn.

## A. Predominance

"The predominance requirement is similar to the commonality and typicality requirements, but far more demanding." *Amchem Prod., Inc., v. Windsor,* 521 U.S. 591, 623–24 (1997). "The guiding principle behind predominance is whether the proposed class's claims arise from a common nucleus of operative facts and issues." *Santiago v. City of Chi.,* 19 F.4th 1010, 1016 (7th Cir. 2021). "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Id.* (cleaned up). "A common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof." *Arandell Corp. v. Xcel Energy Inc.,* 149 F.4th 883, 892 (7th Cir. Aug 5, 2025) (cleaned up). An individual question, on the other hand, is one where the "members of a proposed class will need to present evidence that varies from member to member." *Id.* As the Seventh Circuit has explained, "this inquiry focuses on whether a proposed class is sufficiently cohesive to warrant adjudication by representation." *Id.* (cleaned up). The predominance analysis turns on the elements of the underlying cause of action. *Mish Int'l Monetary Inc. v. Vegas Cap. London, Ltd.,* 2025 WL 1744895, at \*8 (N.D. Ill. June 25, 2025). As with commonality, so too with predominance the Seventh Circuit

18

has instructed courts to "begin the class certification analysis by identifying the elements of the plaintiff's various claims." *Eddlemon*, 65 F. 4th at 339 (cleaned up).

"Predominance is a test readily met in certain cases alleging consumer or securities fraud." *Messner*, 669 F.3d at 815 (quoting *Amchem*, 521 U.S. at 625); *see also Schleicher v. Wendt*, 618 F.3d 679, 686 (7th Cir. 2010) ("Falsehood and materiality are issues on the merits; whether a statement is materially false is a question common to all class members and therefore may be resolved on a class-wide basis after certification."). Still, the Court must conduct "a 'rigorous analysis' into whether the plaintiffs' 'damages are susceptible of measurement across the entire class.'" *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 760 (7th Cir. 2014) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). At the very least, "[t]hat requires matching the theory of liability to the theory of damages." *In re IKO Roofing Shingle Products Liability Litigation*, 757 F.3d 599, 602 (7th Cir. 2014) (explaining that plaintiffs may proceed on one of two damages theories); *see also Comcast*, 521 U.S. at 38 ("The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*.") (cleaned up) (emphases in original). It would, however, put "the cart before the horse to insist" that plaintiffs demonstrate that the proposed method will precisely and accurately prove their damages "before any class can be certified." *Schleicher*, 618, F.3d at 687. Plaintiffs, therefore, "are not required to prove" all of the elements of a Rule 10b-5 claim "at the class-certification stage"; they need only show "that common questions '*predominate* over any questions affecting only individual [class] members.'" *Amgen*

19

*Inc. v. Connecticut Retirement Plans and Trust Funds*, 568 U.S. 455, 468–69 (2013) (quoting Fed. R. Civ. P. 23(b)(3)).

Similar to the requirements above, Plaintiffs argue that, like most securities fraud class actions, Defendants' material misrepresentations during the Class Period affected all Class members and therefore proof of the violations, "including evidence of falsity, materiality, scienter, and loss causation, will "be made on a class-wide basis." Memo. Class Cert. at 15 (quoting *Schleicher*, 618 F.3d at 685, 686–87; citing, *inter alia*, *In re Bank One Sec. Litig./First Chicago S'holder Claims*, 2002 WL 989454, at *7 (N.D. Ill. May 14, 2002) ("The issues of law and fact that flow from Defendants' alleged misstatements and omissions predominate over any individual issue.")).

Relatedly, Plaintiffs maintain that common issues of damages predominate over individual issues, as damages for Plaintiffs' and the Class members' Section 10(b) claims are measured using the well-settled and commonly used "out-of-pocket" methodology, which fits Plaintiffs' theory of liability. Memo. Class Cert. at 15–16 (citing Tabak Rpt. ¶¶ 82–88; *Treehouse*, 2020 WL 919249, at *9 ("the theory of liability matches the theory of damages" where plaintiffs proposed out-of-pocket methodology based on event study); *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *3 (N.D. Cal. Oct. 11, 2018) (describing the "out-of-pocket, or event study, method" as the "standard method for calculating damages in virtually every Section 10(b) class action.")).

The way Plaintiffs see it, common issues of reliance predominate based on the fraud-on-the market presumption, which provides that that "a public, material

20

misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation." Memo. Class Cert. at 16 (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 283–84 (2014) (*Halliburton II*); citing *Groupon*, 2014 WL 5245387, at *2). Therefore, note Plaintiffs, a showing that Boeing's securities traded "in a generally efficient market" triggers a class-wide presumption of reliance as articulated in *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988) (the *Basic* presumption). *Id.* Boeing stock traded in an efficient market, argue Plaintiffs, as they traded on a presumptively "efficient" major securities exchange like the New York Stock Exchange and had daily trading volume over four million shares per day, a volume that the Seventh Circuit has found to "comfortably qualify" for the *Basic* presumption. Memo. Class Cert at 16–17 (citing *Schleicher*, 618 F.3d at 682; *Groupon*, 2014 WL 5245387, at *2).

Moreover, argue Plaintiffs, Boeing's common stock and options satisfy the factors set forth in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) (the *Cammer* factors), which are widely accepted, including by courts in this District, to demonstrate market efficiency. Memo. Class Cert. at 17 (citing *Groupon*, 2014 WL 5245387, at *3; *Waggoner v. Barclays PLC*, 875 F.3d 79, 99 n.30 (2d Cir. 2017)). The *Cammer* factors are: "(1) average weekly trading volume during the class period; (2) number of security analysts who followed and reported on the stock during the class period; (3) number of market makers; (4) whether the company was entitled to file an S-3 Registration Statement; and (5) whether empirical facts demonstrate a cause-

21

and-effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Groupon*, 2015 WL 1043321, at *3. Plaintiffs need not demonstrate that all of the *Cammer* factors are satisfied to show market efficiency because these factors are an "analytical tool," not a "checklist." *Waggoner*, 875 F.3d at 99 n.30 (collecting cases). Defendants do not take issue with the efficiency of the market as to Boeing common stock. *See* Resp. Accordingly, the Court does not engage with Plaintiffs' analysis of each *Cammer* factor or the additional factors relating to market efficiency examined by Plaintiffs under *Krogman v. Sterritt,* 202 F.R.D. 467, 477–78 (N.D. Tex. 2001) (the *Krogman* factors). Memo. Class Cert. at 17–24. The Court addresses the parties' arguments regarding the efficiency of the market as to Boeing's options below. *See infra* Section II.A.3.

Defendants challenge predominance on three bases: (1) Plaintiffs have not satisfied their evidentiary burden under *Comcast*, 569 U.S. 27, 33, 35 to provide "evidentiary proof" of a classwide damages methodology consistent with their liability case; (2) Plaintiffs have not met their burden of proving by a preponderance of the evidence that the December 16, 2019 announcement temporarily halting production of the 737 MAX should mark the end of the Class Period, and therefore if any class is certified, the Class Period should end on October 18, 2019; (3) if a class is certified, it should not include options traders. Resp. The Court addresses each argument in turn, starting with Plaintiffs' damages methodology.

### 1. Damages Methodology[6]

To set the stage, some context is required. In securities fraud litigation, 15 U.S.C § 78u-4 "enables plaintiffs to recover damages based on their economic losses." *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 604 (7th Cir. 2020). "In its simplest form, a plaintiff's economic loss is the difference between the amount she paid to buy the security (higher than it should have been, in successful 10b-5 cases) and the amount she received when she sold it." *Id.* at 604–05. As the Seventh Circuit explained, "[f]or publicly traded securities, individual loss can be a simple arithmetic calculation using common evidence about the security's price movements over the relevant time." *Id.* at 605. In short, the correct measure of damages in a Rule 10(b)-5 case is out-of-pocket loss. Establishing loss in the context of publicly traded securities is challenging. These securities have established market prices, and even if that price is artificially inflated due to fraud, no investor experiences an economic loss until the price drops.

In *Comcast*, the plaintiffs alleged that Comcast engaged in unlawful, anticompetitive conduct to monopolize the cable television market in the Philadelphia area. Comcast, 569 U.S. at 29–30. The plaintiffs advanced four theories to support their antitrust claims, but the district court only certified the class action as to one theory: that Comcast acquired a significant share of the Philadelphia area, which

---

[6]On March 12, 2026, Plaintiffs filed a motion for leave to supplement the class certification record with Dr. Tabak's "full merits damages report" in which he calculates loss causation and damages for Boeing's common stock and options throughout the Class Period. R. 483, Mot. Leave Suppl. According to Plaintiffs, the supplemental report moots Defendants' arguments about Dr. Tabak's methodology not satisfying *Comcast*'s requirement that plaintiffs demonstrate damages can be calculated on a classwide basis consistent with their liability theory. *Id.* ¶¶ 6–7. The Court finds that the proposed supplemental report does not change the Court's analysis, and therefore denies the motion as moot.

unlawfully deterred competitors, or "overbuilders," from entering the market. *Id*. at 31. The district court certified a class finding that "damages resulting from overbuilder-deterrence impact could be calculated on a classwide basis," even though the plaintiffs' expert acknowledged that his damages model did not isolate damages resulting from any one of the four theories of liability. *Id*. at 31–32. The Supreme Court reversed. The Court concluded that that the plaintiffs' damages model was insufficient to establish predominance because the model did not isolate the impact of overbuilder deterrence theory from the other three antitrust theories of liability proposed by the plaintiffs. *Id* at 37–38. Put differently, the model calculated damages that were not caused by the defendant's conduct. *Id*. at 36–37.

Here, Plaintiffs' expert, Dr. David Tabak stated in his expert report that, to calculate classwide damages, he will employ an event study to measure the amount of artificial inflation in Boeing stock, which traded in an efficient market on each day of the Class Period. Tabak Rpt. ¶¶ 8–87. The event study "account[s] for changes in market and/or industry effects, on the dates of (or the trading dates following) the (remaining) corrective disclosures alleged in this case." *Id*. ¶ 85. Dr. Tabak then plans to use the event study to analyze the alleged corrective disclosures and alleged false and misleading statements to "determine how much artificial inflation entered and exited from Boeing's stock price on different dates during the Class Period. This analysis is conducted on a class-wide basis." *Id*. Then, Dr. Tabak would review "the alleged corrective disclosures to determine whether any of the information disclosed on the Event Dates was unrelated to the remaining allegations." *Id*. ¶ 86. According

to Plaintiffs, by using the out-of-pocket methodology and standard economic tools, Dr. Tabak will be able to disaggregate, or separate, the impact on Boeing's stock price of fraud-related information from any impact of non-fraud-related information. *Id*. All-in-all, documents produced by Defendants in discovery and deposition testimony "should aid in some of the exact parameterizations of the damages calculations, a method for determining inflation at any date, and thus damages for any Class member, will be feasible." *Id.* ¶ 87.

Defendants challenge Dr. Tabak's discussion of classwide damages for three reasons: (1) Dr. Tabak does not provide a methodology for measuring per-share inflation on a classwide basis; (2) Dr. Tabak fails to show that his damages methodology is consistent with Plaintiffs' liability theory; and (3) Dr. Tabak's "out-of-pocket" formula does not account for the evolving information about Boeing that became public during the Class Period. Resp. at 12–13. The Court begins with Defendants' first and third arguments.[7]

Defendants argue that while the "formula cited by Dr. Tabak is the *legal standard* for measuring damages for Section 10(b) claims; it is not a *methodology* for calculating damages in any particular case." Resp. at 13 (emphases in original). Put another way, Defendants contend that Dr. Tabak merely sets forth a standard, non-

---

[7]The Court finds that Plaintiffs do not raise new arguments or rely on Dr. Tabak's Reply Report in their Reply in relation to these arguments, and therefore the Court does not consider Defendants' Sur-Response here. *See* R. 480, 1/22/2026 Minute Entry ("The Court will consider those portions of Defendants' sur-response and sur-rebuttal expert report that are responsive to arguments or evidence included in Plaintiffs' reply that could have and should have been raised in their opening brief; however, it will not consider the portions that simply give Defendants a second bite at the apple as to arguments in Plaintiffs' reply that are merely responsive to arguments raised in Defendants' response.").

specific methodology for calculating damages without any specifics for this case, which, according to Defendants, is insufficient under *Comcast*. *Id*. Specifically, assert Defendants, although Dr. Tabak admits that the out-of-pocket measure of damages cannot be applied without first measuring "the amount of artificial inflation in the stock" on each trading day during the Class Period, Dr. Tabak has not provided an actual damages model to measure the inflation in Boeing's stock prices during the Class Period. *Id*. at 13–14 (quoting Tabak Rpt. ¶¶ 84, 87). Dr. Tabak, according to Defendants, even admitted during his deposition that he "copied and pasted" his damages opinion in this case from reports he has submitted in support of class certification in other cases. *Id*. at 14 (quoting R. 418-2, Tabak Dep. at 111:21–112:4). Worse, argue Defendants, Dr. Tabak himself has authored an article that "attempts to provide a framework for thinking about which inflation measures may apply in different situations," yet his report does not mention any framework for doing so in this case. *Id*. at 15 (citing R. 418-16 at 1, 18). Defendants insist that under *Comcast*, it is not enough for Dr. Tabak to assert that he will be able to develop a model at some point in the future. Resp. at 13–14 (citing *Ward v. Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019); *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 253–54 (6th Cir. 2024) (expert's "bald statement alone" cannot "prove" that Rule 23's requirements "have been met"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013) ("No damages model, no predominance, no class certification."); *Ohio Pub. Emps.' Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *19 (N.D. Ohio Aug. 14, 2018)).

Plaintiffs counter that contrary to Defendants' contention, their proposed methodology satisfies *Comcast*. R. 434, Reply at 3. The way Plaintiffs see it, all that *Comcast* requires is that damages are the result of the class-wide injury the plaintiff alleges. *Id.* (citing *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 799 (2013)). In fact, assert Plaintiffs, securities class actions, unlike antitrust cases, lend themselves to class wide damages. *Id.* Turning to Dr. Tabak's out-of-pocket damages methodology, that methodology, assert Plaintiffs, is a well-accepted methodology to calculate Class damages. *Id.* at 4. The Court agrees.

As stated above, Plaintiffs correctly emphasize that the out-of-pocket, or event study,[8] method of measuring damages in Section 10(b) securities cases is widely accepted by courts nationwide, and indeed, has been endorsed by the Supreme Court. Memo. Class Cert. at 15–16 (citing, *inter alia*, *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972); *Treehouse*, 2020 WL 919249, at \*9). Defendants do not dispute this, nor do they address—much less distinguish—the authority cited by Plaintiffs in support of the out-of-pocket damages model. *See* Resp. Recall that Dr Tabak's methodology calculates damages using an event study to measure the amount of artificial inflation in Boeing stock, which was traded in an efficient market on each day of the Class Period. According to Dr. Tabak, the event study "account[s] for changes in market and/or industry effects, on the dates of (or the trading dates

---

[8]"An event study is a statistical method that examines whether a specific event had an impact on a public company's stock price." *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at \*15 (S.D. Cal. Mar. 20, 2023).

following) the (remaining) corrective disclosures alleged in this case." Tabak Rpt. ¶ 85.

The Court finds that Dr. Tabak's proposed methodology is capable of measuring class-wide damages and is consistent with Plaintiffs' theory of liability. Dr. Tabak proposes using an event study and "out-of-pocket" methodology to measure damages. That is all Rule 23(b)(3) and *Comcast* requires. The use of the out-of-pocket damages model is the standard measurement of damages in Section 10(b) securities cases. *TreeHouse*, 2020 WL 919249, at *9. The Court finds that Plaintiffs' proposed damages methodology is sufficient under *Comcast* because the methodology can isolate different categories of misrepresentations and measure the damages stemming from each. Indeed, as Plaintiffs correctly state in Reply, other courts have rejected similar arguments to those Defendants make here about the insufficiency of damages models under *Comcast*. Reply at 4–5 n.3; *TreeHouse*, 2020 WL 919249, at *9 (rejecting defendants' argument that plaintiffs' expert's damages model was insufficient where he "proposed the same nonspecific theory at least five times in the past four years," but no other court rejected that nonspecific theory) (cleaned up); *RH*, 2018 WL 4931543, at *3 (rejecting defendants' argument that plaintiffs' "failure to describe a specific method is fatal to certification because there is no way for the Court to determine whether the proposed methodologies will measure damages that are solely attributable to plaintiffs' theory of liability"). Like in *TreeHouse*, here, Plaintiffs have cited numerous cases in which courts have found Dr. Tabak's event study out-of-damages methodology to be sufficient under *Comcast* and to support class

28

certification. Reply at 5–6 n.4 (citing *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *15–16 & n.20 (S.D. Cal. Mar. 20, 2023) (Dr. Tabak's event study with the out-of-pocket damages methodology is "consistently held" to be "an appropriate method for measuring stock price inflation caused by alleged misrepresentations"); *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at *8 (N.D. Cal. May 9, 2022) (plaintiff "adequately disclosed a class-wide damages model under *Comcast*" where Dr. Tabak set forth the out-of-pocket damages model).[9]

The cases cited by Defendants in support of their position that Dr. Tabak's failure to offer any methodology or model for measuring inflation is fatal, are distinguishable, as correctly argued by Plaintiffs, as they were consumer protection or antitrust, not securities cases, for which the out-of-pocket model advanced by Dr. Tabak here is inapplicable. *See Ward*, 784 F. App'x 539; *In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239; *Ohio Pub. Emps.' Ret. Sys.*, 2018 WL 3861840.[10]

---

[9]*See also Teva*, 2021 WL 872156, at *40 (joining "[n]umerous courts" in holding that Dr. Tabak's "proposed use of [the same] three-step analysis" he articulates here satisfies *Comcast*); *La. Mun. Police Emps. Ret. Sys. v. Green Mountain Coffee Roasters, Inc.*, 2017 WL 3149424, at *7 (D. Vt. July 21, 2017) (Dr. Tabak's methodology "can be applied on a class-wide basis" and "does not run afoul of *Comcast*."); *Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 516–17 (D. Minn. 2015) ("For purposes of finding the predominance requirement satisfied in a securities fraud case, courts commonly accept methodologies similar to Dr. Tabak's proposal for determining individual damages.").

[10]The court in *Treehouse* also found *Ohio Pub. Emps.' Ret. Sys.* to be distinguishable because, in that case, the court struck portions of the expert's report, finding parts of it to be "entirely improper"; moreover, the court also held that the plaintiffs' liability theory did not hold together. *Treehouse,* 2020 WL 919249, at *9 n.8 (citing *Ohio Pub. Emps.' Ret. Sys.,* 2018 WL 3861840, at *7, *17–20). The *Treehouse* court noted, therefore, that there was "little wonder that the court went on to hold that there was no congruence between the inadequate liability theory and sketchy theory of damages." *Id.*

29

All in all, the Court agrees with Plaintiffs that Dr. Tabak's event study including the out-of-pocket damages methodology is an adequate method for measuring stock price inflation caused by Defendants' alleged misrepresentations. At this stage, Plaintiffs' task is to present a viable, internally consistent, and truly classwide approach to damages, and they have done so.

Defendants' argument that Dr. Tabak's damages model "fails to account for the evolving information about Boeing disclosed during the [C]lass [P]eriod that would have affected the market's perception of the value-relevance of the alleged misstatements and thus any inflation in Boeing's stock price" also falls flat. Resp. at 20. Defendants rely on their own expert, Dr. Mark Garmaise's, report, which explains why the evolving nature of the publicly disclosed facts about Boeing during the Class Period presents difficult challenges in measuring inflation. *Id.* Defendants also cite numerous examples of public information released throughout the Class Period related to Boeing's changing relationship with the FAA and the widespread reporting of technical issues with MCAS and the 737 MAX's AOA sensors, which, according to Boeing must be accounted for in a damages model and its effect on inflation during the Class Period. *Id.* at 20–21.

But, as Plaintiffs point out in Reply, Defendants cite no authority in support of this argument. Reply at 15. Moreover, this is the kind of argument addressed—and rejected—by the authority cited by Plaintiffs in their opening motion. *See, e.g.*, *TreeHouse*, 2020 WL 919249, at *10 (rejecting defendants' argument that plaintiffs' expert's damages model was inadequate, as "[a]ll kinds of factors affect a stock's price

on any given day—the effect of any misrepresentation therefore fluctuates over time as investors incorporate that information with the myriad other inputs that go into buy-sell-hold decisions," but "the limitations [d]efendants identify are not unique to this case and need not be resolved before the class is certified."); *see also Washtenaw Cnty. Employees' Ret. Sys. v. Walgreen Co.*, 2018 WL 1535156, at \*4 (N.D. Ill. Mar. 29, 2018) ("Here, the defendants argue that there is not sufficient detail about how damages will be calculated in light of potentially confounding information disclosed during the class period. The impact of the additional information disclosed during the class period, however, is common to the class, and therefore does not call into question whether damages can be calculated on a class wide basis."). Indeed, at least one court has rejected Dr. Garmaise's similar challenges to certification. Reply at 15 (citing *Sheet Metal Workers Nat'l Pension Fund v. Bayer Aktiengesellschaft*, 2023 WL 3569981, at \*8 (N.D. Cal. May 19, 2023) (rejecting Dr. Garmaise's challenges, noting that the out-of-pocket methodology is "flexible enough to accommodate" "complicating factors" such as "investor uncertainty about risk, investors' beliefs about [a] merger," and the "impact of alleged corrective disclosures," concluding that "the fact that calculating damages is a complex undertaking does not undermine the use of the out-of-pocket model, nor does it militate against certifying the class"). The Court agrees with Plaintiffs that the existence of evolving public information does not prevent certification of a Class.

Finally, the Court turns to Defendants' argument that Dr. Tabak fails to explain how his damages methodology is consistent with Plaintiffs' theory of liability

31

in the case, specifically, Plaintiffs' (1) reliance on the repetition of certain alleged misstatements, and (2) contention that certain statements were "corrected" by the materialization of the supposedly understated risk. Resp. at 15–16.

As to the former, the way Defendants see it, "any methodology that attempts to measure inflation in Boeing's stock price throughout the [C]lass [P]eriod must account for Plaintiffs' theory that the repetition of certain statements contributed to their materiality and impact on the market." Resp. at 16. Which would mean, according to Defendants, that the inflation supposedly created by the statements must have increased as they were repeated. *Id.* (citing *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013)) (*BP I*).

The Court finds Defendants' argument regarding repetition of the alleged misstatements to be substantially similar to the ones it has rejected above.[11] As Plaintiffs argue, the potentially inflationary effect of repeated statements can be accounted for in the out-of-pocket damages model and would affect all Class members equally so as to not undermine predominance. Reply at 8 (citing, *inter alia*, *Waggoner*, 875 F.3d at 106 ("[W]e are not persuaded by the Defendants' argument that class certification was improper under *Comcast* because the Plaintiffs' damages model failed to account for variations in inflation over time. *Comcast* does not suggest that

---

[11]The Court finds that it can resolve this argument without addressing Plaintiffs' new Reply arguments citing to Dr. Tabak's Reply Report, and therefore again does not consider Defendants' Sur-Response. More specifically, the Court does not consider Plaintiffs' argument, or Dr. Tabak's Reply Report stating, that the inflation from Defendants' statements "must have increased as they were repeated." Reply at 7–8 (citing R. 434-3, Tabak Reply Rpt. ¶ 37). The cases cited by Plaintiffs in Reply on which the Court relies on here are simply responsive to arguments raised by Defendants' Response.

damage calculations must be so precise at this juncture. To the contrary, *Comcast* explicitly states that '[c]alculations need not be exact.'") (quoting *Comcast*, 569 U.S. at 35); *In re Upstart Holdings, Inc. Sec. Litig.*, 348 F.R.D. 612, 640 (S.D. Ohio 2025) ("Plaintiffs' expert notes that the evidence may show varied rates of artificial inflation and that, if so, the variance can be incorporate[d] into the [out-of-pocket] damages model.").

The only case Defendants cite, *BP I*, does not change the result. In that case the court found a fatal "disconnect[] between damages and liability" given plaintiffs' theory that "the repetition of certain statements" had a "cumulative inflationary effect," and therefore the plaintiffs' damages model did not satisfy the second prong of *Comcast*. 2013 WL 6388408, at *17. The Court respectfully disagrees that variations in inflation—including that caused by repetition of allegedly false and misleading statements—that can be, but are not currently, accounted for in an out-of-pocket damages model cannot satisfy *Comcast*. Critically, the *BP I* court relied on three non-securities cases in support of its conclusion that there was a disconnect between damages and liability. 2013 WL 6388408, at *17 (citing *Turnbow v. Life Partners, Inc.*, 2013 WL 3479884, at *15–18 (N.D. Tex. July 9, 2013); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 253–55 (D.C. Cir. 2013); *In re Montano*, 493 B.R. 852, 860 (Bankr. D. N.M. 2013)). But, as discussed in depth above, myriad courts since *BP I* have found that event studies with the out-of-pocket damages methodology, like the one employed by Dr. Tabak, are sufficient to satisfy *Comcast*.

33

The Court acknowledges that, as Defendants point out in their sur-response, R. 452-1, Sur-Resp. at 1, most of the cases relied on by Plaintiffs—and this Court— that have rejected arguments under *Comcast* are district court cases (the exception being *Waggoner*, 875 F.3d at 106, a Second Circuit case). But in their underlying briefing, Defendants cite just *BP I* (and *BP II*, discussed below—both district court cases) in support of their arguments that models like Dr. Tabak's are insufficient to satisfy *Comcast*. The Court agrees with Plaintiffs that the Sixth Circuit case cited in Defendants' notice of supplemental notice of authority, R. 463, does not move the needle, as in that case, the Sixth Circuit reversed and remanded the district court's grant of class certification on the plaintiffs' Securities Act and Exchange Act claims where the "district court rejected [the defendant's] objections to [the p]laintiffs' experts *in one sentence* and concluded without any additional analysis that predominance exists with respect to damages for the same reasons as articulated in the previous section" concerning statutory Securities Act damages, for which there is a statutory damages formula. *In Re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 621 (6th Cir. 2025) (cleaned up) (emphasis added). At bottom, *In Re FirstEnergy Corp. Sec. Litig.* stands for the proposition that that a district court must conduct the required analysis under *Comcast* for each theory of liability at issue. True, the Fourth Circuit has granted Boeing's petition to decide "[w]hether securities plaintiffs can satisfy their evidentiary burden under *Comcast* by having their expert recite the generally applicable rule for measuring damages for such claims and promise to develop a methodology for applying that rule to the particular facts of the case at a

later date." *In re the Boeing Co. Sec. Litig.*, No. 25-135 Dkt. Nos. 2, 36 (4th Cir. Mar. 21, 2025) (granted May 2, 2025). But the Fourth Circuit has not yet ruled on the question, and, even when it does, such a ruling would be persuasive only. Accordingly, for now, the Court follows the vast majority of district courts answering the above question in the affirmative. And, on the other side of the coin, the Ninth Circuit recently denied a Rule 23(f) appeal challenging plaintiffs' out-of-pocket methodology where the district court had properly analyzed the plaintiffs' Exchange Act theory of liability. *See SEB Inv. Mgmt. AB v. Wells Fargo & Co.*, 2025 WL 1243818, at *8 (N.D. Cal. Apr. 25, 2025), *leave to appeal denied*, 2025 WL 2028400 (9th Cir. July 17, 2025) ("Courts have found that federal securities class actions often fit Rule 23 like a glove, and the out-of-pocket or event study method is the standard method for calculating damages in virtually every Section 10(b) class action.") (cleaned up).

The Court now turns to Defendants' argument that Dr. Tabak's damages model does not account for Plaintiffs' purported "materialization of the risk" theory of liability prior to the Ethiopian Airlines Crash.[12] Resp. at 17. Defendants point out that Dr. Tabak acknowledged in his deposition that he was not even aware that Plaintiffs rely on a materialization of the risk theory, although Plaintiffs expressly invoked such a theory in their opposition to Defendants' second motion to dismiss: that is, Plaintiffs argued that the Ethiopian Airlines Crash "was a materialization of the safety risks" supposedly concealed by the November 2018 statements after the Lion Air accident. *Id.* (citing Tabak Tr. at 118:12–121:4; R. 305 at 40–41). Defendants'

---

[12]Plaintiffs' Reply to this argument relies heavily on Dr. Tabak's Reply Report, and thus the Court considers Defendants' Sur-Response.

expert, Dr. Garmaise, opined that, under this theory of liability, at least some of the stock-price decline on the date when the risk materialized reflects the occurrence of the event itself (*i.e.*, the Ethiopian Airlines Crash) rather than the correction of prior alleged misstatements. *Id.* (citing R. 420-1, Garmaise Rpt. ¶ 71). Indeed, Dr. Tabak acknowledged during his deposition that Boeing's stock price would have declined following the Ethiopian Airlines Crash regardless of whether Defendants made any allegedly misleading statements following the Lion Air Crash. *Id.* (citing Tabak Tr. at 130:12–15). Yet, from Defendants' point of view, Dr. Tabak fails to explain how to separate the price effect of the Ethiopian Airlines Crash from the price effect of the alleged "correction" of Defendants' prior misstatements. *Id.*

Defendants rely heavily on *In re BP p.l.c. Securities Litigation*, 2014 WL 2112823 (S.D. Tex. May 20, 2014) (*BP II*). In *BP*, the Deepwater Horizon, an off-shore drilling rig leased by BP, exploded, resulting in the death of several workers and a catastrophic oil spill. The plaintiffs, like Plaintiffs here, alleged that the defendants' statements about safety "lulled the market into believing that BP was a safer company than it actually was" until the "fraud was revealed when the Deepwater Horizon exploded." *Id.* at *2. The plaintiffs in *BP II* moved to certify two subclasses: a pre-explosion class and a post-explosion class. *Id.* The pre-explosion subclass sought to recover for BP's false assurances that misled investors about BP's process safety and the ability to prevent events like the Deepwater Horizon explosion. *Id.* at *2–4. The post-explosion subclass sought to recover based on BP's false statements regarding the amounts of oil being released in the spill. *Id.* at *4–5.

In opposing certification of the pre-explosion subclass, BP argued that "[b]ecause the pre-explosion damages methodology is not based on the 'but for' price that the stock would have traded at absent [BP's] alleged fraud, it represents an impermissible windfall for investors, protecting them from the downside consequences of an assumed (if allegedly understated) risk." *BP II*, 2014 WL 2112823 at \*10. Importantly, in *BP II*, the pre-explosion subclass did not seek out-of-pocket damages based on the artificial inflation of the stock price; instead, they claimed to be entitled to the full value of the drop in stock price following the Deepwater Horizon explosion as *consequential damages. Id.* The district court refused to certify the subclass, explaining that, "when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent." *Id.* Therefore, the causation damages sought by the pre-explosion sub-class were "antithetical to the 'fraud-on-the-market' theory" of liability by which investors sought class-wide resolution of their claims. *Id.* at \*12. Put another way, the proposed damages model was inconsistent with the class's theory of liability in violation of *Comcast*. The court acknowledged that the plaintiffs may have been able to perform an "out-of-pocket" measurement of damages on a classwide basis, but refused to certify a class on that basis, as the plaintiffs did not give the court "any information about how the alternative calculation would be performed." *Id.* The Fifth Circuit affirmed the denial of class certification, stressing that the question was "not whether the

37

'materialization of the risk' theory" is ever viable, but rather "whether a damages model based on this theory is 'susceptible of measurement across the entire class . . .' as required by *Comcast*." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 689–90 (5th Cir. 2015) (cleaned up).

On the other hand, the district court in *BP II* certified the post-explosion sub-class, as it "propose[d] to model damages . . . by calculating the inflation caused by the fraudulent statements." *BP II*, 2014 WL 2112823 at *4. The Fifth Circuit affirmed, noting that the liability theory for the post-explosion subclass was consistent with its damage theory: "the liability stems from . . . misstatements, and the loss forming the basis for Plaintiffs' damages model comes from the inflated stock price caused by those misstatements." *Ludlow v. B.P., P.L.C.*, 800 F.3d at 687.

As in initial matter, Plaintiffs retort that Defendants' entire argument is misplaced, as the Seventh Circuit has held that materialization of the risk is simply a way to describe loss causation; it is not a separate theory of liability. Reply at 9–10 (citing *Schleicher*, 618 F.3d at 683–84 ("The phrase [materialization of the risk] adds nothing to the analysis . . . . [T]he fraud lies in an intentionally false or misleading statement, and the loss is realized when the truth turns out to be worse than the statement implied.")). Numerous other courts have rejected similar arguments that loss causation theories labeled "materialization of the risk" fail to satisfy *Comcast*. *Id.* at 10–11 & n.6 (citing, *inter alia*, *Weston v. DocuSign, Inc.*, 348 F.R.D. 354, 369 (N.D. Cal. 2024) ("As a threshold matter, materialization of the risk, at least as it is asserted here, is a theory of loss causation, not liability, meaning it is the plaintiffs'

38

burden to prove at the merits stage, not at class certification."); *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *18 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) (collecting cases); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019)).

Plaintiffs stress that, unlike the pre-explosion sub-class in *BP II*, Plaintiffs here do not seek consequential damages; instead, they seek damages to be calculated by an "out-of-pocket" model calculating the amount of inflation the alleged fraudulent statements caused, that were later "corrected" by the Ethiopian Airlines Crash. Reply at 11. Plaintiffs propose two models for calculating the loss.

First, Plaintiffs point out that Dr. Tabak testified, and later memorialized in his Reply Report, that in his expected "but for" analysis where Defendants disclosed the full truth, the 737 MAX would have been grounded at the outset of the Class Period, meaning there would have been no safety-related artificial inflation injected into the stock. Reply at 12–13 (citing Tabak Tr. at 129:18–22; R. 434-3, Tabak Reply Rpt. ¶ 22). Dr. Tabak therefore stated that, "for [his] damages analysis, [he] will not have to estimate the likelihood of a future second crash (after the Lion Air crash before the start of the Class Period) or concern [himself] with issues related to any materialization of risk," apart from certain costs associated with the Ethiopian Airlines Crash itself, such as "payments to the estates of the passengers and crew who perished" in the Ethiopian Airlines crash, which may need to be removed from the market reaction to the Ethiopian Airlines Crash. Tabak Reply Rpt. ¶¶ 22, 57.

39

Second, Plaintiffs posit that, if the Court requires them to supply a distinct methodology for a "materialization of the risk" theory of loss causation, Dr. Tabak's Reply Report explains how, if necessary, he could construct a damages model that would assist the jury in calculating inflation rates over the Class Period based on a "materialization of the risk" theory, guided by discovery in this action. Reply at 14. Specifically, Dr. Tabak explains that this model would compare (i) "the market's actual perception of the risk (here of an MCAS-related 737 MAX plane crash)" and (ii) "what the perception of that risk would be had the alleged misrepresentations and omissions been corrected." *Id.* (quoting Tabak Reply Rpt. ¶ 58). To do so, Dr. Tabak explains that, for example, one could review the analyst reports during the time period between the Lion Air Crash and the Ethiopian Airlines Crash "to see what discount, if any, analysts applied to their valuation of Boeing to account for" the risk of another event "to estimate the market's actual perception of the risk." *Id.* (quoting Tabak Reply Rpt. ¶ 59).

Predictably, Defendants take issue with both of Plaintiffs' proposed models. As to the first one, in which Dr. Tabak presumes that the 737 MAX would have been grounded, Defendants contend that Plaintiffs are now abandoning "a central element of their liability theory on which they relied to avoid dismissal of an alleged corrective disclosure." R. 452-1, Sur-Resp. at 7. That is, Plaintiffs previously argued that the Amended Complaint adequately alleges that the Ethiopian Airlines Crash is a corrective disclosure because that accident constituted a "materialization of the safety risks" concealed by Defendants' alleged misstatements. *Id.* (citing R. 305 at

40

40–41; Am. Compl. ¶ 525). Dr. Tabak's new theory appears for the first time in Plaintiffs' Reply, which is inappropriate, submit Defendants. *Id.* at 8. Moreover, argue Defendants, Dr. Tabak's opinion about "the more reasonable view" of what would have happened if Boeing had made a different disclosure is speculative and outside Dr. Tabak's area of expertise. *Id.* (citing Tabak Reply Rpt. ¶ 57; R. 452-4, Garmaise Sur-Resp. Rpt. ¶ 38; *In re M/V MSC FLAMINIA*, 2017 WL 3208598, at *2 (S.D.N.Y. July 28, 2017); *Warrick* v. *United States*, 2024 WL 4894273, at *11 (N.D. Ill. Nov. 26, 2024)).

As to Defendants' first point, the Court notes that Dr. Tabak testified during his April 7, 2025 deposition that the relevant "risk" that was concealed by Defendants' alleged false and misleading statements in this case was "not a probability of a crash. It's what the effects of either a crash or the safety information would have done on Boeing's ability to sell and deliver planes." Tabak Tr. at 129:18–22. So, the Court disagrees with Defendants that this theory appeared for the very first time in Plaintiffs' Reply, filed on June 6, 2025; however, Defendants are correct that it was not clear from the face of the Amended Complaint that Plaintiffs were pursuing such a damages theory. Sur-Resp. at 7. Along those lines, Defendants correctly point out that the Court allowed Plaintiffs to proceed with their claim that the Ethiopian Airlines Crash functioned as a corrective disclosure based on Plaintiffs' allegation that the crash was a "materialization of the safety risks Defendant concealed." *Seeks v. Boeing Co.*, 752 F. Supp. 3d 992, 1022 (N.D. Ill. 2024) (quoting R. 306 at 49, 42).

41

The Court agrees with Defendants that this damages model is untethered to the theory of liability alleged in the FAC.

Moreover, the Court agrees that Defendants are correct to question Dr. Tabak's expertise to opine whether it was more reasonable, that without Defendants' alleged misstatements, the 737 MAX would have been grounded or been allowed to continue flying and result in a crash. Sur-Resp. at 8. It is well-settled in the Seventh Circuit that, "when an expert's report or testimony is critical to class certification, . . . a district court must conclusively rule on any challenge to the expert's qualifications or submissions prior to ruling on a class certification motion." *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–16 (7th Cir. 2010). Here, Dr. Tabak's report fails to provide a basis for his challenged opinion, and Plaintiffs, as the proponent of the expert, bear the burden of establishing the admissibility of the opinion. Which Plaintiffs failed to do. Therefore, the Court finds that Dr. Tabak may not opine on "the more reasonable view" of what would have happened if Boeing had made different disclosures; thus, for this reason in addition to the one discussed above, the Court will not consider the damages model based on the assumption that the 737 MAX would have been grounded in Defendants had made proper disclosures.

Turning to Plaintiffs' second model, which accounts for the materialization of the risk, Defendants argue that Dr. Tabak has not sufficiently supplied a methodology for calculating the market's actual perception of the risk of a crash or what the perception of that risk would have been if the alleged misrepresentations and omissions had been corrected. Sur-Resp. at 11. For the same reasons that the

42

Court found Dr. Tabak's proposed model to be sufficient to account for inflation, the Court finds it to be sufficient here, as well. *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (defendant's expert's "contention that [p]laintiff's methodology did not adequately isolate the impact of the materialization of known risks from the impact of allegedly concealed risks is simply a loss causation argument in disguise, because it tests the causal relationship between the alleged misstatements and the price decline. Such an argument goes beyond the Rule 23 inquiry.") (cleaned up)); *see also Schleicher*, 618 F.3d at 685 ("It is possible to certify a class under Rule 23(b)(3) even though all statements turn out to have only trivial effects on stock prices. Certification is appropriate, but the class will lose on the merits.").

In sum, the Court finds that Plaintiffs have established a common methodology for measurement of damages that is applicable classwide.

### 2. Class Period

In securities fraud class action cases, "courts are required to cut off the class period on the date of a statement or event that cures the market." *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC.*, 310 F.R.D. 69, 97 (S.D. N.Y. 2015) (cleaned up). "In other words, a class period ends when the truth has been disseminated to the market." *Id.*

Recall, Plaintiffs seek to certify a class for the period between November 7, 2018 and December 16, 2019, ending when Boeing announced that it was suspending production on the 737 MAX. According to Plaintiffs, that announcement "expose[d]

the true depth of the issues surrounding the plane and the unrealistic nature of the return to service timelines Defendants had previously provided." Memo. Class Cert. at 7–8 (citing Am. Compl. ¶¶ 348–49). Boeing shares dropped $14.67 per share the next day, a 4.3% decline. *Id.* at 8.

Defendants, on the other hand, ask the Court to end the Class Period on October 18, 2019, because the "truth" that the 737 MAX was not returning to service in 2019 was "disseminated to the market" *before* December 16, 2019.[13] Resp. at 22. From Defendants' perspective, the evidence uniformly shows that the market learned more than a month earlier, on November 11, 2019, that the return-to-service timeline had been extended into 2020, and that was confirmed again on December 11 and 12, 2019. *Id.* Defendants maintain that there was no statistically significant decline in Boeing's stock price on any of those dates. *Id.* Therefore, argue Defendants, December 16, 2019 cannot serve as the end date of the Class Period. *Id.* (citing *In re Novatel Wireless Sec. Litig.*, 830 F. Supp. 2d 996, 1019 (S.D. Cal. 2011), *abrogated on other grounds by Sodha v. Golubowski*, 154 F.4th 1019 (9th Cir. 2025) ("the decline in stock price caused by the revelation of that truth must be statistically significant")).

Plaintiffs counter that Defendants' argument is, at bottom, a truth-on-the-market defense inappropriate for resolution at the class certification stage. Reply at 17–18 (citing *Amgen*, 568 U.S. at 481–82 (holding evidence that "news of the truth credibly entered the market and dissipated the effects of prior misstatements" is "a

---

[13]The Court finds that Plaintiffs' Reply does not contain new arguments or evidence that should have been included in their opening memorandum, and thus the Court does not consider Defendants' Sur-Response.

44

matter for trial") (cleaned up); *Basic*, 485 U.S. at 249 & n.29 (when news "credibly entered the market and dissipated the effects of the misstatements" is "a matter for trial").

The Seventh Circuit's decision in *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 611 (7th Cir. 2020), undercuts Plaintiffs' position. In *Allstate*, the court began by noting that in *Basic v. Levinson*, the seminal case on the fraud-on-the-market theory, the United States Supreme Court established "the fraud-on-the-market presumption [that] allows plaintiffs to avoid proving individual reliance upon fraudulent misrepresentations and omissions. Instead, plaintiffs may prove that the given securities traded in efficient markets in which prices reflect all publicly available information, including misrepresentations, and all investors were thus entitled to rely on that public information and pricing." 966 F.3d at 600 (citing *Basic*, 485 U.S. at 246–47). The court observed that "[e]vidence supporting or refuting the *Basic* presumption of reliance is often relevant to three other closely related issues in a securities fraud case—materiality, loss causation, and transaction causation." *Id.* The court explained in *Allstate* that "[r]ecent Supreme Court decisions on those issues pose a difficult challenge at the class certification stage." *Id.* A district court deciding whether to certify a class, however, may not use the evidence to decide loss causation, nor may it use the same evidence to decide materiality. *Id.* (citing *Amgen*, 568 U.S. 455; *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011) (*Halliburton I*); *Halliburton II*, 573 U.S. 258). "Those questions are left for the merits." *Id.* Yet "a court *must* consider the same evidence if the defense offers it to show the absence of

45

transaction causation, also known as price impact." *Id.* (citing *Halliburton II*, 573 U.S. 258) (emphasis in original).

> The court explained, in relevant part:

> A district court deciding whether the *Basic* presumption applies must consciously avoid deciding materiality and loss causation. *Halliburton I* and *Amgen* require that much. At the same time, a district court must be willing to consider evidence offered by the defense to show that the alleged misrepresentations did not actually affect the price of the securities. *Halliburton II* requires that. And yes, the same evidence is likely to have obvious implications for the off-limits merits issues of materiality and loss causation. *Halliburton II* teaches, however, that a district court may not use the overlap to refuse to consider the evidence. The court must still consider the evidence as relevant to price impact (also known as transaction causation).

*In re Allstate Corp. Sec. Litig.*, 966 F.3d at 608.

Loss causation is "*the act or omission of the defendant* alleged to violate this chapter [that] *caused the loss* for which the plaintiff seeks to recover damages." *In re Allstate Corp. Sec. Litig.*, 966 F.3d at 605 (quoting 15 U.S.C. § 78u−4(b)(4)) (emphasis in original). Price impact, as defined in *Halliburton I*, is "the effect of a misrepresentation on a stock price." *Id.* at 607 (quoting *Halliburton I*, 563 U.S. at 814). While Plaintiffs seeking certification need not offer evidence of price impact, Defendants may make "*[a]ny showing* that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price," and such a showing "will be sufficient to rebut the presumption of reliance." *Id.* at 608–09 (citing *Halliburton II*, 573 U.S. at 279; *Basic*, 485 U.S. at 248) (emphasis in original). "This showing may include direct evidence demonstrating that the alleged misrepresentations had no impact on the stock price." *Id.* at 609 (citing *Halliburton II*, 573 U.S. at 279–80). At this stage,

46

Defendants bear the burden of production and persuasion by a preponderance of the evidence that they have "sever[ed] the link" of transaction causation. *Id.* at 610–611 (cleaned up).

Accordingly, the Court examines the evidence adduced by Defendants to determine whether they have met their burden.[14] Defendants point to Boeing's November 11, 2019 737 MAX Progress Report that disclosed that Boeing was "working towards final validation of the updated training requirements, which must occur before the MAX returns to commercial service, and which [is] now expect[ed] to begin in January." Resp. at 23 (quoting R. 418-6, Nov. 11, 2019 Report). Defendants note that this report caused securities analysts to report that same day that "Boeing now expects the aircraft to return to service (RTS) in January 2020," *id.* (quoting R. 418-8), and was "pointing toward a return to commercial service (RTS) in January," *id.* (quoting Ex. 418-9). Significantly, argue Defendants, Boeing's stock price *increased* on that date. *Id.* (citing Garmaise Rpt. Exh. 3 at 15). Defendants also cite a December 11, 2019, *Seattle Times* article quoting FAA Administrator Stephen Dickson as saying, "[i]f you do the math, [FAA approval is] going to extend into 2020." *Id.* (quoting R. 418-10). This report caused securities analysts to advise investors that "the 737 MAX recertification would stretch into 2020," contrary to Boeing's prior

---

[14]Plaintiffs argue that Defendants do not make a "price impact" argument, so the Court should not engage in any analysis at this stage. Reply at 20. The Court agrees that Defendants do not use the phrase "price impact," and indeed, do not affirmatively raise that argument. *See* Resp. The substance of their argument, however, falls within *Allstate*'s description of a price impact argument that it found it to be error for a district court to ignore at class certification: that is, Defendants argue that the truth about the 737 MAX's return to service had been corrected on the market before the December 16, 2019 corrective disclosure alleged by Plaintiffs, and "the market shrugged off the purported news." Resp. at 24.

47

estimate of December 2019. *Id.* (citing R. 418-11). One day later, on December 12, 2019, the *Seattle Times* reported that Boeing had announced after a meeting with Dickson that day that "[w]e will work with the FAA to support their requirements and their timeline as we work to safely return the Max to service *in 2020.*" *Id.* (citing R. 418-13 (emphasis in Response)). That same day, the *Wall Street Journal* issued an article stating that the FAA "is expected to approve fixes to a MAX flight-control system and related pilot training no sooner than February." *Id.* at 24 (quoting R. 418-14). On December 13, 2019, securities analysts reported that "Dickson said ungrounding would not be before January—already unlikely given no milestone announcements in the last two weeks. According to reports, *the FAA expects to approve the technical fixes and related pilot training in February, with a risk that this may slip into March.*" *Id.* (quoting R. 418-15 (emphasis in Response)). Defendants stress that Dr. Tabak's event study shows no statistically significant decline in Boeing's stock price on either December 11 or 12, 2019. *Id.* (citing Garmaise Rpt. Exh. 3 at 16).

Defendants aver that, by December 11 and 12, 2019 at the latest, "the truth ha[d] been disseminated to the market" that the 737 MAX was not returning to service in 2019, thereby correcting Defendants' prior estimates challenged in this case, and "the market shrugged off the purported news." Resp. at 24 (citing *In re Apache Corp. Sec. Litig.*, 2024 WL 532315, at *7 (S.D. Tex. Feb. 9, 2024)). Additionally, posit Defendants, Dr. Tabak's report does not explain how he intends to show that the statistically significant stock price decline that occurred on December

48

16, 2019—when the market became aware of a production halt that was itself economically significant for Boeing (*see* Garmaise Rpt. ¶ 103)—can be linked to an alleged misimpression in the market that the 737 MAX would return to service in 2019. *Id.*

Plaintiffs retort that "Defendants have not come close to offering adequate evidence to establish that the fraud was 'conveyed to the public with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements.'" Reply at 20 (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000) (cleaned up)). According to Plaintiffs, Defendants distort the "truth" that Plaintiffs allege was concealed: that is, Defendants style the "truth" that was concealed as being that the 737 MAX was not returning to service in 2019, whereas Plaintiffs' theory in fact, sustained by the previously assigned judge, is that "Muilenburg projected confidence that the MAX would quickly return to service . . . while knowing, but not disclosing, that the FAA saw the matter very differently." Reply at 20–21 (citing *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at \*23 (N.D. Ill. Aug. 23, 2022)). Undermining this theory, however, is one of the reports, issued on December 13, 2019, cited by Boeing, which states that "[p]ress reports late Thursday (Bloomberg, WSJ) indicated FAA Administrator Dickson met with Boeing CEO Muilenburg to discuss ungrounding the 737 MAX. *Reports indicate Dickson was concerned Boeing has discussed an unrealistic recertification timeline.*" Resp. at 24 (quoting R. 418-15) (emphasis in Resp.).

49

Plaintiffs also point to Boeing's public statements on December 12, 2019, that Boeing "had a productive meeting" with the FAA and was "committed to addressing all of the FAA's questions." Reply at 23 (quoting R. 305-5). Courts evaluating loss causation, point out Plaintiffs, have declined to find the truth was previously disseminated to the market where the prior reports were "counteracted by [a company's] contemporaneous statements." *Id.* (quoting *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 238 (S.D.N.Y. 2006); citing *In re Res. Am. Sec. Litig.*, 202 F.R.D. 177, 185 (E.D. Pa. 2001) (defendants' "aggressive public comments . . . aimed at countering the [curative] effect of" a report ensured it "was not curative information or a curative disclosure," since "it would not have been unreasonable for an investor to rely on defendants' alleged misrepresentations after its publication"); *see also In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *7 (C.D. Cal. June 7, 2018) (prior report did not reveal the truth where defendants "misleadingly reassured investors"). The Court is not persuaded that Boeing's statements counteracted the December 11 and 12 articles' dissemination of the truth that Boeing and the FAA were not aligned on the 737 MAX's return-to-service date or that the 737 MAX would not return to service in 2019. The *Seattle Times* article cited by Defendants and released the same day as Boeing's public statement characterized Boeing's statement as "bland." R. 418-3 ("Though the wording of the [FAA] email amounts to a public rap on the knuckles for Muilenburg, Boeing issued a bland statement afterward saying that Muilenburg and Deal had 'a productive meeting' with Dickson and his deputy Dan Elwell."). And the cases cited by Plaintiffs are inapposite: both *Lapin* and *Snap*

50

were decided at the motion to dismiss stage, thus taking all well-pled allegations as true; and *Res. Am. Sec. Litig.* involved just one allegedly corrective report that was counteracted by "aggressive public comments" from the defendant, such that the court found that "it would not have been unreasonable for an investor to rely on defendants' alleged misrepresentations after its publication." 202 F.R.D. at 185. Here, on the other hand, Defendants point to several articles disclosing that the 737 MAX would not be returning to service in 2019 and at least two discuss the disconnect between Boeing and the FAA, countered only by a "bland" public statement from Boeing.

Finally, Plaintiffs cite to the significant market reaction to the December 16, 2019 disclosure, arguing that it demonstrates that it was curative, and that the truth was not previously on the market. Reply at 23. Defendants do not explain, through their expert or otherwise, argue Plaintiffs, what else could have caused the price drop. *Id.* But as stated above, the Court agrees with Defendants that the December 11 and 12, 2019 publications had already made the market aware of the 737 MAX's 2020 return-to-service and Boeing's disconnect with the FAA, with no price drop on those dates, so the fall in Boeing's stock on December 16, on its own, does not demonstrate that the price decline was in response to *new* corrective information (rather than, as Defendants posit, the fact of the production halt in itself).

In sum, based on the evidence before it, the Court finds that Defendants have proven by a preponderance that Defendants' alleged misrepresentations had no

impact on the stock price. Thus, the Court agrees that the end date of the Class Period must be October 18, 2019.

### 3. Options Traders

Recall that Plaintiffs seek to certify a Class that includes not only all persons or entities who purchased or otherwise acquired Boeing *common stock*, but also those who purchased or acquired *call options* or sold *put options*. Memo. Class Cert. at 1. Defendants contend that Plaintiffs fail to satisfy their evidentiary burden on options for two separate reasons: (1) Plaintiffs fail to prove that Boeing options traded in an efficient market, and (2) Plaintiffs fail to present a methodology capable of measuring damages for options on a classwide basis consistent with their theory of liability. Resp. at 26.

### a. Efficiency

Starting with an efficient market, Plaintiffs posit that, "[b]ecause there is a 'close connection between options and the stock on which they are based, if the stock trades in an efficient market, it is highly likely that the options on that stock will as well.'" Memo. Class Cert. at 23 (quoting Tabak Rpt. ¶ 79); citing Tabak Rpt. ¶ 68 ("[I]f the market for Boeing's common stock is efficient, there is a mechanism to make the markets for its options efficient as well . . . option markets may be as efficient if not more efficient than markets for stock in the same company.")). Numerous courts, according to Plaintiffs, have similarly found that evidence that a company's common stock traded in an efficient market to also be evidence that the company's options also traded efficiently. Reply at 24 (citing, *inter alia, see In re Countrywide Fin. Corp. Sec.*

*Litig.*, 273 F.R.D. 586, 609 n.74 (C.D. Cal. 2009) (the efficiency of common stock and options for heavily traded companies is "very nearly a nonissue") (cleaned up)); *Deutschman v. Beneficial Corp.*, 841 F.2d 502, 504 (3d Cir. 1988) (the "market price for options is directly responsive . . . to changes in the market price of the underlying stock, and to information affecting that price"); *Rougier*, 2019 WL 6111303, at \*14 (market efficiency for common stock is sufficient to prove options market efficiency)).

Defendants argue that Plaintiffs fail to prove that Boeing options trade in an efficient market for three reasons. First, Dr. Tabak's analysis oversimplifies the thousands of different options captured by Plaintiffs' proposed class. Resp. at 25. From Defendants' point of view, each listed option is a "distinct financial instrument consisting of a unique combination of option type (call or put), strike price, and maturity date." *Id.* at 26–27 (citing Garmaise Rpt. ¶¶ 122, 125). As a result, argue Defendants, different options series trade in different markets and are not fungible with one another, unlike common stock. *Id.* at 27. Defendants point out that Dr. Tabak admitted that each option is a distinct security trading in a different market, and that the markets for some options can be inefficient even though the markets for other options for the same issuer are efficient. *Id.* (citing Tabak Tr. 65:9–23, 103:9–13). Yet Dr. Tabak treated all options the same. Second, Dr. Tabak failed to apply the *Cammer* factors or the *Krogman* factors to each listed Boeing option, many of which, posit Defendants, do not support a finding of market efficiency. *Id.* (citing Garmaise Rpt. ¶¶ 133–135, 139). For example, argue Defendants, Dr. Tabak provides no analysis of the trade volume of different Boeing options during the Class Period. *Id.*

53

(citing Tabak Rpt. ¶ 69). Relying on Dr. Garmaise's report, Defendants argue that many Boeing options had very low, or even *no*, trade volume during the Class Period. *Id*. at 27–28 (citing Garmaise Rpt. ¶¶ 145–146). Additionally, although Dr. Tabak states that a stock price's reaction to new news is important evidence of market efficiency, he ignores, argue Defendants, that on March 18, 2019, one of the alleged corrective disclosure dates, the price of a substantial portion of Boeing put options actually *decreased* (the opposite of what would be expected for put options trading in an efficient market under Plaintiffs' theory that this disclosure partially revealed the "truth" of Defendants' alleged fraud). *Id*. at 28 (citing Tabak Rpt. ¶ 32; Garmaise Rpt. ¶¶ 151–157). Third, Dr. Tabak admits that options will not always trade in efficient markets just because the underlying stock does, because options and common stock "don't always move together." *Id*. (citing Tabak Tr. at 69:12–19; Garmaise Rpt. ¶¶ 126–132 (explaining why option efficiency does not automatically follow from stock efficiency)). Defendants cite to a case in which the court questioned whether that assumption was valid. *Id*. at 28–29 (citing *In re Apple Inc. Sec. Litig.*, 2022 WL 354785, at *13 n.11 (N.D. Cal. Feb. 4, 2022) (*Apple I*)).

Plaintiffs counter that Boeing options are derivatives of Boeing common stock and it is undisputed that Boeing common stock traded in an efficient market, which is strong evidence that Boeing options also trade efficiently. Reply at 24 (citing Tabak Rpt. ¶¶ 66–69). Numerous courts, according to Plaintiffs, have reached the same conclusion. *Id*. (citing, *inter alia*, *In re Apple Inc. Sec. Litig.*, 2023 WL 2763952, at *1 (N.D. Cal. Mar. 28, 2023) (*Apple II*); *Rougier*, 2019 WL 6111303, at *14). As for *Apple*

*I*, Plaintiffs point out that the *Apple* court later certified a class upon the plaintiffs' submission of a supplemental expert report from Dr. Don Chance, explaining the connection between the efficiency of common stock and options. Reply at 25 (citing *Apple II*, 2023 WL 2763952, at *1). Plaintiffs provide a comparison of portions of Dr. Chance's expert report, which the court in *Apple II* found to be sufficient, and Dr. Tabak's. *Id.* at 25–26 (comparing, *inter alia*, Tabak Rpt. ¶ 68 ("If the put-call parity relationship is violated, then there is an arbitrage opportunity, which would indicate a lack of efficiency in at least one of the markets.") *with* 434-5, Chance Rpt. ¶ 56 ("In the world of options, market efficiency is driven by the possibility of engaging in arbitrage against anyone who fails to understand the most fundamental rule: the law of one price.")). Dr. Tabak further explained in his reply report how the fundamentals of options markets lead to efficiency.[15] *Id.* at 26 (citing Tabak Reply Rpt. ¶¶ 73, 79–80, 82 n.56, 83–84).

The Court finds that Plaintiffs have the better of the argument. Beyond simply relying on the correlation between the efficiency of common stock and options, Dr. Tabak analyzed the efficiency of the markets for Boeing options by testing the extent to which damageable Boeing options (i.e., options with open interest on at least one Class Period disclosure day) satisfied the "put-call parity condition." Memo. Class Cert. at 23 (citing Tabak Rpt. ¶¶ 70–80). Plaintiffs explain that the put-call parity condition is a measure of the alignment between the prices of an issuer's stock and options; satisfaction of the condition indicates that, if the market for the issuer's stock

---

[15]The Court considers Defendants' Sur-Response and Dr. Gamaise's Sur-Response Report.

is efficient, the market for its options is as well. Memo. Class Cert. at 23 (citing Tabak Rpt. ¶¶ 70–80; *Carpenters Pension Tr. Fund*, 310 F.R.D. at 81). Even if the options market is efficient, reason Plaintiffs, one would not expect the put-call parity condition to hold where trading costs are arbitrarily low; here, Dr. Tabak determined that, even under the extremely conservative assumption that there were ***zero*** trading costs, 98.56% of the Options Data Sample satisfy the put-call parity condition. *Id.* at 23–24 (citing Tabak Rpt. ¶ 76). Plaintiffs point out that courts have found options markets efficient where 63% of the options analyzed meet put-call parity, with zero trading costs. *Id.* at 24 (citing *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2013 WL 396117, at *12 (D.N.J. Jan. 30, 2013); Decl. of David Tabak, Ph.D., at 31, *In re Merck & Co. Inc., Sec., Deriv. & "ERISA" Litig.*, No. 2:05-cv-02367-SRC-CLW Dkt. 319-9 (D.N.J. April 10, 2012)). Defendants rely on Dr. Garmaise's report to argue that, simply because a given option passes the put-call parity test does not mean that the market for that option is efficient. *Id.* (citing Garmaise Rpt. ¶¶ 140–143). As Plaintiffs correctly state in reply, however, numerous courts have found the fact that options pass the put-call parity test to be sufficient to establish options efficiency. Reply at 26 (citing, *inter alia*, *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *17 (N.D. Cal. Mar. 11, 2024) (efficiency of underlying stock and "standard put-call parity evaluation" establishes the efficiency of options); *Industriens Pensionsforsikring A/S v. Becton, Dickinson & Co.*, 2023 WL 4981716, at *6 (D.N.J. Aug. 3, 2023) (crediting put-call parity as evidence of options efficiency). Defendants do not distinguish this authority in their Sur-Response. *See* Sur-Resp.

56

As for Defendants' argument that Dr. Tabak concedes that the existence of an "arbitrage opportunity . . . would indicate a lack of efficiency," Resp. at 29 (quoting Tabak Rpt. ¶ 68), but "academic literature has documented instances of arbitrage opportunities and option mispricing," *id.* (quoting Garmaise Rpt. ¶ 132), the Court also finds this insufficient to undermine a finding of efficiency. Defendants rely on Dr. Garmaise's report, in which he explains that Dr. Tabak's put-call parity analysis does not "show that there are no other relevant arbitrage opportunities (other than put-call parity violation) or other mispricing" for Boeing options. *Id.* (quoting Garmaise Rpt. ¶ 128). As Plaintiffs point out in Reply, however, Dr. Garmaise does not establish that such hypothetical opportunities apply to Boeing options. *Id.* The court in *Apple II* found the defense expert's similar contention of "potential for inefficiencies" to be "insufficient to overcome plaintiff's showing of overall efficiency." 2023 WL 2763952, at *1. Like the court in *Apple II*, the Court declines to "resolve this battle between the experts" at class certification. *Id.* So too does the Court find that Defendants' argument that the put-call parity test does not test whether the price of an option "correctly measures the value of the option" to be insufficient to undermine a finding that Boeing's options were efficient. Resp. at 29 (citing Garmaise Rpt. ¶ 142). As Plaintiffs point out in Reply, Dr. Garmaise adduces no evidence that Boeing options were mispriced; therefore, his speculation is insufficient to overcome Plaintiffs' showing. *See Apple II*, 2023 WL 2763952, at *1. Nor do Defendants point to evidence of mispriced options in their Sur-Response. *See* Sur-Resp.

57

As Plaintiffs correctly point out, Reply at 27, Defendants fail to cite any authority finding that efficiency must be shown as to each options security, and courts have explicitly rejected the "contention that efficiency of the market must be empirically established individually for every option at issue." *Industriens*, 2023 WL 4981716, at *6 ("*Basic* requires a showing about the efficiency of the market, not of each of the [] options series potentially at issue in this case"). Moreover, the Court agrees with Plaintiffs that Dr. Tabak's analysis of thousands of individual put-call pairs that he found to overwhelmingly behave efficiently to be sufficient at this stage to show an efficient options market. Reply at 27 (citing Tabak Rpt. ¶¶ 65–81; Tabak Reply Rpt. ¶¶73–88). Finally, the Court also agrees with Plaintiffs that Plaintiffs and Dr. Tabak did not need to apply the *Cammer* and *Krogman* factors to options, and thus the Court does not examine Defendants' arguments related to these factors. *Id.* at 28 (citing *Apple II*, 2023 WL 2763952, at *2 ("direct application of [the *Cammer* and *Krogman* factors] to options is not a useful measure of efficiency.")).

Accordingly, for purposes of class certification, the Court finds that Plaintiffs have sufficiently shown that Boeing's options traded in an efficient market.

### b. Damages

Plaintiffs propose calculating damages using substantially the same out-of-pocket damages methodology used for common stock, combined with the formulaic application of an options pricing formula (like the widely accepted Black-Scholes formula) to translate artificial inflation into corresponding options price inflation during the Class Period. Reply at 29 (citing Tabak Rpt. ¶ 88). According to Plaintiffs,

courts routinely accept this methodology for calculating damages options in securities fraud cases. *Id.* at 29–30 (citing, *inter alia*, *Rougier*, 2019 WL 6111303, at *15 n.5 (accepting proposed method of calculating options damages by using the Black-Scholes formula); *Vrakas v. United States Steel Corp.*, 2019 WL 7372041, at *9 (W.D. Pa. Dec. 31, 2019) (same)).

Defendants take issue with Plaintiffs' reliance on the Black-Scholes formula to calculate classwide damages for option traders. Resp. at 30. Courts, contend Defendants, have rejected the "mere recitation of the Black-Scholes formula as a substitute for an actual damages model for options." *Id.* (citing *Apple I*, 2022 WL 354785, at *12–13). Nor does Dr. Tabak, assert Defendants, propose a methodology for calculating the degree of stock-price volatility that would have exited absent the alleged misstatements. *Id.*

Plaintiffs reply that, contrary to Defendants' contention, damages for option trades can be computed using the Black-Scholes formula "to translate artificial inflation into corresponding options price inflation during the Class Period." Reply at 29. The Court agrees. While Defendants maintain that the court in *Apple I* rejected this method, as Plaintiffs correctly point out, the court in *Apple II* rejected Defendants' argument that there were "differences that exist between the various options that would prevent them from being calculated in exactly the same way or at the same time," holding that the "[p]laintiff is not required to show that each class member's damages can be calculated at once." 2023 WL 2763952, at *2. Like the expert in *Apple II*, Dr. Tabak has confirmed that his methodology can be applied to

each member of the proposed class. Reply at 30 (citing Tabak Reply Rpt. ¶¶ 119–21, 125).

True, Dr. Tabak's original Report failed to explain how he would account for the volatility in Boeing's stock price absent the alleged fraud (an input to the Black Scholes formula). Resp. at 30 (citing Garmaise Rpt. ¶ 162); *see* Tabak Rpt. ¶ 88. To address this concern, Dr. Tabak's Reply Report expands on his methodology. Tabak Reply Rpt. ¶¶120–25. And Plaintiffs point to at least one court that has rejected a similar argument as premature at the class certification stage, as the particular method for calculating damages "does not affect the validity of Plaintiffs' proposed damages model for all proposed Class members." Reply at 30 (quoting *Vrakas*, 2019 WL 7372041, at *9–10). Again, Defendants do not address this authority in their Sur-Response. *See* Sur-Resp. at 20.

The Court finds that, at this stage, Plaintiffs have sufficiently established a methodology for calculating damages for options on a class-wide basis.

### B. Superiority

The final requirement under Rule 23(b)(3) is that a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This requirement is satisfied if a class action "would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem*, 521 U.S. at 615 (cleaned up). The superiority inquiry requires courts to assess the fairness and efficiency of class adjudication "with

an eye toward other available methods." *Mullins*, 795 F.3d at 664 (cleaned up). In general, "securities cases easily satisfy the superiority requirement of Rule 23." *In re NYSE Specialists Sec. Litig.*, 260 F.R.D. 55, 80 (S.D.N.Y. 2009) (cleaned up).

Rule 23(b)(3) requires the Court to consider four factors when determining superiority: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).

The Court agrees with Plaintiffs—and Defendants do not dispute—that this action meets all four factors. Memo. Class Cert. at 25. First, "[a]s with many securities law cases, this case involves a large number of investors who are likely to be geographically dispersed" and many "investors are also likely to have relatively small claims making it expensive to seek recovery through individual litigation." *In re Neopharm, Inc. Sec. Litig.*, 225 F.R.D. at 568. Second, Class members' interests in individually controlling the prosecution of separate actions are minimal. Third, concentrating the litigation in this forum will promote judicial efficiency by resolving the claims of thousands of shareholders in one case. Fourth, there are no manageability concerns. *See Mullins*, 795 F.3d at 663–64. Accordingly, the Court finds the class action device to be the superior method for fairly and efficiently adjudicating this action.

## Conclusion

For the foregoing reasons, the Court grants in part and denies in part Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23 [388]. The Court certifies the following Class: all persons or entities who purchased or otherwise acquired Boeing common stock and/or call options or sold put options between November 7, 2018 and October 18, 2019, inclusive, and were damaged thereby. The Court also appoints Plaintiffs as Class Representatives, and approves Plaintiffs' selection of Bernstein Litowitz Berger & Grossman LLP as Class Counsel (with Kessler Topaz Meltzer & Check, LLP as additional counsel for the Class).

Dated: March 16, 2026

United States District Judge
Franklin U. Valderrama