**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| IN RE THE BOEING COMPANY AIRCRAFT SECURITIES LITIGATION | Case No. 1:19-cv-02394 <br><br> Judge Franklin U. Valderrama |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR LIMITED RECONSIDERATION OF**
**THE COURT'S CLASS CERTIFICATION ORDER**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................................ii

INTRODUCTION ............................................................................................................................... 1

FACTUAL BACKGROUND .............................................................................................................. 5

      I.      The Consolidated Complaint & The Operative Complaint ................................... 5

      II.     The Court's Order Denying Defendants' Motion to Dismiss................................. 7

      III.    Plaintiffs' Motion to Certify the Class and Defendants' Responses...................... 8

      IV.    Dr. Tabak's Merits Report .................................................................................... 9

      V.     The Court's Order on Plaintiffs' Class Certification Motion .............................. 10

ARGUMENT..................................................................................................................................... 11

      I.      The Court Should Reconsider Its Finding That Dr. Tabak's Proposed Model is "Untethered" to Plaintiffs' Theory of Liability ..................................... 11

            A.     Defendants Misstated the Complaint's Allegations................................. 12

            B.     Defendants Misstated the Role of the "Materialization of Risk" Approach In Plaintiffs' Out-Of-Pocket Damages Model ........................ 13

      II.     Alternatively, The Court's Order Invites Amendment of Dr. Tabak's Report.................................................................................................................. 15

CONCLUSION.................................................................................................................................. 15

## TABLE OF AUTHORITIES

**CASES**                                                                                           **PAGE(S)**

*Allman v. Smith*,
  2014 WL 2199970 (S.D. Ind. May 23, 2014) ........................................................................11

*Bank of Waunakee v. Rochester Cheese Sales, Inc.*,
  906 F.2d (7th Cir. 1990) .......................................................................................................12

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ................................................................................................15

*Jaffe Pension Plan v. Household Int'l, Inc.*,
  756 F. Supp. 2d 928 (N.D. Ill. 2010) ..................................................................................5, 8

*Mazzacone v. Tyson Fresh Meats, Inc.*,
  195 F. Supp. 3d 1022 (N.D. Ind. 2016) ...............................................................................11

*Pursley v. DeTella*,
  2000 WL 262626 (7th Cir. Mar. 3, 2000) ............................................................................11

*Ray v. Citigroup Glob. Mkts., Inc.*,
  482 F.3d 991 (7th Cir. 2007) ..................................................................................................5

*Santamarina v. Sears, Roebuck & Co.*,
  466 F.3d 570 (7th Cir. 2006) ................................................................................................11

*Schleicher v. Wendt*,
  529 F. Supp. 2d 959 (S.D. Ind. 2007) ....................................................................................7

*Schleicher v. Wendt*,
  618 F.3d 679 (7th Cir. 2010) ..................................................................................................3

*Schmelzer v. Animal Wellness Ctr. of Monee, LLC*
  2022 WL 3650675 (N.D. Ill. Aug. 1, 2022) .........................................................................12

*Zydus Worldwide DMCC v. Teva API Inc.*,
  2024 WL 5074727 (D.N.J. Dec. 11, 2024) ...........................................................................15

**OTHER AUTHORITIES**

Fed. R. Civ. P. 26(e) ................................................................................................................15

ii

**INTRODUCTION**

Plaintiffs respectfully seek reconsideration of one finding in the Court's March 16, 2026 Order partially granting Plaintiffs' Motion For Class Certification ("Order"): that Dr. Tabak's proposed damages framework was "untethered to the theory of liability alleged in the FAC" because it assumed plaintiffs will prove at trial that the 737 MAX would have been considered unsafe to fly or grounded at the start of the Class Period had the truth been fully disclosed. That theory was expressly alleged in the Complaint, and the Court should reconsider its finding and reject Defendants' argument, only raised in a Sur-Response Plaintiffs were not permitted to rebut. Alternatively, Plaintiffs seek leave to amend Dr. Tabak's already-filed report to conform to the Court's finding. Plaintiffs understand that Defendants plan to seek Rule 23(f) review of the Order and respectfully submit that consideration of this Motion may bear on that review.

In ruling on Defendants' Motion to Dismiss, the Court permitted Plaintiffs to allege the Ethiopian Airlines Crash as a corrective disclosure. At class certification, Plaintiffs presented an out-of-pocket damages methodology consistent with that ruling that the Court agreed was "the correct measure of damages in a Rule 10(b)-5 case" and "sufficient under *Comcast*," as it could "isolate different categories of misrepresentations and measure the damages stemming from each."

However, based on an incorrect argument Defendants raised in their Sur-Response, the Court found that Dr. Tabak's proposed damages model—which assumed the 737 MAX would have been considered unsafe to fly or grounded had the truth been known at the start of the Class Period—was "untethered" to the Complaint's theory of liability. Order at 41-42 (quoting Sur-Response at 7). Plaintiffs respectfully submit that the Complaint specifically alleges this connection. It starts with: "*By misrepresenting the plane's significant safety and regulatory risks, Boeing and Muilenburg ensured that airline customers would continue to place orders for the 737 MAX planes – and that the planes would remain in the skies*." ¶6. It further alleges that the

1

Ethiopian Airlines Crash "partially revealed, contrary to Defendants' statements, the 737 MAX was not safe and pilots did not, in fact, have the information or training necessary to safely pilot the plane" and "*revealed the true nature of the risks of* (1) a catastrophic crash involving the 737 MAX and *(2) regulatory action grounding the 737 MAX fleet*." ¶¶277-78. The Complaint thus expressly ties Boeing's alleged misrepresentations to keeping the 737 MAX flying and identifies the risk concealed by those misrepresentations as not merely that of a second crash, but also of a fleetwide grounding because the 737 MAX was unsafe.

These allegations are central to Plaintiffs' theory that Defendants' misrepresentations about the safety of the 737 MAX and the adequacy of "existing procedures" artificially inflated Boeing's stock price during the Class Period. Plaintiffs allege that Defendants lied to "pilots and the flying public" to keep the 737 MAX in the air. Had the truth been known, the market would have anticipated exactly what eventually occurred: that the plane would stop flying. ████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████ It also cites analyst commentary showing that, after the second crash, analysts focused on "safety concerns," the "ramifications" for the 737 MAX program, and the "growing number of countries grounding the plane," not the crash-related costs. These allegations, and many others, show that one of the concealed risks alleged in the Complaint was that the 737 MAX would be grounded and that the consequences of that are what caused the stock price to decline.

Dr. Tabak's proposed analysis is entirely consistent with these allegations, and demonstrates that the stock price decline following the Ethiopian Airlines Crash was "primarily attributable to the expected decline in demand for the 737 MAX based on the actual and expected grounding of the plane due to safety concerns, rather than to the expected discrete liability

associated with the crash itself." He calculated that $54.12 of Boeing's per-share stock price decline after the Ethiopian Airlines Crash was attributable to safety-related artificial inflation, and only $1.47 was attributable to expected crash-specific liability. This stark disparity confirms what the Complaint alleges: while the second crash was a tragedy, the primary value loss for Boeing was not the crash *per se*, but what it revealed about the plane's safety and, accordingly, the MAX's flying and commercial prospects—including grounding, production, deliveries, and revenues.

These allegations are fully consistent with the "materialization of risk" approach the Court has accepted. As the Seventh Circuit has explained (and both parties have argued), "'materialization of risk' … is not a legal doctrine or anything special as a matter of fact"; it is just a way of describing how events can reveal falsity. *Schleicher v. Wendt*, 618 F.3d 679, 683 (7th Cir. 2010). The Complaint alleges that the Ethiopian Airlines Crash revealed the very facts Defendants' statements concealed—that the 737 MAX was unsafe to fly and referring pilots to "existing procedures" did not make it so. That means the Ethiopian Airlines Crash corrected Defendants' false statements, as Plaintiffs argued. It does not mean that Plaintiffs' damages model must assume, counterfactually, that the plane would have kept flying until a second crash, had the truth been fully disclosed at the start of the Class Period.

Dr. Tabak's seminal paper on applying "materialization of risk" to cases like this one, the only academic source Defendants' expert cites on the issue, makes this clear. It states there is no "universal rule" for applying the approach, which requires "highly case-specific" analysis. It also confirms that, if the market believed a risk was low but would have known it approached 100% had the truth been disclosed (which the evidence supports), a model like Dr. Tabak's is appropriate. Here, given that the Complaint alleges that the 737 MAX was unsafe and was only kept in the air through Defendants' false and misleading statements, Dr. Tabak's model—which assumes that the

3

plane would have been grounded in the "but-for" world in which Defendants told the truth at the beginning of the Class Period—is proper *under* the "materialization of risk" framework.

Thus, Plaintiffs respectfully submit that limited reconsideration is warranted because Defendants' argument that Dr. Tabak's model is "untethered to the theory of liability alleged in the FAC" is wrong: the Complaint's "materialization of risk" approach *is* properly tethered to Dr. Tabak's damages model. The concealed risk alleged in the Complaint is not merely the risk of a second crash but that the 737 MAX was unsafe to fly and should have been grounded. Dr. Tabak's approach measures the inflation attributable to concealment of those risks.

This understanding is also fully consistent with the evidence Plaintiffs will present at trial. As a damages expert, Dr. Tabak does not offer a merits opinion about whether grounding would have occurred—

Dr. Tabak offers a damages opinion based on what Plaintiffs will prove through evidence and these other experts. In doing so, he is required to analyze what would have happened in the

4

"but-for world"—and he properly does so, relying on Plaintiffs' aviation experts, in his Merits Report. *See* Dkt. No. 483-1 ("Merits Report") ¶¶15-22; *Jaffe Pension Plan v. Household Int'l, Inc.*, 756 F. Supp. 2d 928, 934 (N.D. Ill. 2010) ("[D]amages are defined as the difference between the purchase price and the price that would have been received but for the alleged fraud."). The other safety-related disclosures—two March 2019 articles and the October 2019 disclosure of the Forkner messages—also revealed safety issues that would have led to the grounding of the 737 MAX fleet. Because these issues were known to Defendants by the start of the Class Period, in the "but for" world, the 737 MAX would have been grounded at the outset.

Thus, Dr. Tabak's damages methodology matches Plaintiffs' theory of liability and operates coherently across all corrective disclosures. It is manifestly proper here, and the Court should reconsider its finding to the contrary. Alternatively, if the Court declines to reconsider, Plaintiffs respectfully request leave to amend Dr. Tabak's report to conform to the Order.

## FACTUAL BACKGROUND

### I.      The Consolidated Complaint & The Operative Complaint

Judge Tharp partially granted Defendants' Motion to Dismiss Plaintiffs' original Consolidated Complaint in August 2022, stating, in *dicta*, that the Ethiopian Airlines Crash did "not reveal the falsity of any prior statement, since Boeing never represented that a second crash would not occur or that MCAS could never malfunction again." Dkt. No. 191 at 64 n.13.

In September 2023, Plaintiffs filed an Amended Consolidated Complaint.[1] Dkt. No. 275. It clarified that the Ethiopian Airlines Crash was caused by "the very facts about which [Defendants] lied," *Ray v. Citigroup Glob. Mkts., Inc.*, 482 F.3d 991, 995 (7th Cir. 2007), by

---

[1] Unless otherwise noted: (i) capitalized terms have the meaning in the Amended Consolidated Class Action Complaint ("Complaint") (Dkt. No. 275); (ii) "¶__" refers to paragraphs of the Complaint; and (iii) all emphasis is added and internal quotations and citations omitted.

alleging that facts concealed by those lies—the 737 MAX's undisclosed safety and certification failures, and that existing procedures could not address the plane's safety issues—caused the crash.

As to loss causation, the Complaint expressly alleged that the Ethiopian Airlines Crash "revealed the true nature of the risk[] of … ***regulatory action grounding the 737 MAX fleet***." ¶277. This makes economic sense: while a particular crash represents a discrete potential liability, a fleetwide grounding threatens production schedules, delivery pipeline, and orders. Complaint allegations confirm that the market understood the Ethiopian Airlines Crash as significant for what it revealed about fleet-wide safety, grounding, and the Company's future. For example, Morgan Stanley "anticipate[d] another round of volatility due to safety concerns"; Buckingham "expect[ed] shares to fall … due to investor concerns over the ramifications from a second 737 MAX 8 crash" that had "optical similarities to the Lion Air MAX 8 crash," thus raising safety concerns; and Jefferies explained that "[g]rounding … is a decision not taken lightly given it is costly for the airlines and highly disruptive," but "safety is the top priority ahead of all else." ¶¶274-75.

Moreover, the Complaint makes clear that this very risk was concealed by Defendants' statements from the beginning of the Class Period. It alleges that, "[b]y misrepresenting the plane's significant safety and regulatory risks, Boeing and Muilenburg ensured that airline customers would continue to place orders for the 737 MAX planes – and that the planes would remain in the skies." ¶6. It also includes several other allegations confirming this same theory, including:

-

  ¶236.

-

████████████████████████████████████████

                                                          ¶237.

- "By [a senior executive]'s own admission, ***Boeing knew from the start of the Class Period that the MAX should not have been allowed to fly until MCAS was redesigned and rebuilt to include necessary redundancies***." ¶255.

- "As the SEC later charged, by no later than January 2019, Muilenburg and other members of Boeing's senior management were aware of these text messages, ***but did nothing to ground the 737 MAX to address its fatal flaws***." ¶268.

- Boeing concealed "the scope of the ***changes that would have to be made to make the MAX safe to fly again, and the impact of these issues on Boeing's business***." ¶295.

- The Joint Authorities Technical Review Board "concluded that ***the FAA would not have certified the MAX if it had been provided complete and accurate information by Boeing***. ¶502.

- ***[D]ue to the fundamentally unsafe nature of the 737 MAX, the entire 737 MAX fleet was grounded, Boeing halted production of the 737 MAX, [and] multiple customers canceled or substituted existing 737 MAX orders***." *Id.*

## II.     The Court's Order Denying Defendants' Motion to Dismiss

In October 2023, Defendants again moved to dismiss, challenging loss causation for the Ethiopian Airlines Crash. Dkt. No. 293 ("Motion to Dismiss"). They argued that "materialization of the risk" is just a "legal argument" that "adds nothing to the analysis" of loss causation. Dkt. No. 313 at 20-21. In opposition, Plaintiffs explained they could plead loss causation by alleging "an undisclosed risk that subsequently materialized and that the materialization of this risk resulted in the complained of loss." *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 966, 978 (S.D. Ind. 2007); *see* Dkt. No. 306 at 40-42 & n.13. That is what happened here: Defendants falsely asserted that the 737 MAX was safe and referring pilots to "existing procedures" addressed any safety issues, but the facts Defendants concealed caused the Ethiopian Airlines Crash—which revealed not just that a second crash happened, but, more importantly, that the 737 MAX was unsafe and could not continue to fly, causing severe economic impacts to the Company. *See* Dkt. No. 306 at 40-41.

7

In September 2024, the Court partially denied Defendants' Motion, sustaining the Ethiopian Airlines Crash as a corrective event. Dkt. No. 346 at 49. Dr. Tabak followed that holding.

### III. Plaintiffs' Motion to Certify the Class and Defendants' Responses

In February 2025, Plaintiffs moved to certify the class. Dkt. Nos. 388, 388-1 ("Certification Motion"). In a 180-degree pivot, Defendants now argued in opposition that that "materialization of risk" was a "theory of liability" requiring a complicated damages analysis that Dr. Tabak had not explained how he would perform. Dkt. No. 418 at 17-18. In reply, Plaintiffs explained that "materialization of risk" is an approach to loss causation, not a theory of liability. Dkt. No. 434 at 9-10. They also explained that Dr. Tabak's proposed damages model was proper because, in the "but for" world in which Defendants disclosed the truth at the start of the Class Period, the 737 MAX would have been considered unsafe to fly or grounded, and so the analysis Defendants demanded was unnecessary. *Id.* at 12-13; *see also Household*, 756 F. Supp. 2d at 934.

Dr. Tabak also addressed Defendants' arguments in a reply report. Dkt. No. 434-3 ("Reply Report"). He explained that, for assessing the "but-for" world and calculating damages, "[t]he question is what a defendant could have disclosed before the event occurred. If the defendant knew that the event was certain to occur … then it could have disclosed that probability and the market would have updated its assessment of the risk [in a manner] ***matching the update that happened when the event occurred***." *Id.* ¶48. He also explained, consistent with the Complaint, that "the issue here is not a probability of a crash," but "what the effects of either a crash or the safety information would have done on Boeing's ability to sell and deliver planes." *Id.* ¶51.

Defendants submitted a Sur-Response contending that, by assuming truthful disclosures would have led to the grounding of the 737 MAX before a second crash, Plaintiffs were "abandon[ing] a central element of their liability theory"—the "materialization of risk" approach. Dkt. No. 452-1 ("Sur-Response") at 7. Defendants ***incorrectly*** asserted that this theory did not

8

appear in the Complaint. *Id.* The Court denied Plaintiffs leave to respond. Dkt. No. 480.

## IV.     Dr. Tabak's Merits Report

While the Certification Motion was pending, the parties completed discovery. Boeing produced an additional 750,000 pages of documents and Plaintiffs deposed 15 current and former Boeing employees. Then, on March 5, 2026, Plaintiffs served their expert reports, including Dr. Tabak's Merits Report and reports from three aviation experts: (1) Mr. Tenne, who, among other things, served in senior roles within the FAA's Aviation Safety and Flight Standards directorates and in various testing, safety, and instruction roles in the Air Force; (2) Captain Mattson, a former FAA-approved "Check Pilot" for American Airlines who was responsible for training pilots on the 737 MAX in advance of its return to service; and (3) Dr. Fidel Khouli, an avionics expert and professor who teaches courses and conducts research on flight control systems.



Dr. Tabak's Merits Report assumes (as it must) that Plaintiffs will prove their case. Consistent with the Complaint's allegations and Plaintiffs' theory of liability, ███████████ ██████████████, he assumes that, "had the truth regarding the safety of the 737 MAX been disclosed at the beginning of the Class Period, the market would have anticipated that the entire 737 MAX fleet would have been grounded by regulators or that airlines, flight crews, and/or the

flying public would have refused to fly the plane," which "in either case lead[s] to similar declines in market expectations for Boeing orders and deliveries of the 737 MAX." Merits Report ¶¶17-18.

Based on these assumptions, Dr. Tabak concludes that, "[i]f the allegedly concealed truth about the 737 MAX had been disclosed at the beginning of the Class Period, it follows that the market would have reacted to those disclosures in a manner similar to how it reacted after the corrective disclosures." *Id.* ¶19. He reasons that, if Plaintiffs prove their allegations, ███████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ and, "[e]ven if regulators did not formally order a grounding, these disclosures would have led the market to reasonably expect that airlines, pilots, and/or the public would refuse to fly the plane given its disclosed lack of safety and/or deficient certification," with an "economic effect … similar to that of a formal regulatory grounding." *Id.* ¶¶19-20. He further explains that, "[b]ecause it would be unrealistic to expect airlines to continue to fly 737 MAX in either scenario, deliveries would be expected to slow or halt, and expected revenue would decrease" and that, "[i]n addition, orders for future 737 MAX aircraft would also be expected to decline in either scenario, as airlines would be expected to be reluctant to purchase an unsafe aircraft, as actually occurred in 2019." *Id.* ¶20.

As a result, Dr. Tabak concludes that "[t]he change in Boeing's stock price after the March 10, 2019 crash, less [] crash-specific costs … , reflects artificial inflation that came out of Boeing's stock price when the truth regarding the 737 MAX safety issues was disclosed." *Id.* ¶23. He then removes the crash-specific costs from the market-adjusted stock price decline to estimate the inflation caused by Defendants' fraud—consistent with his position that the risk that materialized was not the crash *per se*, but what it revealed about the 737 MAX's safety. *Id.* ¶¶32-33.

## V.    The Court's Order on Plaintiffs' Class Certification Motion

On March 16, 2026, just 11 days after Plaintiffs served their merits reports, the Court

granted the Certification Motion. *See* Order. However, in analyzing the Ethiopian Airlines Crash, the Court determined that the "but for" assumption that the 737 MAX would have been grounded had Defendants told the truth at the start of the Class Period was "untethered to the theory of liability alleged in the [Complaint]." *Id.* at 42. The Court thus credited Defendants' argument, which Plaintiffs were unable to challenge, that Plaintiffs had abandoned "'a central element of their liability theory on which they relied to avoid dismissal of an alleged corrective disclosure.'" *Id.* at 40 (quoting Sur-Response at 7). That finding was inconsistent with the Complaint.

## ARGUMENT

### I. The Court Should Reconsider Its Finding That Dr. Tabak's Proposed Model is "Untethered" to Plaintiffs' Theory of Liability

Under Rule 54(b), "any order or other decision [] that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties … may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b); *see also Mazzacone v. Tyson Fresh Meats, Inc.*, 195 F. Supp. 3d 1022, 1024 (N.D. Ind. 2016) (courts have "broad authority to reconsider" interlocutory orders). Courts should reconsider prior rulings "if there is a compelling reason" to do so. *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 572 (7th Cir. 2006). Reconsideration is particularly appropriate where a court's ruling is based on a misapprehension of a party's contentions. *See Pursley v. DeTella*, 2000 WL 262626, at *1 (7th Cir. Mar. 3, 2000) (vacating denial reconsideration where district court "mischaracterized [plaintiff's] allegations"); *see also Allman v. Smith*, 2014 WL 2199970, at *3 (S.D. Ind. May 23, 2014) (granting reconsideration because court misstated party's position).

Here, based on arguments Defendants first raised in a Sur-Response Plaintiffs could not challenge, the Court stated that Dr. Tabak's model was "untethered to the theory of liability alleged in the FAC." Order at 42 (citing Sur-Response at 7). Respectfully, this was manifest error. The

11

Court "patently misunderstood" the Complaint by crediting Defendants' mischaracterization of its allegations and the "materialization of risk" approach. *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d at 1191 (7th Cir. 1990); *see also Schmelzer v. Animal Wellness Ctr. of Monee, LLC*, 2022 WL 3650675, at \*2 (N.D. Ill. Aug. 1, 2022) (Valderrama, J.) (granting reconsideration where prior ruling rested on incomplete analysis). Left uncorrected, this finding risks confusion, further delay, and improperly constraining Plaintiffs' damages model at trial.

###### A. Defendants Misstated the Complaint's Allegations

Defendants' argument that Plaintiffs' damages theory—premised on a "but-for" world in which the 737 MAX would have been grounded at the start of the Class Period if the truth about its severe safety risks and deficient certification had been disclosed—is somehow "an entirely new theory" that "appears nowhere in the Amended Complaint" (Sur-Response at 7-8) is simply wrong. As detailed above, the Complaint explicitly characterized the Ethiopian Airlines Crash as revealing the "true nature of the risk[]" of a "grounding." ¶278. It identified, as "material information that would have properly informed investors about [the risks they faced]," that ███████████████ ████████████████████████████████████████████ and "the 737 MAX should not have been certified, because certification was obtained by defrauding the FAA during the certification process." *Id*. If these facts had been disclosed at the beginning of the Class Period, it **would** have led to a grounding of the 737 MAX. *See id*.

Indeed, allegations in the Complaint show that Defendants' false statements in the wake of the Lion Air crash averted an effective grounding of the plane. *See, e.g.*, ¶6 (Defendants' misrepresentations "ensured that airline customers would continue to place orders for the 737 MAX planes – and that the planes would remain in the skies"); ¶215 ███████████████ ████████████████████████████████████████████ ███████████; ¶¶236-37 ████████████████████████████████

████████████████████████████████████████████████████

In fact, Defendant Muilenburg, Boeing's CEO, claimed that the 737 MAX was "as safe as any airplane that has ever flown the skies"—a lie that the SEC determined constituted securities fraud. ¶2. The Complaint also cites extensive analyst reaction following the (second) crash showing that the market was focused on what it revealed about the 737 MAX's safety and concerns about a grounding. *See supra* at 6. Indeed, the words "grounded" or "grounding" appear in the Complaint nearly *fifty* times, including in the pertinent "Corrective Event Summary" for March 10, 2019 in the loss causation chart of the Complaint. *See* ¶¶523-26.

These Complaint allegations fully support Plaintiffs' and Dr. Tabak's approach at class certification of assuming that the disclosure of the 737 MAX's true safety issues would have resulted in a formal or *de facto* grounding. They show that Defendants' Sur-Response's characterization of Dr. Tabak's approach in his Reply Report—as reflecting "an entirely new theory" divorced from the approach embraced by the Complaint—is false.

### B. Defendants Misstated the Role of the "Materialization of Risk" Approach In Plaintiffs' Out-Of-Pocket Damages Model

In their Sur-Response, Defendants contended that Dr. Tabak's assumption that the 737 MAX would have been grounded in the "but-for" world where the full truth was known "abandon[ed] a central element of [Plaintiffs'] liability theory on which they relied to avoid dismissal of an alleged corrective disclosure"—the "materialization of risk" approach. Sur-Response at 7. This argument is both factually and legally wrong.

As the Court recognized, the "out-of-pocket" measure—the difference between what shareholders paid and what they should have paid had the truth been disclosed—is "the correct measure of damages in a Rule 10(b)-5 case." Order at 23. "Materialization of risk" addresses an input to that model. In plain terms: when a defendant lies about the probability a bad event will

13

happen, and it later occurs and causes a stock price drop, that drop may exceed the inflation that entered the stock due to the lie—as the drop reflects the event happening with certainty, while all that could have been disclosed earlier may be that it was somewhat *more* likely to happen. But this implies that, if what should have been disclosed was that the event was essentially certain to occur, no discount would be required. Dr. Tabak's article—the sole academic source Defendants' expert cites on the point—confirms this. *See* Ex. 1 at 8; Dkt. No. 420-1 at 29-40 & nn. 103, 112-16, 118; Dkt. No. 452-4 at 13-16 & n.56. It shows that, when the concealed probability of an event approaches 100%, the stock price reaction to the event accurately estimates inflation.

Dr. Tabak's damages model is consistent with this conclusion. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And because Defendants blamed pilot error for the Lion Air Crash, investors did not understand that the 737 MAX was unsafe to fly or expect it to be grounded. Thus, under the "materialization of risk" framework, damages should be calculated precisely as Dr. Tabak proposed.[2]

Allowing the error in the Court's Order, introduced by Defendants, to stand would allow Defendants to argue that Dr. Tabak is foreclosed from offering his well-founded opinion. Indeed, Defendants now double down and oppose any changes by Dr. Tabak to conform to the Court's opinion, notwithstanding the Court's indication that it would allow such analysis and the fact that Dr. Tabak is not permitted a reply in the current schedule. Order at 40. The Court should reconsider its finding that Dr. Tabak's damages model "is untethered to the theory of liability alleged in the FAC," reject Defendants' erroneous argument, and permit Plaintiffs to move forward with Dr. Tabak's model that is already on file, is consistent with their Complaint, corresponds to the facts

---

[2] As noted above, Dr. Tabak's Merits Report does not opine that the 737 MAX was unsafe to fly or should have been grounded on the first day of the Class Period (Order at 4); he assumes that Plaintiffs will prove their case through evidence and other experts. *See* Merits Report ¶¶15-22.

14

developed in discovery, and yields damages estimates a jury can readily comprehend and apply.

## II.  Alternatively, The Court's Order Invites Amendment of Dr. Tabak's Report

If the Court decline to reconsider, Plaintiffs respectfully note that the Order contemplates amendment or supplementation of Dr. Tabak's report. The Court acknowledges that "if the Court requires [Plaintiffs] to supply a distinct methodology for a 'materialization of the risk' theory of loss causation, Dr. Tabak's Reply Report explains how, if necessary, he could construct a damages model that would assist the jury in calculating inflation rates over the Class Period based on a 'materialization of the risk' theory, guided by discovery in this action." Order at 40. Dr. Tabak stands ready to do so as Rule 26(e) expressly permits, and in fact, requires.

Rule 26(e) requires parties to supplement expert disclosures for completeness and accuracy "by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(1)-(2). Thus, Dr. Tabak may amend or supplement his report as necessary. *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 422 (7th Cir. 2015) (permitting amendment to conform damages methodology to post-verdict appellate decision); *Zydus Worldwide DMCC v. Teva API Inc.*, 2024 WL 5074727, at *3 (D.N.J. Dec. 11, 2024) (permitting supplementation to address litigation developments).[3] Defendants will suffer no prejudice if he does: they have only just received Plaintiffs' reports, Plaintiffs' experts have not been deposed, and Defendants will have a full and fair opportunity to respond to any amended analysis in their yet-to-be-served reports.

However, Plaintiffs respectfully submit that reconsideration remains the more appropriate remedy as Dr. Tabak's already-filed expert methodology is consistent with the Complaint.

## CONCLUSION

For the reasons stated above, this Court should grant the Motion.

---

[3] Dr. Tabak will have to amend his already-served report in any event to account for the Court's ruling shortening the Class Period, which Defendants do not oppose.

Dated: March 27, 2025

Respectfully submitted,

*/s/ Salvatore J. Graziano*
**BERNSTEIN LITOWITZ BERGER
 & GROSSMANN LLP**
Salvatore J. Graziano (*pro hac vice*)
Katie M. Sinderson (*pro hac vice*)
1251 Avenue of the Americas, 44th Floor
New York, New York 10020
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Salvatore@blbglaw.com
KatieM@blbglaw.com

-and-

Avi Josefson
875 North Michigan Avenue, Suite 3100
Chicago, IL 60601
Telephone: (312) 373-3800
Facsimile: (312) 794-7801
Avi@blbglaw.com

*Counsel for Lead Plaintiff Public Employees'
Retirement System of Mississippi and
additional Named Plaintiffs City of Warwick
Retirement System and Court-Appointed Class
Counsel*

**DAVIDSON BOWIE, PLLC**
John L. Davidson (*pro hac vice*)
1062 Highland Colony Parkway
200 Concourse, Suite 275
Ridgeland, MI 39157
Telephone: (601) 932-0028
jdavidson@dbslawfirm.net

*Additional Counsel for Lead Plaintiff*

**KESSLER TOPAZ
MELTZER & CHECK LLP**
Andrew L. Zivitz (*pro hac vice*)
Joshua A. Materese
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

16

azivitz@ktmc.com
jmaterese@ktmc.com

*Counsel for Plaintiffs William C. Houser, Bret E. Taggart, and Robert W. Kegley Sr., as Trustee for the Robert W. Kegley Sr. Revocable Living Trust U/A DTD 04/16/2003*

17