# Exhibit 1

**Securities Reform Act Litigation Reporter**

1601 Connecticut Avenue, N.W., Suite 602, Washington, DC 20009 • 202-462-5755 • Fax 202-328-2430

# Risk Disclosures and Damages Measurement in Securities Fraud Cases

by

## David Tabak*

### Introduction

Consider Pat, who you know owns a house worth one million dollars. One day Pat tells you that she does not have fire insurance and that her house has just burned down. What happens to your view of Pat's net worth? Presumably, the direct effect is that you believe that she has lost a million dollars from the destruction of her home. Now consider what Pat could have told you a few days earlier, before the fire. What she could have said is that she does not possess fire insurance and that, as you know, houses can burn down. What would have happened to your view of Pat's net worth then? The direct effect of that disclosure would have been much smaller, and you may have reduced your view of Pat's net worth by the value of the missing fire insurance.[1] The two different disclosures that Pat could have made at different points in time result in very different effects on our view of her net worth.

Defendants facing securities fraud suits are often in a similar situation. They may have announced that their company is not hedged against adverse market or interest rate movements *and* that the market has turned against them, leading to a large loss. The resulting stock price movement is much larger than what would have occurred had they announced earlier that their company was unhedged and that the market or interest rates *could* move against it. Similarly, a company may announce that a risk of product failure, of harm to customers, of a government investigation, or of poor market acceptance of a product was realized. Any of these could easily lead to a large decline in the company's stock price greater than what would have occurred earlier had the company merely announced the existence of such a risk.

In securities fraud cases, damages analyses typically begin by estimating the "artificial inflation" in the stock. The artificial inflation at any point in time is the amount by which the actual stock price exceeds the true value, or the level that the price would be if defendants corrected any previous misrepresentations or unlawful omissions of information. Because an improper misrepresentation or concealment of a material risk would lead to investors' overpaying for a security, if other elements of a case are satisfied, such a misrepresentation or unlawful omission can create liability on the part of defendants.[2]

This paper examines some of the issues relevant to determining the amount of overstatement, often referred to as the artificial inflation, in a stock price when the possible disclosure was only of a risk of an event that was later realized. As discussed below, at a broad conceptual level, the analysis can be broken down into four steps: (1) Determine which risks were required to be disclosed; (2) Measure the price decline on disclosure of the realization of the risk; (3) Estimate the probability at earlier dates that the risk would eventually be realized; and (4) Use the probability to estimate the artificial inflation in the security's price.

---

* David Tabak is Senior Vice President with NERA Economic Consulting in New York, NY. Copyright © 2006 David Tabak.



## Securities Reform Act Litigation Reporter

1601 Connecticut Avenue, N.W., Suite 602, Washington, DC 20009 • 202-462-5755 • Fax 202-328-2430

---

### Determine Which Risks Were Required To Be Disclosed

Because damages can only flow from a misstatement or an omission of information that was required to be disclosed, a first step, therefore, is to determine which ultimate disclosures had risks that were known by the defendants prior to the risks being realized. We can consider several situations relating to risks to see which could give rise to a claim of securities fraud.

For example, if the magnitude of the risk was also known to the market, there can be no liability if the company's securities traded in an efficient market, as is generally alleged in securities class actions. That is, if the market knew of the magnitude of the risk, then that risk would be properly priced into the price of the security and investors would not have overpaid in their purchases. Even if the magnitude is not known explicitly, if there has not been a misstatement or omission of relevant information, then the market can make an informed estimate of the risk.

Next, some risks will be immaterial as a matter of law. For example, a recent opinion[3] noted that one does not have to disclose the "attendant risks or unsustainability of criminal conduct."

> However, while omissions regarding criminal conduct are material, omissions relating to 'the attendant risks' or unsustainability of criminal conduct are not. Even if a corporation is engaging in illegal practices, predictions of future events such as criminal indictments are too speculative to be material. See *Craftmatic, 890 F.2d at 640-41.* The Third Circuit addressed precisely this point in Craftmatic when plaintiffs alleged that that the corporation's 'advertising and marketing program was based on deceptive, illegal sales practices that "would and did result in serious charges being brought against Craftmatic."' The Court dismissed plaintiffs' claim, holding that the possibility of criminal charges was 'sufficiently speculative and unreliable to be immaterial as a matter of law.' *Id. at 644.* The Court then employed the same reasoning to dismiss allegations that Craftmatic's unlawful practices created serious risks for the corporation and were 'not sustainable.' Id.

> Consequently, as a matter of law, the risks inherent in Commerce Bank's unsustainable illegal practices were

too speculative to be material. Only information regarding Defendants' illegal conduct itself is material under *Rule 10b-5*.

In a related manner, some risks of government or other third-party action may be effectively disclosed with the disclosure of the relevant conduct. For example, suppose that on Monday a company announces that it has used improper accounting and on Thursday morning the SEC announces that it has decided to investigate the company, causing a price decline in the company's stock on Thursday. If the Monday announcement detailed the nature of the improper accounting and revealed all relevant prior discussions with the SEC on this issue, one must ask what more the company could have disclosed at that point about the likelihood of an SEC investigation. If there is nothing more that the company could have disclosed, then the actual SEC investigation was the realization of a risk that was already made known to the market on Monday. However, if the company improperly withheld information that would have let the market better analyze the magnitude of the risk of an SEC investigation, then there may be liability for the additional risk of which the market was not aware. The same reasoning applies to analyst or rating agency downgrades after a corrective disclosure.[4]

Because it is not the purpose of this paper to analyze which risks should be disclosed on legal grounds, it is sufficient to note that one should be aware that it may be determined that some risks may be held to be immaterial as a matter of law. A court following *Galati* would presumably find that if criminal conduct and "the possibility of criminal charges was 'sufficiently speculative and unreliable to be immaterial as a matter of law,'" then it is likely to find that lesser risks, such as the possibility of civil charges, government investigations, or private civil suits may also not be material.[5]

Third, one might decide based upon the evidence whether undisclosed or misrepresented risks were significant. Such evidence could include evidence from the case, such as internal notes describing the risks as either imminent or alternatively as trivial, or evidence based on outside research, such as an analysis that shows that the likelihood of the equivalent of Pat's home being destroyed in a fire is so remote that the market would not have cared if

---

## Securities Reform Act Litigation Reporter

1601 Connecticut Avenue, N.W., Suite 602, Washington, DC 20009 • 202-462-5755 • Fax 202-328-2430

she had insurance. Of course, the parties may not agree as to what the evidence shows, in which case it may again be prudent to present scenarios that show damages with and without considering the effects of the misrepresented or omitted information.

### Measure the Price Decline on the Realization of the Disclosure of the Risk

There are two ways to determine the effect of the undisclosed or misrepresented information. One way would be to actually estimate the effect at the time of the omission or misrepresentation at the time that an investor made a purchase through a "bottom-up" analysis that tries to value that information.[6] The second, and more common, way is to begin by using an "event study" to examine the change in the price of the relevant security when the information was eventually disclosed to the market. As this is the analysis used in most shareholder class actions, and is consistent with the Supreme Court's recent ruling in *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, that is the approach that we take here. Also, given that there is extensive legal and academic literature on event studies, we refer the interested reader to that literature and assume that such a calculation has been performed accurately.[7]

### Estimate the Probability At Earlier Dates That the Risk Would Eventually Be Realized

The next step is to estimate the likelihood that the market would have assigned to the risk being realized, had all required information been properly disclosed. This analysis will be highly case-specific, so there will be no universal rule on how to perform such a determination. Nevertheless, there are some examples of relevant information and how that probability could be estimated:

- An internal document revealing views that the risk was "highly likely," "probable," "possible," "remote," or otherwise described may, if credited, suggest a range for the probability. We note that if defendants' simply revealed their actual views of the risk, even without the underlying details, that would probably be considered a complete disclosure of the information they believed necessary to accurately value the stock.

- An analysis of the frequency of similar events may be informative. For example, if one out of every ten thousand homes like Pat's burned down per year, it may be reasonable to assume that the probability of Pat's home burning down was one in ten thousand per year.

- Post-disclosure analyst and news commentary may be useful if it distinguishes between the risk of the event and the overall effect of the disclosure. (E.g., an analyst stating that Pat should have bought fire insurance even though the likelihood of a fire was only one in ten thousand per year.)

With some effort, and perhaps luck, the information to make such a determination will be available. If not, one can allow the trier of fact to make such a determination in a subjective manner, much as the trier can allocate relative responsibility for a tort based not on mathematical formulas but on a subjective view of the evidence as a whole. In that case, the goal is to provide the trier of fact with sufficient information to make an informed decision as to the general magnitude of the probability (e.g., was the realization of the risk nearly inevitable, close to 50:50, or trivially small?) and to allow them to come up with a probability that reasonably expresses this information.

### Use the Probability To Estimate the Artificial Inflation in the Security's Price

The final step is to use the estimated probability to determine the inflation at the time that an investor made a purchase. For ease of exposition, let us suppose that the ultimate disclosure caused a price decline of $100 per share in a company's stock and that at the time of purchase, the undisclosed probability that such an event would occur is determined dentoted by $p$.[8] If we assume for simplicity that the market believed that the event was extremely unlikely to occur, then the effect of the misstatement or omission is to have inflated the stock price by approximately $100*p$.

A more complicated analysis is involved if the market did think that there was a nontrivial risk of the event, but the misstatement or omission hid an even greater risk. Now let $p_m$ represent the market's mistaken view of the probability. The misstatement

## Securities Reform Act Litigation Reporter

1601 Connecticut Avenue, N.W., Suite 602, Washington, DC 20009 • 202-462-5755 • Fax 202-328-2430

or omission then caused the stock price to be inflated by $100*(p-p_m)/(1-p_m)$. Note that if $p_m$ is zero, this formula reverts to the one given above, used when the market perception of the risk is zero, while if $p_m$ equals p, meaning that the market correctly understands the actual probability, the inflation in the stock price is zero. It should also be noted that setting $p_m$ to zero overstates the level of inflation if $p_m$ is positive, allowing for an estimate of the direction of the bias if $p_m$ is assumed to be zero.[9]

Including considerations of the probability of an event in an analysis, while perhaps not commonly thought of in securities fraud cases, does have a long pedigree, stretching back to (and before) none other than *Basic v. Levinson*, 485 U.S. 224 (1988), in which the Supreme Court quoted *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d, stating, "materiality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity,'" and discusses a "probability/magnitude" approach to assessing materiality. An extension of these ideas to damages is therefore fairly straightforward, and

in fact is found in the discussion of overdisclosure and underdisclosure in Bradford Cornell and R. Gregory Morgan's article "Using Finance Theory to Measure Damages in Fraud on the Market Cases."[10]

### Conclusion

Certain risks are not required to be disclosed by companies because they are immaterial as a matter of law. When other risks are ultimately disclosed, it is often not merely the risk that is disclosed, but the realization of that risk. The disclosure, then, will cause a price decline in excess of what would have occurred had the risk alone been disclosed. To properly calculate the level of artificial inflation in a security's price at earlier points in time, it is necessary to adjust that price decline to reflect only the information that could have been revealed earlier. Thus, if before the disclosure of the realization of a risk defendants could only have disclosed that such a risk existed, but not that it would necessarily come to pass, the price decline measured upon realization and disclosure of the risk must be adjusted for the prior probability that the risk would have eventually been realized.

### Notes

[1] Other effects could include considering whether Pat had saved money by not paying fire insurance premiums.

[2] As is particularly clear since the Supreme Court's ruling in *Dura Pharmaceuticals, Inc. v. Broudo*, 125 S. Ct. 1627, Plaintiffs have to prove (by a preponderance of the evidence) that any misrepresentation ultimately led to a decline in the price of a security. This should not, however, be taken to mean that a probability of risk of less than fifty percent is not material, particularly as most damages analyses in securities fraud cases begin with an analysis of the difference between the market price of a security and the true value of that security

absent the fraud. The question of the materiality of a misrepresentation relates to whether that difference in the security's price would be material at the time the misrepresentation was made, a question that involves the product of the undisclosed or misrepresented probability and the effect of the risk if it were realized. I thank Peter Nordberg for referring me to *Herskovitz v. Group Health Cooperative of Puget Sound*, 99 Wn.2d 609; 664 P.2d 474; 1983 Wash. LEXIS 1564, which provides an interesting array of opinions by justices of the Washington Supreme Court on whether a probability differential of under fifty percentage points in risk constitutes a preponderance of the evidence in a non-securities context.

## Securities Reform Act Litigation Reporter

1601 Connecticut Avenue, N.W., Suite 602, Washington, DC 20009 • 202-462-5755 • Fax 202-328-2430

[3] *Galati v. Commerce Bancorp,* 2005 U.S. Dist. LEXIS 26851. (November 7, 2005)

[4] This is not to say that one should not consider the effects of a downgrade occurring immediately after the initial corrective disclosure if one can argue that defendants should have known that that a downgrade was a near-certain consequence of that disclosure. However, when the downgrade occurs with some lag, particularly when it is clear that the market has had the opportunity to consider the effects of the disclosure, then it is likely to be the type of event that defendants could not have disclosed earlier beyond implicitly disclosing the risks of a downgrade via the initial corrective disclosure.

[5] To be safe, one can always prepare alternative calculations assuming that the omitted information is eventually found to be actionable or that either the Court or the trier of fact finds them to be immaterial. The drawback to this is that it can expand the work necessary for the damages analysis and may lead to a confusing array of possible damages scenarios.

[6] One way to do this might be to examine post-disclosure security price movements as the risk changed. Such an analysis may provide information about how the security's price would have changed had the disclosure been made earlier. For example, if after disclosing that it was not hedged against interest rate risk a company's stock price became more sensitive to interest rate changes, then one might apply this higher sensitivity to the pre-disclosure period to determine how the stock would have traded had the lack of hedging been disclosed in a timely fashion.

[7] See, for example, *In re Executive Telecard* 979 F.Supp 1021 (SDNY 1997) at 1027, *In re Imperial Credit Industries, Inc. Securities Litigation* 2003 WL 1563084 (C.D. Cal.), *Goldkrantz v. Griffin* 1999 WL 191540 (SDNY) at 5, or *In Re Zonagen, Inc. Securities Litigation* (USDC SD Texas, Houston Division) H-98-0693 for opinions on the use of event studies in shareholder class actions.

[8] We should note that p can most easily be thought of as the probability that the event would occur in a reasonably short time after the purchase. If p covers a long period of time, then one must discount the probability of future events. For example, if Pat's house was certain to burn down somewhere between five and six hundred years from now, it would be incorrect to treat that as a one hundred percent probability in the same way that would be true if her house were certain to burn down somewhere between five and six days from now. For simplicity, we do not consider long-lived risks in this paper, but restrict ourselves to looking at risks that would materialize in a relatively short period of time over which discounting is not a serious concern.

[9] We have not discussed how to estimate $p_m$, though techniques similar to those used to estimate p may be relevant.

[10] Cornell and Morgan, *UCLA Law Rev.,* Vol. 37:833, 1990, with selections starting at 889 and again at 895. Note the hypothetical along these lines given in the latter section: "It would not be unreasonable to assume that if Basic had disclosed the talks, the market would have attached only a twenty percent probability to a merger … Under these assumptions, the equivalent disclosure price would be approximately $16.50."